UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------- x

MARK A. FAVORS, HOWARD LEIB, LILLIE
H. GALAN, EDWARD A. MULRAINE,
WARREN SCHREIBER, and WEYMAN A.
CAREY,

                          Plaintiffs,

                      v.

ANDREW M. CUOMO, as Governor of the
State of New York, ERIC T.
SCHNEIDERMAN, as Attorney General of the
State of New York, ROBERT J. DUFFY, as
President of the Senate of the State of New
York, DEAN G. SKELOS, as Majority Leader
and President Pro Tempore of the Senate of the
State of New York, SHELDON SILVER, as
Speaker of the Assembly of the State of New
York, JOHN L. SAMPSON, as Minority Leader
of the Senate of the State of New York, BRIAN
M. KOLB, as Minority Leader of the Assembly
of the State of New York, the NEW YORK
STATE LEGISLATIVE TASK FORCE ON
DEMOGRAPHIC RESEARCH AND
REAPPORTIONMENT ("LATFOR"), JOHN J.
McENENY, as Member of LATFOR, ROBERT
OAKS, as Member of LATFOR, ROMAN
HEDGES, as Member of LATFOR, MICHAEL
F. NOZZOLIO, as Member of LATFOR,
MARTIN MALAVÉ DILAN, as Member of
LATFOR, and WELQUIS R. LOPEZ, as
Member of LATFOR,

                        Defendants.

------------------------------------------------------------- x

FILLD
IN CLERK'S OFFICE
U S DISTRICT COURT E.D.N.Y.

★ NOV 17 2011 ★

BROOKLYN OFFICE

**SUMMONS ISSUED**

**CV11 - 5632**

Index No.

**COMPLAINT**

IRIZARRY, J.

MANN, M.J.

      Plaintiffs Mark A. Favors, Howard Leib, Lillie H. Galan, Edward A. Mulraine,

Warren Schreiber, and Weyman A. Carey, by their attorneys, Willkie Farr & Gallagher LLP, for

their Complaint herein, allege as follows:

## INTRODUCTION

1.      New York's process of redistricting its State Senate, Assembly, and congressional districts over the past several decades has become an exercise in partisan self-dealing and incumbent protection. As a result of this process, many New Yorkers have long been denied any meaningful opportunity to select their own leaders.

2.      New York citizens and public interest groups have called upon the Legislature to enact a system of independent redistricting, whereby the individuals drawing district lines are free from political pressure and therefore have the ability to draw those lines based upon standardized criteria, such as population equality, contiguity of districts, fair representation of minority groups, respect for political subdivisions like counties and towns, compactness of districts, and preservation of communities of interest. Despite the fact that majorities of both houses of the Legislature promised to enact such a system of independent redistricting, no such system has been adopted.

3.      Meanwhile, the redistricting process following the 2010 census has stalled and threatens to throw the state's 2012 elections into a quagmire absent court intervention.

4.      The legislative stalemate is a direct result of legislative inaction on reform of the redistricting process. The Governor has promised to veto any redistricting plan that is not the result of an independent process, and no such independent process is underway.

5.      Accordingly, Plaintiffs ask this Court to avert this impending electoral disaster by appointing a Special Master to effectuate independent redistricting based upon fair criteria.

-2-

6.      The redistricting process is also in danger of being conducted in violation of New York's law requiring prisoners to be counted for purposes of redistricting in their home communities. Under this prisoner reallocation law, any prisoners whose home residences are outside of New York or cannot be identified are not to be counted for purposes of redistricting. The law requires Defendant the New York State Legislative Task Force on Demographic Research and Reapportionment ("LATFOR") to effectuate this reallocation of prisoners and to release to the public the amended population data counting prisoners at their home residences only.

7.      The prisoner reallocation law was passed by both houses of the New York Legislature last year. It was signed into law by the Governor on August 11, 2010. The obligations it imposes on LATFOR are mandatory.

8.      LATFOR has not released this amended population data counting prisoners in their home districts. It has only released population data improperly counting prisoners at their prison locations, and it has invited members of the public to submit proposed redistricting plans based upon this improper data. LATFOR thus has violated the prisoner reallocation law.

9.      LATFOR's violation of the prisoner reallocation law threatens to derail the redistricting process, regardless of whether redistricting is accomplished with the supervision of this Court. LATFOR's inaction poses an imminent threat because the public has already begun submitting to LATFOR proposed redistricting plans based upon improper data and because LATFOR itself appears poised to draw up a preliminary redistricting plan that would be illegal for failure to comply with the prisoner reallocation law.

-3-

10.     A Special Master appointed by this Court would require the proper, reallocated population data in order to accomplish Court-supervised redistricting.

11.     Moreover, certain counties have already completed their county legislative redistricting processes using the improper data provided by LATFOR, and those new local districts may have to be completed again once LATFOR has released the proper data. The counties that have not already completed this process are already or should be working to do so.

12.     Accordingly, Plaintiffs request that this Court require LATFOR to comply immediately with the prisoner reallocation law by releasing the amended population data, so that the public and the Special Master to be appointed by this Court have proper data with which to accomplish redistricting.

13.     The Legislature's inaction on independent redistricting and LATFOR's blatant failure to follow state law have created a situation requiring the Court's prompt intervention. The 2012 elections and the votes of millions of New Yorkers are at stake.

## PARTIES

14.     Plaintiff Mark A. Favors is a registered voter in New York County in the State of New York, in the 71st Assembly District, the 30th Senatorial District, and the 15th Congressional District. Mr. Favors works as a registered public health nurse and in his spare time founded and serves as Executive Director of the Youth Civic Leadership Academy, which empowers low-income and minority youths as community leaders. Mr. Favors desires to communicate with the candidates for New York State Senate, State Assembly, and the United States House of Representatives running in his district in the 2012 primary and general elections, and he is interested in volunteering for or contributing money to one or more of these candidates.

15.     Plaintiff Howard Leib is a registered voter in Tompkins County in the State of New York, in the 125th Assembly District, the 51st Senatorial District, and the 24th Congressional District. Mr. Leib is an entertainment and intellectual property attorney and an educator. Mr. Leib spends considerable time working to protect the rights of voters from all parties, including election day poll monitoring. He is actively considering becoming a 2012 candidate for State Senate from the 51st Senatorial District, nicknamed the "Abraham Lincoln riding a vacuum cleaner" district for its odd gerrymandered shape. However, Mr. Leib lives near the far Western border of the current 51st Senatorial District, and he does not know whether he will still live in that District following the current redistricting process, nor does he know who will be the eligible voters in his District. In order to make the important decision about whether to run for office and to begin building political support and raising money, Mr. Leib needs to know where the district lines lie as soon as possible. In addition, regardless of his own candidacy, Mr. Leib desires to communicate with the candidates for New York State Senate, State Assembly, and the United States House of Representatives running in his district in the 2012 primary and general elections, and he is interested in volunteering for or contributing money to one or more of these candidates.

16.     Plaintiff Lillie H. Galan is a registered voter in Westchester County in the State of New York, in the 93rd Assembly District, the 35th Senatorial District, and the 17th Congressional District. Ms. Galan is retired from the New York State Office of Children and Family Services, having worked for the State for 32 years. She serves as President of the Community Advisory Board of Rockland Community Mental Health Center, an adult mental health clinic, and has served on that Board since the mid-1990s. She also serves as a District Leader in the Third Ward in Yonkers. Ms. Galan desires to communicate with the candidates for

New York State Senate, State Assembly, and the United States House of Representatives running in her district in the 2012 primary and general elections, and she is interested in volunteering for or contributing money to one or more of these candidates.

17.     Plaintiff Edward A. Mulraine is a registered voter in Westchester County in the State of New York, in the 87th Assembly District, the 36th Senatorial District, and the 17th Congressional District. Reverend Mulraine is a pastor at the Unity Baptist Tabernacle in Mt. Vernon and engages in a number of local issues, particularly relating to anti-violence initiatives. Reverend Mulraine desires to communicate with the candidates for New York State Senate, State Assembly, and the United States House of Representatives running in his district in the 2012 primary and general elections, and he is interested in volunteering for or contributing money to one or more of these candidates.

18.     Plaintiff Warren Schreiber is a registered voter in Queens County in the State of New York, in the 26th Assembly District, the 16th Senatorial District, and the 5th Congressional District. Mr. Schreiber is retired from the Metropolitan Transit Authority in the State of New York and serves as President of the Bay Terrace Community Alliance, a neighborhood coalition in Queens. Mr. Schreiber desires to communicate with the candidates for New York State Senate, State Assembly, and the United States House of Representatives running in his district in the 2012 primary and general elections, and he is interested in volunteering for or contributing money to one or more of these candidates.

19.     Plaintiff Weyman A. Carey is a registered voter in Kings County in the State of New York, in the 58th Assembly District, the 21st Senatorial District, and the 10th Congressional District. Mr. Carey and his wife have lived in their East Flatbush, Brooklyn home since 1974. Together, Mr. and Mrs. Carey own and run Garden 54, an event facility adjacent to

their home. Mr. Carey serves as District Leader of the 58th Assembly District. He desires to communicate with the candidates for New York State Senate, State Assembly, and the United States House of Representatives running in his district in the 2012 primary and general elections, and he is interested in volunteering for or contributing money to one or more of these candidates.

20.     Defendant Andrew M. Cuomo is the Governor of the State of New York. He is being sued in his official capacity.

21.     Defendant Eric T. Schneiderman is the Attorney General of the State of New York. He is being sued in his official capacity.

22.     Defendant Robert J. Duffy is the Lieutenant Governor and President of the Senate of the State of New York. He is being sued in his official capacity.

23.     Defendant Dean G. Skelos is the Majority Leader and President *Pro Tempore* of the Senate of the State of New York. He is being sued in his official capacity.

24.     Defendant Sheldon Silver is the Speaker of the Assembly of the State of New York. He is being sued in his official capacity.

25.     Defendant John L. Sampson is the Minority Leader of the Senate of the State of New York. He is being sued in his official capacity.

26.     Defendant Brian M. Kolb is the Minority Leader of the Assembly of the State of New York. He is being sued in his official capacity.

27.     Defendant LATFOR is the New York State Legislative Task Force on Demographic Research and Reapportionment. LATFOR is charged by statute with researching the techniques and methodologies that the U.S. Census Bureau used in the decennial census and with providing a technical plan to meet the timeline for redistricting based on such census. LATFOR is further charged with developing a database in which all incarcerated persons are

allocated for redistricting purposes at their addresses prior to incarceration if such prior addresses can be determined, with excluding from the database any prisoners whose prior addresses are unidentifiable or out-of-state, with releasing this database to the public, and with providing this database to New York's local governments. (LATFOR is a Defendant in Counts IV through VII only.)

28.     Defendants John J. McEneny, Robert Oaks, Roman Hedges, Michael F. Nozzolio, Martin Malavé Dilan, and Welquis R. Lopez are members of LATFOR. They are being sued in their official capacities.

## JURISDICTION AND VENUE

29.     This Court has jurisdiction over Plaintiffs' federal constitutional claims pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343, and 42 U.S.C. § 1983.

30.     This Court has jurisdiction over Plaintiffs' Voting Rights Act claim pursuant to 42 U.S.C. § 1973j(f).

31.     This Court has jurisdiction over Plaintiffs' declaratory judgment claim pursuant to 28 U.S.C. § 2201.

32.     This Court has supplemental jurisdiction over Plaintiffs' related state law claims pursuant to 28 U.S.C. § 1367.

33.     Venue is appropriate in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b).

34.     Since this is an action challenging the apportionment of congressional districts and statewide legislative bodies, a three-judge Court should be convened pursuant to 28 U.S.C. § 2284.

-8-

## FACTUAL ALLEGATIONS

I. **Background**

A. **The Redistricting Process**

35. Article III, Sections 4 and 5 of the New York State Constitution provide that after each decennial census, the New York State Senate and Assembly districts must be readjusted or altered so that each district contains, to the extent possible, an equal number of inhabitants, in as compact a form as possible.

36. Similarly, the United States Constitution requires that federal congressional boundaries be re-drawn every ten years to reflect population shifts shown in the census.

37. The process of re-drawing these district lines is known as redistricting. In New York State, redistricting is the responsibility of the State Legislature.

38. In 1978, the Legislature created LATFOR, an advisory task force on demographic research and reapportionment. LATFOR is made up of six members: four legislators (two each from the Senate and Assembly) and two non-legislators. One of the non-legislators is appointed by the President *Pro Tempore* of the Senate, the other by the Assembly Speaker. The current members of LATFOR are Defendants Assemblyman John J. McEneny, Assemblyman Robert Oaks, Senator Michael F. Nozzolio, Senator Martin Malavé Dilan, Dr. Roman Hedges, and Welquis R. Lopez.

39. According to its website, LATFOR's role is to "aid[] the Legislature by providing technical plans for meeting the requirements of legislative timetables for the reapportionment of Senate, Assembly and Congressional districts" and "analyze[] the Census Bureau population figures used in the redistricting plan." In plain English, LATFOR's primary role is to prepare the redistricting maps for the Legislature.

40.     The redistricting plan must be approved by the Legislature and the Governor.  In addition, three counties of New York City (Bronx, Kings, and New York) require that the United States Justice Department's Civil Rights Division or the United States District Court for the District of Columbia review and approve the plan for compliance with the Voting Rights Act.

B.     **New York's History of Partisan Self-Interested Redistricting By the Legislature**

41.     The current process for drawing district lines in New York State has been widely criticized as lacking independence from the Legislature, serving partisan interests, and protecting incumbent office-holders rather than the public interest.

42.     Technological advances in redistricting technology now allow legislators the ability to hand-pick the voters who will elect them, rather than allowing voters to select the legislators.  Sophisticated computer software and voter databases have transformed the redistricting process into a precise and highly manipulable science.

43.     Over the last several decades, New York's legislators have effectively used their direct role in the redistricting process to protect existing incumbents and existing majorities in both houses.  These efforts have ensured that, once elected, incumbents often face uncompetitive elections and little chance of defeat.  For instance, between 1982 and 2008 nearly 3,000 legislative general elections were held, resulting in a mere 39 cases in which an incumbent lost in the general election.  In the decade between 2000 and 2010, the incumbent reelection rate averaged a staggering 96%.  Even in 2010, an historically anti-incumbent year, 92% of incumbent state legislators won reelection.

44.     LATFOR lacks independence in this process.  Two-thirds of LATFOR members are sitting legislators who are literally drawing their own districts.  Partisan concerns

-10-

appear to be regularly taken into account when drawing district lines.  For example, a July 20, 2001 memorandum to Defendant Senator Dean Skelos titled "Size of the Senate," which discusses increasing the Senate from 61 to 63 members, is focused primarily on the political considerations of different scenarios.  The memorandum, written by a legislative redistricting staff member, notes that an additional district in Long Island would be problematic for Republicans because it "almost certainly would not be a republican pickup."  The memorandum also states that a combined Queens-Long Island district would politically help certain senators. Another memorandum, dated December 18, 2001, entitled "The 135," describes how a legislative staff member drew two districts at the time represented by Senators Saland and Leibell "a little bit 'lite'" (*i.e.*, with lower population) in order to "maximize[] the Westchester portion attached to [the] Bronx" to make it more favorable for Senator Guy Velella's district.

45.    These memoranda suggest that LATFOR and legislative redistricting staff members take partisan outcomes and the best interests of incumbents into serious consideration when producing district maps.

46.    Although the partisan legislative redistricting process currently has the force of state law, in the event of a breakdown in the process, it is the responsibility of a Court to supervise the redistricting process according to criteria that it deems to be just.  The Court need not adhere to any elements of this partisan, self-interested redistricting process when carrying out this responsibility.  Indeed, the Court in its supervision of this process is free to adopt the principles of independent redistricting in the interest of justice.

C.    **Features of Fair Redistricting**

47.    Independent redistricting proposals vary in their details, but they share the critical common theme that the line-drawers are disinterested individuals and are not the politicians whose chances of reelection often depend upon the results of the redistricting process.

48.     The process of fair redistricting, whether independent or not, tends to be guided by certain criteria such as the ones that follow.

49.     Population equality is a hallmark of fair redistricting proposals.  The United States Supreme Court has held that a state's House of Representatives districts must be as equal to one another as practicable but that state legislative districts under certain circumstances may vary as much as ten percent between the most and least populous districts.  Independent redistricting proposals typically reduce the maximum deviation, frequently to two percent.

50.     Contiguity refers to the principle that no district should be separated from itself entirely by another district, *i.e.*, that each district shall consist of contiguous territory. Contiguity is required by the New York State Constitution.

51.     Fair representation of minority groups refers to the principle that racial and linguistic minority groups should have an equal opportunity with other citizens to participate in the political process and to elect representatives of their choice.  This principle is espoused in the federal Voting Rights Act.

52.     Respect for political subdivisions refers to complex requirements in the New York State Constitution that essentially provide that wherever possible, districts should not cross over county lines and towns should not be divided into multiple districts.

53.     Compactness refers to the principle that any two locations within a district should be as geographically close to each other as possible.  Compactness is required by the New York State Constitution.

54.     Preservation of communities of interest refers to the principle that communities that have shared interests including geographic, social, economic, and other interests should be united in districts where possible.

55.    A redistricting process that applies the principles of population equality, contiguity, fair representation of minority groups, respect for political subdivisions, compactness, and preservation of communities of interest serves the interests of justice.

D.    **New York's Legislators Committed to Independent Redistricting But Did Not Enact It**

56.    In 2010, a coalition called New York Uprising asked candidates for the New York Legislature to sign a pledge to enact legislation to create an independent, non-partisan redistricting process that prioritizes specific criteria including population equality, competitiveness of elections, contiguity, fair representation of minority groups, respect for political subdivisions, compactness, and preservation of communities of interest. The pledge calls for a redistricting process that expressly prohibits drawing districts favoring any political party, incumbent, or candidate for office.

57.    One hundred thirty-eight current members of the New York Legislature signed this pledge, comprising a majority in each chamber. The vast support for this pledge by candidates for office who are now legislators demonstrates significant political support for independent redistricting.

58.    Despite the fact that majorities of both houses of the Legislature committed to independent redistricting, the legislative process to enact such independent redistricting has broken down, and no independent redistricting process has been established. Upon information and belief, and as discussed further below, it is now too late in the redistricting cycle to establish an independent redistricting process by legislation.

II.     **New York's Redistricting Process Has Reached a Stalemate, Requiring Court Intervention**

   A.     **Redistricting Is Necessary Because Use of Existing Districts Leads to Population Inequality in Violation of the United States and New York Constitutions**

         59.     In 2010, a federal census was conducted. The results of that census were released to the Legislature and to the public on March 24, 2011.

         60.     Under Article III, Sections 4 and 5 of the New York State Constitution, the New York Legislature is obligated to re-draw New York's State Senate and Assembly districts after each national census.

         61.     The 2010 census revealed significant population disparities among State Senate and Assembly districts that would make adherence to the current existing lines illegal.

         62.     For example, the results of the 2010 census show that the population disparity between New York's most and least populous State Senate districts is 25.4%, in violation of State and Federal law. Similarly, the population disparity between New York's most and least populous Assembly districts is 31%, also in violation of State and Federal law.

         63.     The New York Legislature has not yet re-drawn the Senate and Assembly district lines following the 2010 census.

         64.     Article I, Section 2 of the United States Constitution requires that members of the United States House of Representatives be apportioned among the states according to population, with the apportionment to be made every ten years.

         65.     Following the 2000 census, New York was apportioned 29 seats in the United States House of Representatives. However, New York lost two congressional seats following the 2010 census and is now entitled to only 27 seats in the House of Representatives.

-14-

66.     Adherence to New York's existing House of Representatives districts would give New York two more seats than it is entitled to fill, in violation of Federal law. Upon information and belief, if New Yorkers were to elect 29 representatives to the Unites States House of Representatives in 2012, none of those representatives would be seated, thus depriving all New Yorkers of representation in that chamber.

67.     In addition, the population disparity between New York's most and least populous House of Representatives districts is 17.9%, in violation of Federal law.

68.     The New York Legislature has not yet re-drawn the district lines of New York's House of Representatives seats following the 2010 census.

B.     **Governor Cuomo Has Promised to Veto Any Redistricting That Is Not the Product of an Independent Process**

69.     New York Governor Andrew M. Cuomo campaigned for governor in 2010 pledging to implement independent redistricting in the state.

70.     On February 17, 2011, Governor Cuomo introduced the Redistricting Reform Act of 2011, a program bill calling for independent redistricting. Nine months later, the Governor's bill has not received a vote in either chamber of the New York Legislature.

71.     In announcing the bill, the Governor's office stated, "Governor Cuomo has pledged that if an agreement on permanent reform of the redistricting process is not reached, he will veto the redistricting plans passed by the Legislature if those plans have been developed under the existing process and prioritize partisan and incumbent interests over the voters' interests."

72.     Governor Cuomo on July 6, 2011 stated even more clearly that he would veto any redistricting plan that was the product of the ordinary LATFOR-focused process. "I will veto a plan that is not independent or a plan that's partisan," he said. "That's what I've said

all along. That's what the people of the state of New York overwhelmingly support." When asked whether he believed LATFOR could produce non-partisan district lines, Governor Cuomo responded, "No, I don't. It's not non-partisan."

73.   On September 30, 2011, as reported in the *New York Times*, Governor Cuomo reiterated this position. When asked whether he would veto the redistricting boundaries being drafted by LATFOR, Governor Cuomo responded "yes," and added that he "believe[s] the process is not independent, and I don't see how a non-independent process can come up with an independent product. I therefore would veto a bill that was not an independent product. It would then go to the courts. Period. And that's what I have said, and that's what I'm sticking by."

74.   Governor Cuomo's unqualified statements make it clear that New York will be unable to adopt a redistricting plan absent an independent redistricting process.

C.   **No Independent Process Is Currently Underway**

75.   The legislature has not passed any plan that would provide for independent redistricting, and no body that has the force of law has initiated an independent redistricting effort.

76.   The only formal redistricting process currently underway is being conducted by LATFOR, which has conducted hearings. Governor Cuomo has already stated that LATFOR lacks independence and that he will veto any redistricting plan drawn up by LATFOR. Accordingly, it is highly unlikely that any LATFOR plan will become law.

D.   **The Accelerated Timeline Required in 2012**

77.   The federal Military and Overseas Voter Empowerment Act (the "MOVE Act") requires states to provide military and overseas voters a minimum amount of time to apply for, receive, and return absentee ballots. New York's usual September primary date leaves too little time between the primary and general elections to comply with the MOVE Act. As a result,

beginning in 2012, New York can no longer hold its primary elections in September. On November 16, 2011, the United States Department of Defense denied a request by the State of New York to keep its 2012 primary date in September.

78. Discussions are currently underway by the New York Legislature to move the 2012 primary election to June or August.

79. A June 2012 primary election would advance the party nominating and candidate petitioning period, which ordinarily occurs from May through July, up to February through May 2012.

80. In advance of the nominating and petitioning period, prospective legislative candidates must determine whether they will run for office. In order to make this important decision, such individuals need to know in which district they reside and the contours of that district.

81. In practice, prospective candidates for public office begin building support and raising and spending money long before the nominating and petitioning period begins. For example, Defendant Skelos's campaign committee began making expenditures for the 2010 election at least as early as June 1, 2009 (fourteen months before the primary), and Defendant Silver's campaign committee began making 2010 election expenditures at least as far back as December 2, 2009 (nine months prior to the primary). For potential candidates to lay this campaign groundwork efficiently, and indeed to even make a decision to run, they need to know where their districts lie.

82. In addition, politically active citizens typically begin the process of determining which candidates to support and endorse well in advance of the state primary. For example, prior to the 2010 primary election, the Community Free Democrats, a Democratic club

on the Upper West Side of Manhattan, held a candidate forum with candidates for the United States House of Representatives and the New York State Assembly on April 22, five months before the September primary election. Similarly, on March 4, 2010 (six months in advance of the primary), the Westchester and Dutchess County Republican Committees convened a meeting to interview candidates for the Republican nomination for the 99th Assembly district. Citizen engagement with elections begins well before the election is held, and a delay in redistricting will leave voters and political parties unable to meaningfully engage in the political process.

83. Accordingly, time is running out for the redistricting process to conclude in a manner that does not significantly interfere with the electoral process. As of the date of this filing, an August primary would take place nine months from now, and a June primary in 2012 would take place in a mere seven months—leaving potential candidates unsure of their districts well within the window in which campaigns are typically up and running.

84. At the same time, no such process has yet begun that is likely to result in an enacted redistricting plan. Meanwhile, New York's Legislature is currently in recess for the year, and there has been no indication that it will reconvene for a special session. Now is the time for the Court's intervention.

III.    **LATFOR's Failure to Comply with the Prisoner Reallocation Law**

A.    **New York Law Requires Prisoners to Be Counted in Their Home Communities**

85.    In 2010, New York enacted Part XX of Chapter 57 of the Laws of New York (the "prisoner reallocation law"), which effectively banned the practice of counting prisoners for purposes of redistricting in the locations in which they are held as prisoners. The law now requires prisoners to be counted in those locations that they call home and to which they have community ties.

86.    To transform from a system of counting prisoners at their prisons to a system in which prisoners are counted in their home communities, the prisoner reallocation law requires LATFOR and the New York State Department of Correctional Services and Community Supervision to work together to create a database of prisoners' addresses prior to incarceration and to adjust population data for redistricting purposes accordingly.

87.    The prisoner reallocation law requires LATFOR to use this amended population data set to draw district lines.

B.    **LATFOR Has Not Followed the Prisoner Reallocation Law**

88.    The Department of Correctional Services and Community Supervision carried out its responsibilities under the prisoner reallocation law in late 2010 by transmitting to LATFOR a list of the home addresses of the prisoners in its system, to the extent those addresses were in-state and could be determined.

89.    Upon receipt of this list of prisoners' home addresses, it was LATFOR's responsibility under the prisoner reallocation law to assign census blocks to each prisoner's home address and to amend the publicly available population data set, *i.e.* the census data for

redistricting purposes, to reflect the residences of these individuals as being in their home districts rather than in their prison districts.

90.     LATFOR has not completed this process. On August 10, 2011, LATFOR member Roman Hedges announced that LATFOR's Assembly Majority staff was working on the amended population data and invited other members of LATFOR and its staff to participate in this process. On September 7, 2011, LATFOR's Assembly Majority staff released certain reports that purported to be the first step in the process of releasing amended population data. However, those reports were neither adopted nor substantively addressed by LATFOR itself, and on September 30, 2011, Defendant Senator Michael F. Nozzolio, Co-Chair of LATFOR, issued a letter that did not reference the staff work completed to date. Senator Nozzolio's letter instead appeared to suggest starting over from the beginning on the time-consuming prisoner reallocation process.

91.     To date, LATFOR has taken no formal steps toward compiling or releasing the official amended data required by the prisoner reallocation law, except for asking its staff to make a recommendation on how to proceed. LATFOR therefore is in violation of the prisoner reallocation law and requires the Court's intervention.

92.     Although there is currently a lawsuit challenging the constitutionality of the prisoner reallocation law, there is no stay in effect. The existence of a constitutional challenge does not excuse LATFOR's failure to comply in a timely fashion with a duly enacted law.

C.    **The Time for LATFOR's Compliance with the Prisoner Reallocation Law Has Passed**

93.    LATFOR's inaction on compliance with the prisoner reallocation law demonstrates that it does not have any intention or ability to comply with the law in a timely fashion absent Court intervention.  Meanwhile, LATFOR has reached a point in its redistricting process at which it cannot proceed without complying with the prisoner reallocation law.  In short, LATFOR has reached a dead end.

94.    LATFOR's deliberative process in connection with the 2010 census and 2012 redistricting process, as in previous rounds of redistricting, involves several steps: (1) LATFOR releases the population data upon which the new districts will be based; (2) LATFOR holds a round of hearings so that the public may weigh in on the redistricting factors that they believe LATFOR members should consider in adopting new districts; (3) at the request of LATFOR members, interested groups and other members of the public submit proposed district lines to LATFOR based on the population data LATFOR has already released; (4) taking into consideration the testimony and maps submitted by groups and members of the public, LATFOR adopts a preliminary redistricting plan; (5) LATFOR holds another round of hearings so that the public may comment on the preliminary redistricting plan; and (6) LATFOR adopts a final redistricting plan for submission to the Legislature.

95.    LATFOR attempted to perform step (1) by releasing population data counting prisoners at their prison addresses.  However, the prisoner reallocation law prohibits using this data to draw new districts.  As discussed above, LATFOR has not released amended population data counting prisoners in their home districts, which is the only data that may be used in this round of redistricting.

96.     On November 2, 2011, LATFOR held its final hearing in the first round of hearings.  Step (2) is now complete.

97.     The next steps, public submission of proposed redistricting lines and the drawing of preliminary district lines by LATFOR, cannot possibly occur in compliance with the law until LATFOR has released population data that reallocates prisoners to their home districts pursuant to the prisoner reallocation law.  Any submissions of proposed district lines by the public or by LATFOR using the original population data that LATFOR has already released would be a waste of time because those districts could not be adopted by LATFOR consistent with State law.

98.     Accordingly, LATFOR is out of time to comply on its own.  It cannot complete any more steps without complying with the prisoner reallocation law, and it has not done so.  The Court's intervention is needed at this time to ensure compliance with the law.

D.      **The Prisoner Reallocation Law Has the Force of Federal Law**

99.     On May 9, 2011, the United States Department of Justice pre-cleared the prisoner reallocation law as a change in election law pursuant to Article 5 of the federal Voting Rights Act of 1965.  New York State laws affecting voting rights require Voting Rights Act preclearance because three New York counties are "covered jurisdictions" pursuant to Article 5 of the Voting Rights Act.

100.    As a result of this preclearance of the prisoner reallocation law by the Department of Justice, that law now has the force of federal law.  Any return to counting prisoners at their prison locations would effect a further change in election law in New York, which would require additional preclearance by the Department of Justice.  Failure to either comply with the prisoner reallocation law or accomplish such additional preclearance is a violation of the Voting Rights Act.

-22-

101.    The Voting Rights Act gives the Department of Justice 60 days from an application for preclearance to reach a decision.  Upon information and belief, the Department of Justice generally takes almost the full 60 days to make these determinations, thus further increasing the exigency of the current redistricting stalemate and further increasing the need for this Court to intervene immediately.

E.    **LATFOR's Failure to Comply with the Prisoner Reallocation Law Interferes with Local Redistricting Efforts**

102.    New York's prisoner reallocation law does not only affect redistricting of state and congressional legislative districts.  The law also requires LATFOR to provide amended population data to local governments such as counties so that those local governments may count prisoners in their home districts as part of their own local redistricting efforts.  LATFOR has not complied with this obligation.

103.    Because LATFOR has not provided this amended population data to local governments, those local governments are unable to count prisoners in their home districts for local redistricting purposes.

104.    Some local governments have already passed redistricting plans based on the initial, improper population data.  Other local governments will need to pass redistricting plans in the near future, in time for the 2012 elections.  Each local government will need LATFOR to comply with its obligations under the prisoner reallocation law as soon as possible in order to either correct its redistricting plan or to pass a compliant plan.

105.    Thus, LATFOR's separate and distinct violation of the prisoner reallocation law by its failure to provide amended population data to local governments prejudices these local governments and, in turn, the citizens of those local communities including Plaintiffs.  The Court's intervention is needed to redress this wrong.

## COUNT I
### (Violation of the Equal Protection Clause of the 14th Amendment to the U.S. Constitution; Pursuant to 42 U.S.C. § 1983)

106.    The allegations contained above are repeated and re-alleged as if fully set forth herein.

107.    New York's districts were last adjusted in 2002, following the 2000 census. Now that the 2010 census has been completed, the New York Legislature's 2002 redistricting is out of date and may not be used for subsequent state legislative or congressional elections.

108.    New York's current legislative districts lack population equality, in violation of the "one person one vote" requirements of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

109.    Certain Plaintiffs live in overpopulated districts, and therefore their voting power is diluted in violation of the Equal Protection Clause.

110.    In addition, the 2010 prisoner reallocation law requires LATFOR to compile amended population data that allocates prisoners in their home communities rather than their prison communities. For prisoners from out of state or where their home communities cannot be identified, LATFOR is prohibited from including them in its population data. LATFOR has not complied with this requirement.

111.    LATFOR is required to use this amended population data in conducting its redistricting work. LATFOR has not complied with this requirement.

112.    Upon information and belief, certain Plaintiffs live in communities that would stand to gain population and therefore voting power by LATFOR's compliance with the

-24-

prisoner reallocation law. These Plaintiffs are therefore harmed by LATFOR's failure to comply with the law.

113.   New York needs new State Senate, Assembly, and House of Representatives districts before the next elections for those bodies, which will occur in 2012.

114.   Because New York's legislative redistricting process is hopelessly stalled, the ability to complete New York's 2012 elections in a timely and legal fashion is at significant risk.

115.   To remedy these Equal Protection violations in a timely manner, the Court should take control of the redistricting process and oversee the process of re-drawing district lines pursuant to fair and legal criteria.

116.   The Court should appoint a Special Master to prepare a redistricting plan in light of the legislative stalemate.

117.   In the interest of justice, the Special Master appointed by the Court should be entirely independent of partisan interests, and the Court's Order appointing the Special Master should require that the Special Master's redistricting plan be independent of partisan interests and should count prisoners in their home communities. The Court should order the Special Master to prioritize redistricting criteria including population equality, contiguity, fair representation of minority groups, respect for political subdivisions, compactness, and preservation of communities of interest.

118.   Upon presentation of an appropriate independent redistricting plan by the Special Master, the Court should adopt that plan and order elections to proceed in 2012 using those districts.

## COUNT II
### (Violation of the Due Process Clauses of the 5th and 14th Amendments
### to the U.S. Constitution; Pursuant to 42 U.S.C. § 1983)

119.   The allegations contained above are repeated and re-alleged as if fully set forth herein.

120.   As a result of New York's failure to adjust its state legislative and congressional districts pursuant to the 2010 census, certain Plaintiffs live in overpopulated districts, resulting in a dilution of their voting power.

121.   Moreover, upon information and belief, as a result of LATFOR's failure to count prisoners in their home communities rather than in their prison communities, certain Plaintiffs have been harmed by the loss of voting power for their communities.

122.   The diminishment of Plaintiffs' voting power constitutes a deprivation of Plaintiffs' rights without due process of law.  The State of New York has deprived these Plaintiffs of their full rights to vote in state legislative and congressional races by allowing malapportionment of those districts and improperly denying Plaintiffs a fair and full weight in their votes for State Senate, Assembly, and United States House of Representatives.

123.   To remedy these Due Process violations in a timely manner, the Court should take control of the redistricting process and oversee the process of re-drawing district lines pursuant to fair and legal criteria.

124.   The Court should appoint a Special Master to prepare a redistricting plan in light of the legislative stalemate.

125.   In the interest of justice, the Special Master appointed by the Court should be entirely independent of partisan interests, and the Court's Order appointing the Special Master should require that the Special Master's redistricting plan be independent of partisan interests

and should count prisoners in their home communities. The Court should order the Special Master to prioritize redistricting criteria including population equality, contiguity, fair representation of minority groups, respect for political subdivisions, compactness, and preservation of communities of interest.

126. Upon presentation of an appropriate independent redistricting plan by the Special Master, the Court should adopt that plan and order elections to proceed in 2012 using those districts.

**COUNT III**
**(Violation of Article I, Section 2 of the U.S. Constitution; Pursuant to 42 U.S.C. § 1983)**

127. The allegations contained above are repeated and re-alleged as if fully set forth herein.

128. New York's current districts for the United States House of Representatives are too numerous by two seats, in violation of Article I Section 2 of the United States Constitution.

129. Plaintiffs each live in one of 29 congressional districts, even though New York is only permitted 27 congressional districts. Without proper redistricting, New York's representation in the United States House of Representatives is at risk. Plaintiffs, in turn, risk losing their votes in the elections for those congressional seats.

130. New York needs new House of Representatives districts before the next congressional elections, which will occur in 2012.

131. To remedy these constitutional violations in a timely manner, the Court should take control of the redistricting process and oversee the process of re-drawing district lines pursuant to fair and legal criteria.

132.    The Court should appoint a Special Master to prepare a redistricting plan in light of the legislative stalemate.

133.    In the interest of justice, the Special Master appointed by the Court should be entirely independent of partisan interests, and the Court's Order appointing the Special Master should require that the Special Master's redistricting plan be independent of partisan interests and should count prisoners in their home communities.  The Court should order the Special Master to prioritize redistricting criteria including population equality, contiguity, fair representation of minority groups, respect for political subdivisions, compactness, and preservation of communities of interest.

134.    Upon presentation of an appropriate independent redistricting plan by the Special Master, the Court should adopt that plan and order elections to proceed in 2012 using those districts.

### COUNT IV
### (Violation of the New York Constitution)

135.    The allegations contained above are repeated and re-alleged as if fully set forth herein.

136.    New York's current State Senate and Assembly districts lack population equality, in violation of the population equality requirements of Article III, sections 4 and 5 of the New York State Constitution.

137.    Certain plaintiffs live in overpopulated districts, and therefore their votes are diluted in violation of the New York State Constitution.

138.    New York needs new State Senate and Assembly districts before the next elections for those bodies, which will occur in 2012.

-28-

139.     To remedy these violations of the New York State Constitution in a timely manner, the Court should take control of the redistricting process and oversee the process of re-drawing district lines pursuant to fair and legal criteria.

140.     The Court should appoint a Special Master to prepare a redistricting plan in light of the legislative stalemate.

141.     In the interest of justice, the Special Master appointed by the Court should be entirely independent of partisan interests, and the Court's Order appointing the Special Master should require that the Special Master's redistricting plan be independent of partisan interests. The Court should order the Special Master to prioritize redistricting criteria including population equality, contiguity, fair representation of minority groups, respect for political subdivisions, compactness, and preservation of communities of interest.

142.     Upon presentation of an appropriate independent redistricting plan by the Special Master, the Court should adopt that plan and order elections to proceed in 2012 using those districts.

## COUNT V
### (Violation of the New York Prisoner Reallocation Law)

143.     The allegations contained above are repeated and re-alleged as if fully set forth herein.

144.     The 2010 prisoner reallocation law requires LATFOR to compile amended population data that allocates prisoners in their home communities rather than their prison communities. For prisoners from out of state or where their home communities cannot be identified, LATFOR is prohibited from including them in its population data. LATFOR has not complied with this requirement.

-29-

145.    LATFOR is required to use this amended population data in conducting its redistricting work.  LATFOR has not complied with this requirement.

146.    The prisoner reallocation law requires LATFOR to release this amended population data to local governments for use in their local redistricting efforts.  LATFOR has not complied with this requirement.

147.    Upon information and belief, certain Plaintiffs live in communities that would stand to gain population and therefore voting power by LATFOR's compliance with the prisoner reallocation law.  These Plaintiffs are therefore harmed by LATFOR's failure to comply with the law.

148.    To remedy this violation of New York law, the Court should order LATFOR to comply immediately with the prisoner reallocation law requiring the processing and release of amended population data that counts prisoners only at their home residences.

149.    The Court should order LATFOR to work cooperatively with the Special Master to be appointed by the Court so that the Special Master has immediate access to accurate information on prisoners' home residences in order to ensure that the Special Master's plan appropriately counts prisoners at their home residences in compliance with this law.

## COUNT VI
**(Violation of the Voting Rights Act; Pursuant to 42 U.S.C. § 1973j(f) and 42 U.S.C. § 1983)**

150.    The allegations contained above are repeated and re-alleged as if fully set forth herein.

151.    The federal Voting Rights Act requires New York to obtain preclearance from the United States Department of Justice or the United States District Court for the District of Columbia for its statewide laws that change its election laws and voting rights.  New York

obtained preclearance by the Department of Justice for the prisoner reallocation law, as required by the Voting Rights Act. The prisoner reallocation law therefore has the force of federal law.

152. Any failure by New York to comply with the prisoner reallocation law would constitute another change in election law and voting rights that would require further preclearance. New York has not applied for such preclearance.

153. Any failure by New York to comply with the prisoner reallocation law without obtaining further preclearance would constitute a violation of the Voting Rights Act.

154. Accordingly, unless New York promptly repeals the prisoner reallocation law and requests preclearance for such repeal, the Court should order LATFOR to comply immediately with the prisoner reallocation law requiring the release of amended population data that counts prisoners only at their home residences.

155. The Court should order LATFOR to work cooperatively with the Special Master to be appointed by the Court so that the Special Master has immediate access to accurate information on prisoners' home residences in order to ensure that the Special Master's plan appropriately counts prisoners at their home residences in compliance with this law.

### COUNT VII
### (Declaratory Judgment Pursuant to 28 U.S.C. § 2201)

156. The allegations contained above are repeated and re-alleged as if fully set forth herein.

157. For the reasons set forth in this Complaint, Defendants, through their inaction in the redistricting process, have deprived Plaintiffs, and all citizens of the State of New York similarly situated in malapportioned districts, of the constitutional right to vote by denying them equal protection and due process under the law in violation of the United States Constitution.

158.    Plaintiffs are entitled to a declaratory judgment by the Court determining that Plaintiffs' constitutional rights have been violated, in order for Plaintiffs to obtain such further relief as may be necessary to vindicate those rights.

## RELIEF SOUGHT

WHEREFORE, Plaintiffs respectfully request the following relief:

1.    An order or judgment declaring New York's current State Senate, Assembly, and United States House of Representatives districts, last adjusted in 2002, to be invalid for failing to comply with the United States Constitution, the New York State Constitution, and state and federal law;

2.    An order or judgment declaring that Plaintiffs' constitutional rights have been violated by Defendants' inaction in the redistricting process;

3.    An order appointing an independent Special Master to propose new State Senate, Assembly, and House of Representatives district lines in conformity with the 2010 census, applicable state and federal law, and the following principles: population equality, contiguity, fair representation of minority groups, respect for political subdivisions, compactness, and preservation of communities of interest;

4.    An order, judgment, or injunction directing that LATFOR immediately comply with the prisoner reallocation law;

5.    An order requiring LATFOR and its members and staff to cooperate with the Special Master for all purposes, specifically including providing the Special Master with amended prisoner population data to ensure compliance with the prisoner reallocation law;

6.    An order or judgment re-drawing district lines in conformity with the Special Master's proposal, assuming the Special Master's satisfactory completion of an independent redistricting proposal;

7.    An order requiring Defendants to pay to Plaintiffs their reasonable attorney's fees and expenses, expert fees, costs, and other expenses incurred in prosecuting this action, pursuant to 42 USC § 1973l(e) and 42 U.S.C. § 1988; and

8.    Granting such other relief as the Court may deem just and proper.

Dated: New York, New York
      November 17, 2011

WILLKIE FARR & GALLAGHER LLP

By: _Richard Mancino_

Richard Mancino
(A Member of the Firm)

Daniel M. Burstein
Jeffrey A. Williams
787 Seventh Avenue
New York, New York 10019
(212) 728-8000
rmancino@willkie.com
dburstein@willkie.com
jwilliams@willkie.com

Attorneys for Plaintiffs