UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
MARK A. FAVORS, et al.,

                    Plaintiffs,                    **REPORT AND**
                                                      **REMMENDATION**

                    -against-                    **11-CV-5632 (DLI)(RR)(GEL)**

ANDREW M. CUOMO,
*as Governor of the State of New York,*
*et al.,*

                    Defendants.
-----------------------------------------------------------------x

**ROANNE L. MANN, UNITED STATES MAGISTRATE JUDGE:**

       Faced yet again with a dysfunctional state legislature, the federal judiciary in New York

must now undertake the "unwelcome obligation" of creating a plan redrawing the State's

electoral districts for the United States Congress. Perry v. Perez, ___ U.S. ___, 132 S.Ct.

934, 940 (2012) (quoting Connor v. Finch, 431 U.S. 407, 415 (1977)). The legislature's

abdication of its responsibility, and the need for judicial intervention, have become an all-too-

familiar scenario in New York. In 1992, a three-judge court in this district, burdened with the

same task, made the following observation:

> Ten years ago, legislative delay required a federal court's
> intervention to protect the people of the State of New York, and
> the same has happened this decade. We can only hope that the
> census of 2000 will not give birth to yet another judicial
> redistricting drama in 2002.

Puerto Rican Legal Defense & Educ. Fund, Inc. v. Gantt, 796 F.Supp. 681, 696 (E.D.N.Y.

1992) ("PRLDEF") (three-judge court) (citing Flateau v. Anderson, 537 F.Supp. 257

(S.D.N.Y.) (three-judge court) (per curiam), appeal dismissed, 458 U.S. 1123 (1982)).

Unfortunately, the Court's hope in PRLDEF would not be realized: the Census of 2000 did in fact give birth to yet another redistricting drama, see Rodriguez v. Pataki, No. 02 Civ. 618(RMB), 2002 WL 1058054 (S.D.N.Y. May 24, 2002) ("Rodriguez I") (three-judge court) -- as did the Census of 2010, which produced the legislative stalemate that now threatens to disenfranchise New Yorkers and brings the parties before this Court.

As a result of the 2010 Census, the number of congressional districts allotted to New York State was reduced from 29 to 27. The purpose of this Report and Recommendation is to present to the Three-Judge Panel presiding in this case the 27-district congressional redistricting plan (the "Recommended Plan") formulated by the undersigned magistrate judge with the assistance of its redistricting consultant, Dr. Nathaniel Persily. Dr. Persily's affidavit and attachments (collectively referred to as "Persily Affidavit" or "Persily Aff.") accompany this opinion and are incorporated by reference herein. As detailed in the discussion that follows, and in the Persily Affidavit, the Recommended Plan complies with all constitutional and statutory requirements, as well as with the terms of the Three-Judge Panel's order charging this Court with the duty to prepare and propose a congressional redistricting plan for the State of New York. Furthermore, whatever its effects on the political process, the Recommended Plan was prepared according to neutral principles, pursuant to a process aimed at ensuring both the reality and appearance of judicial impartiality.

**BACKGROUND**

**I.  The Instant Action**

On November 17, 2011, plaintiffs Mark A. Favors, Howard Leib, Lillie H. Galan,

Edward A. Mulraine, Warren Schreiber, and Weyman A. Carey ("Plaintiffs"), registered

voters in the State of New York, filed the instant voting rights action against defendants

Andrew M. Cuomo, as Governor of the State of New York; Eric T. Schneiderman, as

Attorney General of the State of New York[1]; Robert J. Duffy (Lieutenant Governor of the

State of New York), as President of the New York State Senate; Dean G. Skelos, as Majority

Leader and President Pro Tempore of the New York State Senate; John L. Sampson, as

Minority Leader of the New York State Senate; Sheldon Silver, as Majority Leader of the New

York State Assembly; Brian M. Kolb, as Minority Leader of the New York State Assembly;

the New York State Legislative Task Force on Demographic Research and Reapportionment

("LATFOR")[2]; and the six members of LATFOR: Assemblyman John J. McEneny,

Assemblyman Robert Oaks, Dr. Roman Hedges, State Senator Michael F. Nozzolio, State

Senator Martin Malavé Dilan, and Welquis R. Lopez (collectively, "Defendants").[3]  See

---

[1]  Plaintiffs voluntarily dismissed all claims against the Attorney General on December 28, 2011, see Plaintiffs' Notice of Voluntarily Dismissal (Dec. 28, 2011), Electronic Case Filing ("ECF") Docket Entry ("DE") #40, and the dismissal was granted on January 10, 2012.  See Order (Jan. 10, 2012).

[2]  LATFOR is comprised of two members of the New York State Senate, two members of the New York State Assembly, and two appointed non-legislators, one selected by the President Pro Tempore of the State Senate and one selected by the Speaker of the State Assembly.  See Memorandum and Order (Mar. 8, 2012) ("3/8/12 M&O") at 4, DE #219.

[3]  For ease of reference: (1) Governor Cuomo and Lt. Governor Duffy will be referred to as the "Governor Defendants"; (2) State Senator Skelos and LATFOR members Nozzolio and

-3-

<u>generally</u> Complaint (Nov. 17, 2011) ("Compl."), DE #1.

Additionally, four sets of individuals have intervened in the matter as plaintiffs pursuant to Rule 24 of the Federal Rules of Civil Procedure, including: (1) Donna Kaye Drayton, Edwin Ellis, Aida Forrest, Gene A. Johnson, Joy Woolley, and Shelia Wright (the "Drayton Intervenors"); (2) Juan Ramos, Nick Chavarria, Graciela Heymann, Sandra Martinez, Edwin Roldan, and Manolin Tirado (the "Ramos Intervenors"); (3) Linda Lee, Shing Chor Chung, Jung Ho Hong, and Julia Yang (the "Lee Intervenors"); and (4) Linda Rose, Everet Mills, Anthony Hoffman, Kim Thompson-Werekoh, Carlotta Bishop, Carol Rinzler, George Stamatiades, Josephine Rodriguez, and Scott Auster (the "Rose Intervenors"). Their respective motions to intervene were granted as unopposed on February 14 and 21, 2012. <u>See</u> Order Granting Motions to Intervene (Feb. 14, 2012); Order Denying Motion to Dismiss and Granting Motion to Intervene (Feb. 21, 2012).

Plaintiffs allege that Defendants' failure to adjust New York's state legislative and federal congressional districts in accordance with the results of the 2010 Census violates their rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution (Count I); the Due Process Clauses of the Fifth and Fourteenth Amendments to the United States Constitution (Count II); Article I, Section 2 of the United States Constitution (Count III); Article III, Sections 4 and 5 of the New York State Constitution (Count IV); the

---

Lopez will be referred to collectively as the "Senate Majority Defendants"; (3) State Senator Sampson and State Senator and LATFOR member Dilan will be referred to collectively as the "Senate Minority Defendants"; (4) Assemblyman Silver and LATFOR members McEneny and Roman Hedges will be referred to collectively as the "Assembly Majority Defendants"; and (5) Assemblyman Kolb and LATFOR member Oaks will be referred to collectively as the "Assembly Minority Defendants."

New York Prisoner Reallocation Law[4] (Count V); and the Voting Rights Act of 1965, 42 U.S.C. § 1973(f) (Count VI), based on the failure to comply with the Prisoner Reallocation Law. See Compl. ¶¶ 106-155. Plaintiffs further seek a declaratory judgment that Defendants' failure to adjust the malapportioned districts has deprived Plaintiffs and all citizens of New York equal protection and due process in violation of the United States Constitution (Count VII). See id. ¶¶ 156-158.

Accordingly, Plaintiffs seek a judgment declaring the current state and congressional districts invalid, declaring that Plaintiffs' rights have been violated as alleged, appointing a Special Master to draw new districts in compliance with the law, ordering LATFOR to cooperate with the Special Master, ordering the redrawing of the district map, and awarding attorney's fees. See Compl. at 32-33.

On December 2, 2011, plaintiffs requested that the Honorable Dora L. Irizarry, the District Judge assigned to the case, convene a three-judge court pursuant to 28 U.S.C. § 2284 and 42 U.S.C. § 1973c. See Plaintiffs' Letter to Judge Irizarry (Dec. 2, 2011), DE #2. Judge Irizarry subsequently ordered the parties to show cause why such a panel should not be convened. See Order to Show Cause (Dec. 6, 2011). While the Governor Defendants did not oppose the convening of a three-judge panel, a number of Defendants requested that the Court delay such empanelment until the resolution of dispositive motions. See Assembly Majority Defendants' Response to Order to Show Cause (Dec. 8, 2011), DE #9; Assembly Minority

---

[4] Plaintiffs have since voluntarily dismissed, without prejudice, their claims under the New York Prisoner Reallocation Law. See Plaintiffs' Notice of Voluntary Dismissal (Jan. 30, 2012), DE #66; Order (Feb. 1, 2012) (dismissing Counts V and VI of Plaintiffs' Complaint).

Defendants' Response to Order to Show Cause (Dec. 9, 2011), DE #16; Defendant Oaks'

Response to Order to Show Cause (Dec. 9, 2011), DE #20. Events in the Northern District of

New York, however, heightened the need for a three-judge panel.

In United States of America v. New York, 10-CV-1214 (N.D.N.Y.) (Feb. 9, 2012),

Exh. to Plaintiffs' Letter (Feb. 10, 2012), DE #72, Chief Judge Gary L. Sharpe of the United

States District Court for the Northern District of New York issued an order that advanced the

date for New York's congressional primary election as a means of ensuring compliance with

the requirements of the Uniformed and Overseas Citizens Absentee Voting Act of 1986, 42

U.S.C. §§ 1973ff-1973ff-7, as amended by the Military and Overseas Voter Empowerment

Act, and ordered the candidate petitioning period for New York's congressional primary

elections to begin on March 20, 2012. As a result of these developments, Judge Irizarry found

it necessary to request a three-judge panel prior to deciding Defendants' motions to dismiss.

See Request to Appoint Three-Judge Panel and Special Master Pursuant to 28 U.S.C. §

2284(b) (Feb. 13, 2012), DE #73. On February 14, 2012, Chief Judge Dennis G. Jacobs of

the United States Court of Appeals for the Second Circuit appointed two Second Circuit

judges, the Honorable Reena Raggi and the Honorable Gerard E. Lynch, to serve with Judge

Irizarry on the three-judge panel (the "Three-Judge Panel" or the "Panel"). See Designation

of Three-Judge Panel (Feb. 14, 2012), DE #74. On February 21, 2012, the Panel referred the

task of creating a redistricting plan to the undersigned magistrate judge, and denied

Defendants' motions to dismiss with an opinion to follow.[5] See Docket Entry Referral Order

---

[5] That opinion was issued on March 8, 2012. See 3/8/12 M&O, DE #219.

(Feb. 21, 2012).

The Three-Judge Panel then held a hearing on February 27, 2012, at which it set forth procedures for the court-based redistricting process. See Minute Entry Regarding Hearing Before the Three-Judge Panel (Feb. 27, 2012) ("2/27/12 Panel Minute Entry"). The Panel's rulings were outlined in a formal referral order issued the following day. See Order of Referral to Magistrate Judge (Feb. 28, 2012) ("2/28/12 Order of Referral"), DE #133. The Order limited the task before this Court to the redistricting of the State's congressional districts, reserving for a later date the question of whether the Court "must intervene to reapportion the State Senate and Assembly Districts." See id. at 2.

In addition, the Panel's Order delineated the responsibilities and powers of the undersigned magistrate judge. First, the Panel directed this Court to "adhere to, and, to the extent possible, reconcile" a number of guidelines, including: (a) "divid[ing] the state into 27 congressional districts in accordance with the 2010 federal Census and applicable law"; (b) creating districts that are "substantially equal in population"; (c) ensuring that the districts are "compact, contiguous, respect political subdivisions, and preserve communities of interest"; and (d) complying with 42 U.S.C. § 1973(b) and with all other applicable provisions of the Voting Rights Act. See 2/28/12 Order of Referral at 3. Moreover, the Panel empowered the undersigned to "consider other factors and proposals submitted by the parties, which, in the magistrate judge's view, are reasonable and comport with the Constitution and applicable federal and state law." Id. at 3.

The Three-Judge Panel also authorized the undersigned to retain a redistricting consultant, Dr. Nathaniel Persily, Professor of Law at Columbia University, to assist in

preparing the redistricting plan.  The Panel directed LATFOR to "cooperate fully in providing

to the magistrate judge, and to any experts, technical advisors, or consultants assisting her,

immediate and unrestricted access to information, data, facilities, and technical support, as

well as any additional assistance that may facilitate and expedite the work of the magistrate

judge."  Id. at 4.

The Panel instructed this Court, in preparing its redistricting plan, to "consider any

proposals, plans, and comments either already submitted or to be submitted by all parties and

intervenors in the action," and authorized the undersigned to "invite additional submissions,

hold hearings, take testimony, and take whatever steps she deems reasonably necessary to

develop the plan contemplated by this Order."  Id. at 4.  The undersigned was further

authorized to "recommend a new plan" or to "incorporate all or parts of extant or newly

proposed plans" submitted either by "the parties or interested members of the public."  Id.

Finally, the Panel ordered this Court to submit its Report and Recommendation by

March 12, 2012, ordered the parties to file any objections by noon on March 14, 2012, and set

a hearing on the Report and Recommendation for March 15, 2012.  Id. at 6.

## II.     Developing the Proposed Plan

Meanwhile, on February 27, 2012, at a proceeding immediately following the hearing

before the Three-Judge Panel, this Court set a schedule for the parties to file their proposed

redistricting plans and then to file responses or objections both to one another's proposals and

to the statewide plan released by a non-party, the public advocacy organization Common Cause

(the "Common Cause Plan"). <u>See</u> Minute Entry (Feb. 27, 2012), DE #129.[6] In a subsequent

order, this Court set forth detailed technical requirements for the submission of plans and

proposals to the Court, and developed an online submission system to allow members of the

public to file proposed plans and comments. <u>See</u> Order (Feb. 28, 2012) ("2/28/12 Order"),

DE #134. Further, the Court arranged to have the docket made accessible free of charge and

available to the public via the website of the United States District Court for the Eastern

District of New York.

The parties submitted their proposed redistricting plans on February 29, 2012,

including four statewide redistricting plans and three partial plans. <u>See</u> Persily Aff. ¶ 61. The

statewide plans included those of the Senate Majority Defendants, the Assembly Majority

Defendants, the Assembly Minority Defendants, and the Rose Intervenors. <u>See</u> <u>id.</u> ¶ 63. The

partial plans included those of the Lee Intervenors, the Ramos Intervenors, and the Drayton

Intervenors. <u>See</u> <u>id.</u> ¶ 64. The Ramos and Drayton plans were each modified versions of the

"Unity Plan," "a nonpartisan plan created as a joint effort of four voting rights' advocacy

organizations for the protected groups of New York City." <u>See</u> Transcript of Public Hearing,

March 5, 2012 ("3/5/12 Tr.") at 24, DE #221. The Plaintiffs, the Governor Defendants, and

the Senate Minority Defendants did not submit proposed plans to the Court.

Non-parties were invited to submit proposed plans on or before March 2, 2012, <u>see</u>

---

[6] Although not expressly addressed in the Panel's Minute Entry, the Common Cause Plan had
been referenced during the earlier hearing before the Panel.

2/28/12 Order, and the Court received and considered thirteen non-party statewide plans[7] and

six non-party partial plans.[8]  See Persily Aff. ¶¶ 66-67.  Additionally, parties and non-parties

were directed to file any comments on the proposed plans – including both the party plans and

the Common Cause Plan – on or before March 2, 2012.  See 2/28/12 Order at 1-2.  Eight sets

of parties filed responses and objections.[9]  The public response, embodied in 61 comments

submitted through the Court's online submission system, was voluminous, passionate, and

thoughtful.  See Order Regarding Public Submissions (Mar. 12, 2012), DE #222.

At a four-hour public hearing convened by this Court on March 5, 2012, the parties

advocated for their respective proposed plans and against the competing proposed plans.  See

Minute Entry (Mar. 5, 2012) ("3/5/12 Minute Entry"), DE #183; see generally 3/5/12 Tr.

---

[7]  The non-party statewide plans included those from Common Cause, as well as individuals
Connor Allen, David Harrison, Michael Danish, Andrew C. White, Vincent Flynn, Elijah
Reichlin-Melnick, Robert Silverstein, Philip Smith, David Gaskell, Jesse Laymon, Michael
Fortner, and Adama D. Brown.  See Persily Aff. ¶ 66; Order Regarding Public Submissions
(Mar. 12, 2012), DE #222.

[8]  The non-party partial plans included those from the Citizens Alliance for Progress,
Concerned Citizens of Fort Greene and Clinton Hill, Keith L.T. Wright (Chairman of the New
York County Democratic Committee), Representative Yvette D. Clarke (Congresswoman from
New York's 11th Congressional District) the Orthodox Alliance for Liberty, and Ruben Diaz.
See Persily Aff. ¶ 67; Order Regarding Public Submissions (Mar. 12, 2012), DE #222.

[9]  See Assembly Majority Defendants' Response to Proposed Redistricting Plans (Mar. 2,
2012), DE #165; Plaintiffs' Memorandum of Law in Response to Parties' Proposed
Congressional Redistricting Plans(Mar. 2, 2012) ("Pl. 3/2/12 Mem."), DE #166; Lee
Intervenors' Response to Congressional Redistricting Plans (Mar. 2, 2012), DE #167; Senate
Majority Defendants' Response to Proposed Congressional Redistricting Plans (Mar. 2, 2012),
DE #170; Rose Intervenors' Memorandum on Other Parties' Proposed Maps (Mar. 2, 2012)
("Rose 3/2/12 Mem."), DE #171; Assembly Minority Defendants' Letter Responding to
Proposed Congressional Districts (Mar. 2, 2012), DE #172; Ramos Intervenors' Objections to
Proposed CD Plans (Mar. 3, 2012), DE #173; Drayton Intervenors' Letter to Court Regarding
Congressional Maps (Mar. 3, 2012), DE #174.

Additionally, the Court heard from nineteen members of the public, including one sitting Congresswoman, two town mayors, a sitting Assembly Committeeman, and numerous community leaders, public interest advocates, and concerned citizens.[10]  See 3/5/12 Minute Entry; 3/5/12 Tr.

Taking the various viewpoints and suggested plans into account, the Court fashioned its own proposed plan (the "Proposed Plan") with the assistance of its redistricting consultant, and publicly released that plan for comment on March 5, 2012, in the form of an Order to Show Cause why the Proposed Plan should not be recommended for adoption by the Three-Judge Panel.  See Order to Show Cause (Mar. 5, 2012), DE #184.  Thereafter, starting on March 6, 2012 and continuing to date, the parties and interested members of the public have responded to the Proposed Plan.  As described more fully in the Persily Affidavit, of the parties, only the Senate Majority Defendants, the Rose Intervenors, the Ramos Intervenors, and the Drayton Intervenors submitted substantive responses to the Court's Order to Show Cause.  See Persily Aff. ¶¶ 143-147.[11]  Approximately 400 non-party members of the public also filed comments

---

[10]  Nine speakers addressed issues related to the existing 12th Congressional District.  See 3/5/12 Tr. at 120-35, 139-42.  Four speakers advocated for preserving communities of interest within the existing 11th Congressional District, including that district's sitting Congresswoman, Representative Yvette D. Clarke.  See id. at 17-23, 144-47, 154-58.  Two speakers, representing separate Asian-American interest groups, advanced their support for the Unity Map.  See id. at 135-44.  Two sitting mayors, representing villages within the 18th Congressional District, requested that the Court's plan retain the town of Greenburgh within that district.  See id. at 158-62.  One individual argued on behalf of the Latino community in northern Manhattan, the Bronx, and Queens.  See id. at 116-20.  Finally, Sean Coffey, a representative of Common Cause, advocated adoption of the Common Cause Plan.  See id. at 147-52.

[11]  The Assembly Majority Defendants, the Senate Minority Defendants, and the Assembly Minority Defendants each expressed no comment about the Proposed Plan.  See Assembly

on the Court's Proposed Plan, in the form of detailed replies, letters to the Court, and petitions, see id. ¶¶ 148-153, and countless concerned citizens have been telephoning the Court's chambers to express their views.[12]

After considering each of those objections, and balancing the need for each proposed modification against competing considerations, the Court modified its Proposed Plan where it deemed warranted. See generally Persily Aff. ¶¶ 154-159. The result of that process is the Court's Recommended Plan, which is attached to the Persily Affidavit at Appendix A.

## DISCUSSION

As explained above, the Three-Judge Panel set forth detailed instructions in its Referral Order to guide this Court in the redistricting process. See 2/28/12 Order of Referral at 3-4. First, the Recommended Plan must comport with the constitutional requirements of population equality and the Equal Protection Clause. See id. at 3. Second, the Recommended Plan must comply with the mandates of the Voting Rights Act of 1965, avoiding the twin ills of minority vote dilution and retrogression. See id. Third, the Recommended Plan must follow the traditional redistricting principles of compactness, contiguity, respect for political subdivisions,

---

Majority Defendants' Response to Order to Show Cause (Mar. 6, 2012) ("Assembly Maj. Def. OTSC Resp."), DE #185; Senate Minority Defendants' Response to Order to Show Cause (Mar. 6, 2012), DE #187; Assembly Minority Defendants' Response to Order to Show Cause (Mar. 7, 2012) ("Assembly Min. Def. OTSC Resp."), DE #193. No response was forthcoming from Plaintiffs, the Governor Defendants, or the Lee Intervenors.

[12] The written non-party responses included, but were not limited to, submissions on behalf of Voting Rights for All, discussing, *inter alia*, proposed districts in the Bronx and Manhattan; Hakeem Jeffries, Karim Camara, and Concerned Citizens of Fort Greene-Clinton Hill, discussing Proposed District 8; and Lincoln Restler, discussing Proposed District 7. See Persily Aff. ¶¶ 149-153.

and preservation of communities of interest.  See id.  Lastly, the Plan may incorporate

additional factors where appropriate and in accordance with the law.  See id.  This section of

the Report and Recommendation will review the existing law with respect to each of these

requirements, will measure the Recommended Plan against those factors, and will discuss the

extent to which permissive factors were employed.  Based on the analysis below, this Court

respectfully recommends that the Three-Judge Panel adopt the Recommended Plan in its

entirety.

## I.      Constitutional Constraints on Redistricting

### A.      *Equal Population*

Consistent with the Panel's Order of Referral, the Recommended Plan satisfies the

requirement of substantial population equality.  Article I, Section 2 of the United States

Constitution provides that the United States House of Representatives "shall be composed of

Members chosen . . . by the People of the several States," and that "[r]epresentatives . . . shall

be apportioned among the several States . . . according to their respective Numbers."  U.S.

Const. art. I, § 2.   The Supreme Court has interpreted this provision to mean that "as nearly

as is practicable one man's vote in a congressional election is to be worth as much as

another's."  See Wesberry v. Sanders, 376 U.S. 1, 7-8 (1964).  As a result, courts must

"make a good-faith effort to achieve precise mathematical equality."  Kirkpatrick v. Preisler,

394 U.S. 526, 530-31 (1969).  Indeed, a court-drawn plan is "held to higher standards than a

state's own plan" with respect to population equality.  Chapman v. Meier, 420 U.S. 1, 26

(1975).  As such, a court's "paramount objective" when faced with the task of redrawing

malapportioned congressional districts is to achieve absolute population equality.  See Karcher

-13-

v. Daggett, 462 U.S. 725, 732 (1983) (citing, *inter alia*, White v. Weiser, 412 U.S. 783, 793 (1973)).  Therefore, any variances in population between districts must be justified, and the Supreme Court has been loath to allow even *de minimis* variations in congressional redistricting plans.  See Karcher, 462 US. at 731-32; White, 412 U.S. at 790 n.8; Kirkpatrick, 394 U.S. at 533.

Based on the total New York population according to the 2010 Census, the ideal population for each of the new 27 congressional districts is 717,707.48 persons.  See Persily Aff. ¶ 103.  The increase from the 2000 Census's ideal district population of 654,360 to the 2010 ideal of 717,707 required each district to gain population.  See id. ¶ 104.  Moreover, the extent of the population deviations varied considerably among the districts, from a population shortfall of 105,869 in Existing District 28 to a shortfall of only 4,195 in Existing District 8. See id. ¶ 105, Table I.

In the Recommended Plan crafted by the Court, fourteen districts contain 717,707 persons, and thirteen districts contain 717,708 persons.  See id. ¶ 106.  Therefore, the Recommended Plan achieves "zero deviation," and meets the constitutional standard of population equality.  See id.

### B.    *Racial Gerrymandering*

The Recommended Plan also comports with the requirements of the Fourteenth Amendment to the United States Constitution, which prohibits both intentional and excessive uses of race in redistricting.  See Shaw v. Reno, 509 U.S. 630, 658 (1993).  First, the Equal Protection Clause prevents state actors engaged in redistricting from purposefully discriminating against a racial group by diluting its vote.  See City of Mobile v. Bolden, 446

-14-

U.S. 55, 66 (1980).  Second, the Supreme Court has held that a redistricting plan violates the

Equal Protection Clause where race is a "predominant factor motivating [a] decision to place a

significant number of voters within or without a particular district."  Miller v. Johnson, 515

U.S. 900, 916 (1995).  Courts have held that race was a "predominant factor" in redistricting

plans where "traditional race-neutral districting principles" were subordinated to

considerations of race.  Id.  Additionally, courts in this district have applied these mandates to

court-drawn plans.  See PRLDEF, 796 F.Supp. at 692.

Here, the Recommended Plan neither purposefully dilutes the vote of citizens on

account of race, nor does it contain any districts drawn predominantly on the basis of race.

See Persily Aff. ¶ 107.  Therefore, the Recommended Plan comports with the requirements of

the Fourteenth Amendment.

## II.  Statutory Constraints on Redistricting: the Voting Rights Act

The Three-Judge Panel's Order of Referral directs that the Recommended Plan "comply

with 42 U.S.C. § 1973(b) and with all other applicable provisions of the Voting Rights Act."

See 2/28/12 Order of Referral at 3.  Sections 2 and 5 of the Voting Rights Act of 1965  are

designed to protect against two principal problems:  minority vote dilution and retrogression in

the electoral position of minorities.  As explained below, the Recommended Plan complies

with the requirements of the Voting Rights Act, and "neither retrogresses nor dilutes the vote

of any citizens on account of race."  See Persily Aff. ¶ 108.

### A.    Section 2: Vote Dilution

Section 2 of the Voting Rights Act ("VRA"), 42 U.S.C. § 1973, is designed to protect

against, among other things, redistricting that has the effect of diluting the voting power of

racial or language minority groups, which may occur through over-concentration ("packing") or excessive dispersion ("cracking") of those groups within or across voting districts. <u>See</u> Persily Aff. ¶ 17. Section 2 provides:

> (a) No voting qualification or prerequisite to voting or standard, practice or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.
>
> (b) A violation of subsection (a) of this section is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivisions are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973 (emphasis in original). Section 2 claims apply equally to state-drawn and court-drawn redistricting plans. <u>See</u> <u>Rodriguez I</u>, 2002 WL 1058054, at *4; <u>PRLDEF</u>, 796 F.Supp. at 688.

In order to determine whether there has been minority vote dilution in violation of Section 2, a court must analyze whether the plaintiff challenging the redistricting plan has met the multi-prong test set forth in <u>Thornburg v. Gingles</u>, 478 U.S. 30, 50 (1986). The <u>Gingles</u>

factors require a plaintiff to establish that, within a challenged district,[13] (1) the minority group is "sufficiently large and geographically compact to constitute a majority"[14]; (2) the minority group is "politically cohesive"; and (3) the majority votes "sufficiently as a bloc to enable it – in the absence of special circumstances . . . – usually to defeat the minority's preferred candidate." Id. at 51.

If a plaintiff fails to establish these factors, then compliance with Section 2 does not require the creation of a new majority-minority district. However, if a plaintiff establishes each of the three Gingles factors, the court must then determine whether, under the "totality of the circumstances," the relevant minority group in the challenged district has "less opportunity . . . to elect representatives of their choice," Gingles, 478 U.S. at 36 (quoting Section 2), taking into consideration a wide array of historical, political, and procedural factors. See Persily Aff. ¶ 20 n.1. One factor that cuts against a finding of improper vote dilution is "proportionality," which occurs when "minority groups constitute effective voting majorities in a number of . . . districts substantially proportional to their share in the population." Johnson v. De Grandy, 512 U.S. 997, 1024 (1994). Nevertheless, the mere fact of

---

[13] Although the Gingles opinion itself dealt with only multi-member districts, the Supreme Court, in Growe v. Emison, 507 U.S. 25, 40 (1993), extended the application of the Gingles test to single-member districting.

[14] See Bartlett v. Strickland, 556 U.S. 1, 20 (2009) (requiring a minority group to constitute a majority of a potential district to establish a Section 2 claim). However, as explained in the Persily Affidavit, a Section 2 analysis raises challenging questions with respect to methods of classifying and measuring the size of minority groups. See Persily Aff. ¶¶ 24-32. To address this challenge, the Office of Management and Budget has set forth guidelines for civil rights enforcement, and the Supreme Court has applied an approach consistent with the those guidelines. See Georgia v. Ashcroft, 539 U.S. 461, 473 n.1 (2003).

proportionality with respect to one minority group does not insulate a state from a Section 2 challenge where, in seeking to achieve proportionality, a redistricting plan has the effect of diluting the voting strength of another minority group.  See Persily Aff. ¶ 21.

### B.  *Section 5: Retrogression*

Section 5 of the VRA requires certain "covered" jurisdictions to obtain advance clearance from either the United States Department of Justice ("DOJ") or the United States District Court for the District of Columbia before implementing any change in a "standard, practice, or procedure with respect to voting."  See 42 U.S.C. § 1973c.  The Supreme Court has held that a new municipal, state, or congressional redistricting plan qualifies as such a change.  See Beer v. United States, 425 U.S. 130, 133 (1976); see also Rodriguez v. Pataki, 308 F.Supp.2d 346, 358 (S.D.N.Y. 2004) ("Rodriguez II") (three-judge court); Flateau, 537 F.Supp. at 261.

In New York, legislatively enacted voting-related changes in three counties – Bronx, Kings, and New York – are covered by Section 5.  See Rodriguez II, 308 F.Supp.2d at 358.  However, Section 5 does not apply to court-drawn redistricting plans.  See Connor v. Johnson, 402 U.S. 690, 691 (1971).  Nevertheless, the Supreme Court has instructed district courts to adhere to the standards set forth in Section 5 and the relevant caselaw when constructing new redistricting plans.  See also Abrams v. Johnson, 521 U.S. 74, 96 (1997) (citing McDaniel v. Sanchez, 452 U.S. 130, 149 (1981)).

By its terms, Section 5 requires that redistricting plans must neither have "the purpose nor . . . the effect of denying or abridging the right to vote on account or race, or color, or [language minority]."  42 U.S.C. § 1973c(a).  The "purpose" standard prohibits redistricting

motivated by "any discriminatory purpose" (rarely applicable in the court-drawn setting), id. §

1973c(c), while the "effect" standard prohibits changes "that would lead to a retrogression in

the position of racial minorities with respect to their effective exercise of the electoral

franchise." Beer, 425 U.S. at 141. The Voting Rights Act Reauthorization Act of 2006

further clarifies that

> [a]ny voting qualification or prerequisite to voting, or standard,
> practice, or procedure with respect to voting that has the purpose
> of or will have the effect of diminishing the ability of any citizens
> of the United States on account of race or color, or in
> contravention of the guarantees set forth in section 1973b(f)(2) of
> this title, to elect their preferred candidates of choice denies or
> abridges the right to vote within the meaning of subsection (a) of
> this section.

42 U.S.C. § 1973c(b).

In short, to determine whether retrogression has occurred, courts must ascertain

whether a particular redistricting plan has the effect of "diminishing [minorities'] ability . . . to

elect their preferred candidates of choice." Id. This requires the Court to compare the new

plan with a "benchmark" plan. See Reno v. Bossier Parish Sch. Bd., 520 U.S. 471, 478

(1997).

### C.    *Analysis of the Recommended Plan*

In formulating both its Proposed Plan and its Recommended Plan, the Court and its

redistricting consultant reviewed and compared the racial data revealed in the 2010 Census, as

well as the submissions and objections of parties and non-parties, and drew on Dr. Persily's

personal expertise from prior redistricting efforts in New York. See Persily Aff. ¶ 109. With

respect to Section 2 compliance, the Recommended Plan "maintains the majority-minority

districts in the [e]xisting [p]lan," which was enacted by the state legislature in 2002 (the "Existing Plan"); however, given "the loss of two districts, the need to reach population equality in every district, and the different rates of growth of different racial groups, some change in district demographic statistics was unavoidable." Id. ¶ 111. With respect to districts touching the three counties covered by Section 5, the Recommended Plan "keeps the demographic composition of the districts largely the same . . . ." Id. ¶ 115.

As more fully explained in the Persily Affidavit, the Recommended Plan avoids retrogression and dilution in all three covered counties. First, in the Bronx, the Recommended Plan adds one more majority-Hispanic voting age population ("VAP") congressional district to the state's total, and otherwise retains substantially similar demographic compositions in the county's three additional districts. See Persily Aff. ¶¶ 116-118. Second, New York County retains two districts with significant minority populations, neither of which experiences retrogression or dilution under the Recommended Plan. See id. ¶¶ 119-121. Third, despite differential rates of population growth among racial and ethnic groups in Kings County (Brooklyn), the Recommended Plan is neither diluting nor retrogressive.[15] See id. ¶¶ 122-126.

Lastly, under the Recommended Plan, the districts in Queens County, which is not covered by Section 5, comply with Section 2 of the VRA, and now include Proposed District

---

[15] Given the population shifts in Kings County, a few points deserve mention. Notably, all of the multi-district plans submitted to the Court -- including the Unity Map proffered by the Drayton, Lee, and Ramos Intervenors -- reflect districts with declines in minority population shares similar to the Recommended Plan. See Persily Aff. ¶ 122. However, although the Recommended Plan's Proposed District 9 experienced a decrease from 57.5% to 55.0% Black VAP share, and Proposed District 8 experienced a decrease in its Black VAP share from 64.8% to 56.0%, both districts remain majority-Black, and any diminution in voting power is a product of "differential rates in population growth." See id.

6, a new compact district in central Queens that is majority-minority (at 60.1% minority VAP) and plurality-Asian (at 38.8% VAP).  See id. ¶¶ 127-129.

## III.    Traditional Redistricting Principles

The Three-Judge Panel directed the Court to create districts that, to the extent possible, are "compact, contiguous, respect political subdivisions, and preserve communities of interest."  See 2/28/12 Order of Referral at 3.  Furthermore, the Panel authorized the undersigned to "consider other factors and proposals submitted by the parties, which, in the magistrate judge's view, are reasonable and comport with the Constitution and applicable federal and state law."  Id.  These traditional redistricting factors arise from two primary sources: state policy and caselaw involving charges of racial gerrymandering.

First, with respect to state policy, the Supreme Court has held that "whenever adherence to state policy does not detract from the requirements of the Federal Constitution, . . . a district court should . . . honor state policies in the context of congressional reapportionment."  White, 412 U.S. at 795.  The Court defined state policy as "the policies and preferences of the State, as expressed in statutory and constitutional provisions or in the reapportionment plans proposed by the state legislature."  Id.  The New York State Constitution requires that state senate districts "be in as compact form as practicable, . . . and shall at all times consist of contiguous territory," and district lines generally should not divide counties, towns, or blocks.  See N.Y. Const. art. III, § 4.  Assembly districts, too, must be "of convenient and contiguous territory in as compact form as practicable."  Id. § 5.  Further, New York State Election Law requires election districts, among other requirements, to "be in compact form . . . ."  N.Y. Elec. Law § 4-100(3)(a).  And, while the state constitutional

provisions are couched in terms of delineating districts for the two bodies of the state legislature, the New York Court of Appeals has made clear that the "standards for State legislative and congressional apportionment are substantially the same." See Schneider v. Rockefeller, 31 N.Y.2d 420, 428 (1972) (quoted in Diaz v. Silver, 978 F.Supp. 96, 127 (E.D.N.Y. 1997)).

Second, violations of redistricting principles, such as the factors enumerated in the Panel's 2/28/12 Order of Referral, may trigger charges of racial gerrymandering in violation of the Equal Protection Clause. As stated above, a redistricting plan violates the Equal Protection Clause where race was a "predominant factor" in redistricting decisions. See Miller, 515 U.S. at 916. Thus, where "the legislature subordinated traditional race-neutral districting principles . . . to racial considerations," a court will find that race was a "predominant factor," and will subject the redistricting plan to strict scrutiny. Id.

Federal courts in New York have recognized a number of these race-neutral redistricting principles, including "(i) compactness, contiguity, and respect for pre-existing political subdivisions . . . ; and (ii) preservation of municipal boundaries, maintenance of the cores of existing districts, communities of interest, and political fairness." Rodriguez I, 2002 WL 1058054, at *4 (citing Miller, 515 U.S. at 918; PRLDEF, 796 F.Supp. at 691).

In drafting its Recommended Plan, the Court applied the mandatory redistricting factors set forth in the Three-Judge Panel's 2/28/12 Order of Referral, and, where appropriate, applied the additional permissive factor of respecting district population "cores." See Persily Aff. ¶¶ 130-142. The following subsections will review each principle in turn.

### A.    Compactness

Compactness is a well-established, traditional redistricting criterion in New York State. Rodriguez I, 2002 WL 1058054, at *4; Diaz, 978 F.Supp. at 126-27; see also N.Y. Const. art. III, §§ 4-5.  In addition, the Supreme Court has recognized the importance of compactness in redistricting.  See, e.g., Bush v. Vera, 517 U.S. 952, 962 (1996); Shaw v. Hunt, 517 U.S. 899, 905-06 (1996).  Nevertheless, courts and experts alike have not accepted any single measure of compactness; "[r]ather, compactness is an aesthetic as well as a geometric quality of districts," drawn from various tests.  See Persily Aff. ¶ 38.

Here, the Court's redistricting consultant applied eight different tests for compactness in analyzing the Recommended Plan.  See id. ¶ 130, App. D.  On the whole, in addition to avoiding irregular shapes, the districts in the Recommended Plan achieve compactness scores "superior to the proposals submitted by the parties and to the Existing Plan."  Id. ¶ 130.

### B.    Contiguity

The second traditional redistricting principle the Panel directed this Court to consider is contiguity.  See 2/28/12 Order of Referral at 3.  The principle of maintaining district contiguity is well-established.  See Shaw v. Reno, 509 U.S. at 647; PRLDEF, 796 F.Supp. at 691.  In brief, a district is contiguous when an individual may travel between any two points in a district without crossing through a second district.  See Persily Aff. ¶ 43.  However, the Supreme Court and courts in New York have also long noted that a body of water bisecting a district does not necessarily violate a state's contiguity standard.  See Lawyer v. Dep't of Justice, 521 U.S. 567, 581 n.9 (1997) (recognizing a Florida state court's holding that a body of water did not violate contiguity); Schneider, 31 N.Y.2d at 430 (citation omitted).

Here, all of the districts in the Recommended Plan are contiguous.  See Persily Aff. ¶ 132; see also id. App. A.

### C.    Respect for Political Subdivisions

The third factor outlined in the Order of Referral involves respecting existing political subdivisions.  See 2/28/12 Order of Referral at 3.  These subdivisions include the boundaries of counties, cities, towns, and villages.  See Miller, 515 U.S. at 908; PRLDEF, 796 F.Supp. at 687.  The Supreme Court has noted the practical benefits – both to constituents and their representatives – of including whole political subdivisions within districts.  See Bush, 517 U.S. at 974.  In addition, avoiding splits within political subdivisions provides administrative benefits during elections.  Id.

Here, the Recommended Plan preserves, to the extent practicable, political subdivision boundaries in New York State.  Indeed, the Recommended Plan splits fewer counties and towns than the Existing Plan, keeping six additional counties, and five additional towns, whole.  See Persily Aff. ¶¶ 133-135, App. J.  Therefore, the Recommended Plan shows sufficient respect for the political subdivisions of New York State.

### D.    Preservation Communities of Interest

The fourth traditional redistricting principle that the Three-Judge Panel identified in its Referral Order was the preservation of communities of interest.  See 2/28/12 Order of Referral at 3.  Unlike the above-mentioned traditional redistricting principles, however, the New York State Constitution is silent on the issue of communities of interest.  Nevertheless, courts in this Circuit have characterized the preservation of communities of interest as "a legitimate goal in creating a district plan."  See Diaz, 978 F.Supp. at 123; see also Rodriguez I, 2002 WL

1058054, at *4.  Likewise, the Supreme Court has recognized that respecting "communities defined by actual shared interests" is a traditional redistricting principle.  See Miller, 515 U.S. at 916.  A community of interest exists "where residents share substantial cultural, economic, political, and social ties."  Diaz, 978 F.Supp. at 123.  Importantly, nothing in the law precludes the coexistence of distinct communities of interest.

The identification of such communities presents a particularly complex challenge.[16]  In Miller v. Johnson, the Supreme Court noted that a state may recognize communities of interest based on racial makeup so long as the state's "action is directed toward some common thread of relevant interests."  515 U.S. at 920.  Nevertheless, a state's ability to consider race in defining communities of interest is cabined by equal protection concerns.  Id.  ("[W]here the State assumes from a group of voters' race that they 'think alike, share the same political interests, and will prefer the same candidates at the polls,' it engages in racial stereotyping at odds with equal protection mandates.") (citing, inter alia, Shaw, 509 U.S. at 647).  In short,

---

[16] As Dr. Persily explained:

> Respecting communities of interest is both an essential and slippery consideration in redistricting processes.  In one respect, redistricting is about representation of communities.  Communities that are split between districts often view their voice as diminished. In another respect, arguments based on communities of interest can often be pretexts for incumbency or partisan-related considerations.  Moreover, community boundaries are inherently amorphous, contested, shifting and conflicting.  By respecting one community's boundaries or some advocates' conception of their community, a redistricting plan might conflict with other advocates' conception of their community or with another community's boundaries.

Persily Aff. ¶¶ 52-53 (numbering omitted).

racial considerations may not be a "predominant factor motivating" redistricting decisions. Miller, 515 U.S. at 916. Of course, communities of interest need not be based on race, ethnicity, or nationality – for example, courts have recognized communities of interest based on socioeconomic factors. See Lawyer, 521 U.S. at 581 (recognizing a community of interest where "[e]vidence indicated that District 21 comprises a predominantly urban, low-income population, . . . whose white and black members alike share a similarly depressed economic condition . . . and interests that reflect it.") (internal citations omitted).

The challenges of defining and accommodating communities of interest are particularly acute in a region as diverse and dynamic as New York City and its environs. Courts have noted the difficulties in defining single Black, Pan-Asian, and Latino communities of interest. See Diaz, 978 F.Supp. at 124-25. Moreover, in his presentation during the March 5th public hearing, Defendant Roman Hedges, of LATFOR, described the complexities encountered in drawing community-based districts in areas such as the Bronx and Queens, which are characterized by the expansion and overlapping nature of the Hispanic and Asian-American communities:

> There is a tension between expanding the Asian community and
> expanding the Hispanic community, you can't do both
> simultaneously . . . . And I think one thing that needs to be
> added . . . is [that] . . . the problem got a lot harder for a really,
> really positive good reason. We have a lot less residential
> segregation than we did ten years ago[, and] that makes
> districting by community . . . really hard. That's even true for
> the black communities of New York. They're less residentially
> segregated than they were 10 years ago. Not as much as the
> Asians and Hispanic[s], but nevertheless, that's happening.
> That's positive and it makes these tensions as you are drawing
> districts harder and harder.

With these challenges in mind, and recognizing the practical impossibility of accommodating all communities of interest, the Recommended Plan respects "certain widely recognized, geographically defined communities." See Persily Aff. ¶ 137. In the Upstate regions, the Recommended Plan delineates "coherent North Country and Southern Tier districts," and "three compact districts surrounding the large metropolitan areas -- Buffalo, Rochester and the Capitol Cities area"; it also creates a separate lower Hudson Valley district. See id. ¶ 138. In New York City, the Recommended Plan retains the Existing Plan's separation of the East and West Sides of Manhattan, keeps Harlem whole, and keeps the South Bronx almost entirely within one district. See id. ¶ 139. Moreover, the Recommended Plan unites many Asian-American communities in Queens in Proposed District 6, and – responding to suggestions concerning the Proposed Plan – "attempts to unite Fort Greene and Clinton Hill with similar communities of interest" in Proposed District 8. See id. Finally, the Recommended Plan respects communities of interest in the Southern and Northern areas of Long Island. See id. ¶ 140.

### E. Other Factors

The Referral Order authorizes this Court to "consider other factors . . . which . . . are reasonable and comport with the Constitution and applicable federal and state law." 2/28/12 Order of Referral at 3. In drafting the Recommended Plan, the Court took into account – to the extent that it did not interfere with the Three-Judge Panel's explicit directives – the preservation of "core constituencies." However, for the reasons stated below, the Court did not consider incumbency in the drafting process.

### 1. Core Constituencies

While not expressly outlined in the Panel's Referral Order, a number of parties and non-parties have urged the Court to maintain the "cores" of existing districts. See Senate Majority Defendants Letter (Feb. 29, 2012) at 1-2 ("Sen. Maj. 2/29/12 Let."), DE #145 at 1-2 (equating core preservation with incumbency protection); Rose Intervenors' Mem. on Proposed Map and its Compliance with Redistricting Principles (Feb. 29, 2012) ("Rose 2/29/12 Mem."), DE #141 at 13-14; Assembly Majority Defendants' Mem. of Law (Mar. 2, 2012) ("Assembly Maj. 3/2/12 Mem.") at 2, DE #153; Rose 3/2/12 Mem. at 5-6, DE #171; Letter of Rep. Yvette D. Clarke (Mar. 7, 2012), at 2-3, DE #222; Letter of Keith L.T. Wright (Mar. 7, 2012), at 2, DE #222. The parties and non-parties advocating for "core" protection proffered four primary justifications: (1) protecting incumbents, (2) preserving communities of interest, (3) deferring to past legislative decisions, and (4) deferring to state policy. Insofar as the first two justifications – and their attendant challenges – are discussed more fully elsewhere in this opinion, this subsection will focus on the justifications based on deference.

### a. *Perry* Deference

The first rationale in support of deference asks whether this Court, pursuant to Perry v. Perez, is required to adopt a "least change" approach when redistricting, under which it respects the "cores" of the districts set forth in the Existing Plan enacted ten years ago, long prior to the 2010 Census.

In Perry v. Perez, the Supreme Court held that it was error for a district court to displace "legitimate state policy judgments with the court's own preference" by neglecting a recently enacted, but not DOJ-precleared, legislative redistricting plan. 132 S.Ct. at 941. In

so holding, the Court stated that "a district court should take guidance from the State's recently enacted plan" when drafting its own plan, since the state's plan "provides important guidance that helps ensure that the district court appropriately confined itself to drawing interim maps that comply with the Constitution and the Voting Rights Act, without displacing legitimate state policy judgments with the court's own preferences." Id. at 941.

However, the Perry Court also distinguished its facts from those of Balderas v. Texas, where, as here, a three-judge court was faced with an unconstitutional existing congressional district plan and a legislature that had failed to enact a new plan. See id. at 943 (citing Balderas v. Texas, No 6:01cv158, 2001 U.S. Dist. LEXIS 25740 (E.D. Tex. Nov. 14, 2001) (three-judge court) (per curiam), summarily aff'd, 536 U.S. 919 (2002)). In deciding that it would develop a plan based on neutral redistricting principles rather than confining itself to any existing plan, the lower court in Balderas noted that "[f]ederal courts have a limited role in crafting a congressional redistricting plan where the State has failed to implement a plan," but that "those limits are not to be found in the traces of the unconstitutional plan being replaced." Balderas, 2001 U.S.Dist. LEXIS 25740, at *11. The Supreme Court summarily affirmed Balderas, see 536 U.S. 919 (2002), and while its decision in Perry may have distinguished Balderas, it did not disapprove its reasoning. As Perry noted, the Balderas court – much like the Court here – was compelled to create its own plan because "there was no recently enacted state plan to which the District Court could turn." Perry, 132 S.Ct. at 943.

Here, as the Three-Judge Panel held in denying Defendants' motions to dismiss, "it is apparent that the 2010 census results have made the current plan unusable and violative of voters' rights due to population reductions and shifts resulting in unequal districts." 3/8/12

M&O at 10, DE #219.  Moreover, "it is clear that there is no legislative redistricting plan in existence as to the congressional districts and none that will be forthcoming soon." Id. at 14. As such, where constitutional infirmities infect the entire Existing Plan, any deference other due under Perry – and by extension to the cores of the Existing Districts – does not apply in this case.

**b.**    ***Upham* Deference**

The second articulated justification for deference turns on whether core preservation is in fact one of the legislative policies to which the Court must defer under Upham v. Seamon, 456 U.S. 37, 40-43 (1982).  As noted *supra*, the New York State Constitution requires state legislatures engaged in redistricting to create compact and contiguous districts that respect certain political subdivisions.  See N.Y. Const. art. III §§ 4-5.  The New York State Constitution does not, however, mandate that new districts maintain the cores of prior districts. In any event, this Court is not persuaded that there is in fact a consistent state legislative policy of maintaining district cores.

First, dramatic population shifts in the last 30 years have cost New York State a total of twelve congressional seats.  Compare Flateau, 537 F.Supp. at 260 (noting New York's decline from 39 to 34 congressional representatives following the 1980 Census), with PRLDEF 796 F.Supp. at 684 (New York's congressional delegation was reduced from 34 to 31 members following the 1990 Census), Rodriguez I, 2002 WL 1058054, at *1 (noting New York's decline to 29 congressional representatives following the 2000 Census), and 3/8/12 M&O at 10 (noting New York's decline from 29 to 27 congressional representatives following the 2010 Census).  Maintaining cores in the wake of such a decline is, practically speaking,

extraordinarily difficult. As such, with each decennial redistricting process comes a new round of constitutionally required and significant changes to the existing lines.

Second, the record suggests that, to the extent that there are in fact district "cores," they are more likely the product of political deal-making – an activity for which courts are ill-suited[17] – than a conscious attempt to advance "core preservation" as a legislative policy. See, e.g., 3/5/12 Tr. at 81 (Defendant Hedges of LATFOR acknowledges that the existing district configurations in Upstate New York were the result of a political compromise in 2002 and not a policy of respecting the districts' prior cores). Nevertheless, in the past, courts in this Circuit have recognized core preservation as a traditional redistricting principle. See Rodriguez I, 2002 WL 1058054, at *4 (citing PRLDEF, 796 F.Supp. at 691).

In this case, endeavoring to preserve the cores of the districts from the legislatively brokered 2002 plan was especially challenging, given various "bizarrely shaped districts in the [E]xisting [P]lan," see Persily Aff. ¶ 59. Further, because core preservation is a permissive consideration, it was applied in the Recommended Plan only "[t]o the extent doing so [did] not conflict with the other criteria identified in the [Panel's] Order." See Persily Aff. ¶ 59.

Despite the obstacles noted above, the Recommended Plan achieves substantial core preservation. "Overall, one of the Recommended Plan's districts is comprised of 90% of a prior district, five districts are comprised of between 80% and 90% of a prior district, seven districts are comprised of between 70% and 80% of a prior district, three districts are

---

[17] "The federal courts by contrast possess no distinctive mandate to compromise sometimes conflicting state apportionment policies in the people's name." Connor v. Finch, 431 U.S. at 415.

comprised of between 60% and 70% of a prior district, four districts are comprised of between 50% and 60% of a prior district, and seven districts are comprised of less than 50% of a prior district." Id. ¶ 142.

## 2. Incumbency

In an argument echoed by the Rose Intervenors, the Senate Majority contends that "incumbency protection is an appropriate factor for the Court to consider in drawing redistricting maps." Sen. Maj. 2/29/12 Let. at 1, DE #145; see Rose 3/2/12 Mem. at 4-5, DE #171. More specifically, those parties complain that the Proposed Plan circulated by the Court on March 5th "violate[d] the New York redistricting principle of . . . respecting incumbent-constituent relationships," Rose Supplemental OTSC Response (Mar. 7, 2012) ("Rose Sup. OTSC Resp.") at 3-4, DE #215, and resulted in two or more incumbents (or "incumbent pairings") in each of several proposed districts. See id. at 5; see also Senate Majority OTSC Response (Mar. 7, 2012) ("Sen. Maj. OTSC Resp.") at 2, DE #192.[18] Plaintiffs, in contrast,

---

[18] Although the Assembly Majority and Assembly Minority also advocated for protection of incumbents, see Assembly Maj. 3/2/12 Mem. at 5-8, DE #153; Assembly Minority Letter (Feb. 29, 2012) ("Assembly Min. 2/29/12 Let.") at 3, DE #137, they thereafter did not object to the Court's recommending its Proposed Plan to the Three-Judge Panel. See Assembly Maj. Def. OTSC Rep., DE #185; Assembly Min. Def. OTSC Resp., DE #193.

Several of the parties have used the terms "incumbency protection" and "[p]reserv[ation of] the cores of existing districts" interchangeably. See, e.g., Sen. Maj. 2/29/12 Let. at 1, DE #145. While those two concepts may be related, this Court declines to equate them. In fashioning the Recommended Plan, the Court attempted to respect the "cores" of existing districts, to the extent that doing so did not conflict with the factors specifically enumerated by the Three-Judge Panel and afforded greater weight in the caselaw. See generally supra pp. 28-32. One may reasonably infer that, while the Court's Recommended Plan reportedly leaves several incumbents outside the boundaries of their existing districts, at least some of those incumbents reside near the fringes of those districts, not their geographical cores.

have urged this Court to adopt the approach taken by Special Master (now Judge) Robert P. Patterson, Jr., in Flateau v. Anderson, No. 82 Civ. 0876 (VLB) (S.D.N.Y. 1982), and "exclude considering incumbency in preparing its redistricting plans." Pl. 3/2/12 Mem. at 5, DE #166 (citing Flateau Special Master Report at 12-13, DE #100-8).

The Referral Order of the Three-Judge Panel directed this Court to consider and reconcile certain enumerated criteria: equality in population among the districts, compactness, contiguity, respect for political subdivisions, preservation of communities of interest, and compliance with the Voting Rights Act. See 2/28/12 Order of Referral at 3. The Panel then afforded this Court discretion to "consider other factors" -- such as incumbency -- if found to be "reasonable" and consistent with "the Constitution and applicable federal and state law." Id.; see also 2/27/12 Panel Minute Entry (Panel directs the parties to submit briefs to the magistrate judge on "[t]he issue of incumb[e]ncy").

The parties thereafter filed written submissions on incumbency, as did several members of the public, who lobbied for protection of their preferred incumbents. See, e.g., Assembly Min. 2/29/12 Let. at 3-4, DE #137; Sen. Maj. 2/29/12 Let. at 1-3, DE #145; Assembly Maj. 3/2/12 Mem. at 2-8, DE #153; Rose 3/2/12 Mem. at 4-5, DE #171; Rose Sup. OTSC Resp. at 1,3-5, DE #215. Additionally, the incumbency issue was a focal point of the March 5th hearing before this Court. See, e.g., 3/5/12 Tr. at 11-17, 56-62, 65-71, 76-78, 82, 88-90, 104, 106-07, 112-13, 115, 146-47, 148-51, 153. After considering and weighing all the competing legal and equitable arguments, the Court concluded that the creation of a redistricting plan that ignored incumbency would enhance both the reality and appearance of judicial impartiality, and would be entirely consistent with governing caselaw. Consequently,

the Court did not obtain from LATFOR the addresses of any incumbents' residences, see, e.g., Order (Mar. 1, 2012), and the Court's March 5th Proposed Plan, and the subsequently revised Recommended Plan, were both created without regard to incumbency.[19]

Admittedly, the Supreme Court has identified incumbency protection as a permissible factor in fashioning redistricting maps. See, e.g., Bush, 517 U.S. at 964 (recognizing "incumbency protection, at least in the limited form of avoiding contests between incumbents, as a legitimate state goal") (internal quotation and alteration omitted); Karcher, 462 U.S. at 740 (describing the goal of "avoiding contests between incumbent Representatives" as one of a number of "legitimate objectives that on a proper showing could justify minor population deviations"); White, 412 U.S. at 791 ("[T]he fact that district boundaries may have been drawn in a way that minimizes the number of contests between present incumbents does not in and of itself establish invidiousness.") (citation and internal quotation omitted).[20]  And courts in this Circuit have observed that "the powerful role that seniority plays in the functioning of Congress makes incumbency an important and legitimate factor *for a legislature* to consider."

---

[19]  To this day, the Court does not know where incumbents live, except as reported (in general terms) in the parties' submissions and in the media.

[20]  The parties urging incumbency protection also rely on language in a series of out-of-circuit cases. See Assembly Maj. 3/2/12 Mem. at 6-7, DE #153; Sen. Maj. 2/29/12 Let. at 2, DE #145; Colleton Cnty. Council v. McConnell, 201 F.Supp.2d 618, 647 (D.S.C. 2002) (three-judge court); Smith v. Clark, 189 F.Supp.2d 529, 545 (S.D. Miss. 2002) (three-judge court); Johnson v. Miller, 922 F.Supp. 1556, 1565 (S.D. Ga. 1995) (three-judge court), aff'd sub nom. Abrams v. Johnson, 521 U.S. 74 (1997); Arizonans for Fair Representation v. Symington, 828 F.Supp. 684, 688 (D. Ariz. 1992) (three-judge court), aff'd mem., 507 U.S. 981 (1993); Prosser v. Elections Bd., 793 F.Supp. 859, 871 (W.D. Wis. 1992) (three-judge court); South Carolina State Conf. of Branches of NAACP v. Riley, 533 F.Supp. 1178, 1180-81 (D.S.C.) (three-judge court), aff'd mem., 459 U.S. 1025 (1982).

Diaz, 978 F.Supp. at 123 (emphasis added); see also Rodriguez II, 308 F.Supp.2d at 370 (legislatively drawn plan reflected permissible policy of limiting incumbent pairing). Nevertheless, it does not follow that a court-drawn redistricting plan must -- or even should -- take incumbency into account. "Many factors, such as the protection of incumbents, that are appropriate in the legislative development of an apportionment plan have no place in a plan formulated by the courts." Wyche v. Madison Parish Police Jury, 769 F.2d 265, 268 (5th Cir. 1985).

The advocates of incumbency protection describe it as "state policy," 3/5/12 Tr. at 77, and a "well-established, traditional districting principle in New York," Sen. Maj. 2/29/12 Let. at 1, DE #145, to which the Court should defer in preparing its own redistricting plan. Had the New York State Legislature done its job and passed its own redistricting plan, judicial deference would be paid. See Perry, 132 S.Ct. at 941; see also supra pp. 28-30. However, the state legislature has been stalemated since the 2010 Census, and the plan enacted in 2002 was found constitutionally infirm by the Three-Judge Panel. See 3/8/12 M&O at 10, DE #219. In these circumstances, it cannot be said that the Court simply steps into the shoes of the state legislators -- who, by "tradition," regularly engage in the kinds of political deal-making and partisan compromises that are incompatible with the role of a judicial officer. As Judge Patterson explained in refusing to consider "continuity of constituencies" and "political fairness" in crafting New York's congressional redistricting plan in 1982:

> [W]hile considerations of "political fairness" may well be
> appropriate in approving a legislative plan, they may not be
> appropriate for a court fashioning its own apportionment plans,
> absent an articulated and rational basis in the statutes or
> Constitution. These considerations are not included in the
> Court's criteria and I have concluded that I should not use such a
> criterion as it may place the Court in the tenuous position of
> appearing to serve partisan political interests. For the same
> reason, while I recognize that some courts have made allowance
> for the protection of incumbents in drawing their plans, the plans
> I submit have not done so.

Flateau Special Master Report, at 13-14, DE #100-8; see also Good v. Austin, 800 F.Supp.

557, 563 (E. & W.D. Mich. 1992) (three-judge court) (court directed Special Master to

construct congressional redistricting plan without regard to incumbency).

Furthermore, having analyzed the rationale for judicial unpairing of incumbents, the

Court finds it to be overstated. Contrary to the arguments advanced to the Court, see, e.g.,

Assembly Maj. 3/2/12 Mem. at 7, DE #153; Assembly Min. 2/29/12 Let. at 3, DE #137, an

incumbent whose residence happens to fall outside the judicially drawn boundaries of her

congressional district will not be deprived of the opportunity to serve her constituents, nor will

her constituents be deprived of the opportunity to vote for her (provided she decides to run).

The only residency requirement for congressional candidates is that they reside within the state

in which the district lies. See U.S. Const. art. I, § 2; 3/5/12 Tr. at 57.[21] Consequently, when,

as a result of redistricting, an incumbent finds herself outside her old district and "paired" with

another incumbent in a different district, the disappointed incumbent may nevertheless run for

_____

[21] Indeed, as noted in the Report and Plan of the Special Master in Rodriguez I, No. 02 Civ.
0618 (May 2002) at 16, at least one incumbent did not reside in her district even *prior to* the
redistricting plan being drawn in that case.

re-election in her former district.  <u>See</u> 3/5/12 Tr. at 58.

Accordingly, in the opinion of this judicial officer, courts need not and should not enter the political thicket in the service of preserving incumbent-constituent relationships and congressional seniority.  To be sure, the proponents of incumbency protection are probably correct that "people tend to want to live in the communities they represent." 3/5/12 Tr. at 59. But to make that argument, and to complain that "the incumbent shouldn't be handicapped," <u>id.</u> at 67, reveal the concept of incumbency protection for what it is: an attempt to protect the position of the politician, rather than the right of the voters to re-elect a preferred incumbent. If, as the advocates of incumbency protection so urgently argue, incumbents have come to know and understand the concerns of their district, thereby forging relationships with constituents that are worth maintaining, <u>see, e.g.</u>, Rose 2/29/12 Mem. at 12, DE #141; Assembly Min. 2/29/12 Let. at 3, DE #137, then an "outdistricted" representative should run for re-election on the basis of that relationship, and not on the particulars of her address. Unlike some parties to this action, who expressed concern that voters should not be "put . . . in the position of having to" weigh whether their interests will be adequately protected by an outdistricted incumbent, <u>see</u> 3/5/12 Tr. at 61, this Court trusts that voters can rationally decide whether to support an incumbent whose home happens to be in an adjoining district.

Finally, in light of the diminishing number of districts, it is undisputed that some incumbent pairings are inevitable.  <u>See</u> Assembly Min. 2/29/12 Let. at 3, DE #137; Rose 3/2/12 Mem. at 4, DE #171.  Consequently, if the Court were inclined to consider incumbency, it would then have to decide which incumbents should be unpaired.   No party

has proposed a neutral principle to guide the Court in making such a decision. On the contrary, different parties oppose different incumbent pairings. Not surprisingly, their challenges reflect partisan biases. Compare Rose Sup. OTSC Resp. at 5, DE #215 (complaining that the Proposed Plan of March 5th "pair[s] incumbent Representatives Hochul and Higgins," two Democrats), with Sen. Maj. OTSC Resp. at 2, DE# 192 (complaining that Representative Turner, a Republican, is paired in the district of Representative Meeks, a Democrat); see also 3/5/12 Tr. at 113 (accusing adverse parties of making "purely political" choice as to whom to leave paired). In the course of the legislative line-drawing process, lawmakers plainly can and do protect their own; this judge is not convinced that courts should follow that tradition of political horse-trading.

For all of these reasons, the Court has declined to exercise its discretion to consider incumbency in crafting its redistricting plan.

## IV.     Balancing the Competing Interests

In crafting its Recommended Plan, the Court has remained mindful of the sensitive and weighty nature of its obligation. See Connor, 431 U.S. at 415. Its primary focus, of course, is the law. The Plan must comport with the terms of the Panel's mandate, and ensure compliance with the state and federal Constitutions, the Voting Rights Act, and applicable caselaw. See 2/28/12 Order of Referral at 3. Consistent with the Panel's Order of Referral, the Court has also considered and attempted to reconcile the interests of New York's diverse and dynamic population. See id. at 4. This latter undertaking is usually – and rightly – left in the hands of the political branches. See Connor, 431 U.S. at 415. And yet, where, as here,

the legislature fails in its obligation to effectively protect the interests of the electorate, the Court is constrained to intervene in the redistricting process.  Id.

This Court undertook a number of steps in order to ensure a full, fair, and open process.  First, the court docket was made available to the public free of charge.  Second, the Court solicited public comment, which appeared in the form of non-party proposals, detailed objections to the Court's original Proposed Plan, and all manner of correspondence and other communications from interested members of the public.  See Order Regarding Public Submissions (Mar. 12, 2012), DE #222.[22]  Third, the Court held a lengthy hearing at which parties and non-parties were given the opportunity to present their views.  After reviewing all of these comments – written and oral – the Court formulated its Recommended Plan, and, where feasible, incorporated proposed revisions that enhanced the criteria identified by the Panel.  See Persily Aff. ¶¶ 143-159.

Nevertheless, having taken into consideration all of the party and non-party arguments, the Court remains unable to accommodate all competing interests.  The complex and divergent communities of interest in New York complicate any effort to satisfy all requests.  That is what makes the outpouring of responses over the course of the redistricting process both heartening and disheartening.  It is heartening to see such a vocal and impassioned expression of a broad array of interests from New Yorkers.  At the same time, it is disheartening to realize that, in the end, many concerned parties will be disappointed.  The Persily Affidavit demonstrates the

---

[22]Indeed, as of the filing of this Report and Recommendation, the Court continues to receive telephone calls from passionate voters from districts around the state.

challenges in making adjustments to a redistricting plan in response to objections:

> The accommodation of any change [in the Court's original Proposed Plan] required the exercise of discretion as to how to offset the suggested change in a manner least likely to be found objectionable to other parties or members of the public. Accommodating any change required the addition and subtraction of individual census blocks between districts in order to maintain precise population equality. This can be quite difficult, especially in densely populated areas, where census blocks often contain hundreds or even thousands of people.

Persily Aff. ¶ 156.

Moreover, standing firm in its commitment to nonpartisanship, the Court remained vigilant in rejecting those objections that were "more in the nature of political lobbying than in the nature of legal argument." PRLDEF, 796 F.Supp. at 695. Reconciling political arguments is not within the Court's ken, nor consistent with its institutional role.

Finally, the Court re-emphasizes the vital importance of procedural fairness in court-drawn redistricting. Here, the Court has opened its eyes and ears to the parties and public, and provided an opportunity for all interested individuals to have input into the redistricting process. In doing so, the Court aimed, as best as possible, to balance all the competing interests. This Court is confident that the process was fair and the result reasonable.

## CONCLUSION

For the reasons detailed above, and in the accompanying Persily Affidavit, it is the recommendation of this Court that the Three-Judge Panel adopt the Recommended Plan as the congressional redistricting plan for the State of New York.

Pursuant to the Three-Judge Panel's 2/28/12 Order of Referral, any and all objections

to this Report and Recommendation must be filed electronically no later than noon on March 14, 2012, and hard copies must be forwarded forthwith to the chambers of each of the three judges.

The Clerk of the Court is respectfully requested to enter this Report and Recommendation and the Persily Affidavit and accompanying Appendices into the ECF system.

**SO ORDERED.**

**Dated:**    **Brooklyn, New York**
            **March 12, 2012**

                                        **ROANNE L. MANN**
                                        **UNITED STATES MAGISTRATE JUDGE**