## AFFIDAVIT OF PROFESSOR NATHANIEL PERSILY, J.D., PH.D.

Nathaniel Persily, first being duly sworn, deposes and says the following:

1.      I am a citizen and resident of the State of New York.  I am currently the Charles Keller Beekman Professor of Law and Professor of Political Science at Columbia Law School, where I teach courses on election law, voting rights, redistricting and constitutional law. I am an expert in election law generally, and reapportionment and districting matters in particular. I have served as a special master or court-appointed expert to assist in drafting redistricting plans for the states of Connecticut, Georgia, Maryland, and New York.  I obtained Bachelors and Masters Degrees in Political Science from Yale University (1992), a Masters (1994) and Ph.D. (2002) in Political Science from the University of California at Berkeley, and a J.D. from Stanford Law School (1998).  I have written over twenty articles on redistricting and election law, several of which have been cited by state and federal courts, including the U.S. Supreme Court. My curriculum vitae is attached at Appendix K.

## BACKGROUND

2.      On February 28, 2012, the Three-Judge Panel (the "Court") composed of: the Honorable Reena Raggi and the Honorable Gerard E. Lynch, United States Circuit Judges of the United States Court of Appeals for the Second Circuit, and the Honorable Dora I. Irizarry, United States District Judge for the Eastern District of New York, entered an Order referring the task of creating a new congressional redistricting plan for the State of New York to the Honorable Roanne L. Mann, United States Magistrate Judge for the Eastern District of New York (the "Magistrate Judge").  *See* Order of Referral (Feb. 28, 2012) ("2/28/12 Order" or "Order"), Electronic Case Filing Document Entry ("DE") #133.

1

3.     The 2/28/12 Order provided that the Magistrate Judge shall submit her Report and Recommendation, along with her Recommended Plan ("Recommended Plan"), to the Court by March 12, 2012.

4.     The 2/28/12 Order empowered the Magistrate Judge to retain appropriate experts as reasonably may be necessary to accomplish her task within the time constraints imposed by the Order.  To that end, the Order appointed me as an expert to assist the Magistrate Judge in formulating a redistricting plan.

5.     I have reviewed the 2/28/12 Order appointing me and have prepared this affidavit in accordance with the Order's instructions and the instructions I received from the Magistrate Judge.

6.     The purposes of this affidavit are to inform the Court of the principles used in the preparation of the Recommended Plan, and to present a description and analysis of the Recommended Plan that may aid the Court in evaluating it.

7.     The data relied upon and analyzed here are of the kind usually relied upon by experts in this field to render opinions on the nature of redistricting of congressional districts.

8.     In fashioning the Recommended Plan, the Magistrate Judge and I drew upon my background and experience, as well as a review of various materials relating to the demography and geography of New York.

9.     We relied upon the data and materials collected and made available by the New York Legislative Task Force on Demographic Research and Reapportionment ("LATFOR"), located at 250 Broadway, New York, New York.

10.     The Recommended Plan was developed using my personal computers. The Recommended Plan was designed using Caliper Corporation's "Maptitude for Redistricting," with use of the Census Bureau's P.L. 94-171 data file as formatted by Caliper.

**PRINCIPLES GOVERNING THE RECOMMENDED PLAN**

11.     The Recommended Plan was prepared in adherence to applicable constitutional requirements and Sections 2 and 5 of the Voting Rights Act.

12.     The Recommended Plan was prepared in accordance with the 2/28/12 Order's direction that the Magistrate Judge must adhere to, and, where possible, reconcile the following guidelines:

a.     The plan will divide the state into 27 congressional districts in accordance with the 2010 federal Census and applicable law.

b.     Districts shall be substantially equal in population.

c.     Districts shall be compact, contiguous, respect political subdivisions, and preserve communities of interest.

d.     The plan shall comply with 42 U.S.C. § 1973(b) and with all other applicable provisions of the Voting Rights Act.

2/28/12 Order at 3.

13.     In addition to the guidelines identified in the above paragraph, the 2/28/12 Order stated that the Magistrate Judge "may consider other factors and proposals submitted by the parties, which, in the magistrate judge's view, are reasonable and comport with the Constitution and applicable federal and state law." 2/18/12 Order at 3.

3

## ELABORATION OF PRINCIPLES GOVERNING THE RECOMMENDED PLAN

### Legal Requirements

#### *The Constitutional Requirement of One Person, One Vote*

14.     The Supreme Court has construed Article I, § 2 of the Constitution to require a strict rule of population equality.  Under this requirement, colloquially referred to as one person, one vote, congressional districts must be equal "as nearly as is practicable," *Wesberry v. Sanders*, 376 U.S. 1, 7-8 (1964), which means that "the State [must] make a good-faith effort to achieve precise mathematical equality."  *Kirkpatrick v. Preisler*, 394 U.S. 526, 530-31 (1969).

15.     For congressional plans, the Supreme Court has rejected population deviations even well under one percent as violative of the one person, one vote rule.  *See*, *e.g.*, *Karcher v. Daggett*, 462 U.S. 725, 730-31 (1983).  Moreover, to the extent courts might permit some deviations from strict population equality in legislatively drawn plans based on a consistently applied state policy, *see id.* at 741 n.11, the Supreme Court has warned that court-drawn plans must be held to an even stricter standard of equality.  *See Chapman v. Meier*, 420 U.S. 1, 26 (1975) ("A court-ordered plan, however, must be held to higher standards than a State's own plan.").

#### *The Constitutional Prohibition on Racial Gerrymandering*

16.     The Equal Protection Clause of the Fourteenth Amendment to the Constitution (and, as applied to the federal government, the equal protection component of the Due Process Clause of the Fifth Amendment) prohibits both intentional race-based vote dilution and excessive use of race in the construction of districts.  As with all forms of state action, the Equal Protection Clause prohibits the use of the redistricting process purposefully to discriminate

4

against a racial group by diluting its vote.  *See City of Mobile v. Bolden*, 446 U.S. 55 (1980).

Beyond that, the Supreme Court has read into the Equal Protection Clause an "analytically

distinct claim" with respect to redistricting.  *See Shaw v. Reno*, 509 U.S. 630, 652 (1993).

Specifically, any district for which racial considerations serve as the predominant factor in its

construction is subject to strict scrutiny under the Equal Protection Clause.  *Miller v. Johnson*,

515 U.S. 900, 916 (1995).

### *Section 2 of the Voting Rights Act*

17.     Section 2 of the Voting Rights Act, 42 U.S.C. § 1973 (2006) (the "VRA"),

protects against even unintentional race-based vote dilution, including in the redistricting process.

Such dilution can occur either through overconcentration ("packing") or excessive dispersion

("cracking") of racial or language minority groups within or across voting districts.

18.     Section 2 of the VRA provides:

(a)     No voting qualification or prerequisite to voting or standard, practice, or
procedure shall be imposed or applied by any State or political subdivision in a
manner which results in a denial or abridgement of the right of any citizen of the
United States to vote on account of race or color, or in contravention of the
guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection
(b) of this section.

(b)     A violation of subsection (a) of this section is established if, based on the
totality of circumstances, it is shown that the political processes leading to
nomination or election in the State or political subdivision are not equally open to
participation by members of a class of citizens protected by subsection (a) of this
section in that its members have less opportunity than other members of the
electorate to participate in the political process and to elect representatives of their
choice. The extent to which members of a protected class have been elected to
office in the State or political subdivision is one circumstance which may be
considered: *Provided*, That nothing in this section establishes a right to have
members of a protected class elected in numbers equal to their proportion in the
population.

42 U.S.C. § 1973.

19.     The Supreme Court has clarified the criteria for proving illegal vote dilution under Section 2. In particular, it has required, as a threshold matter, that plaintiffs demonstrate the so-called *Gingles* prongs. *See Thornburg v. Gingles*, 478 U.S. 30, 50 (1986). *Gingles* and its progeny limit Section 2 lawsuits to situations in which (1) the minority group is "sufficiently large and geographically compact to constitute a majority" in a single-member district; (2) the minority group is politically cohesive; and (3) the majority votes "sufficiently as a bloc to enable it—in the absence of special circumstances . . . —usually to defeat the minority's preferred candidate." *Id*. at 50-51; *see Bartlett v. Strickland*, 556 U.S. 1, 20 (2009) (confirming that only communities that can form over 50% of a district's relevant population have viable Section 2 claims).

20.     If the three *Gingles* factors are satisfied, the court must then determine whether, based on the "totality of the circumstances," the racial minority has "less opportunity . . . to elect representatives of their choice." *Gingles*, 478 U.S. at 36 (quoting 42 U.S.C. § 1973(b)).[1]

---

[1] Such an analysis can consider:

the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process; the extent to which voting in the elections of the state or political subdivision is racially polarized; the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group; if there is a candidate slating process, whether the members of the minority group have been denied access to that process; the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process; whether political campaigns have been characterized by overt or subtle racial appeals; the extent to which members of the minority group have been elected to public office in the jurisdiction. Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are: whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members

21.     One factor in the totality of the circumstances analysis that undercuts a finding of vote dilution is "proportionality."  The Supreme Court has defined proportionality as a situation in which "minority groups constitute effective voting majorities in a number of . . . districts substantially proportional to their share in the population."  *Johnson v. De Grandy*, 512 U.S. 997, 1024 (1994).  Such proportionality is neither a requirement nor a safe harbor, however. A jurisdiction is not required to draw a proportional number of such districts nor is it immune from Section 2 liability simply by doing so.  In particular, Section 2 may still be violated if, in ostensible pursuit of proportionality, a plan creates a district or districts with effective voting majorities of a particular minority group in a way that causes another minority group to lose its own effective voting majorities.

22.     Section 2 does not require creating the maximum possible number of majority-minority districts.  *See De Grandy*, 512 U.S. at 1017 (stating that "[f]ailure to maximize" majority-minority districts "cannot be the measure of § 2").  Moreover, the Supreme Court has recently interpreted the "compactness" requirement of the first *Gingles* prong to be limited to situations in which the minority community is not only geographically compact, but also culturally similar.  In *League of United Latin American Citizens v. Perry*, 548 U.S. 399, 435 (2006) ("*LULAC*"), the Court found that the "disparate needs and interests of [two distinct Texas Hispanic] populations," in addition to the "enormous geographical distance" separating them, meant that Section 2 did not require them to be grouped together in a single district.  Thus, just as proportionality is not a fixed requirement, the construction of districts between geographically

---

of the minority group; whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Gingles*, 478 U.S. at 36-38 (citing S. Rep. No. 97-417 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 206-07) (internal quotation marks and numbering omitted).

distant and culturally distinct minorities is also not mandatory.  Moreover, creating such districts cannot be used to compensate for the failure to draw districts for communities with viable Section 2 claims.

23.     The concept of "cultural compactness" overlaps somewhat with the requirement of minority political cohesion.  It, too, turns on whether the minority group generally supports the same candidates at the polls.  If minority voters do not tend to vote for the same candidates, then no candidate of choice exists for the minority community, and therefore a new redistricting plan cannot be deemed to dilute their vote.

24.     Because only communities that could comprise a majority of a potential district have viable Section 2 claims, how one measures the size of a racial group can affect which communities may raise successful claims of vote dilution.

25.     The 2010 Census, like its predecessors, allowed respondents to check off more than one race on the census form.  As a result, the Census has released redistricting data according to 63 different racial combinations for every level of geography.

26.     For any given racial group, the estimates of its size will vary from a minimum of only those respondents choosing the single race category and nothing else, to a maximum of all respondents choosing that race category and one or more other race categories.

27.     The Census does not consider Hispanic to be a racial group, but it does permit respondents to identify as Hispanic in addition to race.  As a result, every racial group combination has two variations—Hispanic and non-Hispanic.  Thus, the total number of racial and ethnic combinations recognized by the Census is 126.

28.     The Office of Management and Budget has issued guidance on how to reaggregate the Census's racial combinations into a workable format for civil rights enforcement:

Federal agencies will use the following rules to allocate multiple race responses for use in civil rights monitoring and enforcement:

- Responses in the five single race categories are not allocated.

- Responses that combine one minority race and white are allocated to the minority race.

- Responses that include two or more minority races are allocated as follows:

    - If the enforcement action is in response to a complaint, allocate to the race that the complainant alleges the discrimination was based on.

    - If the enforcement action requires assessing disparate impact or discriminatory patterns, analyze the patterns based on alternative allocations to each of the minority groups.

Office of Mgmt. & Budget, Exec. Office of the President, OMB Bull. No. 00-02, Guidance on Aggregation and Allocation of Data on Race for Use in Civil Rights Monitoring and Enforcement (Mar. 9, 2000), *available at* http://www.whitehouse.gov/omb/bulletins_b00-02.

29.     In its one consideration of this issue, the Supreme Court expressed apparent agreement with this approach, saying that in a "case [that] involves an examination of only one minority group's effective exercise of the electoral franchise . . . it is proper to look at *all* individuals who identify themselves as black." *Georgia v. Ashcroft*, 539 U.S. 461, 473 n.1 (2003) (emphasis in original).

30.     The Department of Justice has followed the OMB guidance in its enforcement of Section 5 of the Voting Rights Act. *See* Department of Justice, Guidance Concerning Redistricting and Retrogression Under Section 5 of the Voting Rights Act, 42 U.S.C. 1973c, 66 Fed. Reg. 5412-5414 (Jan. 18, 2001).   It has also clarified that "[i]f there are significant numbers of responses which report Hispanics and one or more minority races (for example, Hispanics who list their race as Black/African-American), those responses will be

9

allocated alternatively to the Hispanic category and the minority race category." *Id*. at 5412-01. Thus, for Voting Rights Act purposes, all racial data must be considered, but the relevant categorization of individual responses may depend on the particular nature of a potential claim to be raised against a plan.

31.     For purposes of the discussion, tables, and appendices that follow, racial categories are designated with the following labels.  "NH White" refers to Non-Hispanics who check off White but no other race on the census form.  "NH DOJ Black" refers to Non-Hispanic Blacks who check off Black alone or Black in combination with White. "NH DOJ Asian" refers to Non-Hispanic Asians who check off Asian alone or Asian in combination with White.  Black refers to any respondent who checks off Black, alone or in combination with another race.  Asian refers to any respondent who checks off Asian, alone or in combination with another race.

32.     These categorizations are used so as to maintain consistency between this affidavit and the submissions of the parties.  The inclusion of "DOJ" in the label tracks the categorization scheme used by the redistricting data providers to indicate data expressed according to Department of Justice guidelines.

### Section 5 of the Voting Rights Act

33.     Section 5 of the VRA provides that certain jurisdictions (including three counties in New York—the Bronx, New York County, and Kings County) must preclear their redistricting plans with either the Department of Justice or the United States District Court for the District of Columbia.  Court-drawn redistricting plans are not subject to the Section 5 preclearance requirement.  *See Connor v. Johnson*, 402 U.S. 690, 691 (1971) ("A decree of the United States District Court is not within the reach of Section 5 of the Voting Rights Act.").  The Supreme Court has instructed, however, that when drawing new congressional plans, district

10

courts "should follow the appropriate Section 5 standards, including the body of administrative and judicial precedents developed in Section 5 cases." *Abrams v. Johnson*, 521 U.S. 74, 96 (1997) (internal quotation marks and citation omitted).

34.     Section 5 requires that redistricting plans neither have "the purpose nor will have the effect of denying or abridging the right to vote on account of race or color, or [membership in a linguistic minority]." 42 U.S.C. § 1973c(a). The "purpose" standard targets voting changes motivated by "any discriminatory purpose." *Id.* § 1973c(c). The "effect" standard covers changes "that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Beer v. United States*, 425 U.S. 130, 141 (1976).

35.     When Congress reauthorized Section 5 of the VRA in 2006, it added a new subsection clarifying Section 5's substantive standard to include:

> Any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting that has the purpose of or will have the effect of *diminishing the ability of any citizens of the United States* on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, *to elect their preferred candidates of choice* denies or abridges the right to vote within the meaning of subsection (a) of this section.

42 U.S.C. § 1973c(b) (2007) (emphasis added). "Retrogression" under Section 5 is established by comparing a proposed plan with the existing, or "benchmark," plan. *See Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 478 (1997). Whether a plan is retrogressive "depends on an examination of all the relevant circumstances," and "'[n]o single statistic provides courts with a shortcut to determine whether' a voting change retrogresses from the benchmark." *Georgia*, 539 U.S. at 479-80 (quoting *De Grandy*, 512 U.S. at 1020-21). *See also* Department of Justice, Guidance Concerning Redistricting Under Section 5 of the Voting Rights Act, 76 Fed. Reg. 7470,

7471 (Feb. 9, 2011) ("Although comparison of the census population of districts in the benchmark and proposed plans is the important starting point of any Section 5 analysis, additional demographic and election data in the submission is often helpful in making the requisite Section 5 determination.").  However, substantial drops in a racial group's share of the voting age population in a district, if avoidable, can often signal likely retrogression.

## Districting Principles Mandated by the Court's Order

### *Compactness*

36.     The 2/28/12 Order directed that the districts drawn by the Recommended Plan "shall be compact."  2/28/12 Order at 3.

37.     Compactness is an important and commonly employed redistricting principle.  It is not, however, an independent requirement of federal law.  Rather, the Supreme Court has referenced compactness in two contexts.  The first concerns the "smoking out" of impermissible motive in a racial gerrymandering case.  Non-compact districts with shapes unexplainable on grounds other than race may violate the Equal Protection Clause of the Fourteenth Amendment.  *See, e.g.*, *Bush v. Vera*, 517 U.S. 952, 958-65 (1996); *Miller*, 515 U.S. at 917; *Shaw*, 509 U.S. at 642.  Second, as discussed above, compactness of a minority community is a prerequisite for a Section 2 VRA claim.  Only compact minority communities that could constitute a majority in a single member district have a potential entitlement to a district under Section 2.  *See LULAC*, 548 U.S. at 443-44; *Gingles*, 478 U.S. at 50.  Other than those two contexts, compactness is primarily relevant only in those states that have explicit compactness requirements in state law.  *See* National Conference of State Legislatures, Redistricting Law 2010, at 106-12 (2009) (identifying states with legal requirements of compactness, including New York for state legislative districts).

12

38.     Neither the courts nor political scientists have accepted any single measure of compactness.  Rather, compactness is an aesthetic as well as a geometric quality of districts.  Thus, although there are objective measures of compactness, it is also the case that compactness, like beauty, can lie in the eye of the beholder.  *See* Kurtis A. Kemper, *Application of Constitutional "Compactness Requirement" to Redistricting*, 114 ALR 5th 311 (2003) (comparing different courts' treatment of state law compactness requirements).

39.     Maptitude for Redistricting, the redistricting software used to formulate the Recommended Plan, provides reports for eight different measures of compactness:  the Reock, Schwartzberg, Perimeter, Polsby-Popper, Length-Width, Population Polygon, Population Circle, and Ehrenburg tests.  *See* Caliper Corporation, Maptitude for Redistricting: Supplemental User's Guide, 117-19 (2010).  The software user's guide describes these tests as follows:

> *Reock Test*:  The Reock test is an area-based measure that compares each district to a circle, which is considered to be the most compact shape possible.  For each district, the Reock test computes the ratio of the area of the district to the area of the minimum enclosing circle for the district.  The measure is always between 0 and 1, with 1 being the most compact.  The Reock test computes one number for each district and the minimum, maximum, mean and standard deviation for the plan.[2]
>
> *Schwartzberg Test*:  The Schwartzberg test is a perimeter-based measure that compares a simplified version of each district to a circle, which is considered to be the most compact shape possible.  This test requires the base layer that was used to create the districts.  The base layer is used to simplify the district to exclude complicated coastlines.
>
> For each district, the Schwartzberg test computes the ratio of the perimeter of the simplified version of the district to the perimeter of a circle with the same area as the original district.  The district is simplified by only keeping those shape points where three or more areas in the base layer come together.  Water features and a

_____

[2] E.C. Reock, Jr., *Measuring Compactness as a Requirement of Legislative Apportionment*, 5 Midwest J. of Pol. Sci. 70 (1961).

neighboring state also count as base layer areas.  This measure is usually greater than or equal to 1, with 1 being the most compact.  Unfortunately, the simplification procedure can result in a polygon that is substantially smaller than the original district, which can yield a ratio less than 1 (e.g., an island has a 0 ratio).  The Schwartzberg test computes one number for each district and the minimum, maximum, mean and standard deviation for the plan.[3]

*Perimeter Test*:  The perimeter test computes the sum of the perimeters of all the districts.  The perimeter test computes one number for the whole plan.  If you are comparing several plans, the plan with the smallest total perimeter is the most compact.[4]

*Polsby-Popper Test*:  The Polsby-Popper test computes the ratio of the district area to the area of a circle with the same perimeter:  4(pi)Area/(Perimeter squared).  The measure is always between 0 and 1, with 1 being the most compact.  The Polsby-Popper test computes one number for each district and the minimum, maximum, mean and standard deviation for the plan.[5]

*Length-Width Test*:  The length-width test computes the absolute difference between the width (east-west) and the height (north-south) of each district.  The bounding box of a district is computed in longitude-latitude space, and the height and width of the box through the center point are compared.  The total is divided by the number of districts to create the average length-width compactness.  A lower number indicates better length-width compactness.  This measure of compactness is designed for contiguous districts, since the bounding box encloses the entire district.[6]

*Population Polygon Test*:  The population polygon test computes the ratio of the district population to the approximate population of the convex hull of the district (minimum convex polygon which completely contains the district).  The population of the convex hull is approximated by overlaying it with a base layer, such as Census Blocks.  [Census Blocks are the smallest geographic units for which the Census distributes population data.]  The measure is always between 0 and 1, with 1 being the most compact.  The population polygon test computes one

---

[3] J.E. Schwartzberg, *Reapportionment, Gerrymanders, and the Notion of Compactness*, 50 Minn. L. Rev. 443 (1966).

[4] H.P. Young, *Measuring the Compactness of Legislative Districts*, 13 Leg. Stud. Q. 105 (1988).

[5] Daniel D. Polsby & R.D. Popper, *The Third Criterion:  Compactness as a Procedural Safeguard Against Partisan Gerrymandering*, 9 Yale L. & Pol'y Rev. 301 (1991).

[6] *See* Iowa State Leg. Website, http://www.legis.state.ia.us/redist/june2001report.htm.

number for each district and the minimum, maximum, mean and standard deviation for the plan.[7]

*Population Circle Test*:  The population circle test computes the ratio of the district population to the approximate population of the minimum enclosing circle of the district.  The population of the circle is approximated by overlaying it with a base layer, such as Census Blocks. The measure is always between 0 and 1, with 1 being the most compact.  The Population Circle test computes one number for each district and the minimum, maximum, mean and standard deviation for the plan.[8]

*Ehrenburg Test*:  The Ehrenburg test computes the ratio of the largest inscribed circle divided by the area of the district.  The measure is always between 0 and 1, with 1 being the most compact.  The Ehrenburg test computes one number for each district and the minimum, maximum, mean and standard deviation for the plan.[9]

40.     The compactness criterion is often in tension with the requirements of

federal law, such as the VRA, or the constitutional requirement of one person, one vote.

41.     Given the strange shape of some of New York's municipalities and

counties, as well as the presence of natural boundaries like coastline, districts that respect such

boundaries will be somewhat noncompact both in appearance and by traditional measures.

### *Contiguity*

42.     The 2/28/12 Order directed that the districts drawn by the Recommended

Plan "shall be . . . contiguous."  2/28/12 Order at 3.

43.     In general, a contiguous district may be defined as one in which it is

possible to travel from any one part of the district to any other part of the district without leaving

---

[7] Thomas Hofeller & Bernard Grofman, *Comparing the Compactness of California Congressional Districts Under Three Different Plans: 1980, 1982, and 1984*, in Toward Fair and Effective Representation 281 (Bernard Grofman ed., 1990).

[8] *Id.*

[9] Y.S. Frolov, *Measuring the Shape of Geographic Phenomena:  A History of the Issue*, 16 Soviet Geography 676 (1995).

the district.  Contiguity is an important and commonly employed criterion in redistricting.  *See*, *e.g.*, *Shaw*, 509 U.S. at 647.

44.     Some of New York's districts include islands or bodies of water that prevent all parts of the district from being connected by land.  The Supreme Court and the New York courts have held that districts that are contiguous only by water can satisfy the contiguity criterion.  *See*, *e.g.*, *Lawyer v. Department of Justice*, 521 U.S. 567, 581 n.9 (1997) ("The Supreme Court of Florida has held that the presence in a district of a body of water, even without a connecting bridge and even if such districting necessitates land travel outside the district to reach other parts of the district, 'does not violate this Court's standard for determining contiguity under the Florida Constitution.'" (quoting *In re Constitutionality of Senate Joint Resolution 2G*, 597 So.2d 276, 280 (Fla. 1992)); *Matter of Schneider v. Rockefeller*, 31 N.Y.2d 420, 430 (1972) ("[T]he requirement of contiguity is not necessarily violated because a part of a district is divided by water.").

### Respect for Political Subdivisions

45.     The 2/28/12 Order directed that the districts drawn by the Recommended Plan "shall . . . respect political subdivisions."  2/28/12 Order at 3.

46.     Political subdivision boundaries include those of counties, cities, towns, and villages.  The Supreme Court and this Court have treated respect for such subdivision boundaries as a traditional principle of districting.  *See*, *e.g.*, *Miller,* 515 U.S. at 908; *Puerto Rican Legal Def. & Educ. Fund, Inc. v. Gantt*, 796 F. Supp. 681, 687 (E.D.N.Y. 1992) ("*PRLDEF*").

47.     The Census designates and provides data broken down according to the boundaries of certain political subdivisions, including counties, Minor Civil Divisions, and

Census Designated Places (which may or may not coincide with a political subdivision boundary).

48.     The Census defines Minor Civil Divisions ("MCDs") as "the primary governmental or administrative divisions of a county in many states . . . .  MCDs in the United States, Puerto Rico, and the Island Areas represent many different kinds of legal entities with a wide variety of governmental and/or administrative functions.  MCDs include areas variously designated as barrios, barrios-pueblo, boroughs, charter townships, commissioner districts, election districts, election precincts, gores, grants, locations, magisterial districts, parish governing authority districts, plantations, purchases, reservations, supervisor's districts, towns, and townships. . . . The MCDs in 12 states [including New York] also serve as general-purpose local governments that can perform the same governmental functions as incorporated places." *See* Census Geographic Terms and Concepts ("Census Terms"), *available at* http://www.census.gov/geo/www/2010census/GTC_10.pdf.

49.     The boroughs of New York City have an unusual status and interrelationship that require them to be treated somewhat distinctively from counties elsewhere in the state when it comes to redistricting.  First, New York City boroughs are counties contained within a city, rather than cities contained within one or more counties.  Second, the boroughs are political entities each with its own government, while still being part of a larger political entity (i.e., New York City) that is not the state as a whole.  Third, the boroughs share many historical links with one another.  Fourth, subway lines tightly link the boroughs, serving as arteries of movement that have shaped the patterns of population settlement that help define New York City's communities and that often cut across borough lines.

*Preservation of Communities of Interest*

50.     The 2/28/12 Order directed that the districts drawn by the Recommended Plan "shall . . . preserve communities of interest."  2/28/11 Order at 3.

51.     The Supreme Court and this Court have treated the preservation of communities of interest as a traditional principle of districting.  *See*, *e.g.*, *Miller*, 515 U.S. at 916; *PRLDEF*, 796 F. Supp. at 687.

52.     Respecting communities of interest is both an essential and slippery consideration in redistricting processes.  In one respect, redistricting is *about* representation of communities.  Communities that are split between districts often view their voice as diminished.

53.     In another respect, arguments based on asserted communities of interest can often be pretexts for incumbency or partisan-related considerations.  Moreover, community boundaries are inherently amorphous, contested, shifting and conflicting.  By respecting one community's boundaries or some advocates' conception of their community, a redistricting plan might conflict with other advocates' conception of their community or with another community's boundaries.

54.     In addition to testimony presented in redistricting-related hearings, including through submissions by parties and the public to the court, information regarding communities of interest can be garnered through certain governmental and non-governmental sources.

55.     For example, the Census provides data for "Census Designated Places." "Census Designated Places (CDPs) . . .  are delineated to provide data for settled concentrations of population that are identifiable by name but are not legally incorporated under the laws of the state in which they are located. The boundaries usually are defined in cooperation with local or

18

tribal officials and generally updated prior to each decennial census. These boundaries, which usually coincide with visible features or the boundary of an adjacent incorporated place or another legal entity boundary, have no legal status, nor do these places have officials elected to serve traditional municipal functions. CDP boundaries may change from one decennial census to the next with changes in the settlement pattern; a CDP with the same name as in an earlier census does not necessarily have the same boundary." *See* Census Terms.

      56.    In addition, New York City is divided into 59 "community districts." As the New York City Department of City Planning website explains: "New York City's 59 community districts, established by local law in 1975, illustrate the remarkable diversity of the city's land uses and population. They range in size from less than 900 acres to almost 15,000 acres, and in population from fewer than 35,000 residents to more than 200,000." *See* Community District Profiles, *available at* http://www.nyc.gov/html/dcp/html/lucds/cdstart.shtml. Given that community districts have their own boards and some political power, they could also be considered as political subdivisions. Those community districts are further divided into "projection areas," which are very rough estimates of neighborhoods with a minimum population of 15,000 people. However, these projection areas are used principally for purposes of projecting population change, by neighborhood, over the next twenty years. *See* New York City Projection Areas, *available at* http://www.nyc.gov/html/dcp/html/bytes/meta_pa.shtml. Presented in Appendix F are maps of the New York City community districts and projection areas.

## Additional Considerations Not Mandated by the Court's Order

57.     The 2/28/12 Order also provided that the Magistrate Judge "may consider other factors and proposals submitted by the parties, which, in the magistrate judge's view, are reasonable and comport with the Constitution and applicable federal and state law." 2/28/12 Order at 2.

58.     An additional principle that guides the Recommended Plan is a desire that the process and decision-making be nonpartisan, even if the effect of a new redistricting plan will have inevitable and substantial effects for political parties and incumbents.  Toward that end, at the Magistrate Judge's direction, the Recommended Plan deliberately ignores political data, such as voter registration or election return data, as well as incumbent residence.  Although avoiding incumbent pairings may be a redistricting principle traditionally followed by the Legislature when it draws lines, the Recommended Plan seeks to avoid picking favorites in its construction of districts.  Therefore, the location of incumbent residences was not even added to the redistricting data considered in the construction of either the Recommended Plan or its predecessor, the Proposed Plan circulated by the Magistrate Judge on March 5.  Moreover, congressional candidates, unlike candidates for the state legislature, are not legally required to live in a district in order to run from it.  Thus, drawing districts around incumbent residences is less important in the congressional context than in other redistricting contexts.

59.     To the extent doing so does not conflict with the other criteria identified in the 2/28/12 Order, the Recommended Plan respects the population cores of prior districts. Following this criterion can be quite challenging for many of the bizarrely shaped districts in the state.  A gallery of the most bizarrely shaped districts in the existing plan ("Existing Plan") is provided in Appendix G.  Moreover, given that the state is losing two districts and that every

district is currently underpopulated, significant shifts among districts are inevitable in order to comply with the requirement of one person, one vote.

## CONSIDERATION OF REDISTRICTING MATERIAL SUBMITTED BY THE PARTIES AND MEMBERS OF THE PUBLIC

60.     The Magistrate Judge directed parties to submit any proposals, plans, and comments by February 29, 2012; responses thereto, and submissions by non-parties, were due by March 2, 2012.  A public hearing was held on March 5, 2012, at the United States Courthouse at 225 Cadman Plaza, Brooklyn, New York.  The redistricting materials and testimony presented by interested parties in advance of, at, and after the hearing were reviewed and evaluated by me and by the Magistrate Judge.

61.     The parties submitted to the Magistrate Judge a total of four statewide redistricting plans and three partial plans.  The Magistrate Judge and I considered those plans and other submissions made to the Magistrate Judge by non-parties, as well as testimony presented at the hearing.  For the reasons set out below, the Recommended Plan does not adopt any of the submitted plans in their entirety.

62.     The four statewide plans submitted by parties are the plans of (1) Defendants Dean G. Skelos (as Majority Leader and President Pro Tempore of the Senate of the State of New York), Michael F. Nozzolio (as member of LATFOR), and Welquis R. Lopez (as member of LATFOR) (hereinafter the "Senate Majority Plan"); (2) Defendants Sheldon Silver (as Speaker of the Assembly of the State of New York), John McEneny (as member of LATFOR), Roman Hedges (as member of LATFOR) (hereinafter the "Assembly Majority Plan"); (3) Defendant Brian M. Kolb (as Minority Leader of the Assembly of the State of New York)

21

(hereinafter the "Assembly Minority Plan"); and (4) Plaintiff-Intervenors Linda Rose, et al. (hereinafter the "Rose Plan").

63.     After carefully reviewing the Senate Majority, Assembly Majority, Assembly Minority, and Rose Plans, as well as the parties' and others' responses to those plans, the Magistrate Judge and I decided to reject those plans and draft our own.  Each of those plans could fairly be characterized (and was characterized by the other parties) as attempting to gain partisan advantage through the redistricting process.  Adopting any such plan would violate the principle of nonpartisanship that undergirds the Recommended Plan.

64.     The three partial plans submitted by parties are the plans of (1) Plaintiff-Intervenors Linda Lee, et al. (hereinafter the "Lee-AALDEF Plan"); (2) Plaintiff-Intervenors Juan Ramos, et al. (hereinafter the "Ramos Plan"); (3) Plaintiff-Intervenors Donna Kaye Drayton, et al. (hereinafter the "Drayton-Unity plan").

65.     Partial and individual district plans cannot be adopted wholesale while fulfilling the requirement that we create a plan of 27 districts.  Furthermore, especially with respect to proposed individual districts, a proposal cannot be inserted into a plan while ignoring the population "needs" of surrounding districts.  Moreover, adopting an individual district proposal risks ignoring the necessary tradeoffs between districts, and can raise VRA problems if one district's configuration leads to race-based dilution or retrogression in another district.  Nevertheless, careful consideration was given to each proposal submitted by the parties.

66.     Non-party members of the public submitted a total of thirteen statewide redistricting plans:  the Common Cause, Connor Allen, David Harrison, Michael Danish, Andrew C. White, Vincent Flynn, Elijah Reichlin-Melnick, Robert Silverstein, Philip Smith, David Gaskell, Jesse Laymon, Michael Fortner and Adama D. Brown plans.  After careful

review of those plans, it was determined that they all violated the constitutional requirement of one person, one vote, and that many risked violating the VRA.

67.     Non-party members of the public submitted a total of six partial plans. They are from the Citizens Alliance for Progress, Concerned Citizens of Fort Greene and Clinton Hill, Keith L.T. Wright, Yvette D. Clarke, the Orthodox Alliance for Liberty, and Ruben Diaz. For the same reasons the partial plans of the parties were rejected but given consideration, these plans were accorded the same treatment.

## DESCRIPTION OF DISTRICTS IN THE RECOMMENDED PLAN

68.     Districts in the Recommended Plan, and any plan for New York State, can be divided into three regions:  Long Island, New York City, and Upstate.  *See* Appendix A (Maps of Regions and Individual Districts in Recommended Plan); Appendix B (Existing Congressional Districts).

### Long Island

69.     Under the Existing Plan, Long Island has approximately 4.2 districts.  To adjust for the loss of two districts and population shifts, it can only sustain 3.95 districts.

70.     District 1, as it exists in a corner, is one of the least changed districts in the Recommended Plan.  Its northwestern border is adjusted to achieve population equality.

71.     Existing Districts 2, 3, and 5, however, are consolidated (mostly into the Recommended Plan's Proposed Districts 2 and 3) to address the population shortfall on Long Island. They are consolidated in an east-west direction, such that Proposed District 2 extends along Southern Long Island and Proposed District 3 extends along Northern Long Island.

72.     Existing District 4 is kept largely intact in Proposed District 4, but extends southeast so as to compensate for the loss of population on its western boundary to Proposed District 5.

### New York City

73.     New York City currently has approximately 12.2 districts (eleven full districts and parts of two others).  Due to population shortfalls, it should have 11.66 districts.

74.     Almost all of the Proposed Districts for New York City retain a majority of the population of a prior district.  *See* Appendix E (Core Constituency Report).  The exceptions are Proposed District 6 and Proposed District 16.

### *Staten Island*

75.     Beginning in another corner, Staten Island, Proposed District 11 largely mirrors Existing District 13, but its Brooklyn component is adjusted in order to achieve population equality (both for Proposed District 11 and the adjacent districts).

### *Brooklyn*

76.     The Proposed Brooklyn Districts (7, 8, 9, 10 and 12) are largely based on their current configurations (but with new numbers), with a few notable exceptions.

77.     Existing District 9 is taken out of Brooklyn and becomes a Queens-based district (Proposed District 6).  Its Brooklyn areas (as well as the Queens neighborhoods of Ozone Park and Howard Beach) are largely transferred to Existing District 10 to form Proposed District 8 (which also picks up the Coney Island area from Existing District 8).

78.      The borders of Existing Districts 10, 11, and 12 are rearranged in order to achieve population equality for Proposed Districts 7, 8, and 9.

79.     Existing District 14 (Proposed District 12) now includes a portion of Brooklyn (namely Greenpoint and East Williamsburg, currently in Existing District 12) in order to bring that district up to population equality and to maintain compactness.

*Queens*

80.     In Queens, Proposed District 5 largely retains the borders of Existing District 6, but it extends both southwest through the Rockaways (into Existing District 9) and east into the Long Island-based Existing District 4.

81.     Above Proposed District 5 is Proposed District 6, which contains much of the Central Queens portion of Existing District 9, but extends north and east to pick up neighborhoods in Existing Districts 5 and 7.

82.     The remaining area between Proposed District 6 and the Queens-Nassau County border is in Proposed District 3, most of which territory was in the Nassau-Queens district—Existing District 5—in the Existing Plan.

83.     Proposed District 14 is modeled on Existing District 7.  The Bronx-based territory and population it cedes to Proposed District 15 are made up by extending Proposed District 14 somewhat farther south into Queens.

84.     Proposed District 12, as previously noted, is a Manhattan, Queens, and now Brooklyn district (with 77% of its population coming from Existing District 14).  To compensate for the Queens-based population it loses to Proposed District 14, it extends south into Brooklyn (as previously described) to pick up Greenpoint and East Williamsburg.

*Manhattan*

85.     Like their counterparts in the Existing Plan (i.e., Existing Districts 8, 12, 14 and 15), Proposed Districts 7, 10, 12, and 13 straddle Manhattan and other boroughs.

25

86.     Proposed District 12 (Existing District 14) extends both south and west into territory held by Existing Districts 8 and 12 (although the "hook" at the bottom of Existing District 14 in Manhattan is largely eliminated in population trades between Proposed District 12 and Proposed District 7).

87.     Proposed District 10, which contains a substantial Brooklyn section, as described above, moves north into Morningside Heights to pick up the requisite population from Existing District 15.  The east and west sides of Manhattan remain (for the most part) in different districts, as under the Existing Plan.

88.     Proposed District 13 (largely based on the Harlem-based Existing District 15) loses its small Queens-based section (which included Rikers Island) and moves into the North Bronx section connected to the Marble Hill-Inwood neighborhood, which is part of New York County but is adjoined to the Bronx.  That area of the Bronx is currently shared between Existing Districts 16 and 17.

### *Bronx*

89.     Proposed District 13's incursion into the Bronx pushes Existing District 16 farther southeast, into Existing District 7, which is why Proposed District 14 must extend farther into Queens than Existing District 7.

90.     With the exception of the territory now taken from it by Proposed District 13, Existing District 17's Bronx portion remains largely intact.

### Upstate

91.     The area of Upstate New York (loosely defined to include every county north of the Bronx) currently contains approximately 12.5 districts.  Because of population shortfalls, it "deserves" 11.66 districts, according to the 2010 Census.  Moreover, due to the

26

bizarre shape and location of many of the districts in Upstate New York, many of which do not have population cores (or have multiple cores), the Recommended Plan faced a challenge in reconciling the Existing Districts with the Court's order that "districts shall be compact, contiguous, respect political subdivisions, and preserve communities of interest." 2/28/12 Order at 3.

92.     Such is the case with Existing District 17, which connects the northwestern Bronx and southeastern Westchester to a substantial share of Rockland County through a narrow corridor in western Westchester.  That District is reconfigured into Proposed District 16, which includes the Bronx section of the Existing District and the geographically proximate towns in Westchester.  As a result, Existing District 18 is reconfigured (as Proposed District 17) to include all of Rockland County and additional towns in northern Westchester.

93.     Existing District 19 remains largely intact in Proposed District 18.   It unifies Orange County by extending northwest, and captures almost all of Poughkeepsie in Dutchess County.

94.     Proposed District 19 represents a combination of the cores of Existing Districts 20 and 22 in the Hudson Valley.  Existing District 22 extended from Northern Orange County west through portions of Delaware, Broome, and Tioga Counties, with a "finger" capturing Ithaca in Tompkins County.  Existing District 20 ran up the Hudson River into the North Country, but also west into Greene, Delaware and Otsego Counties.  Proposed District 19 is a compact district that extends from the southern portion of Dutchess County not contained in Proposed District 18, north to Rensselaer and northwest to Schoharie, Otsego and Delaware Counties (with a small intrusion into Broome County in order to bring it to population equality).

95.     With the exception of Schoharie County, which it loses to Proposed District 19, Proposed District 20 remains largely the same as Existing District 21.  To compensate for the loss of Schoharie County, Proposed District 20 goes into Saratoga County to pick up Saratoga Springs.  (It also loses about half of Montgomery County.)  It remains, however, a Capitol Cities District, centered around Albany, Schenectady, Troy and Rensselaer.

96.     Proposed District 21 retains the North Country core of Existing District 23.  However, it gains the portions of Existing Districts 20 and 24 that intruded into the North Country and loses the portions of Madison, Oneida and Oswego Counties that it previously held, which are transferred to Proposed District 22.

97.     Besides those additions, Proposed District 22 extends south to gain Chenango and Cortland Counties, almost all of Broome County, and a small part of southern Tioga County.

98.     Proposed District 23 is the "Southern Tier" District, mostly resembling Existing District 29.  But it is somewhat more southern-oriented than the Existing District, and it extends west to include Chautauqua and east to include Tompkins, Seneca and most of Tioga Counties.  It also loses its northern extension into Monroe County.

99.     Proposed District 24 is modeled on Existing District 25.  It also extends south to Cayuga County and north into part of Oswego County to acquire the necessary population.

100.    The Western New York districts (Proposed Districts 25, 26 and 27) presented a particular challenge in reconciling Existing District configurations with the Court's order concerning compactness and respect for political subdivision lines.  Moreover, Existing District 28 is not only narrow and "dual-cored" (or perhaps "coreless," stretching from portions

28

of Buffalo to portions of Rochester through a long and narrow land bridge across northwestern New York), but it also has the largest population shortfall (105,869) of any Existing District in the state. Furthermore, Existing District 27 is the second most underpopulated in the state, needing to pick up 88,436 people.

101. As is clear from the district configurations, Proposed Districts 25 and 26 are adopted from the plan submitted by Common Cause. Those configurations represent compact districts that encompass the Rochester metropolitan area (Proposed District 25) and the Buffalo/Niagara Falls area (Proposed District 26), respectively.

102. Proposed District 27, as a consequence, retains (but unifies) most of the counties in Existing District 26, while going east to pick up about half of Ontario County.

## LEGAL EVALUATION OF THE RECOMMENDED PLAN

### Constitutional Requirements

#### *One Person, One Vote*

103. The 2010 Census determined the population of New York to be 19,378,102. Following the 2010 Census, the number of congressional districts allotted to New York was reduced from 29 to 27. Therefore, the ideal population per congressional district is 717,707.48. A "zero deviation" congressional plan for New York would consist of 14 districts with a population of 717,707 and 13 districts with a population of 717,708.

104. The Magistrate Judge and I reviewed census data on the population demography of New York for both 2000 and 2010, broken down into various units including counties and present congressional lines. This analysis demonstrated that relative to the ideal population for each of the 27 districts, each of the existing 29 congressional districts was

underpopulated.  After the 2000 Census, one person, one vote required 654,360 people per congressional district.  No district grew enough over the past ten years so as to reach the required 717,707 people that one person, one vote requires for redistricting after the 2010 Census.

105.    The extent of the population deviations varied considerably between districts, from a population shortfall of 105,869 in Existing District 28 to a shortfall of just 4,195 in Existing District 8.  Table I presents the deviations for all Existing Districts.

**Table I. Population Deviations in Existing New York Congressional Districts**

| District | Population | Deviation | % Deviation |
|---|---|---|---|
| 1 | 705559 | -12148 | -1.69 |
| 2 | 679893 | -37814 | -5.27 |
| 3 | 645508 | -72199 | -10.06 |
| 4 | 663407 | -54300 | -7.57 |
| 5 | 670130 | -47577 | -6.63 |
| 6 | 651764 | -65943 | -9.19 |
| 7 | 667632 | -50075 | -6.98 |
| 8 | 713512 | -4195 | -0.58 |
| 9 | 660306 | -57401 | -8.00 |
| 10 | 677721 | -39986 | -5.57 |
| 11 | 632408 | -85299 | -11.88 |
| 12 | 672358 | -45349 | -6.32 |
| 13 | 686525 | -31182 | -4.34 |
| 14 | 652681 | -65026 | -9.06 |
| 15 | 639873 | -77834 | -10.84 |
| 16 | 693819 | -23888 | -3.33 |
| 17 | 678558 | -39149 | -5.45 |
| 18 | 674825 | -42882 | -5.97 |
| 19 | 699959 | -17748 | -2.47 |
| 20 | 683198 | -34509 | -4.81 |
| 21 | 679193 | -38514 | -5.37 |
| 22 | 679297 | -38410 | -5.35 |
| 23 | 664245 | -53462 | -7.45 |
| 24 | 657222 | -60485 | -8.43 |
| 25 | 668869 | -48838 | -6.80 |
| 26 | 674804 | -42903 | -5.98 |
| 27 | 629271 | -88436 | -12.32 |
| 28 | 611838 | -105869 | -14.75 |
| 29 | 663727 | -53980 | -7.52 |

106.   The Recommended Plan achieves "zero deviation."  Fourteen districts have a population of 717,707 and 13 districts have a population of 717,708.  *See* Appendix C (detailing the demographic composition of districts in the Recommended Plan).

### *Racial Gerrymandering*

107.   The Recommended Plan does not intentionally dilute the vote of citizens on account of race, nor is any district in the Recommended Plan drawn with race as its predominant factor.

### **Voting Rights Act Requirements**

108.   The Recommended Plan was prepared with strict adherence to the requirements of Section 2 and Section 5 of the Voting Rights Act, and neither retrogresses nor dilutes the votes of any citizens on account of race.  Moreover, the Recommended Plan achieves compliance with the VRA without making race the predominant factor in the construction of any districts.

109.   To ensure compliance with the applicable provisions of the VRA, the Magistrate Judge and I reviewed the racial and other characteristics of the 29 Existing Districts, based on data from the 2010 Census.  I have also reviewed racial and other characteristics of the 27 districts contained in the Recommended Plan, and of the plans submitted by the parties and non-parties to the Magistrate Judge.  Based on my experience as part of the team that drew the 2002 Special Master's Plan for New York, I was also intimately familiar with the racial demographics of earlier New York districting plans.

110.   Although federal courts need not submit plans that they draw for preclearance, the Recommended Plan aspires to comply and indeed, does comply with the

31

nonretrogression requirement of Section 5 of the VRA.  Specifically, the Recommended Plan does not diminish the ability of citizens on account of race, color, or linguistic minority to elect candidates of their choice.

111.    The Recommended Plan also complies with the requirement of Section 2 of the VRA that proscribes dilution of votes on account of race or language minority status.  The Recommended Plan maintains the majority-minority districts in the Existing Plan, even where (as a result of relative population decline and the need to add adjacent residents to achieve population equality) some alteration in the demographic composition of the districts was unavoidable.  Because of the loss of two districts, the need to reach population equality in every district, and the different rates of growth of different racial groups, some change in district demographic statistics was unavoidable.

112.    Any district that touches one of the three covered New York counties (Bronx, Manhattan, Kings) would be subject to a retrogression analysis under Section 5, were a plan submitted for preclearance.  In the covered counties, the plan may not diminish the ability of citizens, on account of race, to elect their preferred candidates.

113.    The racial and ethnic data for all districts in the Existing and Recommended Plan are provided in Appendix C.

114.    Of course, the ability and opportunity of groups to elect their preferred candidates are affected by more than the simple racial breakdown of their existing and new districts.  Still, racial data provide the starting point for any retrogression and dilution analysis.  Significant decreases in a group's racial percentage in a district, for example, could raise concerns about retrogression.

115.    In districts touching the counties covered by Section 5, therefore, the Recommended Plan keeps the demographic composition of the districts largely the same, to the extent possible given disparate rates of population growth.  Of course, shifts among the protected districts, and between them and districts in uncovered counties, are inevitable given the need to comply with one person, one vote and to achieve compactness and contiguity.

### *Bronx County*

116.    The racial and ethnic composition of the Existing and Proposed Districts in Bronx County, according to both total population and voting age population, is presented in Table II below.  For ease of explanation, the description of VRA compliance is focused on voting age population ("VAP"), but all population statistics were considered (as were the various ways one can categorize racial groups).

117.    Under both the Existing Plan and the Recommended Plan, the Bronx encompasses all or part of four districts.  All four have substantial minority populations.

118.    The only notable change from the Existing Plan concerns Harlem-based Existing District 15 and its analog in the Recommended Plan, Proposed District 13.  Both the Black and Hispanic shares of the population in that district increase as a result of moving part of that Harlem-based district into the northern Bronx.  The Hispanic VAP share increases from 43.8% to 52.7%, and the Black VAP share increases from 34.1% to 35.7%.  (The NH DOJ Black VAP share increases from 26.9% to 27.4%.)  The Recommended Plan therefore adds one more majority-Hispanic VAP congressional district in the state.  Otherwise, the Recommended Plan's Proposed Districts in the Bronx remain roughly the same in terms of their demographic composition as the Existing Districts in that borough.

33

**Table II. Demographic Breakdown of Existing and Proposed Districts for the Bronx**

### A. Population

| | Existing Plan | | | | | | |
|---|---|---|---|---|---|---|---|
| District | % NH White | % Black | % NH DOJ Black | % Asian | % NH DOJ Asian | % Hispanic Origin | % Minority Population |
| 07 | 20.7% | 21.5% | 16.6% | 17.4% | 16.5% | 44.4% | 79.3% |
| 15 | 20.9% | 34.6% | 26.9% | 5.3% | 4.6% | 46.1% | 79.1% |
| 16 | 2.4% | 39.0% | 28.1% | 2.3% | 1.6% | 66.5% | 97.6% |
| 17 | 37.2% | 34.6% | 30.4% | 5.6% | 5.0% | 25.6% | 62.8% |

| | Recommended Plan | | | | | | |
|---|---|---|---|---|---|---|---|
| District | % NH White | % Black | % NH DOJ Black | % Asian | % NH DOJ Asian | % Hispanic Origin | % Minority Population |
| 13 | 12.2% | 35.9% | 27.0% | 4.9% | 4.2% | 55.1% | 87.8% |
| 14 | 24.9% | 13.0% | 9.6% | 17.1% | 16.2% | 47.5% | 75.1% |
| 15 | 2.3% | 40.0% | 29.2% | 2.5% | 1.8% | 65.3% | 97.7% |
| 16 | 39.3% | 34.5% | 30.8% | 5.5% | 4.9% | 23.3% | 60.7% |

### B. Voting Age Population

| | Existing Plan | | | | | | |
|---|---|---|---|---|---|---|---|
| District | % NH White VAP | % Black VAP | % NH DOJ Black VAP | % Asian VAP | % NH DOJ Asian VAP | % Hispanic Origin VAP | % Minority VAP |
| 07 | 22.9% | 21.0% | 16.6% | 17.5% | 16.7% | 42.1% | 77.1% |
| 15 | 23.0% | 34.1% | 26.9% | 5.6% | 5.0% | 43.8% | 77.0% |
| 16 | 2.8% | 38.8% | 28.5% | 2.5% | 1.8% | 65.5% | 97.2% |
| 17 | 38.0% | 34.5% | 30.7% | 5.8% | 5.2% | 24.2% | 62.0% |

| | Recommended Plan | | | | | | |
|---|---|---|---|---|---|---|---|
| District | % NH White VAP | % Black VAP | % NH DOJ Black VAP | % Asian VAP | % NH DOJ Asian VAP | % Hispanic Origin VAP | % Minority VAP |
| 13 | 14.1% | 35.7% | 27.4% | 5.1% | 4.4% | 52.7% | 85.9% |
| 14 | 27.4% | 12.9% | 9.9% | 17.0% | 16.1% | 45.0% | 72.6% |
| 15 | 2.7% | 39.8% | 29.6% | 2.6% | 1.9% | 64.3% | 97.3% |
| 16 | 41.6% | 33.8% | 30.6% | 5.3% | 4.8% | 21.4% | 58.4% |

### *New York County*

119.    As shown in Table III below, New York County currently includes two districts with substantial minority populations: Existing Districts 12 and 15.  Their analogs in the Recommended Plan are Proposed Districts 7 and 13.

34

120.    The nonretrogression (and lack of dilution) in Harlem-based Proposed District 13 is discussed above, as this district crosses from New York County into the Bronx.

121.    Proposed District 7, like Existing District 12, extends from Manhattan through Brooklyn and Queens.  It is a plurality Hispanic district with a substantial Asian population as well.  It increases from 70.2% minority to 71.6% minority VAP.  Its Hispanic, Asian and Black VAP shares stay almost exactly the same (41.5%, 20.6% and 12.3%, respectively).

### Table III. Demographic Breakdown of Existing and Proposed Districts for New York County

#### A. Population

| Existing Plan | | | | | | | |
|---|---|---|---|---|---|---|---|
| District | % NH White | % Black | % NH DOJ Black | % Asian | % NH DOJ Asian | % Hispanic Origin | % Minority Population |
| 08 | 66.5% | 5.9% | 4.8% | 16.3% | 15.9% | 11.8% | 33.5% |
| 12 | 26.8% | 12.4% | 8.4% | 19.4% | 18.6% | 44.6% | 73.2% |
| 14 | 65.7% | 6.0% | 4.8% | 14.9% | 14.3% | 13.7% | 34.3% |
| 15 | 20.9% | 34.6% | 26.9% | 5.3% | 4.6% | 46.1% | 79.1% |

| Proposed Plan | | | | | | | |
|---|---|---|---|---|---|---|---|
| District | % NH White | % Black | % NH DOJ Black | % Asian | % NH DOJ Asian | % Hispanic Origin | % Minority Population |
| 07 | 27.8% | 12.7% | 8.6% | 19.6% | 18.8% | 43.1% | 72.2% |
| 10 | 65.3% | 5.2% | 4.0% | 17.9% | 17.4% | 12.2% | 34.7% |
| 12 | 67.0% | 6.2% | 4.9% | 13.9% | 13.4% | 13.3% | 33.0% |
| 13 | 12.2% | 35.9% | 27.0% | 4.9% | 4.2% | 55.1% | 87.8% |

B.  **Voting Age Population**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Existing Plan** | | | | | | | |
| District | % NH White VAP | % Black VAP | % NH DOJ Black VAP | % Asian VAP | % NH DOJ Asian VAP | % Hispanic Origin VAP | % Minority VAP |
| 08 | 67.2% | 5.7% | 4.7% | 16.3% | 15.9% | 11.3% | 32.8% |
| 12 | 29.8% | 11.6% | 8.1% | 19.8% | 19.1% | 41.4% | 70.2% |
| 14 | 67.5% | 5.6% | 4.6% | 14.5% | 14.0% | 12.7% | 32.5% |
| 15 | 23.0% | 34.1% | 26.9% | 5.6% | 5.0% | 43.8% | 77.0% |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Proposed Plan** | | | | | | | |
| District | % NH White VAP | % Black VAP | % NH DOJ Black VAP | % Asian VAP | % NH DOJ Asian VAP | % Hispanic Origin VAP | % Minority VAP |
| 07 | 28.4% | 12.3% | 8.6% | 20.6% | 19.8% | 41.5% | 71.6% |
| 10 | 65.4% | 5.4% | 4.2% | 17.9% | 17.4% | 11.9% | 34.6% |
| 12 | 68.6% | 5.8% | 4.7% | 13.7% | 13.2% | 12.3% | 31.4% |
| 13 | 14.1% | 35.7% | 27.4% | 5.1% | 4.4% | 52.7% | 85.9% |

### *Brooklyn (Kings County)*

122.    Because of the relatively large population shortfalls in the majority-minority (particularly majority-Black) districts in Brooklyn, significant decline in the minority population shares in such districts is inevitable. This is demonstrated by the fact that all submitted multidistrict plans (including the "Unity" Plan submitted by a civil rights coalition) propose districts with substantial drops in Black population shares in the relevant areas.

123.    The nonretrogression in Proposed District 7 relative to Existing District 12 was discussed above.

124.    Because Existing Districts 10 and 11 needed to add roughly 40,000 and 85,000 people respectively, and because no district can be drawn that maintains the Black population shares in those districts, they naturally experience a decline in such shares.  Moreover, the requirement that all districts in Brooklyn gain population necessarily leads to alterations in the configurations of those districts relative to one another.

125.   The core of Existing District 11 is now Proposed District 9.  As shown in the Table IV, the District drops from 57.5% Black VAP to 55.0% Black VAP.  Similarly, the 64.8% Black VAP share in Existing District 10 decreases to 56.0% in Proposed District 8.

126.   However, Proposed Districts 8 and 9 both remain majority-Black (and significantly majority-minority) districts.  Therefore, neither District results in dilution according to Section 2, and any diminution in Blacks' ability to elect their preferred candidates  is simply the result of differential rates of population growth.  (To reiterate, all proposals received in this litigation reflect comparable drops in their racial minority population.)

**Table IV. Demographic Breakdown of Existing and Proposed Districts for Kings County**

### A.   Population

| Existing Plan | | | | | | | |
|---|---|---|---|---|---|---|---|
| District | % NH White | % Black | % NH DOJ Black | % Asian | % NH DOJ Asian | % Hispanic Origin | % Minority Population |
| 08 | 66.5% | 5.9% | 4.8% | 16.3% | 15.9% | 11.8% | 33.5% |
| 09 | 57.0% | 6.1% | 4.6% | 20.2% | 19.3% | 17.2% | 43.0% |
| 10 | 18.3% | 64.0% | 58.7% | 4.4% | 3.9% | 17.2% | 81.7% |
| 11 | 25.6% | 58.0% | 53.5% | 6.5% | 5.9% | 13.2% | 74.4% |
| 12 | 26.8% | 12.4% | 8.4% | 19.4% | 18.6% | 44.6% | 73.2% |
| 13 | 62.3% | 8.6% | 7.1% | 14.0% | 13.6% | 16.1% | 37.7% |

| Recommended Plan | | | | | | | |
|---|---|---|---|---|---|---|---|
| District | % NH White | % Black | % NH DOJ Black | % Asian | % NH DOJ Asian | % Hispanic Origin | % Minority Population |
| 07 | 27.8% | 12.7% | 8.6% | 19.6% | 18.8% | 43.1% | 72.2% |
| 08 | 22.4% | 57.9% | 52.9% | 5.4% | 4.8% | 18.0% | 77.6% |
| 09 | 29.7% | 55.3% | 51.2% | 6.7% | 6.2% | 11.3% | 70.3% |
| 10 | 65.3% | 5.2% | 4.0% | 17.9% | 17.4% | 12.2% | 34.7% |
| 11 | 64.2% | 8.7% | 7.2% | 12.4% | 11.9% | 15.7% | 35.8% |
| 12 | 67.0% | 6.2% | 4.9% | 13.9% | 13.4% | 13.3% | 33.0% |

## B.  Voting Age Population

| Existing Plan | | | | | | | |
|---|---|---|---|---|---|---|---|
| District | % NH White VAP | % Black VAP | % NH DOJ Black VAP | % Asian VAP | % NH DOJ Asian VAP | % Hispanic Origin VAP | % Minority VAP |
| 08 | 67.2% | 5.7% | 4.7% | 16.3% | 15.9% | 11.3% | 32.8% |
| 09 | 58.8% | 5.8% | 4.4% | 19.8% | 19.1% | 16.0% | 41.2% |
| 10 | 17.5% | 64.8% | 59.8% | 4.6% | 4.1% | 16.6% | 82.5% |
| 11 | 26.7% | 57.5% | 53.2% | 6.4% | 5.9% | 12.5% | 73.3% |
| 12 | 29.8% | 11.6% | 8.1% | 19.8% | 19.1% | 41.4% | 70.2% |
| 13 | 65.1% | 7.6% | 6.4% | 13.8% | 13.4% | 14.2% | 34.9% |

| Recommended Plan | | | | | | | |
|---|---|---|---|---|---|---|---|
| District | % NH White VAP | % Black VAP | % NH DOJ Black VAP | % Asian VAP | % NH DOJ Asian VAP | % Hispanic Origin VAP | % Minority VAP |
| 07 | 28.4% | 12.3% | 8.6% | 20.6% | 19.8% | 41.5% | 71.6% |
| 08 | 25.2% | 56.0% | 51.6% | 5.3% | 4.8% | 16.6% | 74.8% |
| 09 | 30.4% | 55.0% | 51.1% | 6.6% | 6.1% | 10.7% | 69.6% |
| 10 | 65.4% | 5.4% | 4.2% | 17.9% | 17.4% | 11.9% | 34.6% |
| 11 | 66.9% | 7.7% | 6.5% | 12.2% | 11.8% | 13.9% | 33.1% |
| 12 | 68.6% | 5.8% | 4.7% | 13.7% | 13.2% | 12.3% | 31.4% |

### *Queens*

127.    Although Queens is not a covered county under Section 5, it does contain a significant minority population.  Thus, some discussion of Section 2 VRA issues is warranted with respect to the Queens districts not already discussed.  Data for Proposed Districts 7, 12, and 14 are presented above because they cross over into covered counties.

128.    Existing District 6 is a majority-Black VAP district with a Black VAP share of 54.6% (NH DOJ Black VAP of 49.9%), which is maintained in Proposed District 5.

129.    Proposed District 6, a central Queens District with a core that formerly was the top of the Existing "T-shaped" District 9, (a district that was 58.8% Non-Hispanic White VAP), is now a compact district in the center of Queens.  It is majority-minority (60.1% minority VAP) and plurality-Asian (38.8% VAP).

38

## Additional Requirements of the 2/28/12 Court Order

### *Compactness*

130.    The Recommended Plan contains compact districts.  In fact, by all but one compactness score (the length-width score), the average compactness scores of the Recommended Plan are superior to the proposals submitted by the parties and to the Existing Plan.  *See* Appendix D.

131.    Recognizing that, as mentioned above, compactness is also an aesthetic concept, it is worth noting that the districts in the Recommended Plan generally do not appear irregular to the naked eye.  The one exception may be Proposed Districts 10 and 7, which are irregularly shaped in their current forms, and in most of the submitted plans.

### *Contiguity*

132.    All of the districts in the Recommended Plan are contiguous.

### *Respect for Political Subdivision Lines*

133.    The Recommended Plan respects the boundaries of New York's political subdivisions.  It splits fewer counties and towns than the Existing Districts.

134.    The Recommended Plan keeps 42 of the state's 62 counties whole.   A list of the counties by district is provided at Appendix I.  The Existing Plan, in contrast, keeps only 36 counties whole – six fewer than the Recommended Plan.

135.    The Recommended Plan also keeps 895 of the state's 970 towns (or MCDs) together.  The Recommended Plan splits five fewer towns than the Existing Plan.  A list of towns assigned by district is provided at Appendix J.

*Communities of Interest*

136.   The Recommended Plan attempts to respect communities of interest.  Of course, given the extreme time limitations, a court-drawn plan is inevitably hindered in its ability to weigh the validity, salience, and relative importance of different community-based arguments. Moreover, districts of over 717,000 people inevitably include more than one community of interest, and must sometimes group together quite different or conflicting communities in order to achieve population equality.

137.   Nevertheless, certain widely recognized, geographically-defined communities are respected in the Recommended Plan.

138.   In Upstate New York, the Plan creates coherent North Country and Southern Tier districts.  It creates three compact districts surrounding the large metropolitan areas—Buffalo, Rochester and the Capitol Cities area.  It also creates a lower Hudson Valley district.

139.   In New York City, the Recommended Plan maintains the separation of the East and West sides of Manhattan.  Unlike several proposals, it also keeps Harlem whole, even while joining Harlem with parts of the Bronx in order to achieve population equality.  The South Bronx, however, is kept almost completely contained within a single district.  Proposed District 6 is contained wholly within Queens and unites many of Queens' Asian communities in a compact district.  Proposed District 8, in response to suggestions concerning the initial draft Proposed Plan, attempts to unite Fort Greene and Clinton Hill with similar communities of interest in Brooklyn.

140.   Finally, Proposed Districts 2 and 3 respect the communities of interest in Southern and Northern Long Island, respectively.

### *Respecting the Cores of Existing Districts*

141.    Although the constitutional, statutory, and court-ordered criteria required considerable departures from the Existing Plan, the Recommended Plan respects the cores of most Existing Districts.  A "Core Constituency Report," detailing which districts have which cores, is provided at Appendix E.

142.    Overall, one of the Recommended Plan's districts is comprised of 90% of a prior district, five districts are comprised of between 80% and 90% of a prior district, seven districts are comprised of between 70% and 80% of a prior district, three districts are comprised of between 60% and 70% of a prior district, four districts are comprised of between 50% and 60% of a prior district, and seven districts are comprised of less than 50% of a prior district.

## CONSIDERATION OF OBJECTIONS TO THE PROPOSED PLAN

143.    Following the March 5, 2012 hearing, the Magistrate Judge's Proposed Plan was released for comment.  The Magistrate Judge directed the parties and interested members of the public to show cause, by the morning of March 7, 2012, why the Proposed Plan should not be presented to the Court as the recommendation of the Magistrate Judge.  Among the parties, the Senate Majority defendants, the Rose and the Drayton Plaintiff-Intervenors, and the Ramos Plaintiff-Intervenors, each submitted responses to the Magistrate Judge's Order to Show Cause.

144.    The objections of the Senate Majority Defendants include the following:

a.    They argue that the Proposed Plan's Long Island districts (which are retained in the Recommended Plan) fail to respect the cores of current districts and the communities of interest that have formed around them.

41

Specifically, they contend that Long Island districts have traditionally run north-south, and that the Proposed Plan needlessly flips Districts 2 and 3 to run east-west along Long Island's northern and southern shores.  They further object to dividing the town of Smithtown between the Proposed Plan's Districts 1 and 3, suggesting that it be kept entirely within District 1.

b.      They argue that the Proposed Plan's District 5 fails to preserve the core of the prior district and creates a conflict between incumbents by pairing Representatives Meeks and Turner, and by creating an unnecessary open seat in the Proposed Plan's District 6.  They further contend that the Proposed Plan fails to respect communities of interest by dividing among four different districts (the Proposed Plan's Districts 5, 8, 9, and 10) traditional Russian and Jewish neighborhoods in Brooklyn and traditional communities of interest in Far Rockaway Peninsula, Howard Beach, and Ozone Park.  Finally, they argue that the Proposed Plan's District 5 is not compact and fails to respect political subdivisions by crossing into Nassau County.

c.      They argue that Marlboro Housing Development and Coney Island are communities of interest and have traditionally been in the same district.  Thus, they object to placing the former in the Proposed Plan's District 11 and the latter in its District 8.  As a remedy, they argue that Marlboro should be placed in District 8 and, in exchange, all of Midwood should be placed in District 11.

42

d.      They argue that the Proposed Plan's District 19 fails to respect the traditional core of that District and the communities of interest that have formed around it.  Specifically, they argue that it should include communities in the Hudson Valley that were traditionally part of this District, including Warren, Washington, and Saratoga Counties.

e.      They argue that the Proposed Plan's Districts 23 and 27 fail to respect political subdivisions by splitting several towns in Wyoming and Livingston Counties.  They contend that Wyoming and Livingston Counties should be located entirely within District 27, and that part of Erie County should then be included within District 23.

145.    The objections of the Rose Plaintiff-Intervenors include the following:

a.      They argue that Representative Israel, who is the incumbent in Proposed District 3, has long represented the communities of Wyandanch, Babylon, and Brentwood in central Long Island, and thus that the Proposed Plan errs by including those communities in its District 2, where Representative King is the incumbent.  They further argue that the growing African-American populations in these communities have strong ties to the sizable African-American population in Huntington Station, and that the growing Hispanic population in these areas has a well-established working relationship with Representative Israel.  Thus, they argue that these communities should be transferred from the Proposed Plan's District 2 to Proposed District 3.  Populations could then be equalized, they argue, by

43

transferring communities historically represented by Representative King, like Old Bethpage, from the Proposed Plan's District 3 to District 2.

b.       Although the proposal submitted by the Rose Plaintiff-Intervenors to the Magistrate Judge reflected a similar division, they object that the Proposed Plan's Districts 4 and 5 divide Nassau County.  Specifically, they argue that Nassau County border cities should be kept with their Nassau County neighbors, with whom they share local government services like schools and public safety systems.  Thus, they suggest that the Proposed Plan's District 5 should be wholly contained in Queens County, while District 4 should extend westward to the Nassau County line.

c.       They object that the Proposed Plan's Districts 16 and 17 radically redraw Existing Districts 17 and 18 in ways that fail to respect the cores of the Existing Districts.  They argue that the areas of Rockland County presently represented by Representative Engel should be placed in the Proposed Plan's District 16 and that areas in Westchester County presently represented by Representative Lowey should be placed in Proposed Plan's District 17.  They further object to the fact that the latter district divides six towns, and argue that several of those towns could be made whole by preserving more of Existing District 18.

d.       They argue that the Proposed Plan's District 21 makes unnecessary changes to Existing District 23 without respecting other districting principles.  They object to the removal of Madison, Oswego, and much of Oneida Counties from this District, and to the inclusion of Saratoga,

44

Warren, and Washington Counties, which, they contend, have nothing in common with the North Country counties in the District. They urge that Madison, Oswego, and preferably also Oneida Counties be returned to the Proposed Plan's District 21 from District 22, and that Saratoga, Warren, and Washington Counties be returned to the Proposed Plan's District 19, where they have been historically located.

e.     They argue that the Proposed Plan's Districts 26 and 27 involve unnecessarily large changes that pair incumbent Representatives Kathy Hochul and Brian Higgins, and that the Proposed Plan's District 27 should be returned to a shape more similar to Existing District 26 and should be drawn to include Representative Hochul's residence.

146.   The objections of Drayton Plaintiff-Intervenors include the following:

a.     They contend that Ozone Park and Howard Beach are communities of interest and should be included in the Proposed Plan's District 5 and removed from Proposed District 8, and that they should not be joined with the East New York area of Brooklyn.

b.     They argue that the Proposed Plan's District 8 is a "traditional VRA district . . . that was created for Black voters," and that the areas of Fort Greene, Clinton Hill, downtown Brooklyn, Brooklyn Heights, and Williamsburg should all be included within this District.

c.     They contend that the Proposed Plan's District 9 covers "the original VRA district . . . that was created for Black voters in Brooklyn," and that it should "honor the east-west orientation of North Brooklyn and the

45

Southeast orientation of the Black communities in Central Brooklyn below Atlantic Avenue." Specifically, they urge that the Brownsville and Flatlands areas should be moved into the Proposed Plan's District 9, while the Cobble Hill and Fort Greene areas should be moved to Proposed District 8.

d.      With respect to the Plan's Proposed District 16, they argue that Rye, Scarsdale, and Eastchester should be removed and that the Mount Pleasant areas should be added.

147.    The Ramos Plaintiff-Intervenors filed a response objecting to the Proposed Plan's District 7 on the ground that Greenpoint and Central/Eastern Williamsburg are a single community of interest and should be included in their entirety within this District. They further suggest that this addition be offset by removing from this District a section of South Williamsburg.

148.    Almost 400 non-party members of the public responded to the Magistrate Judge's Order to Show Cause. Those responses were reviewed and have been made part of the public record. The following is a summary of a representative sample of those responses.

149.    A non-party coalition called Voting Rights for All submitted a series of responses, arguing that certain features of the Proposed Plan's treatment of Proposed Districts 12, 13, 14, and 15 do not adequately respect communities of interest, including the African-American, Hispanic and Dominican-American communities. Among those responses was a submission by Congresswoman Yvette Clarke, objecting to the Proposed Plan's District 9 on the ground that it does not preserve the core of the prior district, does not maintain communities of interest, does not achieve compactness, and violates the Constitution and the VRA. She

46

proposes that the District be reconfigured to unite the Canarsie, Flatlands, Remsen-Village-Rugby, East Flatbush, Erasmus, Brownsville, Ocean Hill, and Crown Heights communities. Another submission, from Carl E. Heastie, contends that African-American communities in the Proposed Plan's District 15 should be joined with African-American communities in Proposed District 14, and that the change should be offset by reconfiguring the Proposed Plan's District 13 "to reflect the commonalities within the communities of Harlem, Spanish Harlem, and the Bronx."

150.     Non-parties Hakeem Jeffries and Karim Camara submitted separate responses, arguing that the Proposed Plan's District 8 wrongly excludes the traditionally African-American communities of Fort Greene and Clinton Hill and wrongly includes heavily white neighborhoods such as Gerritson Beach, Gravesend and Georgetown in Brooklyn, and Ozone Park, Howard Beach, and Woodhaven in Queens.  A similar response was received from a non-party coalition called Concerned Citizens of Fort Greene-Clinton Hill, arguing that the communities of Fort Greene, Clinton Hill, Bedford-Stuyvesant, Brownsville, East New York, and Canarsie are communities of interest that should be maintained within the same district.  A group of 365 concerned citizens affiliated with the Brown Memorial Baptist Church submitted a petition and a series of letters voicing the same concerns.

151.     Non-party Lincoln Restler submitted a response arguing that all of the communities of the north side of Williamsburg and Greenpoint are communities of interest that should be included within the Proposed Plan's District 7.

152.     Non-party David M. Pollock submitted a response on behalf of the Jewish Community Relations Council of New York, raising concerns that the traditional Russian and Jewish communities of southern Brooklyn are divided among the Proposed Plan's Districts 8, 9, 10, and 11.

153.     Non-party David Nir submitted a response arguing that certain aspects of
the Proposed Plan do not adequately respect political subdivisions.

## CHANGES MADE IN RESPONSE TO COMMENTS ON THE PROPOSED PLAN

154.     Determining which, if any, of the parties' and the public's suggested
changes to the Proposed Plan should be implemented and incorporated into the Recommended
Plan presented a considerable challenge.  Given our goal that the Recommended Plan be, and
appear to be, nonpartisan and incumbent-blind, the formulation of neutral principles to evaluate
which suggestions to accept proved quite difficult.

155.     Ultimately, the Magistrate Judge and I decided to make (and did make)
only those changes that furthered the requirements of the Court's 2/28/12 Order.  *See* Appendix
H (Changes Made to Proposed Plan).  However, to ensure that any such alterations did not
degrade the underlying features of the plan or cause cascading population changes likely to
trigger a new round of objections, we made such changes only when doing so was possible by
means of obvious population swaps between two adjoining districts.

156.     It should also be recognized that, perhaps given time constraints, no
submission provided complete and precise remedies for the problems it claimed to identify in the
Proposed Plan.  Therefore, if implemented by itself, each change would result in a violation of
the constitutional requirement of population equality.  The accommodation of any change thus
required the exercise of discretion as to how to offset the suggested change in a manner least
likely to be found objectionable to other parties or members of the public.  Accommodating any
change required the addition and subtraction of individual census blocks between districts in
order to maintain precise population equality.  This can be quite difficult, especially in densely
populated areas, where census blocks often contain hundreds or even more than a thousand

people.  Therefore, even some small suggested changes could not be accommodated without major reconfigurations of districts.

157.   All the accepted changes can be justified on the basis of reducing violations of county boundaries or respecting communities of interest.  However, community-of-interest arguments that were tied to incumbent-related goals—such as preserving the relationship between a community and an incumbent – were not credited, given the Recommended Plan's aim of remaining incumbent-blind.  We also did not make changes that were based merely on respecting the cores of prior districts or reducing town splits, as we could not distinguish those from pretextual arguments for protecting incumbents.

158.   Based on the above-described criteria, the following changes were made to the Proposed Plan:

a.   The borders of Proposed Districts 8 and 9 were adjusted in order to place Fort Greene and Clinton Hill in Proposed District 8 for community-of-interest reasons.  The southern end of Proposed District 9 was expanded to compensate for the loss of population and adjustments were made along the border with Proposed District 8.

b.   The borders of Proposed Districts 23 and 27 were adjusted to unite Livingston and Wyoming Counties in Proposed District 27.  The split of Ontario County was reoriented to compensate for the population loss.

c.   Genesee County was united by placing the errant zero-population block assigned to Proposed District 25 in Proposed District 27.

159.   All other suggested changes could not be justified according to criteria in the Court's 2/28/12 Order, would likely entail violations of the Constitution or VRA, appeared

49

motivated by partisan or incumbency-related interests, or required altering multiple districts in the Proposed Plan.

## CONCLUSION

160.    In my professional opinion:

The Recommended Plan achieves a zero population deviation, adheres to all constitutional and statutory requirements, and complies with the terms of the 2/28/12 Order.  The Recommended Plan is superior overall to any other plan made available to the Magistrate Judge by the public for her review.  It satisfies the need for population equality across districts, respects the compactness and contiguity of districts, respects political subdivisions, and preserves communities of interest.

Further affiant sayeth not.

Nathaniel Persily

Sworn to and subscribed before me this

12th day of March, 2012.

LINDA F. BELLER
Notary Public, State of New York
No. 02BE6095109
Qualified in New York County
Commission Expires July 7, 2015