UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
MARK A. FAVORS, et al.,

        Plaintiffs,

   -against-

ANDREW M. CUOMO,

        Defendants.

--------------------------------------------------------X

        11 Civ. 5632
        (RR) (GEL) (DLI)
        (RLM)


## PLAINTIFFS-INTERVENORS MEMORANDUM IN SUPPORT OF THEIR MOTIONS FOR A PRELIMINARY INJUNCTION, DECLARATORY JUDGMENT, APPOINTMENT OF SPECIAL MASTER AND EXPEDITED DISCOVERY

Joan P. Gibbs
Esmeralda Simmons
Center for Law and Social Justice
Medgar Evers College, CUNY
1150 Carroll Street
Brooklyn, New York 11225
(718) 804-8893 – phone
(718) 804-8833 - fax
joanpgibbs@hotmail.com
JG: 4191
ES: 0215

Randolph M. McLaughlin
Jeffrey M. Norton
Newman Ferrara LLP
1250 Broadway, 27th Floor
New York, New York 10001
(212) 619-5400
Rmclaughlin@nfllp.com
Jnorton@nfllp.com
RM: 2690

LAW OFFICES OF FREDERICK K. BREWINGTON
By: Frederick K. Brewington
Valerie M. Cartwright
556 Peninsula Boulevard
Hempstead, N.Y.  11550
516-489-6959
office@brewingtonlaw.com
FB:5295
Attorneys for Plaintiffs-Intervenors

Donna Kaye Drayton *et al* and Melvin Boone *et al.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................. iii

PRELIMINARY STATEMENT....................................................................................1

ARGUMENT

I.  PLAINTIFFS-INTERVENORS REQUEST FOR PRELIMINARY
    INJUNCTIVE RELIEF WITH RESPECT TO THEIR CLAIMS
    THAT THE NEW SENATE AND ASSEMBLY MAPS
    VIOLATES THE FOURTEENTH AMENDMENT AND
    SECTION 2 OF THE VOTING RIGHTS ACT
    SHOULD BE GRANTED.............................................................................1

    A . APPLICABLE LEGAL STANDARDS.......................................................1

    B. PLAINTIFFS-INTERVENORS ARE LIKELY TO SUCCEED
    ON THEIR CLAIM THAT THE NEW SENATE MAP VIOLATES
    THE FOURTEENTH AMENDMENT.............................................................3

    C.  PLAINTIFFS-INTERVENORS ARE LIKELY SUCCEED
    ON THEIR CLAIM THAT THE NEW SENATE PLAN
    VIOLATES SECTION 2 OF THE VOTING RIGHTS........................................8

    D. THE BOONE PLAINTIFFS-INTERVNORS ARE LIKEKLY
    TO SUCCEED ON THEIR CLAIMS THAT THE ENACTED NEW
    YORK STATE SENATE AND ASSMBLY PLANS
    VIOLATE SECTION 2 OF THE VOTING RIGHTS ACT .....................................13

II.  PLAINTIFFS-INTERVENORS' MOTION FOR EPEDITED
     DISCOVERY SHOULD BE    GRANTED .......................................................17

CONCLUSION ..........................................................................................20

**TABLE OF AUTHORITES**

**CASES:**

Ayyash v. Bank A-Madina,
    223 F. R.D.35  (S.D.N.Y. 2005)……………………………………………………17

Arbor Hill Concerned Citizens Neighborhood Assn v. County of Albany,
    281 F. Supp. 2d 436 (N.D.N.Y. 20003)………………………………………………2

Bartlett v. Stickland,
    129 S. Ct. 1213 (200(9)………………………………………………………………14

Burns v. Richardson, 384 U.S. 73 (1966)…………………………………………………13

Bush v. Vera, 517 U.S. 952 (1996)………………………………… ……………………4

Campos v. City of Baytown, Texas,
    840 F. 2d 1240 (5th Cir. 1988)………………………………………………………15

Concerned Citizens of Hardee County v. Hardee County Board of Commissioners,
    906 F.2d 524 (11th Cir. 1990)………………………………………………………..15

Crawford-el v. Britton, 523 U.S. 574 (1998……………………………………………18.

Easley v. Cromartie, 532 U.S. 234 (2001)………………………………… ………………4

Edudata Corp. v. Scientific Computers, Inc.,
    599 F. Supp. 1084 (D. Minn. 1984)…………………………………………………19.

Ellsworth Associates Inc. v. United States, 917 F. Supp. 841 (D.D.C. 1996)……………18, 19

Flateau v. Anderson, 537 F. Supp. 237(S.D.N.Y 1992)…………………………………11

Fletcher v. Lamone,
    No. 11-cv-3220, 2011 WL
      6740169 (D. Md. Dec. 23, 2011)..................................................................4

Goosby v. Town Board of the Town of Hempstead,
    956 F. Supp. 326 (E.D.N.Y.1997)..............................................................13

Gray v. Sanders,
    372 U.S. 368 (1963)....................................................................................3

Gray Drug Store, Inc., v. Simmons,
    522 F. Supp. 961 (N.D. Ohio 1981)..........................................................18

Growe v. Emison, 507 U.S. 25 (1993)....................................................................10

Hulme v. Madison County,
    188 F. Supp. 2d 1041 (D. Ill. 2001)...........................................................7

Larios v. Cox,
    300 F. Supp. 2d 320  (N.D. Ga. 2004),
    affirmed Cox v. Larios, 124 S. Ct. 1503 (2004)....................................2,7.

Little v. LATFOR, Index No. 2310-2011
    (Sup. Ct., County of Albany, December 1, 2011).....................................12

Licht v.  Quattrocchi, 49 A 2d 887 (R,I, 1982)......................................................7

Miller v. Johnson, 515 U.S. 900 (1995).................................................................4

Moore v. Consolidated Edison Co. v. New York, Inc.,
    409 F. 3d 506 (2d Cir. 2005)....................................................................2

Neighbors Organized to Insure a Sound Envt., Inc. v,. McArtor,
    878 F. 2d 174 (6th Cir 1989)....................................................................18

v

OMG Fidelity, Inc. v. Sirius Technologies, Inc.,
    239 F.R.D. 300 (N.D.N.Y. 2006)……………………………………………………….17

Optic-Electronic Corp. v. United States,
    683 F. Supp. 269 (D.D.C. 1987)……………………………………………………….18

Puerto Rican Legal Defense Fund v. Gantt,
    796 F. Supp. 681 (E.D.N.Y. 1992)…………………………………………………….11

People United for Children v. City of New York,
    214 F.R.D. 252  (S.D.N.Y. 2003)……………………………………………………..12

Reynolds v. Simms, 377 U.S. 533 (1964)…………………………………………………..2, 3.

Rodriquez v. Pataki, 308 F. Supp. 2d 346 (S.D.N.Y. 2004)…………………………………..5,
7, 11

Shaw v. Reno, 509 U.S. 630 (1993)…………………………………………………………..4

Semitool, Inc. v. Tokyo Electron Am., Inc.,
    208 F.R.D. 273 (N. D. Cal. 2002)………………………………………………… 20

Stanley v. Univ.of  S. Cal, 13 F. 3d 1313 (9th Cir. 1994)…………………………..,,,,,,,,,,,,,18

Thornburg v. Gingles, 478 U.S. 30 (1986)……………………………………..................8, 9

Vigo County Republican Party v. Vigo County Commissioners,
    144 F. Supp. 1080 (S.D. Ind. 1993) ….………………………………………………7

Voinovich  v. Quilter, 507 U.S. 146  (1993)………………………………………………..7

Wesberrry v. Sanders, 376 U.S. 1
(1964)………………………………………………………………..……………..2

Whitcomb v. Chavis, 403 U.S. 124 (1971)...........................................................................13

Whitkop v. Baldwin, 1 F.R.D. 169 (D. Mass. 1939)..................................................18.

## CONSTITUTIONAL AND STATUTORY PROVISIONS:

Federal Rule of Civil Procedure 26.......................................................1,1 7, 18

Federal Rule of Civil Procedure 30.........................................................1, 17

Federal Rule of Civil Procedure 33.........................................................1, 17

Federal Rule of Civil Procedure 34.........................................................1, 17

Federal Rule of Civil Procedure 45.........................................................1, 17

Part XX of Chapter 57 of Laws of 2010..................................................12

Voting Rights of 1965, as amended, 1973 et seq...........................................passim

## OTHER AUTHORITIES:

Advocates for Children, "Dead Ends; The Need for More Pathways
    To Graduation for Overage, Under-Credited Students
    In New York City, "(December 2007).......................................12

Juan Cartagena," Report Voting Rights in New York City:
    1982 – 2006," 17 S.  Cal. L. & Social Justice 559 (2008)......................11

David N. Gelman and David Quigley,
    Jim Crow New York: A Documentary History of
    Race and Citizenship (NYU Press 2003)..................................12

Human Rights Project, Urban Justice Center,
    Race Realities in New York City (2007)....................................12

Lawrence Nordeen and Sundeep Iyver,
    Design Deficiencies and Lost Votes
    Brennan Center for Justice at New York
    University School of Law 2011)..............................................12

Eric Schrimshaw et al., "Insurance Related Barriers to Accessing
    Dental  Care Among African American Adults With
    Oral Health Symptoms in Harlem," 101 American Journal
    Of Public Health 8 (August 2011)........................................................... 12

Julie Sez, Noxious New York: The Racial Politics of Urban Health   and Environmental
    Justice (MIT 2006) ..........................................................................12

## PRELIMINARY STATEMENT

Pursuant to the Court's Orders, dated  April 3, 2012 and April 4, 2012,  Plaintiffs-Intervenors Donna Kaye Drayton, Edwin Ellis, Aida Forrest, Gene A. Johnson, Joy Woolley, Sheila Wright, Melvin Boone, Grisselle Gonzalez, Dennis O. Jones, Regis Thompson Lawrence, Aubrey Phillips, by their undersigned counsel, respectfully submit this memorandum, along with the attached Declaration of Joan P. Gibbs, dated April 12, 2012,  Declaration of Randolph M. McLaughlin, dated April 12, 2012, Declaration of Andrew Beveridge, dated April 12, 2012, Declaration of Zulema Blair, dated April 12, 2012, and Declaration of Frank Lewis, dated April 12, 2012, in support of their **Motion for a Preliminary Injunction, Declaratory Relief and Appointment of a Special Master**,  pursuant to Federal Rule 65 of the Federal Rules of Civil Procedure and their **Motion for Expedited Discovery** in Aid of their Motion for a Preliminary Injunction, Declaratory Relief and Appointment of a Special Master, pursuant to Rules 26, 30 33, 34 and 45 of the Federal Rules of Civil Procedure.

## ARGUMENT

### I.

### PLAINTIFFS-INTERVENORS REQUEST FOR PRELIMINARY INJUNCTIVE RELIEF WITH RESPECT TO THEIR CLAIMS THAT THE NEW YORK STATE LEGISLATIVE MAPS VIOLATE THE FOURTEENTH AMENDMENT AND SECTION 2 OF THE VOTING RIGHTS ACT SHOULD BE GRANTED

## I. Applicable Legal Standards

The legal standards for obtaining preliminary injunctive relief in this Circuit are well established. In general, a district court may grant a preliminary injunction where the moving party establishes: (1) that it is likely to suffer irreparable injury of the injunction is not granted, and (2) either (a) a likelihood of success on the merits of its claims, or (b) the existence of a

serious questions going to the merits of its claim and a balance of the hardships tipping decidedly in its favor. See e.g., Moore v. Consolidated Edison Co. v. New York, Inc., 409 F.3d 506, 510-511 (2d Cir. 2005). Where, as is the case here, the moving party seeks to affect government action taken pursuant to a statutory or regulatory scheme, the injunction should be granted only if the moving party meets the more rigorous likelihood- of- success on the merits test.  See e.g., Arbor Hill Concerned Citizens Neighborhood Assn v. County of Albany, 281 F.Supp.2d 436, 442 (N.D.N.Y. 20003); No Spray Coalition, Inc. v. City of New York, 252 F.3d 148, 150 (2d Cir. 2001).

As explained below, Plaintiffs-Intervenors satisfy both prongs of the test for preliminary injunctive relief. Plaintiffs will suffer irreparable injury if their request for injunctive relief is not granted.   The equal right to vote is one of the most fundamental rights of Americans... Reynolds v. Simms, 377 U.S. 533, 561-562 (1964).  As the Supreme Court stated in Reynolds, "the right to vote freely for the candidates of one's choice is the essence of a democratic society". Id. at 555. See also, Wesberry v. Sanders, 376 U.S. 1, 17 (1964) ("Other rights even the most basic are illusory if the right to vote is undermined."). Consequently, any illegal impediment to right to vote will by its very nature be an irreparable injury. Cf. Reynolds v. Simms, 377 U.S. at 585.

Plaintiffs-Intervenors are also likely to succeed on the merits on both their claims that the enacted new New York State Senate redistricting plan violates the Fourteenth Amendment to the United States Constitution and Section 2 of the Voting Rights Act of 1965, 42 U.S. C. 1973 et seq., as amended, ("Voting Rights Act"). See e.g., Larios v. Cox, 300 F.Supp.2d 1320 (N.D.

Ga. 2004), *affirmed* <u>Cox v. Larios</u>, 124 S. Ct. 1503 (2004).[1] In addition, the Boone et al. Plaintiffs-Intervenors are likely to succeed on their claim that the enacted State Senate and Assembly plans violate Section 2 of the Voting Rights Act.

## B. PLAINTIFFS-INTERVENORS ARE LIKELY TO SUCCEED ON THEIR CLAIM THAT THE NEW SENATE MAP VIOLATES THE FOURTEENTH AMENDMENT

The Fourteenth Amendment   the United States Constitution requires that state legislative seats be apportioned equally to ensure that the constitutionally guaranteed right of suffrage is not denied by the debasement or dilution of the weight of citizen's vote.  <u>Reynolds v. Simms</u>, 377 U.S. 533, 561-562 (1964).  As the Supreme Court explained in <u>Gray v. Sanders</u>, 372 U.S. 368 (1963):

> Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote –whatever their race, whatever their sex whatever their occupation, whatever their income, and wherever their home may be in that geographical unit. This is required by the Equal Protection Clause of the Fourteenth Amendment. The concept of "we the people" under the constitution visualizes no preferred class of voters but equality among those who meet the basic qualifications. The idea that every voter is equal to every voter in his State, when he casts his ballot in favor of several competing candidates, underlies many of our decisions.

<u>Gary v. Sanders</u>, 372 U.S. at 379-380.

---

[1] Preliminarily, Plaintiffs-Intervenors note that because of the time-constrains herein and the absence of any discovery, Plaintiffs-Intervenors are unable to fully present all the evidence necessary to succeed on either their Fourteenth Amendment or their claims under Section 2 of the Voting Rights Act. Notwithstanding this, however, the Court should grant Plaintiffs-Intervenors motion for a preliminary injunction because from the limited evidence and legal authorities cited herein it is clear that Plaintiffs-Intervenors are more likely , than not, to succeed on their claims under the Fourteenth Amendment and Section 2.

Along with the One-Person, One-Vote Rule, the Fourteenth Amendment's Equal Protection Clause also prohibits the use of race as the sole or predominant factor in constructing district lines, unless doing so satisfies strict scrutiny. Fletcher v. Lamone, No. 11-cv-3220, 2011 WL 6740169, at *11 (D. Md., Dec. 23, 2011) (citing Easley v. Cromartie, 532 U.S. 234, 241 (2001); Bush v. Vera, 517 U.S. 952, 958-59 (1996) (O'Connor, J., plurality). As the redistricting process will "almost always be aware of racial demographics." Miller v. Johnson, 515 U.S. 900, 916 (1995), a redistricting plan does not violate the Equal Protection Clause because it takes racial demographics into account. Id. Rather, the consideration of race in redistricting is only problematic if the state "subordinate[s]" traditional, "legitimate districting principles" in order to serve the goal of racial gerrymandering. Vera, 517 U.S. at 958-959 (citing Miller, 515 U.S. at 916).  If a plaintiff can prove that a plan has no rational explanation, "other than [as an] effort to separate voters into districts on the basis of race," then strict scrutiny will apply, and the plan will only survive if it is the least restrictive, narrowly tailored means for achieving a compelling governmental interest. Miller, 515 U.S. at 903; Shaw v. Reno, 509 U.S. 630, 649 (1993) ("Shaw I"). Without such a showing, however, the plan survives so long as it satisfies rational basis review, that is, that the plan is rationally related to a legitimate government interest. See Vera, 517 U.S. at 1010 (Kennedy, J., concurring).

In their First Amended Complaint, Plaintiffs-Intervenors allege that the New York State Legislature violated the Fourteenth Amendment, in locating the  new Senate District , Senate District 63,  upstate, rather than downstate, specifically in the New York City area, where the majority of Black and other minorities in New York City reside.  Plaintiffs-Intervenors First Amended Complaint at paragraphs 99–110. To succeed on this claim, Plaintiffs-Intervenors must show that the location of and population deviations in the new Senate plan "results solely from

4

an unconstitutional or irrational state purpose rather than from other state policies recognized by the Supreme Court." See *e.g.*, Rodriquez v. Pataki, 308 F.Supp.2d 346, 366 (S.D.N.Y. 2004).

Plaintiffs-Intervenors are likely to succeed on their claim here for two reasons. Even at this early stage of the proceedings and without any discovery having been had as to the creation and location of Senate District 63, it is clear that that the New York State Legislature, specifically the Senate Majority, in creating the new Senate District, Senate District 63, upstate, rather than downstate, where, the majority of Black and other minorities reside, was motivated by the desire to create a new Non-Hispanic White district. The location and demographics of the new Senate district, Senate District 63, and the deviations between the Senate Districts, upstate and downstate, particularly within the City of New York, singularly and collectively, strongly suggest that the Legislature, specifically the Senate Majority, in creating and locating Senate 63 in upstate New York was impermissibly motivated by a desire to create a new Non-Hispanic White seat.

First, notwithstanding the fact while that population growth upstate has been dramatically slower than the population growth downstate, the Senate Majority opted to create a new Senate district upstate, rather than downstate. Specifically, they avoided creating the new district with New York City, the location which has experienced dramatic growth and where the majority of New York State's Black and other minority residents live.[2] In the new State Senate district,

---

[2] According to the 2010 Census, the majority of Blacks in New York State live in New York City. 1,861,295 Black people lived in New York City: 416,695 Black people lived in the Bronx; 799,066 in Kings County; 205,340 in New York County; 395,881 in Queens; and 44,313 on Staten Island. Of the 1,861,295 Black people residing in New York City, the overwhelming majority, 1,421,101 persons, lived in the three counties covered by Section 5 (the Bronx, Kings, and New York).

Likewise, the majority of the Hispanics in New York State also live in New York City. According to the 2010 Census, 2,236,073 Hispanics reside in New York City. Of the 2,236,073 Hispanics who live in New York City, 1,641, 375 live within the three counties covered by Section 5 of the Voting Rights Act. In particular, 741,413, Hispanics live in the Bronx, 496,285 in Kings County, 403,577 in New York County. 613,750 Hispanics live in Queens County and 81,051 on Staten Island.

Senate District 63, Non-Hispanic Whites make up 61.24% of the population, Black people constitute 30.8% of the population; Hispanics constitute 5.30% of the population, and Asians 2.62% of the population. See Declaration of Joan P. Gibbs, dated April 9, 2012, at paragraph 2.

Second, the new Senate is also significantly malapportioned. In particular, every single upstate district is underpopulated, while every single downstate district is overpopulated. For example, all of the districts in New York City and Long Island are overpopulated. The districts in the three covered counties under Section 5and in Richmond County all have population deviations of +3.47% above the statewide mean; those in Queens County all have deviations of +3.83%, and those in Long Island all have deviations of +2.54%. The two districts wholly within Westchester, and adjoining New York City are virtually at the mean (+0.03%). Exhibit A attached to the Declaration of Eric Hacker, dated April 9, 2012, at pp. 11-14. [hereinafter "Hacker Declaration"]

By contrast, of the 26 districts to the north and west, 23 have deviations at least 4% below the mean, and 22 have deviations more than 4.6% below the mean. The cumulative effect is that the upstate region gets one-and-one-seventh district more than its proportional share of the total state population. New York City and Long Island together get one-and-one-seventh district less than their proportional share, with New York City being deprived of nearly a whole district, and the three covered counties left nearly two-thirds of a district short. Id.

Third, the regional malapportionment of the new Senate plan is not justified by traditional redistricting principles. A glance at the maps submitted to the Department of Justice by the

---

Similarly, the majority of Asians in New York State reside in New York City. Indeed, seven out of ten Asians in New York State reside in three boroughs of New York City: Queens, Brooklyn and Manhattan. According to the 2010 Census, of the 1,028,119 Asian who live in New York City, 508,334 live in Queens, 177,524 live in Manhattan, and 260,129 live in Brooklyn. In short, of the 1,028,119 Asians who live in New York City, 437,753 live in two of the counties (Kings and New York) covered by Section 5 of the Voting Rights Act.

Senate Majority shows many of the districts in the Senate plan are extremely non-compact, in many cases almost impossible to follow, except on a large scale map. See Exhibit A attached to the Hacker Declaration at p. 13.   In addition, the districts in the new Senate Plan divide so many counties districts, divide them into so many pieces, and create so many pairs of bi-county districts, that it erases county boundaries as a basis for drawing the districts. This is directly contrary to the traditional redistricting of New York State as pronounced in Article III, Section 4 of the New York State Constitution, which prohibits dividing any county into multiple Senate districts not wholly contained within one county. Id.

In short, the population deviations in the new Senate plan between upstate and downstate district are not justified by traditional state principles. Rather, the deviations, from the limited evidence presently available to Plaintiffs-Intervenors at this time, strongly appear to be systematically and intentionally applied by the Legislature, specifically the Senate Majority, to create a new non-Hispanic White seat.  In so doing, the Senate Majority debased or diluted the votes of Black and other minorities living downstate, specifically in New York City, in violation of the in violation of the Fourteenth Amendment.  Thus, the traditional "ten percent" is no safe harbor for the defendants here. See e.g., Larios v Cox, 300 F.Supp.2d 1321, (N.D. Ga. 2004) aff'd, Cox v. Larios, 124 S.Ct. 2806 (2006); Hulme v. Madison County, 188 F.Supp.2d 1041 (C.D. Ill. 2001); Vigo County Republican Party v. Vigo County Commissioners, 144 F.Supp. 1080 (S.D. Ind. 1993); Licht v. Quattrocchi, 49 A 2d 887 (R.I. 1982). See also Rodriquez v. Pataki, 308 F.Supp.2d at 364 ("We think Brown v. Thomson, 62 U.S. 5 (1983); Mahan  v. Howell, 410 U.S. 315 (1973); Gaffney v. Cummings, 412 U.S.7 35 (1973); and Abate v. Mundt, 4 U.S. 182, 187; 29 S.Ct.2d 399 (1971), lend support to the proposition that the 'ten percent' rule is not meant to state that systematically disadvantaging groups of voters with no permissible

justification for the disproportion.") Accordingly, the Court should grant Plaintiffs-Intervenors motion for a preliminary injunction, or, in the alternative, grant Plaintiffs-Intervenors motion for expedited discovery.

## C. PLAINTIFFS-INTERVENORS ARE LIKELY SUCCEED ON THEIR CLAIM THAT THE NEW SENATE PLAN VIOLATES SECTION 2 OF THE VOTING RIGHTS ACT

Section 2 of the Voting Rights Act provides that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State . . .in a manner which results in a denial or abridgement of the right to vote of any citizen of the United States on account of race or color. . .as provide in subsection (b) of this section." 42 U.S.C. Section 1973(a). Subsection (b) provides that a violation of subsection (a)

"is established if, based on the totality of circumstances, it is shown that political processes leading to the nomination or election in the State . . .are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less of an opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."

42 U.S.C. Section 1973(b).

Section 2 is a "flexible, fact-intensive" doctrine, the "essence" of which is triggered when "a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority] and [majority] voters to elect their preferred representatives." Thornburg v. Gingles, 478 U.S. 30, 46-47 (1986). In contrast to an equal protection claim, a Section 2 claim does not require a showing of discriminatory intent and may be proved by an election procedure's discriminatory effects alone. Id. at 35.

In order to establish that a challenged districting map has a disparate impact on minority voters, a plaintiff bringing a Section 2 claim must first satisfy three necessary preconditions (the "Gingles preconditions"): First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district . . . . Second, the minority group must be able to show that it is politically cohesive . . . . Third, the majority must be able to demonstrate that the majority votes sufficiently as a bloc to enable it . . . in the absence of special circumstances . . . to defeat the minority's preferred candidate. Id. at 50-51 (internal citations omitted). If the Gingles preconditions are satisfied, the plaintiff must then demonstrate that the totality of circumstances shows that the minority group does not possess the same opportunities to participate in the political process as other voters. See id. at 48-49. Factors relevant in this functional inquiry include, "the lingering effects of past discrimination," "the use of appeals to racial bias in election campaigns," and the use of electoral devices which tend to dilute the minority vote, such as anti-bullet voting laws and majority vote requirements. Id. at 51 n.15.

In their complaint, Plaintiffs-Intervenors allege that the New York State Legislature, in locating the new Senate District 63 upstate, rather than downstate, specifically in the New York City area, where the majority of Black and other minorities in New York City resides, in addition to violating the Fourteenth Amendment, violated Section 2 of the Voting Rights Act. Plaintiffs-Intervenors' First Amended Complaint at paragraphs 111-121. To succeed on their Section 2 claim, Plaintiffs-Intervenors must show: (1) that Blacks and other minorities living downstate in New York City and the adjoining areas are a large enough group and geographically compact enough to constitute a majority in a new Senate district downstate; (2) that Blacks minorities residing in New York City are "politically cohesive," meaning that they vote in a similar fashion,

and (3) that the majority votes as a bloc, allowing them usually to defeat Black and other minorities preferred candidates. See e.g., Growe v. Emison, 507 U.S. 25, 40 (1993).  Once Plaintiffs-Intervenors have satisfied their burden of proving the aforementioned three conditions, the Court must decide, based on a totality of the circumstances, whether Section 2 has been violated, after considering (among other things) the state's history of voting-related discrimination, the degree of racial polarization in voting, and whether and how the state has used voting practices or procedures that facilitate discrimination against Plaintiffs-Intervenors and other minority voters.  See e.g., Voinovich v. Quilter, 507 U.S. 146, 157 (1993).

Plaintiffs-Intervenors here satisfy each prong of the three-part test set forth Gingles. First, Blacks and Hispanics are sufficiently large and geographically compact to constitute a majority in another single-member Senate district in New York City. Second, Black and Hispanics are each political cohesive groups in New York City and more often than not vote as a bloc in New York City elections.  Declaration of Frank Lewis, dated April 12, 2012; Declaration of Zulema Blair, dated April 12, 2012.   Third, New York State, including New York City, has a long history of racially polarized voting. Id. For example, during the 2008 presidential primary, a majority of the New York State's Non-Hispanic Whites voted for then US Senator, Hillary Clinton, while the majority of the state's Black population voted for then US Senator, Barack Obama. See Matthew Stevens, New York State Senate Minority Report (2012) attached to Declaration of Joan P. Gibbs, dated April12, 2012, para.10. Similar evidence of racially polarized voting can be found in local New York City primary and general elections. Declaration of Frank Lewis, dated April 12, 2012; Declaration of Zulema Blair, dated April 12, 2012.

The "totality of circumstances" of the circumstance here also favor Plaintiffs-Intervenors, Blacks in New York as well as other racial minorities have a long and immediate

10

history of being subjected to open and official discrimination from their cities, their counties and the state. <u>See</u> *e.g.*, David N. Gelman and David Quigley, *Jim Crow New York: A Documentary History Race and Citizenship* (NYU Press 2003). As discussed below, this discrimination is documented in books, reports, studies as well as pending legal cases.

For example, Black people still do not possess the same opportunities to participate in the political process as other voters. For example, recently during the 2010 elections, according to a report issued by the Brennan Center for Justice at New York University School, 20,000 voters in New York State did not have their votes for governor counted because the machines read as "overvotes," 30,000 to 40,000 lost their votes in other contests. Lawrence Nordeen and Sundeep Iyver, *Design Deficiencies and Lost Votes* (Brennan Center for Justice at New York University School of Law 2011) at 1. According to that report, "polling places with high concentration of poor residents and language minorities had the highest overvote rates." <u>Id.</u> In particular, the report noted: "Across New York City black and Hispanic voters were more than twice as likely as non-Hispanic white voters to have votes voided as a result of overvoting." <u>Id.</u>

Moreover, in recent decades, during every redistricting cycle, Black and other minorities have complained about racial discrimination in the redistricting process. <u>See</u> *e.g.*, <u>Rodriquez v. Pataki</u>, 308 F.Supp. 346 (S.D.N.Y. 2004); <u>Puerto Rican Legal Defense Fund v. Gantt</u>, 796 F.Supp. 681 (E.D.N.Y. 1992); <u>Flateau v. Anderson</u>, 537 F.Supp. 237 (S.D.N.Y 1992). <u>See generally</u>, Juan Cartagena, "Report Voting Rights in New York City: 1982-2006" 17 S. Cal. L. & Social Justice 559 (2008).

For years, Blacks and Latinos complained that the practice of counting incarcerated persons at their places of incarceration, rather than at their home addresses, for the purposes of redistricting, violated their rights under the Fourteenth Amendment and the Voting Rights Act

because a disproportionate number of the people incarcerated are Black and Latino. Finally, in 2011, in part because of these complaints, the Prison Reallocation Law, Part XX of Chapter 57 of Laws of 2010, was enacted.  See Little v. LATFOR, Index No. 2310-2011 (Sup. Ct., County of Albany, December 1, 2011) at p. 8. (noting that the memorandum in support of Part XX had stated that  counting incarcerated persons at their places of incarceration, rather their home addresses "tends to dilute minority voting strength in violation of the federal Voting Rights Act and the one-person, one vote rule."). Almost immediately after the passage of Part XX, the law was unsuccessfully challenged by several upstate White State Senators of the New York Senate Majority and others. Id.

Furthermore, Blacks as well as other minorities, still suffer from discrimination in the health care, law enforcement, child welfare, public school system, employment, housing, and other areas of life in New York, including within New York City.  See e.g., Eric Schrimshaw, et al., "Insurance Related Barriers to Accessing Dental Care Among African America Adults With Oral Health Symptoms in Harlem," New York, American Journal of Public Health, August 2011, Vol. 101, Issue 8, pp. 1420-1428; Julie Sez, Noxious New York: The Racial Politics of Urban Health and Environmental Justice (MIT Press 2006);Human Rights Project Urban Justice Center,  Race Realities In New York City (2007); Advocates for Children, "Dead Ends : The Need for More Pathways to Graduation for Overage, Under Credited -Students for New York City  (December 2007); Floyd, et al v. City of New York, No. 08 Civ. 01034 (S.D.N.Y. 2008) (federal class action against the City of New York and the New York Police Department challenging NYPD's practices of racial profiling and unlawful stop-and-frisk practices); People United for Children v. City of New York, 214 F.R D. 252 (S.D. N. Y. 2003) (challenging racial discrimination in NYC's foster care system removal practices).

In short, Plaintiffs-Intervenors are likely to succeed on their claim that in locating the new Senate District 63 in upstate New York, rather than downstate, specifically in the New York City area, where the majority of Blacks and other minorities reside, Defendants violated their rights under Section 2 of the Voting Rights Act.

## D. THE BOONE PLAINTIFFS-INTERVNORS ARE LIKEKLY TO SUCCEED ON THEIR CLAIMS THAT THE ENACTED NEW YORK STATE SENATE AND ASSEMBLY PLANS VIOLATE SECTION 2 OF THE VOTING RIGHTS ACT

With respect to Nassau County, these issues have historically been found in previous voting rights cases commenced in jurisdictions within the County of Nassau, including Goosby v. Town Board of the Town of Hempstead, 956 F.Supp. 326, 350 (E.D.N.Y. 1997), where the Court stated:

> Defendants concede that black voters in the Town are politically cohesive in their support for Democratic candidates over Republican candidates. In every Town Board election analyzed by plaintiffs and defendants, except for the 1985 election, a majority of blacks supported a particular Democratic candidate. Therefore, plaintiffs have proved that black voters in the Town are politically cohesive.

Judge Gleeson continued that:

> Racially polarized voting in the Town is significant and persistent. The invidious effect of these divergent voting patterns is especially apparent where, as in this case, the district is large in relation to the total number of legislators, the entire legislature is elected at-large, and there is no provision for at-large candidates running from geographic subdistricts.

Id. at 351-52 (citing Whitcomb v. Chavis, 403 U.S. 124, 143–44 (9171); Fortson v. Dorsey, 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965); Burns v. Richardson, 384 U.S. 73, 88, 86 S.Ct. 1286, 1294–95, 16 L.Ed.2d 376 (1966). The applicability of these findings within the Town of Hempstead is especially relevant as the bulk of the Black population of Nassau County is located in the Town of Hempstead.

The historical findings of racially polarized voting is further demonstrated by the Report of Dr. Michael McDonald who looked at racially polarized voting in Nassau County in connection with his work in the *Boone* case and found a persistent pattern of racially polarized voting patterns among Black and White voters over time.  Dr. McDonald also found evidence that Black and Hispanic voters tended to vote as a coalition in support of the same candidates of choice.  See Dr. McDonald's Report submitted as Exhibit A to the Declaration of Randolph M. McLaughlin.

One of the issues faced by legislatures in drafting a redistricting plan is whether, and to what extent, districts can be created that will provide a minority group or groups an opportunity to nominate and elect candidates of choice. In approaching this question, courts have developed several concepts that are used to determine whether a redistricting plan violates Section 2.  Three such concepts, relevant to the immediate analysis, include "effective minority districts," "coalitional districts," and "influence districts."

An effective minority district is a district that contains a sufficient population to provide the minority community with an opportunity to elect a candidate of its choice. A coalitional district, by contrast, is a district where more than one minority group resides and where, working in coalition, they can form a majority to elect a minority-preferred candidate.  To date, the Supreme Court has not held expressly that a claim under Section 2 can be stated where a jurisdiction has failed to establish a minority coalitional district. Bartlett v. Stickland, 129 S.Ct. 1231, 1242-43  (2009) Court declined to address that question); Growe v. Emison, 507 U.S. at 41 ("Assuming (without deciding) that it was permissible for the District Court to combine distinct ethnic and language minority groups for purposes of assessing compliance with §2, when dilution of the power of such an agglomerated political bloc is the basis for an alleged

14

violation."). However, a number of lower courts have held that a Section 2 case may consist of a coalition of minority groups if they are sufficiently politically cohesive and have a sufficient commonality of interest. See Concerned Citizens of Hardee County v. Hardee County Board of Commissioners, 906 F.2d 524, 526 (11th Cir. 1990) ("Two minority groups . . . may be a single section 2 minority if they can establish that they behave in a politically cohesive manner."); Campos v. City of Baytown, Texas, 840 F.2d 1240, 1244 (5th Cir. 1988) ("There is nothing in the law that prevents the plaintiffs from identifying the protected aggrieved minority to include Blacks and Hispanics.").

The Report of Dr. Robert Smith prepared in connection with the Boone litigation conclusively establishes that voting in a cohesive fashion, the Black and Hispanic communities are functionally a coalitional community of interest. See Dr. Smith's Report submitted as Exhibit B to the McLaughlin Declaration. Dr Smith posits that these two communities share a number of similar interests along a broad spectrum of indicia that would warrant their consideration as a coalitional district.

The Declaration of Dr. Andrew Beveridge also establishes conclusively that the Legislature could have easily created two majority Black and/or two majority minority coalition districts in Nassau. The adopted Assembly Plan concentrates the Blacks in one district (District 18). That district has a composition of 60.85% Non-Hispanic Black Citizens and 79.74% of Citizens of Voting Age Hispanics and Blacks combined. See Exhibit 2 annexed to the Beveridge Declaration. As Exhibit 2 shows, the adopted plan splits portions of this community of interest into five districts: 13, 15, 18, 21 and 22. This serves to dilute the voting strength of the Black citizens and the Hispanics and Black citizens together. Dr. Beveridge was able to create two proposed districts which reunite these communities of interest and have majorities of Black

15

citizens of voting age in each of two districts (50.8% and 50.9%). It also has a substantial majority of Hispanics and Black citizens in these same two districts (69.9 and 66.3 percent). The proposed districts are shown in Exhibit 4 submitted with the Beveridge Declaration, annexed as Exhibit B to the Declaration of Randolph M. McLaughlin. As Exhibit 5, annexed to the Beveridge Declaration shows, only District 18 has a substantial concentration of Black citizens of voting age, so the current lines serves to crack the Black community.

A similar cracking or splitting of the Hispanics and Black citizens is found in the adopted plan. No district has a majority of Non-Hispanic Black and Hispanic Citizens of Voting Age. See Exhibit 5 of the Beveridge Declaration. As illustrated in Exhibit 7 and 7 of the Beveridge Declaration, the Hispanics and Black areas are split into four districts: 6, 7, 8, and 9. This situation serves to dilute the voting strength of the Black citizens and the Hispanics and Black citizens together. The proposed district has a majority of Hispanic and Black citizens of 56.6%. In short, it creates a district that reunites a community of interest. The proposed Assembly plan deprives Black voters and Black voters allied with Hispanics to elect their candidates of choice in two districts. Rather, the current configuration "packs" those voters into one district, while splitting the remaining members of the group among several districts.

Similarly, the proposed Senate plan deprives Black voters allied with Hispanics to elect their candidate of choice in one Senate district. The current configuration "cracks" the voting strength of those voters among several districts. Based upon this analysis, Dr. Beveridge concludes that the current Senate and Assembly plans both deprive minority voters of their right to choose one candidate of choice in both the Senate and the Assembly. Accordingly, Plaintiffs-Intervenors Boone *et al.* offered sufficient evidence, at this stage of the proceedings, to satisfy these three prongs of the Gingles criteria.

16

## ARGUMENT

## II.

## PLAINTIFFS-INTERVENORS' MOTION FOR EXPEDITED DISCOVERY SHOULD BE GRANTED

The Federal Rules of Civil Procedure contemplate that discovery may be expedited in appropriate circumstances. Rules 26(a), 26 (d), 30(a), 34(b) and 45(c )(1), which govern initial disclosures, depositions, requests for production of documents and subpoenas, respectively, each state that discovery may be served and responses may be required in advance of the standard time periods provide by the Rules, either if the Court so "direct[s ] by order" or if leave of the Court is obtained.

Pursuant to 26(d)(1), district courts may grant  expedited discovery based on "the flexible standard of reasonableness and  good cause. <u>Ayyash v. Bank A-Madina, 223 F. R.D.35, 27</u> (S.D.N.Y. 2005). Determining whether good cause exists typically requires weighing the prejudice the moving party will suffer from delay against the prejudice, if any, that the responding party will suffer from expedited discovery. <u>See OMG Fidelity, Inc. v. Sirius Technologies, Inc.,</u> 239 F.R.D. 300, 305 (N.D.N.Y. 2006) ( granting expedited discovery based on a "comparison of the potential prejudice which will be suffered by the defendant if discovery is permitted, and that which will be experienced by the plaintiff if denied the opportunity for discovery at this stage.").

District courts also enjoy broad authority to sequence discovery This power is expressly conferred by Federal Rule of Civil Procedure 26 (d) which provides that a district court may order that discovery proceed in stages based on the convenience of parties or witnesses, or when

" the interest of justice" so warrant. The Supreme Court has explained that this Rule "vests the trial court with broad discretion . . .to dictate the sequence of discovery." Crawford-el v. Britton, 523 U.S. 574, 598 (1998).

In the instant case, Plaintiffs-Intervenors only seek expedited discovery of documents with respect to the enacted 2012 New York State Senate and State Assembly plans.  The discovery that Plaintiffs-Intervenors requests is not only reasonably calculated to lead to the discovery of admissible evidence, Fed.R.Civ.P. 26, but will aid this Court's resolution of Plaintiffs-Intervenors' pending Motion for Preliminary Injunction, Declaratory Relief – which are based on Defendants' alleged violations of Plaintiffs-Intervenors rights under the Fourteenth Amendment and the Voting Rights  Act. Without the requested discovery Plaintiffs-Intervenors will be strained to fully show that their rights under the Fourteenth Amendment and Section 2 have been violated. A party's need for timely information constitutes good cause. See e.g., Optic-Electronic Corp. v. United States, 683 F.Supp. 269, 271 (D.D.C. 1987) (granting discovery where "[i]t is in the best interest of all parties to have this case resolved as soon as possible."); Whitkop v. Baldwin, 1 F.R.D. 169 (D. Mass. 1939).

Expedited discovery is particularly appropriate when a plaintiff seeks injunctive relief because of the expedited nature of injunctive proceedings. See e.g., Ellsworth Associates Inc. v. United States, 917 F.Supp. 841, 844 (D.D.C. 1996) (also noting that "Courts have wide discretion with respect to discovery ...") (citations omitted). Indeed, federal courts generally permit expedited discovery to enable the parties to prepare for a preliminary injunction hearing. See e.g., Stanley v. Univ. of  S. Cal, 13 F.3d 1313, 1326 (9th Cir. 1994); Neighbors Organized to Insure a Sound Envt., Inc. v. McArtor, 878 F.2d 174, 177 (6th Cir 1989); Gray Drug Store, Inc. v. Simmons, 522 F.Supp. 961, 963 (N.D. Ohio 1981).  Expedited discovery has been ordered

where it would "better enable the court to judge the parties; interests and respective chances for success on the merits" at preliminary injunction hearing. Edudata Corp. v. Scientific Computers, Inc., 599 F.Supp. 1084, 1088 (D. Minn. 1984). [C]ourts have [also] routinely granted expedited discovery in cases involving challenges to the constitutionally of government action." Ellsworth Associates Inc. v. United States, 917 F, Supp at 844.

   Plaintiffs-Intervernors' discovery request is narrowly tailored and will better enable the Court to assess the parties' respective interests at the preliminary injunction hearing in this matter. See Exhibit A attached to the Declaration of  Joan P. Gibbs Among other things, on the record herein it is impossible to fully ascertain  the reasons of Defendants Robert Duffy, Dean G, Skelos, Sheldon Silver, John L. Sampson, Brian M. Kolb, the New York Legislative Task Force on Demographic Research and Apportionment, John J. McEnney, Roman Hedges, Michael F. Nozzolio, Martin Malave Dilan, Welquis R. Lopez or the creation of the enacted New York State Plan and the location of the new 63rd Senate seat, challenged herein. Likewise, notwithstanding the numerous public meetings and public hearings that occurred prior to the enactment of the new New York State Senate Plan, the current record is scant on the reason or reasons for the location of the new 63rd Senate seat, challenged herein. As such, good cause exists for granting Plaintiffs-Intervenors request for expedited discovery as such discovery is necessary  so that the parties can properly prepare for  a hearing on Plaintiffs-Intervenors' motion for a preliminary injunction which is being filed concurrently with this motion  for expedited discovery.

   Furthermore, Plaintiffs-Intervenors will be substantially harmed if their request for expedited discovery is not granted and their request for a preliminary injunction is denied. In contrast, to the substantial harm that Plaintiffs-Intervenors will suffer if their request for expedited discovery is denied, Defendants will suffer no prejudice from being required to

19

produce the documents requested by Plaintiffs-Intervenors.  These are "core documents central to the underlying case" that Defendants would have to produce "in the normal course of discovery" in any event." Semitool, Inc. v. Tokyo Electron Am., Inc., 208 F.R.D. 273, 276 N.D. Cal. 2002).

In short, the Court should grant Plaintiffs-Intervenors' request for expedited discovery.

## CONCLUSION

For the forgoing reasons, this Court should grant Plaintiffs-Intervenors' motions for a Preliminary Injunction, Declaratory Judgment, the Appointment of a Special Master and Expedited Discovery.

Dated: Brooklyn, New York
      April 12, 2012

                              Respectfully submitted,

                              Joan P. Gibbs
                              Esmeralda Simmons
                              Center for Law and Social Justice
                              Medgar Evers College, CUNY
                              1150 Carroll Street
                              Brooklyn, New York 11225
                              (718) 804-8893 – phone
                              (718) 804-8833 - fax
                              joanpgibbs@hotmail.com
                              JG: 4191
                              ES: 0215

                              Randolph M. McLaughlin
                              Jeffrey M. Norton
                              Newman Ferrara LLP
                              1250 Broadway, 27th Floor
                              New York, New York 10001
                              (212) 619-5400
                              Rmclaughlin@nfllp.com
                              Jnorton@nfllp.com
                              RM: 2690