# EXHIBIT B

Separate and Unequal:
A History of Segregation and Discrimination on Long Island and in Nassau County,  and African American and Latino Communities of Interest.

Robert Courtney Smith, Ph.D.
June 30, 2011.

My  name is Robert Courtney  Smith, and I reside in Montclair, NJ.  I am Full Professor of Sociology, Immigration Studies and Public Affairs at Baruch College, and the Graduate Faculty in Sociology at the Graduate Center, CUNY, since 2009, and have taught at CUNY since 2004.  Prior to that, I taught at Barnard College, Columbia University, for ten years.  My specialization is in immigration and related fields, including race and ethnicity, education, inequality, voting rights, and immigration and American institutions.  I have consulted before on various cases involving immigration, including in deportation proceedings.  I have also consulted on cases that settled out of court.   I was an expert witness in US. v. Village of Port Chester, a Voting Rights Act Case, in 2006-2007.

I received an Honors B.A., magna cum laude, from the University of Delaware, in economics and political science, and my M.A. and Ph.D. from Columbia University in political science.  My book, *Mexican New York* (University of California Press, 2006) won the 2006 Thomas and Zaniecki Award from the International Migration Section of the American Sociological Association (ASA); the 2007 Robert Park Prize from the Urban and Community Sociology Section of ASA;  the 2008 Best Book prize in the Latino/a Section of ASA; and the 2008 overall Distinguished Book Award from the ASA. I am also co-editor of the book,  *Migration, Transnationalization and Race in a Changing New York* (Temple, 2001).  I have published more than two dozen articles, book chapters, or other publications on immigration and related issues.   My work has focused on how immigrants are incorporating into the US political, economic and educational systems; and how gender, race, ethnicity and legal status affect those processes;  on transnational processes between the US and Mexico, including Mexico's relationship with its emigrant population.  I am currently doing work on children of Mexican immigrants' experience of education and incorporation into New York, and on political incorporation of immigrants.   In addition to these thematic concerns, I have a research agenda involving the scientific bases of qualitative research (and was a member of National Science Foundation Workshop on this issue), including interviewing, participant observation or ethnography, and historical research.  My work has been funded by grants from

the National Science Foundation,  The Social Science Research Council,   The Spencer Foundation/National Academy of Education,  the W.T. Grant Foundation, and the Guggenheim Foundation, which awarded me a fellowship in 2009-2010.

A detailed record of my professional qualifications is set forth in the attached Curriculum Vitae, which I prepared and know to be accurate.

I have been retained by counsel for the plaintiffs in the case of <u>Boone et al v. Nassau County Legislature</u> to provide my expert opinion.  I am being paid $200 per hour plus expenses for my time related to my study and testimony in this case.  My compensation does not depend on the outcome of the case.

At the request of the plaintiff attorneys in this case,  I have summarized in this declaration historical and contemporary evidence concerning the history of discrimination and segregation against African Americans and Latinos[1] on Long Island and in Nassau County, and evaluate available evidence on conditions promoting a community of interest among African Americans and Latinos in Nassau County. Among the sources I have consulted are:  published work by social scientists and historians on African Americans and Latinos on Long Island and elsewhere;  newspapers and online publications;  data from the governments of New York State,  Nassau County,  as well as other government sources, such as the Bureau of the Census, including the Census and the American Community Survey (ACS);  judgments, consent decrees and other documents describing legal proceedings;  a recording of a public hearing on the Redistricting plan in Nassau County; and interviews with informed parties in Nassau County.


I have focused my analysis on the history and mechanisms of segregation and inequality on Long Island and in Nassau County,  and on the issue of African American and Latino Communities of Interest. These issues are especially important in redistricting decisions, and in evaluating the importance of Senate Factors in Voting Rights Act cases or contexts.

**Segregation and Inequality on Long Island and in Nassau County.**

---

[1]  I use "African Americans" and "Blacks", and "Hispanic" and "Latino" interchangeably; "Browns" is a shorthand sometimes used in scholarly analysis as a counterpoint to "Blacks" and indicates Hispanics.

There is a long history of segregation and inequality on Long Island and in Nassau County, which continues to impact upon the lives of African American and Latino communities today.   It is well established that such socioeconomic and structural inequality is strongly associated with lower participation in politics, including voting, as is central to any Voting Rights Act analysis[2].  It also affects the formation of communities of interest.  Long Island has a history of discrimination and segregation that has resulted in a dominant social structure that results in categorical inequalities that persist and create very different life chances for African Americans and Latinos compared to whites on Long Island and in Nassau County.   Once established, these kinds of inequality, structural segregation and institutional racism can be reproduced without active or conscious individual level racial bigotry between whites and nonwhites (Hartigan, 2002; Massey and Denton, 1993).  They are often supported by government action or inaction, which need not be primarily racially motivated, but which persists in producing radically different life chances for white residents of Nassau County and Long Island and their African American and Latino counterparts.   Long Island has particularly serious issues with segregation and inequality in housing and educational opportunities.   Because educational opportunities are based on where one lives, residential segregation gains direct institutional expression in different educational opportunities for whites compared to African Americans and Latinos.

*Housing.*

Long Island and Nassau county have a long and well documented history  with housing discrimination.  Interestingly, Long Island was less segregated in the late 19th and early 20th centuries.  With very small

---

[2] See Raymond Wolfinger and Steven Rosenstone. 1980.  *Who Votes?* New Haven: Yale University Press; Sidney Verba and Norman Nie. 1972. *Participation in America: Political Democracy and Social Equality*. Chicago: University of Chicago Press; Rodolfo de la Garza and Louis DeSipio. 1999.  *Awash in the Mainstream: Latino Politics in the 1996 Election*.  Boulder: Westview Press;  Benjamin Highton and Arthur Burris. 2002 New Perspectives on Latino Voter Turnout.  *American Politics Research*. 30 (3): 285-306.  Louis DeSipio, 1996. *Counting on the Latino Vote: Latinos as a New Electorate*. Charlottesville: University of Virginia Press;  Sharon Navarro and Armando Xavier Mejia. 2004.  *Latino Americans and Political Participation*.  Santa Barbara, CA: ABC-CLIO.

black populations, whites did not try to control where blacks settled as much. However, segregation was imbricated into the very development of Nassau County housing after World War II, underpinned by federal government policies that discriminated against nonwhites, real estate practices and other methods. The 1934 National Housing Act established the federal mortgage guarantee programs administered through the Federal Housing Administration (FHA). These mortgages supported the tremendous growth in suburbs in the postwar period. Nassau County's Levittown is the quintessential postwar suburb, where many former city residents moved to the greener pastures of the suburbs. Levittown's original development of 17,400 houses on 4000 acres was reserved for "the race for which they were intended" and the deeds for these houses prohibited occupancy by "any person other than members of the Caucasian race." (Hartigan, 2002; Racial Equity Report Card, 2008) Indeed, "redlining" practices in the sale of real estate reflected government policies, which had included consideration of race (Massey and Denton, 1993). While the Supreme Court ruled FHA restrictive covenants unconstitutional in 1949, "private restrictions remained in effect until the Civil Rights Act of 1968." While not accomplished through restrictive covenants, this segregation continues today on Long Island and Nassau County. In the last decade, Levittown was 94.1% white, non Latino, and 0.5% were African American (Racial Equity Report Card, 2008).

In the postwar period, many local governments took measures that decreased their existing black population, and steered many of the newly arriving African Americans into unincorporated areas. Urban renewal in the 1940s-50s "pushed blacks out of incorporated communities and into unincorporated areas... the cities of Glen Cove and Long Beach, the incorporated villages of Freeport, Hempstead and Rockville Centre, and the communities of Inwood, Manhasset, and Port Washington, all in Nassau County, initiated slum clearance or urban renewal programs. The result was reductions in the Black populations in Glen Cove, Freeport, Rockville Centre, and Manhasset. " (Hartigan, 2002). The Black population was then relocated into segregated housing, including more high density public housing.

Continued housing segregation results from related policies on housing, practices in the real estate industry, and from ineffective government responses to discrimination in housing. Several factors either

make it harder for middle class minorities to move out of poorer areas, or reinforce segregation in other ways.   Exclusionary zoning, which requires a great deal of land for each housing unit, makes the construction of affordable housing very difficult, thus making it harder for middle class minorities to move out of poorer areas into more middle class areas (Racial Equity Report Card, 2008). (This issue is at issue in a lawsuit filed in US Eastern District Court No 05-CV-2301 (ADS) (WDW)).  In other places, "access to new affordable housing is set aside to those who already live or work in a particular community." (Racial Equity Report Card, 2008: i).  Real estate agents often "steer" clients to white or nonwhite areas, based on their skin color.  Indeed,  the Racial Equity Report Card reports that in cases where an African American alleged housing discrimination,  real estate agents were defendants in 73% of race based complaints (Racial Equity Report Card, 2008: ii).   In a joint effort by HUD, the Long Island Housing Services and the National Fair Housing Alliance, did testing or sting operations with real estate professional on Long Island. In their 2006 study, they report that "African American homebuyers were marketed homes in the very areas that whites were told to avoid." (Racial Equity Report Card, 2008: 54)The result of such practices is that nonwhites are kept out of white residential areas, where schools are usually better.  Another practice -- blockbusting -- occurs when minorities buy houses on a block or in an area, and real estate agents scare other whites into selling more cheaply before property values decline too much with the arrival of more minorities.  The resulting sell off depresses housing values, but makes profits for the real estate agents.   One upshot of this is that even when a nonwhite family becomes middle class, they have a hard time moving into a more middle class neighborhood, hurting the life chances of their children (Massey and Denton, 1993).

Government enforcement of fair housing laws has not been an effective deterrent to these practices.  The US Department of Housing and Urban Development (HUD) contracts with the New York State Division of Human Rights (NYDSHR) to enforce fair housing law.   But the NYSDHR has been extremely so in addressing fair housing cases, to the point that enforcement seems ineffective.  According to a 2006 NYS Office of the State Comptroller report,  two thirds of the fair housing complaint cases that went to the hearing stage  were processed late, and the "Central Office took between five and ten years to reach a

resolution." NYSDHR regulations require complaints to be resolved within 465 days from the date of filing.  Most cases at Regional offices are not assigned an investigator until 218 days after filing, while a probable cause is supposed to be determined within 180 days.  Some 64% of late processed cases took one to four years to complete (Racial Equity Report Card, 2008: 10).  In one case documented by the Housing Project (2008), a race discrimination case filed in 1995 did not have probable cause determined until 2003, some eight years later.  Such delays make the prosecution of cases more difficult for a variety of reasons, including witnesses or plaintiffs forgetting details or moving away, or even dying.   Another problem is that the statute of limitations can expire before the case is properly handled, creating a situation where they system meant to protect against such discrimination is making it impossible for victims of it to pursue a remedy.

Moving beyond the investigation of discrimination,  there is a lack of effective deterrence in the ways that the government (NYSDHR and federal Department of Justice or DOJ) addresses cases of housing discrimination.  Most race based housing discrimination cases that are prosecuted by DOJ result in a consent decree with compensatory damages, which are usually quite small,  but usually not punitive damages (which occurred in only one in 33 cases) or civil penalties.  The end result, according to the Housing Project (2008),  is that many perpetrators of discrimination come to see the risk of such compensatory damages as "the cost of doing business." (Racial Equity Report Card, 2008: 53). Such enforcement offers little disincentive to continue to discriminate.

The end result is that Long Island is extremely segregated.  According to Hartigan (2002),  Long Island is the 3rd most segregated suburban area in the US on a measure of Black-White segregation, and 13th most segregated on Hispanic-White segregation of all suburban areas.   One datum tells the impact of this reality: in 2000, Latinos on Long Island making more than $91,000 were "more likely to be turned down for conventional home loans than were Whites earning less than $38,250." (Hartigan, 2002).

This housing segregation is maintained through institutional racism, reproduced through both active and passive means.   For example, the failure of the government to enforce fair housing laws in any meaningful way on Long Island and Nassau County does little to counteract the informal practices of real

estate agents who steer clients to racially specific neighborhoods.   But continuation of this segregation does not require any action or active racial bigotry on the part of most residents of the white areas.

*Education and Political Division*.

Unequal educational opportunity and on Long Island and on Nassau County reflects racial segregation and also results from particular ways political authority and educational systems are organized on Long Island and in Nassau County.   Long Island has 125 school districts,  56 in Nassau County,  compared to most counties in the US, which have an average of 15 school districts.   These school districts are mostly small, with 75% enrolling fewer than 5,500 students, and 36% covering less than five square miles (Long Island's Educational Structure, 2009).   These myriad school districts are directly related to the fragmented structure of political authority and governance on Long Island.   Long Island's 1199 square miles are home to over 1000 separate governmental units, including county, town city and village governments, school districts, and 'special districts' for services like electricity and sewerage systems".   Such fragmentation is closely tied to segregation by race and class, and perpetuates "structural racism, i.e. laws and policies that, while racially neutral on their face, produce racial and economic inequalities in their effect... (including) isolat(ing) children of color in racially segregated, high poverty schools." Hartigan, 2002).

A key engine driving and reproducing inequality on Long Island is the way public education public is funded.  Much of the funding for public education comes from property taxes, which means that housing values in reality determine how much money spent on each student.   These property values reflect the history of discrimination recounted above.  School funding comes from several sources, including grants, state aid,  property taxes.  While poorer school districts get a greater percentage of state aid, the much higher revenue generated through property taxes in areas with higher property values ends up producing a situation in which students in wealthier, higher performing school districts get more money per pupil than those in lower performing, poorer school districts.  With property taxes rising on Long Island in the recent past, this funding disparity has grown.  Between 1995 and 2005 the per pupil spending of wealthiest 10%

of districts and the poorest increased from $8,756 to $11,032. The wealthiest districts can end up spending nearly 50% more per student than the poorest districts (Wells, 2009). On average, high income schools spend about $26,000 per student, while low income schools spend $18,000 per student. (Ten Key Facts About Long Island School Districts. Erase Racism, 2010).

An ironic result of this property value based funding is that wealthier school districts need to raise taxes less than poorer districts to raise the same amount of money. An analysis by the Fiscal Policy Institute estimated, for example, that to raise spending by $250 per pupil, Mineola (which is primarily white, 83% in 2000) would need to raise taxes by $76.57, while Roosevelt (79% African in 2000) would need to raise taxes by $303.92. Similarly, Syosset (mainly white) would need to raise its taxes by $83.48, while Hempstead (mainly minority) would have to raise taxes by $312.35. The report concluded that poor districts must raise taxes up to 6.5 times as much as similarly sized wealth districts to raise per pupil spending by the same amount (Wells, 2009: 11).

The Roosevelt school district provides a case of how funding formulas, political and educational divisions, and racial segregation combine here in a kind of perfect storm of disadvantage and unequal opportunity. In 2000, Roosevelt's school district was 89% African American, and 11 Hispanic. There were 4 white students in the whole district. Scores in Roosevelt's middle and high schools were inferior. Roosevelt is an unincorporated area within the town of Hempstead, and has the smallest tax base per student of any district in Nassau County, and covers less than two square miles. It has few commercial properties, and low home values. Hence, non-state revenues are minimal and per pupil spending is low. But New York State provides only 45% of the funding for Roosevelt schools. The State of New York actually took over the Roosevelt school district in 2002. When State Education Commissioner Mills proposed raised the idea that Roosevelt's middle and high schools be merged combined with its neighboring white (93%) district of Bellmore-Merrick, residents in that area rejected the idea. The result was the continued persistence of higher performing, better funded, white school district next to a low performing, lower funded, mainly African American district (Hartigan, 2002).

The reputations of school districts and towns reinforce the inequalities that students experience in school. For some wealthier districts, there were "hundreds" of applications for each teaching job, while "in poorer districts just miles away, schools had difficulty attracting a single applicant for a teaching job." according to Professor Amy Stuart Wells of Teachers College (Wells, 2009).

The outcomes in Long Island Schools are extremely unequal and segregated.  For example,  80% of students in low and medium poverty schools met state  standards on the 8th grade math test, while only 40% did so in high poverty schools.  On Long Island as a whole,  half of all Black and Latino children attend schools that are at least 95% students of color (Hartigan, 2002).   Dr. Wells summarized the educational system on Long Island this way: "Building 125 walls between 125 districts has led to great social injustice, intolerable property tax costs, and will ultimately lead to failure." (Long Island's Educational Structure, 2009).

Education is a key institution that "sorts" children into different class categories in society as adults. Inequality in educational funding, organized along racial and ethnic lines,  leads to profoundly different life chances for whites, African Americans and Latinos on Long Island.

**African American and Latino Communities of Interest[3].**

A question at issue in Nassau County now is whether African Americans and Latinos there constitute a "community of interest."  "Communities of interest" form when groups have common interests, confront similar problems, and relate similarly to structures of inequality and power.     Communities of interest can include neighborhoods or municipalities,   can be ethnically or religiously based,  can emerge from common experiences of exclusion, common experiences with the major institutions of society (school, labor market etc), or can emerge in other ways.      Evidence of communities of interest can include the following:  common socio-economic, educational and demographic and other characteristics;  recognition that others confront the same or substantially similar issues; collaboration in addressing said issues in social, organizational or institutional arenas;  common political action, broadly defined.   The conditions

---

[3]  This section draws especially on Hum, 2002; Jackson et al 1994; Guinier and Torres, 2002; Kaufman, 2003; McClain and Karnig, 1990; Meier et al, 2004; Segura and Alves Rodrigues, 2006; Vaca, 2004; and Wooten, 2008.

and factors that contribute to the formation of a community of interest are also relevant in a Senate Factor analysis in a Voting Rights Act context or a redistricting analysis.

One clear expression of a community of interest is a political coalition. When more than one group selects a person as their candidate of choice, it strongly suggests a community of interest. It is possible to have a community of interest without a political coalition, but the presence of such a coalition or the preference for a common candidate of choice strengthen the case for the existence of a community of interest. The research literature shows that several factors promote the formation of African American-Latino coalitions. These include: 1) when both communities are similarly located in socio-demographic, racial, educational and other terms, or in similar geographical areas; that their conditions of life and life chances are similar; 2) when both groups see the other as being in the "same boat," and see their being placed in that boat being related to race and ethnicity through common feelings of discrimination; 3) when leaders in each group seek to promote a sense of common problems and future, and the need to unite to face common problems and pursue common goals; 4) when one Latino group does not predominate, and Latinos have a sense of pan-Latino ethnicity, which is related to a stronger sense of affiliation with African Americans.

Data show that African Americans and Latinos in Nassau County form a community of interest. These data also invoke the Senate Factors in Voting Rights Act cases, especially those of the impact of socio-economic status on political participation, and in redistricting cases.

1) *Common Social Locations and Conditions of Life.*

African Americans and Latinos share considerable overlap in their social locations and conditions of life, as described at length in the housing and educational analysis above. One statistic bears repeating here: half of all Black and Latino on Long Island children attend schools that are at least 95% students of color, and these schools underperform significantly, even dramatically, compared to those in white districts (Hartigan, 2002). There are also a number of other statistical indicators that show similarities between the social locations and conditions of life among Latinos and African Americans, as compared with whites, in Nassau County.

According to the 2005-2009 American Community Survey or ACS, in Nassau County some 80.5% of white non Hispanics live in a single family, detached house, compared to 63.0% for Latinos and 67.8% for African Americans. Similarly, 87.4% of whites in Nassau County live in owner occupied housing, while 61.5% of Latinos and 67.4% of African Americans do. And in Nassau County, 15% of whites have grandparents responsible for their own grandchildren under age 18, compared to 21.5% of Latinos and 29.0% of African Americans. Whites and African Americans and Latinos have different income profiles. In Nassau County in 2005-2009, 3.1% of non Hispanic whites had incomes below the poverty level, compared to 10.0% of African Americans and 10.1% of Latinos. Similarly, per capita income over the same period in Nassau County for African Americans was $27,485, was $21,353 for Latinos, and $46,361 for non Hispanic whites. The differences in median earnings for men were even larger. African American men earned $39,405, Latino men earned $29,728, and white non Hispanic men earned $60,915. African Americans and Latinos have also been more harshly affected by the foreclosure crisis in New York State. While New York State has 5.1% of homes "under water" (worth less than their mortgages), and 0.5% are in pre-foreclosure, Nassau County has 10.2% under water and 1.1% in pre-foreclosure, while areas of concentration of African Americans and Latinos, such as Freehold, have even higher rates of pre-foreclosure, 3.0% -- six times higher than the NYS average. Indeed, the Mayors of the Villages of Freeport and Hempstead have announced their intentions to pull their investments out of Chase Manhattan Bank, as a protest of that bank's failure to take sufficient remedial action to help residents of those Villages (NY Communities for Change, 2011a, b; News12 Long Island, 6/2/11; Hempstead, in Protest, Is Severing Ties With Chase. New York Times. Cara Buckley, 4/5/11).

2) *African Americans and Latinos see themselves as being in the same boat in terms of common problems and futures, and in facing discrimination.*

African Americans and Latinos on Long Island perceive themselves to be the targets of racial discrimination. A 2008 report by the Stony Brook University Center for Survey Research showed widespread perceptions of discrimination among African Americans and Latinos. Some 80% of African Americans and 70% of Latinos surveyed had lived on Long Island more than 10 years, and 23% of

African Americans and 9% of Latinos had lived there their whole lives.  Some 60% of African Americans and 40% of Latinos reported that they had experienced some form of significant local discrimination (with housing, police, or neighbors).  Some 39% of African Americans and 21% of Latinos reported experiencing some form of housing discrimination,  and 42% of African Americans and 19% of Latinos reported being stopped by the police because of their race or ethnicity.  Some 16% of both groups reported being verbally harassed by a neighbor.

Interestingly,  both whites and nonwhites believe that housing discrimination exists on Long Island.  Just under 60% of all Long Islanders surveyed believe it is somewhat or very likely that some "African Americans or Latinos miss out on housing because real estate agents will not show them homes in good areas that they can afford,"  and 58% thought white landlords would be somewhat or very likely not to sell or rent homes to African Americans or Latinos (African American and Latino Experiences With Discrimination on Long Island. 2008).  Interestingly,  84% of African Americans and 73% of Latinos thought this housing discrimination was somewhat or very likely to occur, compared to 53% of whites.  Only 19% of whites thought it was very likely that real estate agents would steer African Americans or Latinos away from good areas they could afford,  while 50% of African Americans and 37% of Latinos did.  Moreover,  84% of African Americans and 69% of Latinos thought this was a somewhat or very serious problem, compared to only 54% of whites.

Another set of questions focused on feeling out of place walking or driving, shopping or in entertainment venues.  On Long Island,  34% of African Americans and 18% of Latinos felt out of place while walking or driving in a local community because of their race or ethnicity, while 28% of African Americans and 12% of Latinos felt that way while shopping.   If we combine those who felt out of place some or most of the time in these settings with those who reported discrimination in housing, with the police, or neighbor harassment,  we find that "71% of African Americans and 52% of Latinos have faced direct discrimination or felt discomfort on Long Island because of their racial or ethnic background." (Black and Latino Experiences with Discrimination on Long Island. 2008).

These statistics reflect conditions promoting a community of interest among African Americans and Latinos.    That majorities of all the groups surveyed belief that African Americans and Latinos are steered away from white housing areas suggests that this perception is true.   That many more African Americans and Latinos feel this to be a serious issue is an objective measure of the community of interest between these two groups.

3) *Mixed national origin and pan-Latino identity tend towards stronger identification with African Americans.*

African American and Latino coalitions and communities of interest are more likely to from when one nationality group does not predominate in the Latino population.  For example, in a city with a predominantly Mexican origin population,  or with a predominantly African American population, there may be a tendency for that group to try to go it on its own in politics, and not form a coalition.   The nativity and nationality statistics of Latinos and socio-demographic and other indicators of Latinos and African Americans in Nassau County point to conditions that should be fruitful for formation of a African American-Latino coalition and community of interest.   According to the 2010 Census,  Latinos in Nassau County are 12.2% of the population, and African Americans 10.5%, while non Hispanic Whites are 69.2%.  The similar population size of African Americans and Latinos, and their common conditions of life, including segregation and poorer performing schools,   contribute to the formation of  coalitions and a community of interest.  Foreign born Latinos are diverse in their origins. Foreign born Latinos account for 46% of the foreign born population in Nassau County.[4] Of this total,  the numbers for particular countries are all quite low, reflecting the diversity of the population.  Some 18.3%  are from the Caribbean, including 4.2% from the Dominican Republic.   Some 16.1% are from Central America, including 9.9% from El Salvador the largest single group.  Some 11.6% are from South America, including the largest single group, Colombians, at 3.2%.   This diversity lends itself to a pan-Latino consciousness in public policy contexts,  which is associated with a greater propensity for African American-Latino coalitions.   Larger Puerto Rican and Dominican populations also tend towards stronger

---

[4]  Of the rest of the foreign born, 21.5% are from Europe, 29.3% from Asia, 2.1% from Africa.

identification with African Americans;  Puerto Ricans are the second and third largest subgroups (1.9% and 1.4% of the population of Nassau County, respectively) in the Latino population.

4)  *African American and Latino leaders seek to address common problems together.*

An important expression of an African American and Latino community of interest were the protests against cuts in bus service on Long Island.  A rally organized by Legislator Robert Troiano in support of maintaining bus service with the support of Hispanic community organization (such as the Hispanic Counseling Center, and Hempstead Hispanic Civic Association)  and African American organizations (such as the NAACP), and others led by or mainly serving African American or Latino youth and other clients (the Equal Opportunity Commission, the Long Island Progressive Coalition, and the Hempstead Coordinating Council of Civics Associations. (Other supporters included Vision Long Island, a green advocacy group, and the New Hempstead Democratic Club).

The greater importance of public transportation to the African American and Hispanic populations in Nassau County compared to the white population can be seen in data from the 2005-2009 ACS.   Whites were more likely to use their own private vehicle to drive alone to work (83.3%) compared to Hispanics (59%) and African Americans (65.7%).  African Americans and Hispanics were more likely to use public transportation (18.7% and 16.3% respectively) than whites (2.5%).   Hispanics and African Americans were also more likely to walk or take another form of transportation, such as a bicycle to work.

**Means of Transportation to Work for Geography (Nassau County)   (Source: 2005-2009 ACS)**

| Means/group | African American | Hispanic | Non Hispanic White |
|---|---|---|---|
| Car, truck drove alone | 65.7% | 59.0% | 83.3.0% |
| Carpooled | 8.3 | 16.3 | 6.5 |
| Public transport | 18.7 | 15.0 | 2.5 |
| Walked | 3.2 | 5.1 | 2.3 |

| Taxicab, bicycle, etc | 2.2 | 2.5 | 1.0 |
| Worked at home | 1.9 | 2.1 | 4.4 |

These statistics speak both to the community of interest between African Americans and Latinos in Nassau County,  and to the disproportionate impact that changes in public policy have on that common community of interest compared to the impact on the white community in Nassau County.

Civic leaders with whom I have spoken have expressed a strong sense of a common fate between African Americans and Latinos.   George Siberon, Executive Director of Hempstead Hispanic Civic Association, remarked that "Blacks and Browns are clearly are a community of interest. There are great clusters of Black and Brown living together in Hempstead, Freeport, Roosevelt...who have less housing and are renters, not in professional jobs, qualify for hot lunch (in school), are in school districts that are less advantaged than other communities on Long Island, predominantly white communities... These large pockets of Black and Brown living together... in underperforming schools, lower incomes than whites, the students are less better off than their white counterparts."

Iris Johnson of the Equal Opportunity Commission, which she estimates serves 55% African American children and 45% Latino children,  believes that African Americans and Latinos are a community of interest because they both confront the same issues of "poverty, issues of worse housing, lower income, worse school districts, access to transportation.  When the bus lines were cut in Nassau County, those services, low income people depend on it." In answer to a question of whether Black and Hispanic leaders feel their communities share a common fate, she said "Latino and African American leaders share common problems -- health, education, housing gang issues.  How we work together to address them. We live together.  We serve all people."

Sergio Argueta of STRONG (Struggling to Reunite our New Generation) answered a question on whether African Americans and Latinos are a community of interest this way: "A lotta social issues impacting our

communities are one and the same.  I focus on youth violence.  The youth passing away from youth violence are Latino and African American both.  We coordinate with groups working with both African Americans and Latinos.   We look at schools underperforming with mainly minority students performing at a lower level than their Caucasian counterparts. " He has done anti-violence presentations in Black churches in Elmont. He finds there are many who understand we have the same interests.  He concludes that the Black-Latino coalition has gotten stronger in recent years.

A final and very important indicator of a community of interest in Nassau County between Latinos and African Americans comes in the form of coalition voting.  According to the report of Michael McDonald for this case,  African Americans and Latinos voted in coalition in 7 of 9 of the races in the legislative districts of most interest for this case.

Two Nassau County Legislators expressed similar sentiments when asked if they felt African Americans and Latinos formed a community of interest.  Legislator Kevan Abrahams from LD1  said that African Americans and Latinos "see their schools do not perform at the same level white schools, they are less advantaged and have less resources.  The problem is that school funds are tied to property taxes, so those districts with lower property values get less than wealthier districts...  most blocks and Blacks and Latinos living next to each other...  Blacks and Latinos live very integrated with each other,  but not with whites." An issue that Black-Brown coalitions sometimes face is that related to the timing of the incorporation of each group.  Because African Americans are incorporated first,  they often occupy powerful positions as Latinos become established and begin to rise to positions of leadership.   All the leaders with whom I spoke broached this issue, and expressed strong interest in working together.  Legislator Troiano highlighted several efforts,  including asking Latino leaders to sit on the boards of important civic associations, or the support of African Americans to get more Latinos on the Hempstead police department "because we see our own struggles" reflected in demands by Latinos for such representation. He sees this cooperation as critically important because of the common problems these groups face. When asked to compare the schooling and life opportunities of African American and Latino students

compared to white students in Nassau Country, Legislator Robert Troiano of LD2 answered succinctly: "Separate and unequal."

In my opinion,  African Americans and Latinos on Long Island and in Nassau County have experienced a segregated and discriminatory incorporation resulting in significantly unequal life chances for themselves and their children.  African Americans and Latinos also constitute a community of interest on Long Island and in Nassau County, based on their common life circumstances, perceptions of discrimination and of facing common problems.  Finally, African Americans and Latinos demonstrate significant coalitions, especially in voting for common candidates in 7 of 9 LD elections analyzed by Dr. McDonald, and are working jointly or seeking ways to work jointly on the many common issues they confront.

_____                    Dated:  June 30,2011.

Robert Courtney Smith

## References

Black and Latino Experiences with Discrimination on Long Island.  2008.  Report Prepared for Erase Racism by Stony Brook University Center for Survey Research.

Black and Brown Bridges: Successful Partnerships between African Americans and Latinos in the New South.  2007.  Georgia Center for Continuing Education, University of Georgia, Athens.

Guinier, Lani and Gerald Torres. 2002.  The Miner's Canary: Enlisting Race, Resisting Power, Transforming Democracy.  Harvard University Press.

Jackson, Bryan, E. Gerber and B. Cain. 1994.  Coalitional Prospects in a Multi-Racial Society: African American Attitudes toward Other Minority Groups.  Political Research Quarterly.  47 (2): 277-294.

Kaufmann, Karen. 2003. Cracks in the Rainbow: Group Commonality as a Basis for Latino and African American Political Coalitions.  Political Research Quarterly.  56 (2): 199-210.

Hartigan, Susan. 2002.  Racism and the Opportunity Divide on Long Island.  Study prepared for the Erase Racism Initiative of the Long Island Community Foundation by the Institute on Race and Poverty, University of Minnesota Law School.

Hum, Tarry. 2002. Redistricting and the New Demographics: Defining "Communities of Interest" In New York City.  A/P/A Studies Working Paper. Department of Urban Studies, Queens College, CUNY.

Massey, Douglas and Nancy Denton.  1993. American Apartheid: Segregation and the Making of the Underclass. Harvard University Press.

McClain, Paula and Albert Karnig. 1990.  Black and Hispanic Socioeconomic and Political Competition.  American Political Science Review.  84 (2): 535-545.

McKanders, Karla. 2010. Black and Brown Coalition Building During the "Post Racial" Obama Era.  Legal Research Paper Series.  University of Tennessee, Knoxville, Law School.

Meier, Kenneth, Paula McClain, J L Polinard, and Robert Wrinkle.  2004. Divided or Together? Conflict and Cooperation between African Americans and Latinos.  Political Research Quarterly.  57 (3): 399-409.

National Fair Housing Alliance. 2006.  Housing Segregation Background Report: Long Island, New York.

New York Communities for Change.  2011a Chase is Failing to Provide New Yorkers Needed Mortgage Modifications.  Feb. 2011.

----.  Foreclosure Crisis: Disproportionate Impact on African American and Latino Households and Neighborhoods. An analysis of newly released data.  January, 2011.

Racial Equity Report Card: Fair Housing on Long Island.  2008. Report by Erase Racism with the support of the Rauch Foundation.

Segura, Gary and Helena Alves Rodrigues. 2006.  Comparative Ethnic Politics in the United States: Beyond Black and White. Annual Review of Political Science.  9: 375-395.

Ten Key Facts About Long Island School Districts. Erase Racism, 2010.

Vaca, Nicholas. 2004.  The Presumed Alliance: The Unspoken Conflict between Latinos and Blacks and what it means for America.  Harper Collins.

Wells, Amy Stuart. 2009.  Why Boundaries Matter: A Study of Five Separate and Unequal Long Island School Districts.  Study Conducted by Teachers College for the Long Island Index.

Wooten, Matthew. 2008.  Past the Politics of Black and White: Understanding Black-Latino Coalitions in the New South.  Masters Paper, University of Texas at Austin,  Lozano Long Institute for Latin American Studies.