UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x

MARK A. FAVORS, HOWARD LEIB, LILLIE H.
GALAN, EDWARD A. MULRAINE, WARREN
SCHREIBER, and WEYMAN A. CAREY,

                    Plaintiffs,

DONNA KAYE DRAYTON, EDWIN ELLIS, AIDA
FORREST, GENE A. JOHNSON, JOY WOOLLEY,
SHEILA WRIGHT,  MELVIN BOONE, GRISSELLE
GONZALEZ, DENNIS O. JONES, REGIS THOMPSON
LAWRENCE, AUBREY PHILLIPS, LINDA LEE, SHING
CHOR CHUNG, JULIA YANG, JUNG HO HONG, JUAN
RAMOS, NICK CHAVARRIA, GRACIELA HEYMANN,
SANDRA MARTINEZ, EDWIN ROLDAN, MANOLIN
TIRADO, LINDA ROSE, EVERET MILLS, ANTHONY
HOFFMAN, KIM THOMPSON-WEREKOH, CARLOTTA
BISHOP, CAROL RINZLER, GEORGE STAMATIADES,
JOSEPHINE RODRIGUEZ, SCOTT AUSTER, and
ITZCHOK ULLMAN,

                    Intervenor-Plaintiffs,

           -against-

ANDREW M. CUOMO, as Governor of the State of New
York, ROBERT J. DUFFY, as President of the Senate of the
State of New York, DEAN G. SKELOS, as Majority Leader
and President Pro Tempore of the Senate of the State of
New York, SHELDON SILVER, as Speaker of the
Assembly of the State of New York, JOHN L. SAMPSON,
as Minority Leader of the Senate of the State of New York,
BRIAN M. KOLB, as Minority Leader of the Assembly of
the State of New York, NEW YORK STATE
LEGISLATIVE TASK FORCE ON DEMOGRAPHIC
RESEARCH AND REAPPORTIONMENT ("LATFOR"),
JOHN J. McENENY, as Member of LATFOR, ROBERT

**OPINION AND ORDER**

**DOCKET # 11-CV-5632
(RR)(GEL)(DLI)(RLM)**

1

OAKS, as Member of LATFOR, ROMAN HEDGES, as Member of LATFOR, MICHAEL F. NOZZOLIO, as Member of LATFOR, MARTIN MALAVÉ DILAN, as Member of LATFOR, and WELQUIS R. LOPEZ, as Member of LATFOR,

Defendants.

-------------------------------------------------------------------------x

**REENA RAGGI, United States Circuit Judge,**
**GERARD E. LYNCH, United States Circuit Judge,**
**DORA L. IRIZARRY, United States District Judge:**

In this opinion and order, we address several outstanding motions following our previous orders denying defendants' motions to dismiss the original complaint, see Favors v. Cuomo, No. 11-cv-5632 (RR)(GEL)(DLI)(RLM), 2012 WL 824858 (E.D.N.Y. Mar. 8, 2012), and adopting, with slight modifications, Magistrate Judge Roanne L. Mann's report and recommendation for the enactment of a new congressional redistricting plan for New York that complies with federal and state law, see Favors v. Cuomo, No. 11-cv-5632 (RR)(GEL)(DLI)(RLM), 2012 WL 928223 (E.D.N.Y. Mar. 19, 2012).  First, we deny defendants Dean G. Skelos's, Michael F. Nozzolio's, and Welquis R. Lopez's (collectively, the "Senate Majority Defendants") motion to dismiss the amended complaints for lack of ripeness and failure to state a claim.  Second, we grant the Senate Majority Defendants' and defendants Sheldon Silver's, John J. McEneny's, and Roman Hedge's (collectively, the "Assembly Majority Defendants") motions to dismiss intervening plaintiff Itzchok Ullman's complaint for failure to state a claim.  Third, we deny the motions for preliminary injunctive

relief filed by Donna Kaye Drayton, Edwin Ellis, Aida Forrest, Gene A. Johnson, Joy Woolley, Sheila Wright, Melvin Boone, Grisselle Gonzalez, Dennis O. Jones, Regis Thompson Lawrence, and Aubrey Phillips ("Drayton Intervenors"); and Juan Ramos, Nick Chavarria, Graciela Heymann, Sandra Martinez, Edwin Roldan, and Manolin Tirado ("Ramos Intervenors").  Fourth, we grant defendants John L. Sampson's and Martin Malavé Dilan's (collectively, the "Senate Minority Defendants") motion for leave to amend their answer and to file a cross-claim against the Senate Majority Defendants.  Fifth, we deny the motion to intervene filed by Todd Breitbart, Tobias Sheppard Bloch, Gregory Lobo-Jost, Raul Rothblatt, Mark Weisman and David Wes Williams (collectively, "Proposed Breitbart Intervenors") .

In resolving these motions, we assume familiarity with the facts and record of the underlying proceedings.  Nevertheless, we begin by providing a brief background focusing on the events that transpired on and after March 15, 2012, when New York enacted redistricting plans for the State Assembly and Senate.

I.    Background

On March 15, 2012, Governor Andrew M. Cuomo signed into law newly enacted state legislative districts based upon the 2010 census ("New Senate Plan," "New Assembly Plan" and, collectively, "New Plans").  Before putting the New Plans into effect, however, defendants[1] had to obtain preclearance under Section 5 of the Voting Rights Act, see 42

---

[1] Defendants, all sued in their official capacities, are Andrew M. Cuomo, as Governor of the State of New York; Robert J. Duffy, as President of the State Senate; Dean G. Skelos,

U.S.C. § 1973c, from either the United States Department of Justice ("DOJ") or the United States District Court for the District of Columbia ("D.C. District Court") because New York, Kings, and Bronx counties are "covered" jurisdictions, see 28 C.F.R., pt. 51, App. Defendants took both steps to obtain preclearance. The New Senate Plan was submitted to DOJ on March 16, 2012, and the New Assembly Plan was submitted to DOJ on March 28, 2012. Meanwhile, actions were filed with the D.C. District Court seeking the empaneling of a three-judge court and declaratory judgments that the New Plans comply with Section 5 of the Voting Rights Act. See Compl., New York v. United States, No. 12-cv-413 (RBW)(JWR)(RJL) (D.D.C. Mar. 16, 2012); Compl., New York v. United States, No. 12-cv-500 (RBW)(JWR)(RJL) (D.D.C. Mar. 30, 2012).

On March 15, 2012, a group of petitioners, including defendant Dilan and proposed intervenor Breitbart, brought a special proceeding in New York State Supreme Court, New York County, alleging that the New Senate Plan violates the New York State Constitution because of the inconsistent application of two mathematical formulas to add a new sixty-third State Senate district. See Cohen v. Cuomo, No. 102185/2012 (Sup. Ct. N.Y. Cnty. Mar. 15, 2012).

---

as Majority Leader and President Pro Tempore of the State Senate; Sheldon Silver, as Speaker of the State Assembly; John L. Sampson, as Minority Leader of the State Senate; Brian M. Kolb, as Minority Leader of the State Assembly; the New York State Legislative Task Force on Demographic Research and Reapportionment ("LATFOR"); John J. McEneny, as a member of LATFOR; Robert Oaks, as a member of LATFOR; Roman Hedges, as a member of LATFOR; Michael F. Nozzolio, as a member of LATFOR; Martin Malavé Dilan, as a member of LATFOR; and Welquis R. Lopez, as a member of LATFOR.

Due to these intervening events since the filing of this action, this Court orally directed the plaintiffs to file any amended complaints by March 27, 2012.[2] See Minute Entry, Mar. 21, 2012. In their new pleadings, the Amending Plaintiffs requested that this Court draft state legislative redistricting plans for the 2012 elections because the New Plans cannot be implemented until they are precleared, and there was a substantial risk that preclearance would not be obtained by the beginning of the candidate petitioning period on June 5, 2012. Without this Court's intervention, they maintained, New York would be forced to hold an election using the outdated and malapportioned existing plans, which would violate the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the United States Constitution, as well as Article III, §§ 4 and 5 of the New York State Constitution.

The Drayton Intervenors, Lee Intervenors, and Ramos Intervenors alleged that, even if the New Plans obtained preclearance and survived the state court challenge, the New Senate Plan improperly dilutes the voting power of African Americans, Asian Americans and Hispanics in violation of the United States Constitution and the Voting Rights Act, and the malapportioned districts lack any legitimate justification. The Drayton and Ramos Intervenors alleged that the New Assembly Plan also violates Section 2 by failing to create new majority-minority districts in Nassau County and New York and Bronx Counties,

---

[2] Plaintiffs are Mark A. Favors, Howard Leib, Lillie H. Galan, Edward A. Mulraine, Warren Schreiber, and Weyman A. Carey ("Favors Plaintiffs"); Linda Lee, Shing Chor Chung, Julia Yang, and Jung Ho Hong ("Lee Intervenors"); the Drayton Intervenors; the Ramos Intervenors. We refer to these plaintiffs collectively as the "Amending Plaintiffs" in this opinion and order. In addition to the Amending Plaintiffs, Intervenor Itzchok Ullman filed an amended complaint, which we address separately, see infra Part II.B.

5

respectively. The Drayton and Ramos Intervenors moved for preliminary injunctive relief on their Fourteenth Amendment one person, one vote and race discrimination claims, and their Voting Rights Act claims.

The Senate Majority Defendants moved to dismiss the Favors Plaintiffs' amended complaint in its entirety, as well as the Drayton, Lee, and Ramos Intervenors' amended complaints to the extent that they sought relief from allegedly malapportioned districts on grounds of ripeness, see Fed. R. Civ. P. 12(b)(1), and for failure to state a claim upon which relief can be granted, see Fed. R. Civ. P. 12(b)(6). Amending Plaintiffs and the Senate Minority Defendants opposed the motion.

On March 27, 2012, Intervenor Plaintiff Itzchok Ullman filed an amended complaint alleging that the New Assembly Plan improperly divides the Town of Ramapo, which could be contained in a single Assembly district, in a way that dilutes the Chasidic Jewish community's political power in violation of the Fourteenth Amendment and Article III, § 5 of the New York State Constitution. The Assembly Majority Defendants together with the Senate Majority Defendants moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).

At a status conference held on April 18, 2012, this Court orally denied the motions to dismiss the amended complaints with the exception of that filed by Ullman, on which we reserved decision, and indicated that this written decision would follow. See Minute Entry, Apr. 18, 2012. Two days later, on April 20, this Court heard oral argument regarding the standard of review applicable to the Drayton, Lee, and Ramos Intervenors' malapportionment

challenge to the New Senate Plan, as well as the population measurement the Court should use to assess the various challenges presented. At the conclusion of the hearing, we ordered the Drayton and Ramos Intervenors to produce the evidence on which they intended to rely to support their preliminary injunction motions. See Minute Entry, Apr. 20, 2012.

On April 27, 2012, DOJ advised the D.C. District Court that it had precleared the New Senate Plan. On May 3, 2012, following an expedited appeal directly from the trial court, the New York State Court of Appeals held that the application of two different methods to calculate the number of districts in the New Senate Plan did not violate the New York State Constitution. See Cohen v. Cuomo, 2012 WL 1537411 (N.Y. Ct. of Appeals May 3, 2012). Thus, Amending Plaintiffs' claims regarding the need for this Court to create interim State Senate maps while preclearance and the New York Court of Appeals decisions were pending are now moot. Those claims remain viable with respect to the New Assembly Plan, however, which has not yet obtained preclearance. Further, the Drayton, Lee, and Ramos Intervenors' constitutional and Voting Rights Act challenges to the New Senate Plan remain to be decided.

II.    Discussion

A.    Senate Majority Defendants' Motion To Dismiss the Amended Complaints

At the April 18 hearing, we stated that we would file a written decision to explain our oral denial of the Senate Majority Defendants' motion to dismiss the amended complaints to the extent they sought to have this Court create interim redistricting maps while the

preclearance process and state court litigation were pending.  Although those claims are now moot with respect to the New Senate Plan, because we represented that a written decision would follow, and because the New Assembly Plan has not yet been precleared, we offer the following explanation for why the Amending Plaintiffs' claims were and are ripe for review and why their amended complaints stated claims for relief.

1.    Ripeness Challenge

The Senate Majority Defendants' contention that Amending Plaintiffs' claims were not ripe as of April 18, 2012, can be understood in two parts.  First, insofar as the Amending Plaintiffs complained that defendants had failed to provide the state with election districts that had secured either DOJ or court approval necessary for implementation, the Senate Majority Defendants argued that no remediable injury was shown because the New Plans had been submitted for such approval in sufficient time to secure preclearance before June 5, 2012.  They dismissed as speculative Amending Plaintiffs' allegations that the New Plans would not be precleared by June 5 or would be found to violate the New York State Constitution.

Second, insofar as the Amending Plaintiffs complained that the New Plans, even if precleared, violate the Equal Protection guarantee of one person, one vote and Section 2 of the Voting Rights Act, the Senate Majority Defendants asserted that these claims were premature because the New Plans could not be implemented—and, thus, the constitutional violations could not occur—before preclearance was secured.

8

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). "Ripeness is a jurisdictional inquiry." Murphy v. New Milford Zoning Comm'n, 402 F.3d 342, 347 (2d Cir. 2005). "Ripeness is peculiarly a question of timing. Its basic rationale is to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements." Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 580 (1985) (internal quotation marks, brackets, and citation omitted).

Amending Plaintiffs' claims are ripe for reasons analogous to those discussed in this Court's denial of the initial motions to dismiss this matter. See Favors v. Cuomo, 2012 WL 824858, at *4–*7. Although the Governor signed the New Plans into law on March 15, 2012, those Plans could not be implemented for the upcoming elections until they were precleared. See Perry v. Perez, 132 S. Ct. 934, 941 (2012) ("Section 5 prevents a state plan from being implemented if it has not been precleared."). Insofar as those Plans had not been precleared at the time of our April 18 oral ruling, New York was thus without a lawful redistricting plan for an election cycle that would start within only six weeks. It is undisputed that the Court could not allow that election cycle to proceed under the existing plans because they are based upon the outdated 2000 census. See, e.g., Flateau v. Anderson, 537 F. Supp. 257, 262 (S.D.N.Y 1982) (three-judge court) ("If we waited until there no longer was time in 1982 for the reapportionment to be effected, the constitutional violation

9

would then have occurred, but it would be too late for any timely remedy to be structured.").

Therefore, as of the date of this Court's oral order, there were no State Senate and Assembly districts that could be used in the 2012 state legislative elections. Moreover, and what the Senate Majority Defendants fail to address satisfactorily, even if the New Plans were precleared by June 5, 2012, the amended complaints also assert federal constitutional and Section 2 Voting Rights Act claims that fall outside of the preclearance process and the state constitutional challenge in Cohen. Regardless of the outcome of the preclearance process and the state constitutional challenge, this Court needs to address these claims.

Thus, as of April 18, the Amending Plaintiffs adequately alleged injury from either (1) the complete lack of a precleared redistricting plan for the 2012 elections to the state legislature, or (2) the implementation of a plan that, even if precleared under Section 5 of the Voting Rights Act, nevertheless violated the Fourteenth Amendment's guarantee of one person, one vote and Section 2 of the Voting Rights Act. In short, resolution of the pending preclearance process and the Cohen litigation would not eliminate the Amending Plaintiffs' claimed injuries, but would only clarify their scope.

Insofar as the Senate Majority Defendants' ripeness challenge argues that any remedy would be premature, we are not persuaded. Redistricting remedies cannot be created on the spot (as this Court knows all too well after drafting congressional districts in an extremely tight time frame). As the Court's appointed expert, Professor Nathaniel Persily, has advised, "a court should have as its goal the imposition of a plan no later than one month before

10

candidates may begin qualifying for the primary ballot," which "means that the court should begin drawing its plan about three months before the beginning of ballot qualification in order to build in time for possible hearings and adjustments to the plan."  Nathaniel Persily, When Judges Carve Democracies: A Primer on Court-Drawn Redistricting Plans, 73 Geo. Wash. L. Rev. 1131, 1147 (2005).  Here, less than two months remained from the date of the Court's April 18, 2012 oral order until the June 5 start of the candidate petitioning period for the Court to craft a contingent redistricting plan.  Under such circumstances, Amending Plaintiffs' claims were certainly ripe for consideration as to both their merits and to the possible remedy of a judicially created redistricting plan, particularly if the New Plans were not precleared by June 5, 2012.  See Branch v. Smith, 538 U.S. 254, 259–61, 265–66 (2003) (affirming three-judge panel's interim plan where state plan had not yet been precleared); Fund for Accurate & Informed Representation, Inc. v. Weprin, 796 F. Supp. 662, 673 (N.D.N.Y.) (three-judge panel) (exercising jurisdiction where state plan had not been precleared "for the sake of ensuring a fair, timely election in New York State this Fall"), aff'd mem., 506 U.S. 1017 (1992); Scaringe v. Marino, No. 92-cv-0593, 1992 WL 144627, at *2 (N.D.N.Y. June 18, 1992) (three-judge panel) ("[U]nless new districts are devised in accordance with constitutional and statutory mandates, cleared through the procedural maze, and implemented in a timely fashion, plaintiff alleges that he will be deprived of his right to vote for a Senator and an Assemblyman because no valid districts will be in existence.").[3]

---

[3]   The Senate Majority Defendants' reliance on the Supreme Court's holding in Branch that "a district court may not impose a remedial plan unless the State plan 'had not

Time did not permit the Court to run the risk of having no contingent plan ready if the New Senate Plan was not precleared, and simply to hope that the legislature could remedy any defects in the short time frame remaining, particularly when the legislature had taken more than a year to pass the New Plans following the release of the 2010 census results.  See Smith v. Clark, 189 F. Supp. 2d 503, 511 n.5 (S.D. Miss. 2002) (three-judge court) ("We are simply unwilling to wait until a point in time that would not provide ample time for our thorough consideration of the reapportionment issues presented in this case."), aff'd sub nom. Branch v. Smith, 538 U.S. 254 (2003).

For similar reasons, Amending Plaintiffs' constitutional and Voting Rights Act challenges to the New Plans were ripe for review even while preclearance and Cohen were pending.  Because of the short period between the amended complaints' filing and the beginning of the petitioning period, this Court needed to be prepared to resolve any preliminary injunction motions filed in response to the precleared New Plans, and, if Amending Plaintiffs sustained their burdens, to grant preliminary relief before the state election cycle commenced.[4]

---

been precleared and had no prospect of being precleared in time for the . . . election,'" Senate Majority Defs.' Mem. 13, Dkt. Entry 286-1 (quoting Branch v. Smith, 538 U.S. at 265) (emphasis and alteration in memorandum of law), misses the mark.  The Court here did not propose to adopt its own plan at the expense of the New Plans.  Nor did it determine that there was no possibility the New Plans would be precleared in time.  It merely recognized its jurisdiction to begin the process of crafting a contingent plan to be implemented if necessary.

[4] As we explain, see infra Part II.C, the Drayton and Ramos Intervenors did not carry their burdens to obtain preliminary injunctive relief in part because the Court finds that it

Additionally, the Court notes that the New Assembly Plan was submitted to DOJ on March 28, 2012.  As of the date of this Opinion and Order, no action has been taken by DOJ, whose sixty-day deadline for review expires on May 27, 2012, nine days before the candidate petitioning period begins.  Thus, with respect to the New Assembly Plan, the situation remains as it did on April 18, 2012, with the people of the State of New York facing the risk that the New Assembly Plan will not be precleared in time for the petitioning period.  There is a continued need for the Court to exercise jurisdiction to prepare an interim Assembly map.

In sum, this case was ripe for review at the time of the Court's April 18, 2012 oral ruling and remains so today.

2.      12(b)(6) Challenge

The Senate Majority Defendants also moved to dismiss the amended complaints under Fed. R. Civ. P. 12(b)(6), contending that they failed to plead facts that would entitle the Amending Plaintiffs to the relief sought, i.e., implementation of State Senate and Assembly plans drafted by the Court.  The Senate Majority Defendants argued that the Amending Plaintiffs failed to establish that any part of the New Senate Plan would be denied preclearance or that the Court has the authority to craft a remedy in the event that the 63rd district is found unconstitutional in Cohen.

---

cannot resolve the complex issues raised in their favor in the short time available.  This only reinforces our ripeness determination, in that the issues raised and relief sought required immediate court consideration.

13

To determine whether dismissal is appropriate under Fed. R. Civ. P. 12(b)(6), "a court must accept as true all [factual] allegations contained in a complaint," but it need not accept "legal conclusions." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). For this reason, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to insulate a claim against dismissal. Id. Moreover, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Bell Atl. v. Twombly, 550 U.S. 544, 570 (2007)). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint . . . has not shown . . . that the pleader is entitled to relief." Id. at 679 (internal citations and quotation marks omitted).

Applying these principles, we conclude that the Senate Majority Defendants' arguments are misplaced. Accepting Amending Plaintiffs' allegations as true, as the Court must for the purpose of deciding this motion, this Court has the authority to grant the relief sought. The Senate Majority Defendants' assertion that, under Perry, the Court cannot draft an interim plan but can only implement the New Senate Plan, misreads the Supreme Court's holding. In Perry, the Supreme Court instructed that, while courts must look to a duly enacted redistricting plan for "guidance" in drafting an interim judicial plan, "[a] district court making such use of a State's plan must, of course, take care not to incorporate into the interim plan any legal defects in the state plan." 132 S. Ct. at 941. Thus, Perry describes the standards the Court must use in drafting a redistricting map, not, as the Senate Majority

Defendants suggest, the Court's <u>ability</u> to implement an interim plan when there is no precleared plan based upon the latest census.  See <u>id.</u> ("[T]he state plan serves as a <u>starting point</u> for the district court." (emphasis added)).

Here, Amending Plaintiffs have alleged that portions of the New Senate Plan do not pass muster under federal law.  For example, the Ramos Intervenors allege that the New Senate Plan violates Section 2 of the Voting Rights Act and the Fourteenth Amendment because it purposefully dilutes the Hispanic vote by underpopulating majority White districts upstate while overpopulating downstate districts with large percentages of Hispanic and other minority voters.  The Drayton Intervenors allege that the New Plans divide, or "crack," compact African American and other minority communities in Nassau County to dilute their voting power in violation of Section 2 of the Voting Rights Act.  Similarly, the Lee Intervenors allege that Asian American communities are divided and diluted in the New Plans.  At this stage of the litigation, the Court cannot assess the ultimate merits of these allegations.  But if Amending Plaintiffs were ultimately to succeed on these Section 2 and Fourteenth Amendment claims, and the Court were compelled to draft a new plan, the Court could not adopt the New Senate Plan wholesale.  It would have to exclude any identified legal defects in the enacted plan.  See <u>Perry</u>, 132 S. Ct. at 941–42.

Thus, because Amending Plaintiffs state claims upon which this Court can grant relief, the Senate Majority Defendants' motion to dismiss is denied as without merit.  Further, the motion is denied as moot insofar as the New Senate Plan has been precleared and has

survived petitioners' state law challenge in <u>Cohen</u>, and this Court may now consider the underlying one person, one vote and Section 2 challenges to the New Senate Plan.

      B.     <u>Assembly and Senate Majorities' Motions To Dismiss Ullman Intervenor's Complaint</u>

Intervening plaintiff Itzchok Ullman faults the New Assembly Plan because it divides the Town of Ramapo into three districts, and purposefully separates into two different districts the villages of New Square and Kaser, both of which contain large Chasidic Jewish populations.[5] Ullman alleges in his amended complaint that this division of Ramapo violates the Fourteenth Amendment because it (1) is improperly based upon religious considerations; (2) diminishes Ullman's voting power without due process of law; and (3) runs afoul of the one person, one vote requirement of the Equal Protection Clause.

Ullman, however, has since disclaimed the argument that the New Assembly Plan's division of Ramapo is based upon religious considerations.  When, at oral argument, the Court asked Ullman's counsel whether "there was deliberate discrimination against these Jewish communities on the basis of religion," Counsel responded, "No, your Honor.  What

---

[5] As one court has explained:

A large portion of the Town of Ramapo is a state park and undeveloped land.  In the occupied area, a "village movement" has resulted in the formation of eleven incorporated villages within the town borders along its perimeter.  An incorporated village controls the tax base within its boundaries and has the authority to execute its own zoning laws, run schools, operate police, fire, water and sewage departments and regulate the use of the streets.

<u>Leblanc-Sternberg v. Fletcher</u>, 763 F. Supp. 1246, 1247 (S.D.N.Y. 1991) (footnote omitted).

we are alleging is that there is deliberate discrimination against these communities based on their voting patterns."  Apr. 18, 2012 Hr'g Tr. at 41–42.  Ullman now contends that the Villages of Kaser and New Square were intentionally placed into separate Assembly districts, not because of any invidious discrimination against Chasidic Jewish people, but to enhance Assemblywoman Ellen C. Jaffee's reelection prospects.  These allegations are insufficient to state a claim under the Fourteenth Amendment.

As the Second Circuit has recognized, "[i]t is well settled that there is no right to community recognition in the reapportionment process.  Voting is a personal right and, in the absence of invidious discrimination, voters of a city, town, or geographic or ethnic community are not entitled to be grouped together in a single election unit."  Mirrione v. Anderson, 717 F.2d 743, 745 (2d Cir. 1983) (citation omitted); see also United Jewish Orgs. of Williamsburgh, Inc. v. Wilson, 510 F.2d 512, 521 (2d Cir. 1974) (rejecting argument that a "state must in a reapportionment draw lines so as to preserve ethnic community unity" because such a holding would "make reapportionment an impossible task for any legislature"), aff'd sub nom. United Jewish Orgs. of Williamsburgh, Inc. v. Carey, 430 U.S. 144 (1977); Wells v. Rockefeller, 281 F. Supp. 821, 825 (S.D.N.Y 1968) (three-judge panel) ("The Legislature cannot be expected to satisfy, by its redistricting action, the personal political ambitions or the district preferences of all of our citizens.  For everyone on the wrong side of the line, there may well be his counterpart on the right side."), rev'd on other grounds, 394 U.S. 542 (1969).  Thus, in the absence of any invidious motive such as religious

discrimination (and Ullman has conceded there is none), the Chasidic Jewish community, or any other ethnic community, in Ramapo does not have an absolute constitutional right to be grouped in the same district.

Ullman asserts that the division of the Ramapo Chasidic Jewish community in the New Assembly Plan is an impermissible political gerrymander. Although the Supreme Court has held that partisan gerrymandering claims are justiciable under the Equal Protection Clause, see Davis v. Bandemer, 478 U.S. 109, 125 (1986); but see Vieth v. Jubelier, 541 U.S. 267, 305–06 (2004) (plurality opinion) (concluding that partisan gerrymandering claims are non-justiciable political questions), a question arises as to what showing a plaintiff must make to sustain such a claim, see Davis v. Bandemer, 478 U.S. at 132 (plurality opinion) (stating that, at minimum, plaintiff must show that "the electoral system is arranged in a manner that will consistently degrade a voter's or a group of voters' influence on the political process as a whole"); but see Vieth v. Jubelier, 541 U.S. at 309–13, 317 (Kennedy, J., concurring) (concluding that partisan gerrymandering claims are justiciable, but that no judicially manageable standards exist for determining when legislature's consideration of voters' political classifications in redistricting amounts to Equal Protection violation). Assuming arguendo, as Ullman urges, that the standard set forth in Davis v. Bandemer, 478 U.S. 109, still applies, we dismiss Ullman's complaint for failure to state a claim, see Fed. R. Civ. P. 12(b)(6).

Ullman fails to explain either in his amended complaint or his arguments how the

18

division of Kaser and New Square is an impermissible partisan gerrymander, particularly because Ullman has not alleged that the New Assembly Plan's division of two villages degrades or dilutes the Chasidic Jewish community's influence on the political process as a whole.  Rather, Ullman alleges that the community's influence is diluted in one Assembly district.  Moreover, drawing a district boundary based, at least in part, on protecting an incumbent such as Assemblywoman Jaffe, does not automatically violate the Fourteenth Amendment.  See White v. Weiser, 412 U.S. 783, 797 (1973) ("The fact that district boundaries may have been drawn in a way that minimizes the number of contests between present incumbents does not in and of itself establish invidiousness." (internal quotation marks omitted)).  The Supreme Court has recognized that "[p]olitics and political considerations are inseparable from districting and apportionment." Gaffney v. Cummings, 412 U.S. 735, 753 (1973); see also Vieth v. Jubelier, 541 U.S. at 313 (Kennedy, J., concurring) (rejecting allegation that legislature "adopted political classifications" in enacting redistricting plan as sufficient to state claim under Equal Protection Clause). Indeed, if courts were to second guess the precise placement of every single district boundary and make sure they were not drawn on the basis of any political considerations, redistricting would essentially be taken out of the hands of the New York Legislature and given to the federal courts, a result we cannot countenance.[6]  See Perry v. Perez, 132 S. Ct. at 940

---

[6] At oral argument, Ullman's counsel suggested that Larios v. Cox, 300 F. Supp. 2d 1320 (N.D. Ga.) (three-judge court), aff'd mem., 542 U.S. 947 (2004), a case not cited in his memorandum of law, supports his contention that his political gerrymandering allegations state a viable Fourteenth Amendment claim because incumbency was not considered

("Redistricting is primarily the duty and responsibility of the State." (internal quotation marks omitted)); see also Favors v. Cuomo, 2012 WL 928223, at *17 ("[T]he power to draw [district] lines is committed in the first instance to the states, not to the federal government, and is properly exercised by the most democratic branch of state government, the legislature.").

Insofar as Ullman's amended complaint pleads a one person, one vote claim under the Equal Protection Clause, he did not discuss this claim in his memorandum of law.  To be sure, the Equal Protection Clause requires the legislature to "make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable."  Reynolds v. Sims, 377 U.S. 533, 577 (1964).  But Ullman's complaint does not allege that the Ramapo Assembly districts are malapportioned.  Instead, the amended complaint reflects only Ullman's dissatisfaction with how the legislature divided Ramapo into multiple Assembly districts, which is not a one person, one vote issue.  Accordingly,

---

consistently throughout the state in drawing Assembly districts.  See Apr. 18, 2012 Hr'g Tr. at 58.  Ullman's amended complaint, however, contains no allegations that incumbency protection was a factor only in redistricting Ramapo and, in any event, Larios is a one person, one vote case, not a political gerrymandering case.  See League of United Latin Am. Citizens v. Perry, 548 U.S. 399, 422–23 (2006) ("The Larios holding and its examination of the legislature's motivations were relevant only in response to an equal-population violation."); Cox v. Larios, 542 U.S. at 949–50 (Stevens, J., concurring) (distinguishing political gerrymander claims from one person, one vote claims).  The Larios court discussed incumbency protection only to the extent that it found that incumbency was not a valid excuse for malapportioning Georgia's state legislative districts.  Larios, 300 F. Supp. 2d at 1338 ("[T]he protection of incumbents is a permissible cause of population deviations only when it is limited to the avoidance of contests between incumbents and is applied in a consistent and nondiscriminatory manner." (emphasis in original)).  The court did not discuss the extent to which incumbency protection can be considered in drawing district boundaries.

Ullman's allegations that the Chasidic Jewish community in Ramapo is divided into separate districts do not state a claim under the Equal Protection Clause and, therefore, his amended complaint is properly dismissed.

To the extent that Ullman also claims that Ramapo's division into multiple assembly districts violates Article III, § 5, of the New York State Constitution, we decline to exercise supplemental jurisdiction over the remaining state law claim.  See 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."); Valencia ex rel. Franco v. Lee, 316 F.3d 299, 304–06 (2d Cir. 2003); Pu v. Charles H. Greenthal Mgmt. Corp., No. 08-cv-10084(RJH)(RLE), 2010 WL 774335, at *5 (S.D.N.Y. Mar. 9, 2010) ("Generally, where federal claims are dismissed at an early stage, courts decline supplemental jurisdiction and dismiss pendant state law claims without prejudice.").  Accordingly, Ullman's New York State Constitution claim is dismissed without prejudice.

C.    Drayton and Ramos Intervenors' Motions for a Preliminary Injunction

The Ramos and Drayton Intervenors have filed separate motions for preliminary injunctions based on their claims under the Fourteenth Amendment and Section 2 of the Voting Rights Act.  They also seek expedited discovery and the appointment of a special master.[7]  For the following reasons, we deny the motions.

"In order to justify a preliminary injunction, a movant must demonstrate 1) irreparable

_____

[7]  To the extent that Intervenor Ullman also moves for preliminary relief, the motion is mooted by our dismissal of his complaint.

21

harm absent injunctive relief; 2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor; and 3) that the public's interest weighs in favor of granting an injunction." Metro. Taxicab Bd. of Trade v. City of New York, 615 F.3d 152, 156 (2d Cir. 2010) (internal quotation marks and citation omitted). We find the second and third factors dispositive here.

On the current record, the intervenors have not shown a likelihood of success on the merits. The movants' claims are both factually and legally complex. For example, their one person, one vote claims rest on novel, contested legal ground. The parties sharply dispute the circumstances under which a redistricting plan with population disparities closely approaching the ten percent range that has sometimes been found acceptable can be rejected. Compare Larios v. Cox, 300 F. Supp. 2d at 1337–42 (holding that plan with just-below-10% population disparity is impermissible "where population deviations are not supported by [] legitimate interests but, rather, are tainted by arbitrariness or discrimination," including inconsistent application of redistricting criteria for political gain), with Rodriguez v. Pataki, 308 F. Supp. 2d 346, 365–71 (S.D.N.Y. 2004) (three-judge court) (upholding a just-below-10% disparity plan despite evidence of political motive because plan was supported by traditional redistricting criteria and the plaintiffs did not show that "the deviations resulted solely from impermissible considerations"). Both the one person, one vote claim and the racial discrimination claim will turn on the factual inferences to be drawn from a close

22

evaluation of the details of the plan, and on whatever evidence of the legislature's purpose or intent may be available.  See, e.g., Larios v. Cox, 300 F. Supp. 2d at 1337–38, 1347 ("Simply stated, a state legislative reapportionment plan that systematically and intentionally creates population deviations among districts in order to favor one geographic region of a state over another violates the one person, one vote principle firmly rooted in the Equal Protection Clause."); Rodriguez v. Pataki, 308 F. Supp. 2d at 363–65 (holding that "a one-person, one-vote claim will lie even with deviations below ten percent" if plaintiff "can present compelling evidence that the drafters of the plan ignored all the legitimate reasons for population disparities and created the deviations solely to benefit certain regions at the expense of others"); Bush v. Vera, 517 U.S. 952, 958–59 (1996) (plurality opinion) (holding that strict scrutiny applies to a redistricting plan if plaintiff shows that race was "the predominant factor motivating the legislature's redistricting decision" (internal quotation marks, brackets, and emphasis omitted)).  But the Drayton and Ramos Intervenors have presented little evidence on this question, and the parties vigorously dispute whether discovery into the subjective motivations of the drafters of the plan is either legally relevant or permissible in light of legislative privilege.

Similarly, the movants' Section 2 vote-dilution claims require proof of the three "necessary preconditions" established by the Supreme Court in Thornburg v. Gingles, 478 U.S. 30, 50–51 (1986).  To win on the merits, they must show that a minority group is (1) "sufficiently large and geographically compact to constitute a majority in a

23

single-member district," (2) "politically cohesive," and (3) the majority votes "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." Id.; accord Bartlett v. Strickland, 556 U.S. 1, 11–12 (2009).  But the movants have introduced virtually no evidence on these factors, which typically require substantial expert testimony and analysis.  See, e.g., Rodriguez v. Pataki, 308 F. Supp. 2d at 387–404 (analyzing voluminous expert record in vote-dilution claim).

In sum, on the limited record thus far compiled by the movants, we cannot conclude that they have established that they are likely to prevail in a case that will present difficult legal and factual issues.[8]

To the extent the Drayton and Ramos Intervenors argue that they would be able to show a likelihood of success on the merits at an evidentiary hearing if they are given expedited discovery, we conclude that conducting such discovery and holding such a hearing in sufficient time to provide relief cannot be done consistent with the third prong of the preliminary injunction standard, the public interest.  The intervenors argue that, if their legal

---

[8] It is not clear that the movants are permitted to rely on the alternative second prong of the preliminary injunction standard: a serious merits question, and the balance of hardships tipping strongly in their favor.  See Oneida Nation of N.Y. v. Cuomo, 645 F.3d 154, 164 (2d Cir. 2011) ("A party seeking to enjoin 'governmental action taken in the public interest pursuant to a statutory or regulatory scheme' cannot rely on the 'fair ground for litigation' alternative even if that party seeks to vindicate a sovereign or public interest." (quoting Monserrate v. N.Y. State Senate, 599 F.3d 148, 154 (2d Cir. 2010))); see also Montano v. Suffolk Cnty. Legislature, 268 F. Supp. 2d 243, 260 (E.D.N.Y. 2003) (in VRA and constitutional challenge to county legislature districting, holding that plaintiffs must show likelihood of success, not simply serious question of law).  Even if the Drayton and Ramos Intervenors could rely on this alternative second prong, however, preliminary relief still would not be consistent with the public interest.

and factual contentions are correct, they and the broader New York public face the serious and irreparable harm of an election proceeding on the basis of unconstitutionally and illegally drawn, discriminatory and unbalanced districts.  At the same time, the paramount interest in fair and legal voting counsels caution rather than haste.

First, elections are complex to administer, and the public interest would not be served by a chaotic, last-minute reordering of Senate districts.  It is best for candidates and voters to know significantly in advance of the petition period who may run where.  See, e.g., Diaz v. Silver, 932 F. Supp. 462, 466–68 (E.D.N.Y. 1996) (three-judge court) (in redistricting challenge, holding that, even assuming that plaintiffs had shown likelihood of success on the merits, the public interest weighed against an injunction because there was insufficient time before the election to create a new plan, and citing authority).  Indeed, the Supreme Court has held that an injunction may be inappropriate even when a redistricting plan has actually been found unconstitutional because of the great difficulty of unwinding and reworking a state's entire electoral process.  E.g., Reynolds v. Sims, 377 U.S. at 585; Roman v. Sincock, 377 U.S. 695, 709–10 (1964).

Second, plaintiffs' claims are not just important, but legally and factually complicated. The greatest public interest must attach to adjudicating these claims fairly—and correctly. We have little confidence that a few weeks of discovery and an abbreviated trial leaves enough time for the parties to marshal all the relevant facts and make their best arguments. We cannot ignore that the primary election process begins in less than four weeks with the

opening of the period for candidates to solicit nominating petitions.  In order to grant relief in time to guide (and not disrupt) that process, the Court would need to decide the complex legal issues governing discovery and the scope of the issues to be resolved at the hearing, allow the parties time to conduct whatever discovery is allowed, conduct the hearing, resolve the difficult legal and factual issues to establish whether the movants are likely to prevail, and then, if the movants succeed in establishing entitlement to relief, craft what at least some intervenors argue should be an entirely new plan for the redistricting of the state Senate, all within a few weeks.  No party has even attempted to set forth a realistic schedule on which this formidable agenda can be accomplished.  We are not persuaded that this Court would be able to give the issues or a possible remedy the careful consideration they deserve in such an abbreviated time frame.  If, upon such full and careful consideration, plaintiffs do prevail, this Court can then decide what relief, including the vacatur of conducted elections and the ordering of new ones, may be warranted.  See, e.g., Arbor Hill Concerned Citizens v. County of Albany, 357 F.3d 260, 262 (2d Cir. 2004) ("It is within the scope of [the court's] equity powers to order a governmental body to hold special elections.").

The motions for preliminary injunction and expedited discovery are therefore denied.

D.      Senate Minority Defendants' Motion for Leave To Amend

On May 1, 2012, following DOJ's preclearance of the New Senate plan, the Senate Minority Defendants moved under Fed. R. Civ. P. 15 to amend their answer to the Favors Plaintiffs' amended complaint to assert a cross-claim.  Their proposed cross-claim charges

that the New Senate Plan fails to reflect a good faith effort to create districts with equal populations, and underpopulates upstate districts while overpopulating downstate districts for the impermissible purpose of achieving a political gerrymander, which, they contend, violates the Equal Protection Clause.  See, e.g., Larios v. Cox, 300 F. Supp. 2d at 1337–42. Only the Senate Majority Defendants oppose the amendment, which is granted for the reasons set forth below.

When, as here, a party seeks to amend a pleading before trial, "[t]he court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  In the Second Circuit, a party can amend its pleadings "unless the nonmovant demonstrates prejudice or bad faith." City of New York v. Grp. Health Inc., 649 F.3d 151, 157 (2d Cir. 2011); see also R.G.N. Capital Corp. v. Yamato Transp. USA, Inc., No. 95-cv-2647 (CSH), 1997 WL 3278, at *1 (S.D.N.Y. Jan. 3, 1997) ("[I]t is well settled that delay is not enough standing alone to defeat a motion to amend.  The party opposing the relief must demonstrate prejudice resulting from delay.").  An amendment is prejudicial "when, among other things, it would require the opponent to expend significant additional resources to conduct discovery and prepare for trial or significantly delay the resolution of the dispute." AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A., 626 F.3d 699, 725–26 (2d Cir. 2010) (internal quotation marks omitted).

The Senate Majority Defendants have failed to demonstrate that they will be prejudiced by their legislative colleagues' proposed cross-claim.  This case, at least as it relates to the New Senate Plan, is still in its early stages.  The Senate Minority Defendants'

27

answer to the Favors Plaintiffs' amended complaint was filed only approximately one month ago.  Discovery has not yet begun.  The proposed cross-claim does not expand or alter the scope or posture of this case significantly, as other parties already have asserted similar one person, one vote claims based upon the alleged malapportionment of districts in the New Senate Plan.  Indeed, the Senate Minority Defendants' proposed cross-claim does not come as a surprise to the Senate Majority Defendants, as they concede that the Senate Minority Defendants, despite being named as defendants, "have all along been operating as if they are plaintiffs in this action" by consistently opposing the Senate Majority Defendants and raising the same Equal Protection claims.  Senate Majority Defs.' Opp. 7, Dkt. Entry 361.

The Court previously issued a scheduling order setting March 27, 2012, as the deadline for the parties to file amended complaints and April 2, 2012, as the deadline for the parties to file answers to any amended complaints.  While the Senate Minority Defendants did not file their motion to amend until May 1, 2012, a court can grant leave to amend a pleading after a deadline set in a scheduling order where there is "good cause."  Parker v. Columbia Pictures Indus., 204 F.3d 326, 340 (2d Cir. 2000).  "Whether good cause exists turns on the diligence of the moving party."  Holmes v. Grubman, 568 F.3d 329, 335 (2d Cir. 2009) (quotation marks omitted).

Here, the Senate Minority Defendants sought to amend their answer four days after DOJ precleared the New Senate Plan on April 27, 2012, which, they argue, made their proposed cross-claim ripe for the first time.  The argument confronts a hurdle: this Court had

28

already orally rejected the Senate Majority Defendants' argument that challenges to the New Plans were not ripe in advance of preclearance.  Further, in setting a schedule for all Plaintiffs to amend their complaints, the Court had suggested to the Senate Minority Defendants that they amend their answers to add cross-claims in light of their quasi-plaintiff posture in this case.  See Mar. 21, 2012 Hr'g Tr. at 47.  Nevertheless, it appears that the Senate Minority Defendants acted in good faith in delaying the filing of their proposed cross-claim based on their unusual status as named defendants and the pendency of the preclearance process.  Further, because the Senate Minority Defendants have been a party in this case since its inception and have consistently stood in opposition to the Senate Majority Defendants, allowing the Senate Minority Defendants to bring their cross-claim does not materially alter the posture of this case.

The Senate Majority Defendants' contention that the motion to amend should be denied because the proposed cross-claim does not arise out of the same transaction as the "original action," Senate Majority Defs.' Opp. 17–18, is meritless.  A party may bring a cross-claim that "arises out of the transaction or occurrence that is the subject matter of the original action."  Fed. R. Civ. P. 13(g).  In determining whether a cross-claim arises out of the same transaction or occurrence as the original claim, courts generally consider the "(1) identity of facts between original claim and [cross-claim]; (2) mutuality of proof; [and] (3) logical relationship between original claim and [cross-claim]."  Federman v. Empire Fire & Marine Ins. Co., 597 F.2d 798, 811–12 (2d Cir. 1979); see also id. at 813 ("[T]he Rule 13(a)

29

test for determining a compulsory counterclaim is identical to the Rule 13(g) test for cross-claims."). "Rule 13(g) is to be construed liberally so as to 'avoid multiple suits and to encourage the determination of the entire controversy among the parties before the court with a minimum of procedural steps . . . in order to settle as many related claims as possible in a single action.'" Bank of Montreal v. Optionable, Inc., No. 09-cv-7557 (GBD), 2011 WL 4063324, at *3 (S.D.N.Y. Aug. 12, 2011) (quoting Charles Alan Wright, et al., Federal Practice and Procedure § 1431, at 229–30 (3d ed. 2011)).

This Court permitted all plaintiffs to amend their complaints once the Court had developed and issued a new congressional district map and the impasse posture of the case had changed due to the enactment of the New Senate and Assembly Plans. This was done for the sake of judicial economy and because plaintiffs still objected to the New Plans on federal constitutional and Voting Rights Act grounds. The claims asserted in the amended complaints and the proposed cross-claim are logically related. While this action has undergone several permutations since it was originally commenced in November 2011, at its core, all plaintiffs' amended complaints and the Senate Minority Defendants' proposed cross-claim relate to the decennial redistricting process for state legislative districts and the results of that process.

Accordingly, the Senate Minority Defendants' motion to amend their answer is granted.

E.      Proposed Brietbart Intervenors' Motion To Intervene

Until his retirement in 2005, Todd Breitbart directed the staff work on redistricting for successive Democratic State Senate leaders.  He and the other Proposed Breitbart Intervenors now seek to intervene in this action as of right, or permissively, as "six registered voters who reside in districts in and around New York City that are severely over-populated under the" New Senate Plan.  Proposed Breitbart Intervenors' Proposed Compl., Dkt. Entry 345-3, ("Proposed Breitbart Compl.") ¶¶ 1, 6–11.  Like the Senate Minority Defendants, Proposed Breitbart Intervenors challenge the New Senate Plan, alleging that it is not the result of a good faith effort to create equipopulous State Senate districts as required by the Fourteenth Amendment.  The Senate Majority Defendants oppose the proposed intervention. We deny the Proposed Breitbart Intervenors' motion for the following reasons.

To intervene as of right, pursuant to Fed. R. Civ. P. 24(a), the putative intervenor must:  "(1) file a timely motion; (2) claim an interest relating to the property or transaction that is the subject of the action; (3) be so situated that without intervention the disposition of the action may impair that interest; and (4) show that the interest is not already adequately represented by existing parties."  Butler, Fitzgerald & Potter v. Sequa Corp., 250 F.3d 171, 176 (2d Cir. 2001).  Proposed Breitbart Intervenors' motion is denied because they have not shown that their interests are not already adequately represented by the various intervening plaintiffs and the Senate Minority Defendants.[9]

---

[9]  Because Proposed Breitbart Intervenors' motion fails on the adequacy of representation prong, the Court need not discuss whether they have satisfied the other three

31

While the burden to demonstrate inadequacy of representation typically is "minimal," the Second Circuit has "demanded a more rigorous showing of inadequacy in cases where the putative intervenor and a named party have the same ultimate objective. Where there is an identity of interest, as here, the movant to intervene must rebut the presumption of adequate representation by the party already in the action." Id. at 179–80 (internal citations omitted). Here, the Drayton, Lee, and Ramos Intervenors, all of whom are registered New York State voters, as well as the Senate Minority Defendants, seek to strike down the New Senate Plan under the Fourteenth Amendment to the United States Constitution based upon its alleged malapportionment favoring upstate New York. Proposed Breitbart Intervenors, also registered New York State voters, seek the same relief on virtually identical grounds and, therefore, the Court concludes that their interests are already adequately represented.

In urging otherwise, Proposed Breitbart Intervenors contend that they disagree with other parties' interpretations of some of the precedents relevant to this action. Even if strategic differences could demonstrate inadequate representation in some cases, they fail to do so here, where Proposed Breitbart Intervenors and the Senate Minority Defendants are represented by the same able counsel, who would presumably interpret precedent the same way whether acting on behalf of Proposed Breitbart Intervenors or the Senate Minority Defendants. Indeed, insofar as Proposed Breitbart Intervenors contend their putative claim is different because they do not allege that the malapportionment is based upon racial animus,

---

criteria.

32

we note that, while other intervening plaintiffs appear to allege a racial motivation for the malapportionment, the Senate Minority Defendants do not.  Their malapportionment theory is essentially indistinguishable from that of Proposed Breitbart Intervenors.  Indeed, the Senate Minority Defendants' cross-claim is worded identically to Proposed Breitbart Intervenors' proposed complaint.  Compare Senate Minority Defs.' Proposed Cross-cl., Dkt. Entry 344-3, ¶¶ 1–10 with Proposed Breitbart Compl. ¶¶ 52–61.

Proposed Breitbart Intervenors' request for permissive intervention under Fed. R. Civ. P. 24(b) is also denied.  A court "may grant a motion for permissive intervention if the application is timely and if the applicant's claim or defense and the main action have a question of law or fact in common." In re Holocaust Victim Assets Litig., 225 F.3d 191, 202 (2d Cir. 2000) (internal quotation marks omitted).  Courts have "considerable discretion" in deciding whether to grant permissive intervention. AT&T Corp. v. Sprint Corp., 407 F.3d 560, 562 (2d Cir. 2005).  Here, as already discussed, Proposed Breitbart Intervenors have not shown how their presence as intervenors will assist the Court in resolving this case, particularly when other parties—especially parties represented by the same counsel—already are asserting the same claims and interests.  To the extent Breitbart maintains that he brings an "important perspective" to this case, Breitbart Mem. at 3, Dkt. Entry 345-1, he has been able to provide that perspective to this Court as a witness for the Senate Minority Defendants, just as he did as a co-petitioner with State Senator Dilan in Cohen.  In sum, he need not be

allowed to intervene to assist the Senate Minority Defendants or to have his views heard by the Court.

Finally, the Court set March 27, 2012, as the deadline for any motions to intervene, and Proposed Breitbart Intervenors missed this deadline by more than one month. They claim that their Equal Protection challenge did not become ripe until the New Senate Plan was precleared. This is belied by our April 18, 2012 order rejecting the Senate Majority Defendants' ripeness challenge to Amending Plaintiffs' claims. Further, unlike the Senate Minority Defendants, who in good faith could have thought that, as party defendants, they could not file a cross-claim challenge while preclearance was pending, Proposed Breitbart Intervenors operated under no comparable conflict and have offered no satisfactory explanation justifying their late filing. Under such circumstances, the Court exercises its discretion to deny permissive intervention.

Accordingly, Proposed Breitbart Intervenors' motion to intervene is denied.

III.   Conclusion

For the reasons set forth above, the Court hereby

(1) DENIES the Senate Majority Defendants' motions to dismiss the amended complaints (Dkt. Entry 286), reiterating the oral ruling made on April 18, 2012;

(2) GRANTS the Assembly Majority and Senate Majority Defendants' motions to dismiss the Ulman Intervenor complaint (Dkt. Entries 270, 286), and directs the Clerk of Court to enter judgment in favor of defendants on this claim;

34

(3) DENIES the Drayton and Ramos Intervenors' motions for preliminary injunctive relief (Dkt Entries 305, 306);

(4) GRANTS the Senate Minority Defendants' motion for leave to amend their answer and file a cross-claim (Dkt. Entry 344); and

(5) DENIES the Proposed Breitbart Intervenors' motion to intervene (Dkt. Entry 345).

The matter is hereby referred to Magistrate Judge Mann to supervise discovery on such schedule, including an expedited schedule, as she may deem appropriate, and to issue all discovery-related orders, including, but not limited to, scheduling orders and orders resolving or otherwise addressing any discovery disputes that the parties are unable to resolve after good faith efforts to reach resolution thereof without court action.

SO ORDERED.

DATED:  Brooklyn, New York
          May 16, 2012

_____/s/_____
        REENA RAGGI
    United States Circuit Judge


_____/s/_____
      GERARD E. LYNCH
    United States Circuit Judge


_____/s/_____
       DORA L. IRIZARRY
    United States District Judge

35