**UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| MARK A. FAVORS, et al. | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No.  1:11-cv-05632-DLI-RR-GEL |
| | ) | **ORAL ARGUMENT REQUESTED** |
| | ) | **Date of Service**: June 29, 2012 |
| ANDREW M. CUOMO, et al. | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF SENATE MAJORITY DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT ON
<u>ALL EQUAL-POPULATION CLAIMS AGAINST THE SENATE PLAN</u>**

Michael A. Carvin (MC 9266)
Louis K. Fisher (admitted pro hac vice)
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001-2113
202/879-3939
202/869-3637

Todd R. Geremia (TG 4454)
JONES DAY
222 East 41st Street
New York, NY 10017-6702
212/326-3939

David Lewis (DL 0037)
LEWIS & FIORE
225 Broadway, Suite 3300
New York, NY 10007
212/285-2290

*Attorneys For Defendants Dean G. Skelos,
Michael F. Nozzolio, and Welquis R. Lopez*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................ 1

ARGUMENT ..................................................................................................................... 5

I.     DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON  ALL EQUAL-POPULATION CHALLENGES TO THE SENATE PLAN ............ 5

     A.     Population Deviations Under 10% Must Be Shown To Harm Voting Equality And To Result Solely From An Unconstitutional Or Irrational Purpose .................................................................................................. 5

     B.     The Senate Plan Benefits, Rather Than Harms, New York City Voters ............. 10

     C.     The Senate Plan Promotes Traditional Redistricting Policies ............................ 16

          1.     The Senate Plan Adheres To Appropriate State Policies ........................ 17

          2.     Drayton's And Ramos's Racial Discrimination Allegations Do Not Salvage Their One-Person, One-Vote Claims ......................................... 21

CONCLUSION ................................................................................................................. 25

i

# **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)................................................................................24

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007)................................................................................24

*Brown v. Thomson,*
  462 U.S. 835 (1983)......................................................................6, 7, 9, 16

*Burns v. Richardson,*
  384 U.S. 73 (1966)......................................................................11, 14, 15

*Cohen v. Cuomo,*
  No. 135 (N.Y. May 3, 2012).......................................................................3

*Daly v. Hunt,*
  93 F.3d 1212 (4th Cir. 1996)....................................................................10

*Easley v. Cromartie,*
  532 U.S. 234 (2001)................................................................................25

*Flemming v. Nestor,*
  363 U.S. 603 (1960)................................................................................17

*Gaffney v. Cummings,*
  412 U.S. 735 (1973)............................................................................6, 19

*Garza v. Cnty. of Los Angeles,*
  918 F.2d 763 (9th Cir. 1990)....................................................................23

*Hunter v. Underwood,*
  471 U.S. 222 (1985)................................................................................16

*In re Primus,*
  436 U.S. 412 (1978)..................................................................................8

*Karcher v. Daggett,*
  462 U.S. 725 (1983)................................................................................18

*Kirkpatrick v. Preisler,*
  394 U.S. 526 (1969)..................................................................................7

*Larios v. Cox*,
300 F. Supp. 2d 1320 (Feb. 10, 2004),
*summ. aff'd*, 542 U.S. 947 (June 30, 2004)................................................................8, 9, 19

*LULAC v. Perry*,
548 U.S. 399 (2006)....................................................................................................14

*Mahan v. Howell*,
410 U.S. 315 (1973)..........................................................................................7, 9, 14, 16

*Mandel v. Bradley*,
432 U.S. 173 (1977)........................................................................................................2, 8, 9

*Marylanders for Fair Rep. v. Schaefer*,
849 F. Supp. 1022 (D. Md. 1994)..................................................................................6

*Md. Comm. for Fair Rep. v. Tawes*,
377 U.S. 656 (1964)......................................................................................................15

*NAACP v. Snyder*,
No. 2:11-cv-15385 (E.D. Mich. Apr. 6, 2012) ......................................................25

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
461 U.S. 190 (1983)....................................................................................................17

*Palmer v. Thompson*,
403 U.S. 217 (1971).....................................................................................................17

*Personnel Adm'r v. Feeney*,
442 U.S. 256 (1979)....................................................................................................23

*Reno v. Bossier Parish Sch. Bd.*,
528 U.S. 320 (2000)......................................................................................................5

*Reynolds v. Sims*,
377 U.S. 533 (1964)............................................................................................. passim

*Rodriguez v. Pataki*,
308 F. Supp. 2d 346 (S.D.N.Y. 2004),
*summ. aff'd*, 543 U.S. 997 (2004)............................................................................. passim

*Roman v. Sincock*,
377 U.S. 695 (1964)........................................................................................7, 9, 10

*Sanks v. Georgia*,
401 U.S. 144 (1971)......................................................................................................8

*Swann v. Adams*,
   385 U.S. 440 (1967)........................................................................................7

*Thornburg v. Gingles*,
   478 U.S. 30 (1986)........................................................................................22

*Washington v. Davis*,
   426 U.S. 229 (1976)......................................................................................23

*WMCA, Inc. v. Lomenzo*,
   377 U.S. 633 (1964)......................................................................................11

**STATUTES**

42 U.S.C. § 1973............................................................................................23

42 U.S.C. § 1973c(c).................................................................................4, 5, 25

**OTHER AUTHORITIES**

New York Constitution......................................................................................13

Public Hearing Schedule—Second Round, *available at*
   http://www.latfor.state.ny.us/hearings/docs/20120125hrg_schedule.pdf...............21

The Senate Majority—Senators Dean G. Skelos and Michael F. Nozzolio, and LATFOR member Welquis R. Lopez—respectfully submits this memorandum in support of its motion for summary judgment on all equal-population claims asserted against the Senate Plan.

## PRELIMINARY STATEMENT

Ten years ago, the *Rodriguez* plaintiffs claimed that the 2002 Senate Plan violated the Fourteenth Amendment's equal-population requirement because it failed to place a 27th district in New York City. *See Rodriguez v. Pataki*, 308 F. Supp. 2d 346, 366–71 (S.D.N.Y. 2004) (per curiam), *summ. aff'd*, 543 U.S. 997 (2004). The plaintiffs alleged that the 2002 plan "discriminate[d] against 'downstate' residents" by "systematically overpopulating all [New York City] districts and systematically underpopulating all of the 'upstate' districts." *Id.* at 366. The plaintiffs asserted that such "regional discrimination" is unconstitutional, alleged that the Legislature acted with improper political purpose, and "suggest[ed] that racial bias may have animated the plan because all fourteen Senate majority-minority districts were overpopulated and are 'downstate,' where most of the state's minority population lives." *Id.* at 366–69.

The 2002 plan had a maximum population deviation of 9.78%,[1] which is below the 10% "minor" deviation presumed constitutional. *See id.* at 362–65. The three-judge court therefore held that "the defendants have no burden to justify the plan's minor deviation," but instead that the plaintiffs bore the heavy burden to establish that the minor deviation "result[ed] *solely* from an unconstitutional or irrational state purpose" and not even *in part* "from other State policies recognized by the Supreme Court to be appropriate reasons for deviations." *Id.*

The three-judge court granted summary judgment to the defendants because the plaintiffs failed to meet their burden of negating every conceivable rational basis for the 2002 plan's minor

---

[1] The maximum population deviation is the difference between the most and least populous districts, divided by the ideal district size.

1

deviation.  *See id.* at 366–71.  As the court pointed out, the 2002 plan actually *under*populated New York City districts and *over*populated "upstate" districts as measured by citizen voting age population (CVAP) and registered voters.  *See id.* at 369.  And the 2002 plan did not result "solely" from an illegitimate purpose because it "promote[d] the traditional principles of maintaining the core of districts and limiting incumbent pairing."  *Id.* at 370.  The Supreme Court summarily affirmed the judgment in a decision binding on this Court.  *See* 543 U.S. 997; *see also Mandel v. Bradley*, 432 U.S. 173, 176 (1977) (per curiam).

The Drayton Intervenors, Lee Intervenors, Ramos Intervenors, and Senate Minority (collectively, "Intervenors") bring *exactly the same* equal-population challenge to the Senate Plan that *Rodriguez* rejected a decade ago.  The Senate Plan has a maximum deviation of only 8.8%, which is *smaller* than the 9.78% in the plan *Rodriguez* upheld and well within the 10% constitutional presumption.  *See* Statement of Material Facts 17 ("SMF").  As this Court has recognized, *Rodriguez* held that such a presumptively constitutional minor deviation violates the one-person, one-vote rule only where it "'resulted *solely* from impermissible considerations.'" 5/16/12 Op. at 22 (quoting *Rodriguez*, 308 F. Supp. 2d at 368 (emphasis added)) (DE 367).  The Senate Minority—in a letter joined by Lee (DE 385) and Ramos (DE 387)—has conceded that that *Rodriguez*'s "'solely' standard would be virtually impossible to satisfy."  (DE 383 at 2).

Yet like the *Rodriguez* plaintiffs, Intervenors contend that the Senate Plan violates one-person, one-vote because it does not place a 27th district in New York City, and recycle the theory that the Plan is discriminatory because it overpopulates New York City districts and underpopulates "upstate" districts.  *See* Drayton Am. Compl. ¶ 105 (DE 254); Lee Am. Compl. ¶¶ 103, 110 (DE 256); Ramos Am. Compl. ¶ 42 (DE 257); Cross-Claim ¶¶ 1–10 (DE 370).  Like the *Rodriguez* plaintiffs, Drayton and Ramos also allege racial discrimination and nakedly assert

2

that the Plan has a discriminatory effect on New York City Black and Hispanic voters.  *See Drayton Am. Compl.* ¶¶ 110, 114, 116, 123; *Ramos Am. Compl.* ¶¶ 49–50.  Finally, Intervenors have claimed that the Plan's creation of the 63rd seat was "all inextricably bound with" their equal-population claim (4/20/12 Hr'g tr. at 48), yet the New York Court of Appeals has unanimously endorsed creation of the 63rd seat, thus vitiating the premise of Intervenors' equal-population claim.  *See Cohen v. Cuomo*, No. 135 (N.Y. May 3, 2012) (per curiam) (DE 351).

As Intervenors' own letters have confirmed, this Motion presents no factual dispute.  (*See* DE 383 at 2).  Instead, this Motion turns on the purely legal questions of (1) whether CVAP and voter registration can be used to assess whether under-10% population deviations have a cognizable adverse effect and (2) whether the *Rodriguez* "solely" standard applies in this case.  The answer to both questions is yes, and the Court should therefore grant the Motion.

Specifically, *Rodriguez* squarely forecloses Intervenors' claim for at least four reasons.

*First*, as with the 2002 plan, "the practical effect" of the Senate Plan "is to dilute the votes of 'upstate' residents, not those who reside 'downstate'" because it *under*populates New York City districts and *over*populates upstate districts as measured by CVAP, registered voters, and turnout.  *Rodriguez*, 308 F. Supp. 2d at 369.  In fact, even if Intervenors' regional discrimination theory were cognizable, it would fail even on total population measures, since the Assembly Plan and the Senate Plan award New York City *one whole seat more*—not less—in the Legislature than its population would justify on strict proportional representation.  This regional bias is even starker when measured by CVAP because the enacted Plans give New York City *nearly ten whole seats more* in the Legislature than its CVAP would entitle it to—and the Senate Plan alone gives New York City just under *two whole extra districts*.  Intervenors' claims of regional bias *against* New York City plainly fail under these indisputable facts.

3

*Second*, as Intervenors appear to recognize (DE 383 at 2), they cannot possibly establish that the Senate Plan's presumptively constitutional deviations "result[ed] *solely* from an unconstitutional or irrational state purpose." *Rodriguez*, 308 F. Supp. 2d at 366 (emphasis added). To the contrary, the Plan adhered to other "appropriate" state policies. *Id.* The Plan offsets (although it does not eliminate) the dilution in upstate voting strength caused by both the CVAP overpopulation and the Assembly Plan's disproportionate representation of New York City. Moreover, the Plan "promotes the traditional principles of maintaining the core of districts and limiting incumbent pairing," *id.* at 366, 370, and, as Intervenors concede, does so better than Intervenors' proposed alternatives. *See* Breitbart Decl. ¶¶ 49–56 (DE 327).

*Third*, Intervenors' allegations of political purpose are completely irrelevant because there is no negative *effect*, and because any political considerations could not be the "*sole*" justification since the Plan serves the identified legitimate interests. And Intervenors' allegation that the Legislature overpopulated politically disfavored areas is irreconcilable with the fact that the Senate Plan *favors* predominantly Democratic New York City, *overpopulates* all districts on Republican-leaning Long Island, and "underpopulates" upstate Democratic districts.

*Finally*, Drayton's and Ramos's racial discrimination allegation is irreconcilable with the fact that, under CVAP, voter registration, and turnout measures, the Senate Plan overvalues the votes of citizens in New York City Black and Hispanic districts even more heavily than the votes of other New York City voters. And this racial allegation is even more meritless here than in *Rodriguez* because it has been expressly rejected by the Justice Department, which is required under Section 5, as amended in 2006, to ensure that the Plan, including the creation of the 63rd seat, is free of *any* racially discriminatory purpose. *See* 42 U.S.C. § 1973c(c). In contrast, in the 2002 redistricting cycle, the Justice Department was foreclosed from making such a

4

discriminatory purpose inquiry and did not do so prior to the *Rodriguez* opinion.[2]

The Court should grant summary judgment to Defendants.

## ARGUMENT

## I.     DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON ALL EQUAL-POPULATION CHALLENGES TO THE SENATE PLAN

As they admit (DE 383 at 2), Intervenors cannot show that the Senate Plan's presumptively constitutional deviations "result[ed] *solely* from an unconstitutional or irrational state purpose." *Rodriguez*, 308 F. Supp. 2d at 366 (emphasis added).  Intervenors, in fact, merely rehash the *same* equal-population theory that the *Rodriguez* court *rejected* on summary judgment, and whose rejection the U.S. Supreme Court *summarily affirmed* in a binding decision.  Intervenors thus ignore the undisputed facts that the Senate Plan both greatly *over*values the weight of a New York City vote compared to an "upstate" vote, and that the Plan's minor deviations reflect "appropriate" state policies.  *Id.*

### A.     Population Deviations Under 10% Must Be Shown To Harm Voting Equality And To Result Solely From An Unconstitutional Or Irrational Purpose

In a one-person, one-vote case, such as this one, where the maximum population deviation is under 10%, there is no injury absent extraordinary circumstances.  That is because the "one-person, one-*vote*" principle obviously "protects the right of all qualified citizens to *vote*." *Reynolds v. Sims*, 377 U.S. 533, 554 (1964) (emphases added).  Given differences in registration and turnout, it is, of course, impossible to make all citizens' votes precisely equal in weight.  The Fourteenth Amendment thus requires only "that the vote of any citizen is

---

[2] In 2000, the Supreme Court held that Section 5 did not "prohibit[] preclearance of a redistricting plan enacted with a discriminatory but nonretrogressive purpose." *Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 328 (2000).  Congress overruled this holding in 2006, when it amended Section 5 to require the party seeking preclearance to prove that the redistricting plan does not have "*any* discriminatory purpose." 42 U.S.C. § 1973c(c) (emphasis added).

*approximately* equal in weight to that of any other citizen in the State." *Reynolds*, 377 U.S. at 579 (emphasis added); *see id.* at 568 (an "individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a *substantial fashion* diluted when compared with votes of [other] citizens" (emphasis added)).  And since *population* equality is only a rough proxy for *voting* equality, "it makes little sense to conclude from relatively minor 'census population' variations among legislative districts that any person's vote is being substantially diluted." *Gaffney v. Cummings*, 412 U.S. 735, 745–46 (1973).

Based on these principles, the Supreme Court has "established, as a general matter, that an apportionment plan with a maximum population deviation under 10% falls within this category of minor deviations" that impose no cognizable injury.  *Brown v. Thomson*, 462 U.S. 835, 842 (1983); *Gaffney*, 412 U.S. at 745.  A plaintiff challenging such a plan thus bears the heavy burden to establish that it is one of the rare instances where under-10% deviations are not *de minimis* and harmless.  *See, e.g.*, *Brown*, 462 U.S. at 842; *Gaffney*, 412 U.S. at 745.

Moreover, "an apportionment plan with a maximum population deviation under 10%" "require[s] [no] justification by the State." *Brown*, 462 U.S. at 842.  The plaintiff therefore must also demonstrate that "the minimal deviation results *solely* from an unconstitutional or irrational state purpose" and not even *in part* from "appropriate" state policies.  *Rodriguez*, 308 F. Supp. 2d at 366.  In light of these dual daunting obstacles, it is hardly surprising that "nearly no state districting plan with a maximum deviation below ten percent has ever been struck down by a court as violating population equality."  *Id.* at 364; *see also Marylanders for Fair Rep. v. Schaefer*, 849 F. Supp. 1022, 1031 (D. Md. 1994) (three-judge court).

That is, if a plaintiff meets the daunting burden of showing that the under-10% deviation has more than a "minor" effect, he then must show that it serves no rational purpose.  This

burden on plaintiffs to prove irrationality is simply the flip side of the rule that even over-10% deviations are permissible if they "may *reasonably be said* to advance a *rational* state policy." *Brown*, 462 U.S. at 843 (emphases added); *Mahan v. Howell*, 410 U.S. 315, 328 (1973). This is an objective test that upholds over-10% deviations without regard to whether the Legislature's subjective motivation was political or "illegitimate."[3] Since over-10% deviations are permissible if they objectively advance a rational policy, those rare under-10% deviations with a cognizable effect are *a fortiori* permissible if they are objectively rational. And since there is no burden on the State to justify under-10% deviations, plaintiffs must *disprove* the existence of such rational state policies. *See Brown*, 462 U.S. at 843; *Mahan*, 410 U.S. at 328.

In short, the burden is on the plaintiff to prove that the only purpose of the deviations is an impermissible one. Thus, in *Rodriguez*, the parties cross-moved for summary judgment, and the three-judge court granted the defendants' motion because the under-10% deviation resulted in part from "the traditional principles of maintaining the core of districts and limiting incumbent pairing," even though the plan allegedly reflected improper regional, political, and racial bias against the New York City area. 308 F. Supp. 2d at 360–61, 366, 370.

This dooms Intervenors' claim because they concede that "the 'solely' standard would be virtually impossible to satisfy." (DE 383 at 2). And this Court has recognized that *Rodriguez* applied the "solely" standard. *See* 5/16/12 Op. at 22 (*Rodriguez* upheld "a just-below-10% disparity plan despite evidence of political motive because [the] plan was supported by traditional redistricting criteria and the plaintiffs did not show that the deviations resulted solely from impermissible considerations"). Intervenors thus make two main attempts to escape the

---

[3] The Supreme Court typically does not even look at legislators' testimony in equal-population cases, but simply refers to counsel's arguments or alternative plans. *See Brown*, 462 U.S. 835; *Mahan*, 410 U.S. 315; *Kirkpatrick v. Preisler*, 394 U.S. 526 (1969); *Swann v. Adams*, 385 U.S. 440 (1967); *Roman v. Sincock*, 377 U.S. 695 (-1964); *Reynolds*, 377 U.S. 533.

"solely" standard, both of which fail.

   *First*, although Drayton concedes that *Larios v. Cox* imposes a "similar . . . burden on plaintiffs" as *Rodriguez* (4/20/12 Hr'g tr. at 8), Lee, Ramos, and the Senate Minority contend that *Larios* changed the law governing equal-population claims and, thus, somehow undermined the *Rodriguez* rule.  *See* Ramos Memo. at 7–17 (DE 337); 5/14/12 Hr'g tr. at 4.  But as Intervenors well know, *Rodriguez* was both decided by the three-judge court and summarily affirmed by the U.S. Supreme Court *after Larios*.  *Compare, e.g.*, *Larios v. Cox*, 300 F. Supp. 2d 1320 (Feb. 10, 2004), *summ. aff'd*, 542 U.S. 947 (June 30, 2004), *with Rodriguez*, 308 F. Supp. 2d 346 (Mar. 15, 2004), *summ. aff'd*, 543 U.S. 997 (Nov. 29, 2004).  This alone conclusively demonstrates that *Rodriguez* is binding here and that *Larios* did not alter this Court's obligation to follow it.  Thus, Intervenors' burden is to persuasively distinguish their claims here from their claims in *Rodriguez*; it is plainly not Defendants' burden to distinguish *Larios*.  This is particularly obvious because, *after* assessing Mr. Hecker's claims that *Larios* is in tension with *Rodriguez* on precisely the same grounds offered here (*see Rodriguez* Juris. Stmt. at 20 (DE 356-8)), the Supreme Court affirmed *Rodriguez summarily*.[4]  Thus, this claimed "tension" between *Larios* and *Rodriguez* did not even raise a "substantial question" warranting submission of briefs.  *In re Primus*, 436 U.S. 412, 414 (1978); *Sanks v. Georgia*, 401 U.S. 144, 145 (1971).  This was obviously a conscientious determination, since eight Justices disagreed with Justice Stevens' contention that probable jurisdiction and full briefing should be granted.  *See* 543 U.S. 997.

   In any event, *Larios* is completely compatible with *Rodriguez*, as the *Rodriguez* court recognized.  *See* 308 F. Supp. 2d at 367–71 & nn.23, 27.  In fact, *Larios* seemed to apply the

---

   [4] That summary affirmance "without doubt reject[s] the specific challenges presented in the statement of jurisdiction [and] prevent[s] the lower courts from coming to opposite conclusions on the precise issues presented and necessarily decided."  *Mandel*, 432 U.S. at 176.

same standard as *Rodriguez*, but came to a different result on different facts.  In *Larios*, the deviations did have the unusual effect of "dilut[ing] . . . the weight of certain citizens' votes." 300 F. Supp. 2d at 1322.  Specifically, there were no relevant citizenship or registration deviations in *Larios,* so systematic, politically motivated overpopulation *did* dilute voting power. *See Larios* Mot. to Affirm at 19 (Geremia Decl. Ex. N).  Thus, *Larios* is distinguishable since, unlike *Rodriguez* and this case, the challenged plans had an adverse effect on voting equality. And no case anywhere has found a one-person, one-vote violation without such an effect.

Moreover, in *Larios* there was "*no* evidence that the population deviations in the plans were driven by the neutral and consistent application of any traditional redistricting principles." 300 F. Supp. 2d at 1349 (emphasis added); *see also id.* at 1349–50 ("[T]he record evidence squarely forecloses the idea that *any* . . . legitimate reasons could account for the deviations." (emphasis added)).  Thus, *Larios* is also distinguishable because the 2002 plan in *Rodriguez* and the Senate Plan in this case further some "traditional redistricting principle."

*Second*, Intervenors contend that *Rodriguez*'s "'solely' standard cannot be reconciled with *Roman v. Sincock*, 377 U.S. 695, and its progeny."  (DE 383 at 2).  That contention must be rejected because the *Rodriguez* plaintiffs advanced it in their jurisdictional statement seeking Supreme Court review.  (*See* DE 356-8 at 3, 16–19); *see also Mandel*, 432 U.S. at 176 (summary affirmance "without doubt reject[s] the specific challenges presented in the statement of jurisdiction").  In all events, there is nothing to that contention.  As noted, post-*Roman* Supreme Court cases have held that even an over-10% deviation is permissible if it may "*reasonably be said* to advance a *rational* state policy."  *Brown*, 462 U.S. at 843 (emphases added); *Mahan*, 410 U.S. at 328.  It would, of course, make no sense to inject a subjective inquiry into the analysis of *under*-10% deviations—which presumptively cause *no* harm—when no such inquiry is

authorized with respect to *over*-10% deviations, which presumptively *do* cause harm.

The lower court case Intervenors rely upon, *Daly v. Hunt*, 93 F.3d 1212 (4th Cir. 1996) (cited at DE 383 at 2), recognizes this reality. After the *Daly* court quoted *Roman*'s language regarding "any taint of arbitrary discrimination," it went on to explain that "the [Supreme] Court's apportionment decisions subsequent to *Roman*" indicate "willingness to recognize a *de minimis* level below which population variances are deemed acceptable." *Id.* at 1220. Contrary to Intervenors' assertion, this rule does not mean that under-10% deviations are "immune from constitutional scrutiny." (DE 383 at 1). Instead, it means that such minor deviations are judicially reviewable and may be overturned only in the rare circumstances where they somehow harm voters and are imposed solely for an illegitimate purpose.

Here, Intervenors cannot possibly establish that the Senate Plan's minor deviations "result[] *solely*" from an improper purpose, *Rodriguez*, 308 F. Supp. 2d at 366 (emphasis added), much less that their claims satisfy *Larios*'s extraordinary circumstances. In any event, as we presently explain, the Court should not even reach the purpose question because the Senate Plan has *no* discriminatory *effect* on New York City and indeed, *over*values New York City votes.

### B.     The Senate Plan Benefits, Rather Than Harms, New York City Voters

Intervenors' central thesis is that the Senate Plan harms New York City voters by "overpopulating" New York City districts on the basis of total population. Thus, the threshold dispositive question is whether the Senate Plan did, in fact, inflict cognizable harm on the New York City area. Indeed, if New York City voters are not being treated worse than others, then it is a *non sequitur* to ask whether the (nonexistent) adverse treatment was motivated by racial or political or legitimate purposes. Thus, because the Senate Plan has *no* discriminatory effect on New York City voters, Intervenors' equal-population claims fail.

*First*, Intervenors do not dispute that the Senate Plan *under*populates New York City

10

districts, and *over*populates "upstate" districts, in terms of CVAP—so, like the plan *Rodriguez* upheld, it actually discriminates *in favor of* New York City. *See* 308 F. Supp. 2d at 369. Since the entire point of population equality is to prevent "dilution of the weight of a *citizen's* vote," *Reynolds*, 377 U.S. at 555 (emphasis added), CVAP is a basic measure for determining whether a one-person, one-vote violation even potentially exists, *see Rodriguez*, 308 F. Supp. 2d at 369.

Moreover, the Fourteenth Amendment's equal-population requirement is satisfied by "substantial equivalence" of districts "in terms of *voter* population or *citizen* population," as well as total population, so the Supreme Court makes "no distinction between the acceptability of" a test based on those measures "and a test based on total population." *Burns v. Richardson*, 384 U.S. 73, 91 (1966) (emphases added). In the New York case of *WMCA, Inc. v. Lomenzo*, 377 U.S. 633 (1964), the Supreme Court "treated an apportionment based upon United States *citizen* population as presenting problems no different from apportionments using a total population measure" and the Court has never "suggested that the States are required to include aliens, transients . . . or persons denied the vote for conviction of crime in the apportionment base by which their legislators are distributed." *Burns*, 384 U.S. at 91–92 (emphasis added). Since the Legislature could have used "voter population or citizen population" as the measure of equal population, it obviously cannot be found to have disfavored New York City residents when those residents are *favored* under those measures. *See id.* at 91 n.20.

CVAP figures demonstrate that the Senate Plan underpopulates the New York City districts by 7.41% and overpopulates "upstate" districts by 5.49%. SMF 42, 45.[5] Moreover, because there are fewer registered voters in the New York City districts than in the upstate

---

[5] Like Intervenors, the Senate Majority uses CVAP figures that have not been adjusted to reflect prisoner reallocation under New York law. *See* Breitbart Decl. ¶ 80 (using such data because "[i]mprisoned felons . . . are disenfranchised until the expiration of their sentences").

11

districts, the average weight of a New York City citizen's vote under the Senate Plan is 10% more than the average weight of an upstate citizen's vote as measured by voter registration. SMF 57.[6] And because voter turnout is lower in New York City than in upstate, the average weight of a New York City voter's vote in the most recent Presidential (2008) and State Senate (2010) elections is approximately *30%* and *65%* more than the weight of an upstate voter's vote. SMF 67, 76. Thus, "[t]he practical effect" of the Senate Plan "is to dilute the votes of 'upstate' residents, not those who reside 'downstate.'" *Rodriguez*, 308 F. Supp. 2d at 369. And at the same time it visits this dilution on voters in Republican-leaning upstate, the Senate Plan also disfavors Republican-controlled Long Island, where it overpopulates all nine districts by 2.54% as measured by total population and 4.32% as measured by CVAP. SMF 27, 39.[7]

Obviously, no court should *exacerbate* this dilution of "upstate" voting strength in the name of ensuring that "one person's vote . . . be counted equally with those of all other voters." *Reynolds*, 377 U.S. at 560. Intervenors' proposed plans, however, seek to do precisely that. According to Intervenors' CVAP data, the Breitbart Plan underpopulates New York City districts by 10.44% and overpopulates upstate districts by 9%. SMF 114, 117. The Breitbart Plan also inflates the average weight of a New York City citizen's vote, as measured by registered voters, to 18% more than the average weight of an upstate citizen's vote. SMF 127. Measured by recent voter turnout, the Breitbart Plan increases the average weight of a New York City voter's vote to *38%* and *76%* more than the average weight of an upstate voter's vote. SMF 135, 143.

The Common Cause Plan is even more drastic. Measured by CVAP, it underpopulates

---

[6] The *Rodriguez* court relied on a similar vote-weight comparison in concluding that the 2002 plan discriminated *in favor of* New York City and, thus, in rejecting the equal-population challenge to it. *See Rodriguez*, 308 F. Supp. 2d at 369.

[7] An analysis of the citizen total population (CPOP) data confirms the Senate Plan's bias in favor of New York City. On that measure, the Senate Plan underpopulates the New York City districts by 5.68%, and overpopulates upstate districts by 3.44%. SMF 30, 33.

New York City districts by 10.98% and overpopulates upstate districts by 9.54%. SMF 167–70. It also increases the average weight of a New York City citizen's vote, as measured by registered voters, to 19% more than the average weight of an upstate citizen's vote. SMF 180. And when measured by voter turnout, it increases the average weight of a New York City citizen's vote to *40%* and *79%* more than the average weight of an upstate citizen's vote. SMF 188, 196.[8]

Intervenors do not dispute that the Senate Plan discriminates *in favor of* New York City on these measures, but instead seek to sweep aside this dispositive showing on the assertion that "[t]he New York Constitution requires that Senate districts be apportioned on *total* population." (DE 383 at 3 (emphasis in original)). But, of course, New York's use of total population to *apportion* districts in no way refutes that the under-10% deviation has no adverse effect on voting equality because, when measured on the basis of eligible (citizen) and registered voters, no "[New York City citizen's] vote . . . is in a substantial fashion diluted when compared with votes of [other New York] citizens." *Reynolds*, 377 U.S. at 568. *Rodriguez* patiently explained this truism to Intervenors when it rejected precisely the same meritless argument and noted that "the state constitution has no bearing on whether [this Court] may analyze CVAP numbers in assessing the viability of a one-person, one-vote cause of action under the United States Constitution." 308 F. Supp. 2d at 370 n.25. Thus, the court granted summary judgment to the defendants because the CVAP data demonstrated that the plan "dilute[d] the votes of 'upstate' residents, not those who reside 'downstate.'" *Id.* at 369. Here as well, Defendants are entitled to summary judgment because CVAP data confirms that the Senate Plan's presumptively constitutional deviations do not harm *any* voters. *See id.*

---

[8] By CPOP, the Breitbart Plan underpopulates New York City districts by 8.78% and overpopulates upstate districts by 6.87%, and the Common Cause Plan underpopulates New York City districts by 9.33% and overpopulates upstate districts by 7.42%. SMF 102, 105, 155, 158.

*Second*, Intervenors attempt to change the law by suggesting that the equal-population principle, rather than guaranteeing equality for voters, guarantees proportional representation for cities. *See, e.g.*, Drayton Memo. at 1–2 (DE 307); Lee Letter at 2–3 (DE 340); Cross-Claim ¶¶ 5–10. But the Equal Protection Clause "protect[s] *citizens* and not geographic areas." *Rodriguez*, 308 F. Supp. 2d at 369 (emphasis added); *see also Reynolds*, 377 U.S. at 562 ("Legislators are elected by voters, not farms or *cities* or economic interests." (emphasis added)). Indeed, the Supreme Court conclusively rejected Intervenors' proportional representation theory in *Mahan*, where it upheld a *16.4%* deviation even though the plan discriminated against Northern Virginia by systematically underpopulating Tidewater districts. *See* 410 U.S. at 319.

The Supreme Court reached a similar result in *Burns*, where it held that regional overpopulation visits no cognizable harm if voters within that region are not substantially disfavored as measured by citizen population or registered voters. In *Burns*, Hawaii populated districts based on registered voters. *See* 384 U.S. at 90–91. Thus, even though Oahu had 79% of Hawaii's total population, it received only 71% of the seats in the Hawaii House, or *three fewer seats* than it would have received on proportional representation. *See id.* The Supreme Court nonetheless upheld Hawaii's approach. *See id.* at 90–98; *cf. LULAC v. Perry*, 548 U.S. 399, 436 (2006) ("We proceed now to the totality of the circumstances, and first to the proportionality inquiry, comparing the percentage of total districts that are Latino opportunity districts with the Latino share of *the citizen voting age population*." (emphasis added)).

In all events, even if Intervenors' proportional representation theory were not foreclosed, it still would fail because, even in terms of total population, New York City has *greater* representation in the state legislature than its 42.2% of statewide population warrants. SMF 3. The Assembly Plan has 150 districts, and the Senate Plan has 63 districts, for a total of 213

14

legislative seats.  SMF 21, 79.  On proportional representation based on total population, New York City would receive 42.2% of those seats, or 89.886 seats.  SMF 3.  But the Assembly Plan and the Senate Plan apportion 91 of the 213 seats to New York City—which is more than *one whole seat* and 0.5% *more* than the City's portion of statewide population.  SMF 21, 79.  These facts belie any contention that the Senate Plan harmed New York City voters.  *See Md. Comm. for Fair Rep. v. Tawes*, 377 U.S. 656, 673 (1964) ("It is simply impossible to decide upon the validity of the apportionment of one house of a bicameral legislature in the abstract, without also evaluating the actual scheme of representation employed with respect to the other house.").

Moreover, even focusing on the Senate in isolation, New York City's 42.2% population share corresponds to 26.586 senators, and the Plan places 26 districts in New York City.  SMF 21.  This 0.586 difference is much smaller than the three-seat deviation upheld in *Burns*—so, *a fortiori*, it does not have any cognizable effect on New York City voters.  *See* 384 U.S. at 90–98; *Rodriguez*, 308 F. Supp. 2d at 370 (rejecting equal-population claim where "the overall effect of the deviation is only one seat (actually, two-thirds of a seat) in a 62-seat Senate").

The overrepresentation of New York City is even more pronounced when measured by CVAP.  New York City has 38.2% of the statewide CVAP.  SMF 11.  Thus, on a strictly proportional CVAP representation, New York City would receive 81.366 of the 213 legislative seats, and 24.066 of the 63 Senate seats.  Yet the Assembly Plan and the Senate Plan award New York City *nearly ten whole seats more* (91 total) than its CVAP would support—and the Senate Plan itself awards New York City just under *two whole extra seats* (26 total).  SMF 21, 79.

Finally, Intervenors' suggestion that the placement of a new Senate district in the Hudson Valley does not fairly reflect the State's population growth trend (*see* Drayton Am. Compl. ¶ 105; Lee Am. Compl. ¶ 103) is fundamentally flawed and provides no basis for distinguishing

*Rodriguez*.  Intervenors correctly allege that New York City had 2.06% population growth over the last decade, but that was *lower* than the statewide population growth of 2.12% that Intervenors also correctly note.  *See* Breitbart Decl. ¶ 68; SMF 83–84.  By stark contrast, in the 1990s growth relevant to *Rodriguez*, New York City experienced *9.3%* population growth, which was significantly *higher* than the statewide population growth of *5.5%*.  SMF 81–82.

As a matter of simple math, New York City's below-average population growth over the last decade must have been offset by above-average population growth elsewhere in the State.  And while Intervenors' "self-serving and defective" "upstate" region, *Rodriguez*, 308 F. Supp. 2d at 369, *as a whole* had lower population growth than New York City (*see* Breitbart Decl. ¶¶ 70–73), the growth in the area where the new Senate district was actually *placed* far *exceeded* New York City's growth.  The Hudson Valley experienced 5% population growth, and the five counties in the new Senate district experienced 3.36% growth.  SMF 85-86.

Moreover, the Hudson Valley lies *between* the rest of upstate and New York City, and the three districts in the Westchester area are nearly perfectly populated.  SMF 87–89.  Thus, Intervenors are inviting the Court to collapse a *pre-existing* upstate district and move it to New York City, thereby disrupting district cores and pairing incumbents far beyond what the Senate Plan does.  The Court should decline that invitation and grant Defendants summary judgment.

## C.    The Senate Plan Promotes Traditional Redistricting Policies

Even if Intervenors had established harm from the Senate Plan, this would not open up an inquiry into the Legislature's purpose.  Even where, unlike here, a plan's maximum deviation is *over* 10%, the only relevant inquiry is the objective one whether the deviation "may *reasonably be said* to advance a rational state policy," not a subjective one into legislators' motivations. *Brown*, 462 U.S. at 843 (quoting *Mahan*, 410 U.S. at 328 (emphasis added)).  And "[p]roving the motivation behind official action is often a problematic undertaking," *Hunter v. Underwood*, 471

16

U.S. 222, 228 (1985), and "an unsatisfactory venture" because "[w]hat motivates one legislator to vote for a statute is not necessarily what motivates scores of others to enact it." *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 216 (1983).[9]

But even if the Court were to engage in such an inquiry, it still should reject Intervenors' equal-population claims because the Senate Plan's minor deviation did *not* "result *solely* from an unconstitutional or irrational state purpose." *Rodriguez*, 308 F. Supp. 2d at 366 (emphasis added).  Intervenors appear to concede as much (DE 383 at 2), with good reason: the Senate Plan plainly adheres to "appropriate" state policies.  *Rodriguez*, 308 F. Supp. 2d at 366.

### 1.    The Senate Plan Adheres To Appropriate State Policies

The Senate Plan adheres to at least four "appropriate" state policies, any one of which is sufficient to defeat Intervenors' equal-population claims.  *Rodriguez*, 308 F. Supp. 2d at 366.

*First*, the Legislature served the traditional policy of preventing the further "dilution of the weight of a citizen's vote" in the "upstate" region due to those districts' higher CVAP levels as compared to New York City districts.  *Reynolds*, 377 U.S. at 555.  As measured by CVAP, the Senate Plan *overvalues* New York City votes and gives New York City nearly *two whole districts more* than its population would warrant on proportional equality.  Intervenors' proposed alternatives would exacerbate this "upstate" dilution by systematically overweighting New York City votes even further.

*Second*, the Legislature also served the legitimate objective of offsetting (although not eliminating) the Assembly Plan's disproportionate representation in favor of New York City.  It

---

[9] *See also Palmer v. Thompson*, 403 U.S. 217, 224–25 (1971) ("[I]t is extremely difficult for a court to ascertain the motivation, or collection of different motivations, that lie behind a legislative enactment" and "to determine the 'sole' or 'dominant' motivation behind the choices of a group of legislators."); *Flemming v. Nestor*, 363 U.S. 603, 617 (1960) ("Judicial inquiries into Congressional motives are at best a hazardous matter, and when that inquiry seeks to go behind objective manifestations it becomes a dubious affair indeed.").

is axiomatic that "apportionment in one house could be arranged so as to balance off minor inequities in the representation of certain areas in the other house." *Reynolds*, 377 U.S. at 577. The Assembly Plan effects such inequities by underpopulating nearly every New York City district—and, even when combined, the Assembly Plan and the Senate Plan still award New York City approximately *one whole seat* more than its total population would warrant on proportional representation and *nearly ten whole seats* more than its CVAP would support.

The Legislature thus was faced with a choice whether to round the 26.586 Senate districts New York City would receive on a proportional total population measure up to 27 or down to 26. Rounding up would have exacerbated the existing bias in favor of New York City.  Rounding down partly alleviated that bias and therefore was the rational, sensible legislative option.

*Third*, as in 2002, the Legislature consistently served the valid policy of "preserving the cores of prior districts." *Karcher v. Daggett*, 462 U.S. 725, 740 (1983).  As Intervenors concede, in the Senate Plan, "the average district takes 77.24% of its population from a single preexisting (2002 enactment) district," while in the Breitbart Plan, the average district takes only "69.46% of its population from a single pre-existing (2002 enactment) district."  Breitbart Decl. ¶ 54.

*Fourth*, again as in 2002, the Legislature served the valid state policy of "avoiding contests between incumbent [r]epresentatives." *Karcher*, 462 U.S. at 740; *see also Rodriguez*, 308 F. Supp. 2d at 370.  The Senate Plan pairs only two incumbents, while the New York City-only Unity Plan pairs four incumbents and the Common Cause Plan pairs eighteen incumbents. SMF 19, 149, 201.  Intervenors attempt to reduce their incumbent pairings in their *post hoc* Breitbart Plan, but that plan *still* pairs eight incumbents, including four Republicans.  SMF 93. Among those four Republicans is Senate Majority Leader Skelos.  SMF 94.

Thus, Intervenors' inability to satisfy "the 'solely' standard" does not result from the

Senate Plan merely "pay[ing] lip service to traditional redistricting objectives" or merely tak[ing] *some* account" of those objectives.  (DE 383 at 2).  Rather, the Senate Plan serves those objectives in ways that Intervenors' alternative plans do not.  The Legislature's advancement of even one of these "appropriate" policies defeats Intervenors' equal-population claims. *Rodriguez*, 308 F. Supp. 2d at 366.  Accordingly, Intervenors' allegation that the Legislature acted with a political purpose (*see, e.g.*, Lee Letter at 2-3; Cross-Claim ¶¶ 1–10) is completely irrelevant.  Indeed, the *Rodriguez* court rejected an identical claim and was summarily affirmed by the Supreme Court "despite evidence of political motive."  5/16/12 Op. at 22.

 *Larios* does not hold otherwise because there "the record evidence squarely foreclose[d] the idea that *any* . . . legitimate reasons could account for the deviations" and the court expressly *reserved* the question of "whether or when partisan advantage alone may justify deviations." 300 F. Supp. 2d at 1349–50, 1352 (emphasis added).  And it is difficult to imagine how a political purpose could turn a presumptively constitutional deviation into a constitutional violation because "[p]olitics and political considerations are inseparable from districting and apportionment."  *Gaffney*, 412 U.S. at 753.  Thus, if the Court were to find that the Senate pursued the compelling policy of avoiding dilution of upstate votes because a disproportionate number of Republicans reside upstate, it still would have no warrant to overturn that legitimate policy and penalize upstate voters (Republican and Democratic) by further diluting their votes.

 Intervenors' political discrimination theory, moreover, contradicts the evidence because the Senate Plan overpopulates Republican-leaning Long Island even on Intervenors' preferred total population measure and overpopulates upstate as measured by CVAP.  SMF 27, 45.  Thus, to the extent the Senate Plan discriminates at all, it discriminates in *favor* of Democratic New York City and *against* Republican upstate and Long Island.

Intervenors thus invoke memoranda written by Mark Burgeson in 2001 regarding the Legislature's 2002 redistricting, and contend that they encouraged adoption of a 62-seat Senate on the view that *a 63-seat* Senate would be politically *disadvantageous* to the Senate Majority. (DE 288-1). Yet the *Rodriguez* court found the memoranda insufficient to prove improper political motive because, even "[p]utting aside the . . . questionable assumption that Burgeson's motives are a proxy for those of the Legislature," they "reveal[] many permissible redistricting considerations," including preserving cores and avoiding incumbent pairings. 308 F. Supp. 2d at 367. If the memoranda did not prove a constitutional violation in 2002 when the Legislature *embraced* their recommendation, they cannot possibly evince such a violation in 2012 when it *contradicted* that recommendation and exercised its discretion to apportion 63 Senate seats.[10] And the *Rodriguez* court's discussion of the memoranda reinforces the point that service of traditional redistricting principles suffices to validate minor population deviations, regardless of

---

[10] In any event, Intervenors' use of these memoranda is a complete *non sequitur*. Even though Intervenors assert that the memoranda established that a 63-seat Senate was politically *disadvantageous* in 2002, they ask the Court to infer that a 63-seat Senate was politically *advantageous* in 2012. Intervenors simply cannot have it both ways: the memoranda might establish that a 63-seat Senate is *either* bad *or* good for the Senate Majority, but not both.

Intervenors attempt to reconcile this inconsistency by saying that a 63-seat Senate is *now* advantageous to the Senate Majority because population growth patterns allow the 63rd seat to be placed in Republican-leaning "upstate." *See, e.g.*, Lee Letter at 2–3. This "changed circumstances" argument is multiply flawed. First, it is an explicit concession that the memoranda are irrelevant because they deal with a different political environment. Second, and in any event, it distorts the memoranda, which discussed adding the 63rd seat to *Long Island*, which is just as Republican as "upstate." Third, the memoranda viewed the 63rd seat in 2000 as politically *advantageous*, not harmful as Intervenors consistently incorrectly allege. *See* 7/20/01 Burgeson Memo. at 1 (DE 288-1 at 47). Thus, their only relevance is their proof that the Senate will *reject* politically helpful Senate-size options if they unduly conflict with neutral redistricting principles. *See Rodriguez*, 308 F. Supp. 2d at 367. Finally, the fact that the 63rd seat on Long Island would have helped Republicans by combining "politically *undesirable*" areas and "strengthen[ing]" *adjacent* Republican districts (*see* 7/20/01 Burgeson Memo. at 1 (emphasis added)) refutes Intervenors' premise that only an extra seat in a *Republican* area is politically advantageous. Thus, if politics was the sole criterion, the Legislature could have had the best of both worlds by adopting a *64-seat* plan with one extra district in friendly territory "upstate" and one extra district combining politically undesirable areas in and around New York City.

whether political objectives are also a factor, "primary" or otherwise.

Finally, Intervenors' allegation that the timing of LATFOR's announcement of its 63-seat Senate Plan evinces political motivation (*see, e.g.*, Ramos Memo. at 4–10) likewise fails.  By the time of this announcement in January 2012, the Senate size already had been extensively discussed in LATFOR public hearings across the State—including by Mr. Breitbart.  (*See* DE 288-2 at 58).  After LATFOR's announcement, the 63-seat Senate Plan was the subject of another round of public hearings throughout the State, and Common Cause had plenty of time to propose its 63-seat alternative plan before the Legislature acted.  *See* Public Hearing Schedule—Second Round, *available at* http://www.latfor.state.ny.us/hearings/docs/20120125hrg_schedule.pdf.  And, of course, this argument was extensively presented to the New York Court of Appeals, which nonetheless upheld the Plan's creation of a 63rd seat.  (DE 351).

## 2.  Drayton's And Ramos's Racial Discrimination Allegations Do Not Salvage Their One-Person, One-Vote Claims

Lee has abandoned—and the Senate Minority has never even advanced—the accusation that the Senate Plan's presumptively constitutional minor deviation reflects a racially discriminatory purpose or effect.  (DE 381).  Drayton and Ramos, however, continue to press this accusation.  *See* 4/20/12 Hr'g tr. at 6–8, 33; *see also* Drayton Am. Compl. ¶¶ 110, 114, 116, 123; Ramos Am. Compl. ¶¶ 49–50, 77.  But this accusation fails to distinguish this case from *Rodriguez* and is demonstrably false.

Drayton's and Ramos's allegation of racially discriminatory effect was advanced—and rejected—in *Rodriguez*.  The *Rodriguez* court rejected the allegation that the purported overpopulation of "downstate" districts "ha[d] a discriminatory effect" on New York City minority voters, *see* 308 F. Supp. 2d at 366 n.22, because, as measured by CVAP and voter registration, the 2002 plan "dilute[d] the votes of 'upstate' residents, not those who reside

21

'downstate,'" *id.* at 369.  Here as well, the Senate Plan *over*values New York City votes (*see supra* Part I.B), so it has a *beneficial* disparate effect on New York City minority voters.  In fact, the Senate Plan overvalues New York City minority votes even more heavily than it overvalues New York City votes generally.  According to CVAP figures, the Senate Plan underpopulates its 14 New York City Black and Hispanic districts by 12.04%.  SMF 48.[11]  With respect to registered voters, the average weight of a vote in a New York City Black or Hispanic district is 11% more than the average weight of an upstate vote.  SMF 59.  And with respect to voter turnout, the average weight of a vote in a New York City Black or Hispanic district is *31%* and *76%* more than an upstate vote.  SMF 69, 77.  Thus, far from discriminating against New York City minority voters, the Plan greatly enhances the value of their votes.  And, of course, the Legislature was not required to *aggravate* this distortion in the name of achieving voter equality, *see Reynolds*, 377 U.S. at 560, as Intervenors' proposed plans do.[12]

Drayton and Ramos suggest that their racially discriminatory purpose allegation distinguishes *Rodriguez* and invalidates the Plan if proven, (*see* 4/20/12 Hr'g tr. at 6–8), but this assertion is multiply flawed.  *First*, the absence of any discriminatory *effect* on New York City minority voters obviously forecloses any showing of a discriminatory *purpose*.  *See Thornburg v.*

---

[11] As measured by CPOP, the Senate Plan underpopulates New York City Black and Hispanic districts by 7.35% and overpopulates upstate districts by 3.44%.  SMF 33, 36.

[12] The Breitbart Plan underpopulates its putative 15 New York City Black and Hispanic districts by 9.03% as measured by CPOP and 14.02% as measured by CVAP, and overpopulates upstate districts by 6.87% as measured by CPOP and 9% as measured by CVAP.  SMF 105, 108, 117, 120.  Measured by enrollment and turnout, the Breitbart Plan inflates the average weight of a vote in a New York City Black or Hispanic district to between 19% and 88% more than the average weight of an upstate vote.  SMF 128, 136, 143.  The Common Cause Plan underpopulates its putative 14 New York City Black and Hispanic districts by 10.24% as measured by CPOP and 14.61% as measured by CVAP, and overpopulates upstate districts by 7.42% as measured by CPOP and 9.54% as measured by CVAP.  SMF 158, 161, 170, 173.  Based on enrollment and turnout, the Common Cause Plan increases the average weight of a vote in a New York City Black or Hispanic district to between 21% and 92% more than the average weight of an upstate vote.  SMF 181, 188, 197.

*Gingles*, 478 U.S. 30, 44 (1986) (a plaintiff that fails to prove discriminatory effect cannot satisfy the "'inordinately difficult'" burden of proving discriminatory purpose (quoting S. Rep. No. 97-417, at 36 (1982)); *Garza v. Cnty. of Los Angeles*, 918 F.2d 763, 771 (9th Cir. 1990) ("[P]laintiffs must show that they have been injured as a result" of the allegedly "intentional discrimination."). Moreover, contrary to Drayton's and Ramos's representation, the *Rodriguez* plaintiffs *did* allege racially discriminatory purpose, but were forced to abandon that allegation because they offered nothing to support it. *See* 308 F. Supp. 2d at 366 & n.22.

*Second*, for the reasons stated, Intervenors must show that the Plan's presumptively constitutional minor deviation "result[ed] *solely* from an unconstitutional or irrational state purpose." Intervenors have not alleged and cannot allege that the deviations resulted *solely* from race because, as demonstrated, the Plan reflects "appropriate" state policies. 308 F. Supp. 2d at 366 (emphasis added); *see also supra* Part I.C.1.

*Third*, Drayton and Ramos do not even properly plead a claim of racial purpose, because they nowhere allege that the "state legislature[] selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Adm'r v. Feeney*, 442 U.S. 256, 279 (1979); *Washington v. Davis*, 426 U.S. 229, 240 (1976). Ramos's barebones equal-population counts do not even touch on race-based allegations. *See* Ramos Am. Compl. ¶¶ 68–74. While Drayton asserts that the Senate Plan "intentionally discriminates," the support for this assertion is that the plan "den[ied]" Intervenors "an equal opportunity to participate in the political process, to elect candidates of their choice[,] and to have any meaningful or significant influence in election for members of the New York State Senate." Drayton Am. Compl. ¶ 109. But that supporting assertion merely echoes the discriminatory *results* proscribed by Section 2. *See* 42 U.S.C. § 1973.

23

*Fourth*, even if it had been pled, there is no basis for a "plausible" claim of a discriminatory purpose here.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In the first place, Drayton and Ramos cannot demonstrate that the Plan's minor deviations somehow *caused* the absence of an additional Black-majority or Hispanic-majority district.  Prior to the Senate Plan's enactment, no party proposed a 63-seat plan that added a majority-Black or majority-Hispanic district to the Senate Plan's minority districts.  The 2002 plan contained 8 performing Black districts and 6 performing Hispanic districts in New York City.  SMF 23-25.  The Senate Plan retained those 14 districts and added a majority-Asian district in Queens.  SMF 26.  Neither the Common Cause Plan nor the New York City-only Unity Plan (both proposed prior to the Senate Plan's enactment) created an additional minority district that was majority-Black or majority-Hispanic, even though both plans *underpopulated* New York City districts.  (Intervenors cobbled together the Breitbart Plan which, they allege, creates one more majority-Hispanic district than the Senate Plan only after the Senate Majority's counsel made this point at the April 20 hearing (*see* Apr. 20 Hr'g tr. at 77).)  Thus, none of the alternative proposals suggested *any* connection between "overpopulation" of New York City districts and additional majority-minority districts, which refutes the notion that the purpose of the "overpopulations" was to prevent this (nonexistent) "extra" minority district.

In any event, there is no plausible basis for saying the Plan deliberately imposes *race-based* differential treatment because (1) all upstate residents, whether blacks in Buffalo and Rochester, or whites elsewhere, are in underpopulated districts as measured by total population; (2) all New York City districts—white, black, or Hispanic—are overpopulated as measured by total population; (3) all Long Island districts are overpopulated, regardless of their minority populations; and (4) no plan introduced into the Legislature was able to use placement of the

24

63rd seat in the City to create an additional minority district that was majority-Black or majority-Hispanic.  Since the only possible basis for differential population treatment was "region," rather than race or ethnicity, and since the placement of the 63rd seat upstate could not rationally have been motivated by a desire to deny minorities a nonexistent "extra" seat, the Attorney General, in his Section 5 review, was compelled to find that the State carried its burden to prove the absence of "*any* discriminatory purpose" in the Senate Plan.  42 U.S.C. § 1973c(c) (emphasis added).

Finally, Drayton and Ramos cannot show that the challenged action—i.e., the addition of the new Senate district in upstate rather than New York City—is attributable to "race *rather than* politics."  *Easley v. Cromartie*, 532 U.S. 234, 243 (2001) (emphasis added).  Because "race and political affiliation" often "are highly correlated," plaintiffs in redistricting cases must decouple the two and establish that racial, rather than political, purpose caused a discriminatory effect.  *Id.* at 242, 258.  Here, the correlation between race and politics is quite clear, since allegedly disadvantaged New York City is both less white and more Democratic than the allegedly advantaged "upstate."  Drayton and Ramos, however, do not even *attempt* to disentangle race and politics.  *See* Drayton Am. Compl. ¶¶ 105, 109; Ramos Am. Compl. ¶¶ 42, 49–51.  This failure is fatal, particularly since it is far *more* likely that the Legislature acted with a political purpose to disadvantage Democratic-leaning New York City (although any such political purpose clearly was not its sole purpose, *see supra*) than that it acted with a racial purpose in a Plan that overvalues minority voting strength.  *See NAACP v. Snyder*, No. 2:11-cv-15385 at 20 (E.D. Mich. Apr. 6, 2012) (DE 356–13) (dismissing claim because pairing of five minority incumbents was consistent with both political and racial purpose).

## CONCLUSION

The Court should grant summary judgment to Defendants.

Dated:   June 29, 2012                 Respectfully submitted,


                                       /s/Michael A. Carvin
                                       Michael A. Carvin (MC 9266)
                                       JONES DAY
                                       51 Louisiana Avenue, NW
                                       Washington, DC 20001-2113
                                       202/879-3939

                                       Todd R. Geremia (TG 4454)
                                       JONES DAY
                                       222 East 41st Street
                                       New York, NY 10017-6702
                                       212/326-3939

                                       David Lewis (DL 0037)
                                       LEWIS & FIORE
                                       225 Broadway, Suite 3300
                                       New York, NY 10007
                                       212/285-2290

                                       *Attorneys For Defendants Dean G. Skelos,
                                       Michael F. Nozzolio, and Welquis R. Lopez*

## CERTIFICATE OF SERVICE

I hereby certify that, on this 29th day of June, 2012, a true and correct copy of the

foregoing was served on the following counsel of record through the Court's CM/ECF system:

Richard Mancino
Daniel Max Burstein
Jeffrey Alan Williams
WILLKIE FARR & GALLAGHER
787 Seventh Avenue
New York, NY 10019

*Attorneys for Plaintiffs*

Leonard M. Kohen
67 E. 11th Street #703
New York, NY 10003

*Attorney for Defendants John L. Sampson and Martin Malave Dilan*

Harold D. Gordon
Couch White, LLP
540 Broadway
Albany, NY 12201

*Attorney for Defendant Brian M. Kolb*

James D. Herschlein
KAYE SCHOLER LLP
425 Park Avenue
New York, NY 10022

*Attorney for Intervenors Lee, Chung, Hong, and Lang*

Jeffrey Dean Vanacore
Perkins Coie LLP
30 Rockefeller Center, 25th Floor
New York, NY 10112

*Attorney for Rose Intervenors*

Joshua Pepper
Assistant Attorney General
120 Broadway, 24th Floor
New York, NY 10271

*Attorney for Defendants Andrew M. Cuomo, Eric T. Schneiderman, and Robert J. Duffy*

Jonathan Sinnreich
SINNREICH KOSAKOFF & MESSINA LLP
267 Carleton Avenue, Suite 301
Central Islip, NY 11722

*Attorney for Defendant Robert Oaks*

Joan P. Gibbs
Center for Law and Social Justice
1150 Carroll Street
Brooklyn, NY 11225

*Attorney for Intervenors Drayton, Ellis, Forrest, Johnson, Woolley, and Wright*

Jackson Chin
LatinoJustice PRLDEF
99 Hudson Street, 14th Floor
New York, NY 10013

*Attorney for Intervenors Ramos, Chavarria, Heymann, Martinez, Roldan, and Tirado*

/s/ Michael A. Carvin
_____

27