UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
MARK A. FAVORS, et al.,

                         Plaintiffs,                          MEMORANDUM
                                                             AND ORDER

             -against-                                       11-CV-5632 (DLI)(RR)(GEL)

ANDREW M. CUOMO,
*as Governor of the State of New York,*
*et al.*,

                         Defendants.
------------------------------------------------------------x

ROANNE L. MANN, UNITED STATES MAGISTRATE JUDGE:

         The parties to this redistricting litigation have presented the Court with two discovery-

related groups of motions.  The first motion, filed on June 11, 2012 by the Senate Minority

defendants, seeks an order compelling the Senate Majority defendants to produce all

documents, and respond to two interrogatories, concerning the determination of the size of the

New York State Senate following the 2010 Census redistricting cycle, "including without

limitation all attorney-client communications and attorney work product . . . ."  See Mem. of

Law in Supp. of the Senate Minority's Mot. to Compel Regarding Waiver of Attorney-Client

and Work Product Privileges with Respect to the Senate Size (June 11, 2012) ("6/11/12 Senate

Minority Mem."), Electronic Case Filing ("ECF") Docket Entry ("DE") DE #390.  The

second group of motions, filed on June 18, 2012 respectively by the Senate Majority,

Assembly Majority, and Assembly Minority defendants, requests a protective order precluding

the compelled disclosure of documents and information protected by the legislative privilege.

See Mem. in Supp. of Mot. for Protective Order for the Assembly Majority on the Ground of

Legislative Privilege (June 18, 2012) ("6/18/12 Assembly Majority Mem."), DE #394; Mem. of Law in Supp. of Senate Majority Defendants' Mot. for a Protective Order (June 18, 2012) ("6/18/12 Senate Majority Mem."), DE #397-1; Mem. in Supp. of Assembly Minority's Mot. for a Protective Order (June 18, 2012) ("6/18/12 Assembly Minority Mem."), DE #399.[1]

For the reasons stated herein, the Senate Minority's motion to compel is denied without prejudice. The Court defers ruling on the motions for protective orders filed by the Senate Majority, Assembly Majority, and Assembly Minority defendants (hereinafter, the "Senate Majority," "Assembly Majority," and "Assembly Minority," respectively), pending the completion of the Court's *in camera* review of privileged documents.

The defendants are directed to produce to the Court, for *in camera* inspection, the following documents by August 17, 2012: The Senate Majority is directed to produce all documents listed in its privilege logs, and the Assembly Majority and Assembly Minority are directed to produce all documents in their respective privilege logs relating to the Assembly districts in Nassau County. Additionally, the Senate Majority, Assembly Majority, and Assembly Minority are directed to supplement their privilege logs as described in Part III of this opinion, and to serve and file (via ECF) their revised logs by August 20, 2012.

---

[1] Although named as defendants, the Senate Minority defendants (the "Senate Minority") have essentially aligned themselves with the plaintiff-intervenors, and have even filed a cross-claim against the other defendants. See Senate Minority's Amended Answer to Amended Complaint and Cross-Claim (May 23, 2012) ("5/23/12 Senate Minority Answer and Cross-Claim"), DE #370. Therefore, for ease of reference, the Court's use of the term "plaintiffs" will include within the referenced group the Senate Minority, as well as the plaintiff-intervenors, and its use of the term "defendants" will exclude from its scope the Senate Minority.

## BACKGROUND[2]

The instant litigation involves challenges to the newly enacted New York State Senate and Assembly redistricting plans (the "2012 Senate Plan" and the "2012 Assembly Plan," respectively), which were signed into law by Governor Andrew M. Cuomo in March 2012. See Favors v. Cuomo, 2012 WL 1802073, at *2.  The challenges are brought by three sets of plaintiff-intervenors -- the Drayton Intervenors, the Lee Intervenors, and the Ramos Intervenors -- as against the Governor of New York, various executive officials, New York state legislators, the New York State Legislative Task Force on Demographic Research and Reapportionment ("LATFOR"), and members of LATFOR.  Id.  As relevant to the instant motions, the Drayton Intervenors, Lee Intervenors, and Ramos Intervenors allege that the 2012 Senate Plan "improperly dilutes the voting power of African Americans, Asian Americans and Hispanics in violation of the United States Constitution and the Voting Rights Act [("VRA")], and the malapportioned districts lack any legitimate justification."  See id.  The Drayton Intervenors and Ramos Intervenors also allege that the 2012 Assembly Plan "violates Section 2 [of the VRA] by failing to create new majority-minority districts in Nassau County and New York and Bronx Counties, respectively."  See id.[3]  Lastly, the Senate Minority has asserted a

---

[2]  Familiarity with the claims and parties in this case and prior proceedings is assumed.  See generally Favors v. Cuomo, -- F.Supp.2d --, 2012 WL 1802073 (E.D.N.Y. May 16, 2012); Favors v. Cuomo, No. 11-cv-5632 (RR)(GEL)(DLI)(RLM), 2012 WL 928216 (E.D.N.Y. Mar. 19, 2012), aff'd with modifications, 2012 WL 928223 (E.D.N.Y. Mar. 19, 2012); Favors v. Cuomo, -- F.Supp.2d --, 2012 WL 824858 (E.D.N.Y. Mar. 8, 2012). Nevertheless, the Court will provide a brief overview of the case to help frame the discussion.

[3]  The Ramos Intervenors have now withdrawn their VRA Section 2 claim by stipulation.  See Stipulation (July 20, 2012), DE #459-1.

cross-claim against all defendants, alleging that the 2012 Senate Plan violates the one-person, one-vote principle of the Equal Protection Clause of the Fourteenth Amendment because the Senate Majority, "[r]ather than making an honest and good faith effort to adhere as closely as possible to the Fourteenth Amendment's equal population principle, . . . maximized the population deviations[,] . . . because doing so (and increasing the size of the body by one district) was the only way the Majority could draw lines specifically intended to perpetuate the Republic majority in the Senate." See 5/23/12 Senate Minority Answer and Cross-Claim at 9-11.

Throughout the course of this litigation, the parties have from time to time raised the issues of attorney-client privilege and legislative privilege. On April 20, 2012, the three-judge court (the "Panel") assigned to this case ordered the defendants to "show cause as to why they should not be required to identify the person(s) who drew the challenged [New York State Senate] map . . . , and be prepared to produce the individual(s) for depositions." See Minute Entry for Three-Judge Court Hearing (Apr. 20, 2012). In response, the Senate Majority claimed "an absolute testimonial privilege bar[ring] plaintiffs from deposing the individual or individuals who drew the 2012 Senate redistricting map about deliberations and communications regarding this legislative activity." See Senate Majority's Response to the Court's April 20 Order (Apr. 27, 2012) ("4/27/12 Senate Majority Resp.") at 15, DE #338.

Shortly thereafter, the Panel referred the matter to the undersigned magistrate judge "to supervise discovery on such schedule, including an expedited schedule, as she may deem appropriate, and to issue all discovery-related orders, including, but not limited to, scheduling orders and orders resolving or otherwise addressing any discovery disputes that the parties are

4

unable to resolve after good faith efforts to reach resolution thereof without court action." See

Favors, 2012 WL 1802073, at *15.  At a proceeding held on May 29, 2012, this Court set a

discovery schedule,[4] as well as a briefing schedule for the parties' unresolved privilege issues.

See Minute Entry and Order (May 29, 2012), DE #377.  The parties have now filed their

discovery cross-motions addressing the attorney-client privilege, work product protection, and

legislative privilege.

The Senate Minority, Drayton Intervenors, Lee Intervenors, and Ramos Intervenors

jointly served twenty-nine document demands and fifteen interrogatories on all defendants.

See generally See generally Plaintiffs' Consolidated Initial Discovery Requests (May 31, 2012)

("Pl. Disc. Requests"), Ex. A. to Decl. of Todd R. Geremia (June 18, 2012) ("6/18/12

Geremia Decl.") at 7-15, DE #395-1.  The demands and interrogatories seek documents and

information regarding the development of the 2012 Senate and 2012 Assembly Plans.  See id.

With respect to the 2012 Senate Plan, the plaintiffs generally request documents and

information regarding the instructions given to the mapmakers, the reasons that the plan

deviates from equal population, the use of traditional redistricting principles or partisan goals

in the development of the plan, considerations of alternative plans and public proposals, the

decision to add and placement of a 63rd district, regional malapportionment, attorney

communications and time sheets, and documents intended for use in motions now pending

before the Panel.  See id.  As for the 2012 Assembly Plan, the plaintiffs request non-public

---

[4]  Pursuant to that schedule, the plaintiffs' discovery demands were to be served by May 31, 2012, and the defendants' responses were due by June 18, 2012.  See Minute Entry and Order (May 29, 2012) at 2, DE #377.  The defendants' privilege logs were due, in final form, by June 25, 2012.  Id.

documents and information concerning the redistricting of the districts in New York City and

on Long Island.  See id.  In connection with all of their demands, the plaintiffs request

communications between and among legislators, legislative staff members, LATFOR members,

LATFOR staff, attorneys, and experts.  See id.  Finally, the plaintiffs' interrogatories ask the

defendants to identify the individuals involved with the 2012 redistricting plans, and, among

other information, the motivations behind the drafting of those plans.  See id. at 13-15.

## DISCUSSION

I.      **Motion to Compel: Attorney-Client Privilege and Work Product Protection**

On June 11, 2012, the Senate Minority filed a motion for an order compelling the

defendants to produce "all documents relating to or reflecting the determination of the size of

the [New York State] Senate in 2012, including without limitation all attorney-client

communications and attorney work product, and to . . . respond to Interrogatories Nos. 5 and

6 in Plaintiffs' Consolidated Initial Discovery Requests."[5]  See 6/11/12 Senate Minority Mem.

at 1.[6]  The Senate Minority argues that the Senate Majority waived its attorney-client privilege

and work product protection when it released to the public (and later relied upon in state court)

---

[5]  In Plaintiffs' Consolidated Initial Discovery Requests, Interrogatory 5 requests that the
defendants "[i]dentify the reasons why a 63rd Senate district was added in 2012," and
Interrogatory 6 requests that the defendants "[i]dentify the reasons why a different Senate size
(i.e., other than 63 Senate districts) was not adopted in 2012."  See Pl. Disc. Requests at 13.

[6]  The Lee Intervenors joined the Senate Minority's motion to compel, see Letter from Grace
Yang to the Court (June 11, 2012) at 1, DE #392, incorporating by reference a letter-brief
submitted in connection with the April 20, 2012 Order to Show Cause.  See Letter Brief
Regarding 4/27/12 Senate Majority Response (May 4, 2012), DE #363.  Because the letter
brief does not alter this Court's analysis, and relies on legislative privilege waiver arguments,
it is not further described in connection with the instant motion to compel.

a January 5, 2012 memorandum from attorney Michael A. Carvin to New York State Senators Dean Skelos and Michael Nozzolio[7] (the "2012 Carvin Memorandum") discussing the appropriate size of the Senate following the 2010 Census.  See 6/11/12 Senate Minority Mem. at 3-5; see also 2012 Carvin Memorandum, Ex. 2 to Decl. of Eric Hecker in Supp. of Senate Minority Mot. to Compel (June 11, 2012) ("6/11/12 Hecker Decl."), DE #391-2.[8]

More specifically, the Senate Minority asserts that the Senate Majority effectuated a subject-matter waiver of the attorney-client privilege with respect to documents related to the determination of the Senate size in the current redistricting cycle because (1) it "affirmatively chose" to release the memorandum on the LATFOR website, "actively represent[ing] to the public that the analysis in the Carvin Memorandum is *the reason* why a 63rd Senate district was added in 2012," see 6/11/12 Senate Minority Mem. at 5 (emphasis in original); and (2) "expressly and repeatedly relied" on the memorandum in Cohen v. Cuomo, 19 N.Y.3d 196 (N.Y. 2012), a state lawsuit that involved an unsuccessful challenge, under the New York State Constitution, to the addition of the 63rd Senate district.  See 6/11/12 Senate Minority Mem. at 5.  Citing the Second Circuit's decisions in United States v. Bilzerian, 926 F.2d 1285,

---

[7]  Senator Skelos is Majority Leader and President Pro Tempore of the New York State Senate and Senator Nozzolio is a member of LATFOR.  Both are named as defendants in this lawsuit.

[8]  Although the Senate Minority's initial moving papers purport to seek a compulsion order against "defendants" generally, see, e.g., 6/11/12 Senate Minority Mem. at 1, its reply memorandum makes clear that its waiver argument is limited to the Senate Majority, see generally Reply Mem. of Law in Further Supp. of the Senate Minority's Mot. to Compel Regarding Waiver of Attorney-Client and Work Product Privileges Regarding the Senate Size (July 2, 2012) ("7/2/12 Senate Minority Reply"), DE #425, and no other defendant has responded substantively to the motion to compel.  See Assembly Minority Letter (June 25, 2012), DE #403 ("express[ing no] opinion" as to the motion to compel).

1292 (2d Cir. 1991), and In re County of Erie, 546 F.3d 222, 228 (2d Cir. 2008) ("Erie II"), the Senate Minority argues that "[b]asic rules of fairness dictate that the Senate Minority must be allowed to test the veracity of Defendants' claim that they increased the size of the Senate for the purportedly neutral reason that the 'most faithful' reading of the New York Constitution required them to do so."  See 6/11/12 Senate Minority Mem. at 4, 6.[9]

The Senate Majority levies a series of arguments in opposition.  See Senate Majority Defendants' Opp. to the Senate Minority's Mot. to Compel Privileged Commc'ns and Work-Product with Respect to the Size of the State Senate (June 25, 2012) ("6/25/12 Senate Majority Opp."), DE #405.  First, the Senate Majority argues that because the 2012 Carvin Memorandum was never intended to be confidential, the attorney-client privilege and work product protection do not attach to the document, and therefore its publication does not constitute a waiver of those privileges.  See id. at 8.  Second, citing In re von Bulow, 828 F.2d 94, 102 (2d Cir. 1987), and John Doe Co. v. United States, 350 F.3d 299, 306 (2d Cir. 2003), the Senate Majority avers, in the alternative, that even if the publication of the 2012 Carvin Memorandum waived the privilege, the waiver is limited to the memorandum itself, since it was used only defensively in the Cohen case, and was not affirmatively relied upon in that (or the instant) litigation.  See 6/25/12 Senate Majority Opp. at 10-18.  Third, the Senate Majority asserts that documents and information regarding the Senate size are not relevant to the issues now before the Panel.  See id. at 18-19.  Finally, the Senate Majority argues that, in any event,

---

[9]  The Senate Minority argues, in passing, that Rule 502 of the Federal Rules of Evidence, which governs disclosures of privileged materials in "federal proceedings," Fed. R. Evid. 502, is inapplicable.  See 6/11/12 Senate Minority Mem. at 7.  This Court agrees that Rule 502 does not apply.

the documents and information sought are protected against compelled disclosure by an absolute legislative privilege.  See id. at 19-24.

In a reply filed on July 2, 2012, the Senate Minority counters that the issue of the Senate size is "not just relevant but central" to the instant case, see 7/2/12 Senate Minority Reply at 1; that Senator Skelos caused the 2012 Carvin Memorandum to be posted on the LATFOR website "to give reviewing courts . . . the false impression that the decision to add a 63rd district was based in good-faith on his counsel's legal advice," see id. at 4; that the legal advice contained in the 2012 Carvin Memorandum was the "centerpiece of the Senate Majority's defense in Cohen," see id. at 5, and "will be at the center of the Senate Majority's defense in this case," see id. at 6; and that in these circumstances, fairness counsels in favor of allowing the Senate Minority to investigate the "*real* legal advice" that attorney Carvin provided to the Senate Majority.  See id. at 10 (emphasis in original).  Finally, the Senate Minority notes that the Senate Majority failed to offer "any evidence supporting [its] conclusory assertion" that the 2012 Carvin Memorandum was not intended to be confidential. See id. at 3.

### A.    *Legal Standards*

#### 1.    **Attorney-Client Privilege**

"The attorney-client privilege protects confidential communications between client and counsel made for the purpose of obtaining or providing legal assistance."  In re Cnty. of Erie, 473 F.3d 413, 418 (2d Cir. 2007) ("Erie I") (citing United States v. Constr. Prods. Research, Inc., 73 F.3d 464, 473 (2d Cir. 1996)).  The attorney-client privilege "exists for the purpose of encouraging full and truthful communications between an attorney and his client and

9

'recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client.'" In re von Bulow, 828 F.2d at 100 (citing Upjohn Co. v. United States, 449 U.S. 383, 389 (1981)). It is the burden of the proponent of the privilege to establish its applicability, and courts should construe assertions of privilege narrowly, sustaining the privilege "only where necessary to achieve its purpose." See Erie I, 473 F.3d at 418 (citing Fisher v. United States, 425 U.S. 391, 403 (1976); In re Grand Jury Proceedings, 219 F.3d 175, 182 (2d Cir. 2000)).

To substantiate a claim of attorney-client privilege, the proponent must establish three elements: "(1) a communication between client and counsel that (2) was intended to be and was in fact kept confidential, and (3) was made for the purpose of obtaining or providing legal advice." See Erie I, 473 F.3d at 419 (citing Constr. Prods. Research, 73 F.3d at 473). As relevant here, a communication intended for publication is "not intended to be confidential[,] . . . and therefore [is] not within the privilege." See Robbins & Myers, Inc. v. J.M. Huber Corp., 274 F.R.D. 63, 83-84 (W.D.N.Y. 2011) (citing, inter alia, In re von Bulow, 828 F.2d at 102; United States v. Tellier, 255 F.2d 441, 447 (2d Cir. 1958); 5 McCormick on Evidence § 91 at 408 (Kenneth S. Broun, 6th ed. 2006)); see also In re Chevron Corp., 650 F.3d 276, 290 (3d Cir. 2011) (stating that where "communications [are] not made 'in confidence[,]'. . . they [are] not privileged to begin with, and there [is] no privilege to waive by their disclosure."). And, in this Circuit, the publication of a non-confidential attorney-client communication does not create an inference that related communications or earlier drafts were similarly not intended to be confidential. See In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983, 731 F.2d 1032, 1037 (2d Cir. 1984). Lastly, in order for the attorney-client

privilege to apply, "the predominant purpose" of the communication must be "to render or solicit legal advice." Erie I, 473 F.3d at 420 (citing United States v. Int'l Bus. Machs. Corp., 66 F.R.D. 206, 212 (S.D.N.Y. 1974)); see also id. at 421.

Even where the privilege does attach to a communication, "[a] client may . . . by his actions impliedly waive the privilege or consent to disclosure." In re von Bulow, 828 F.2d at 101 (citations omitted). It is well established in this Circuit that a party may not use the privilege as both a sword and a shield. See Bilzerian, 926 F.2d at 1292 (holding that "[a] defendant may not use the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes") (citing In re Von Bulow, 828 F.2d at 103). The question whether there has been an implied waiver is best "decided on a case-by-case basis, and depends primarily on the specific context in which the privilege is asserted." See In re Grand Jury Proceedings, 219 F.3d at 183; see also John Doe Co., 350 F.3d at 302 (citations omitted). To that end, courts have identified three related but slightly different species of implied waiver: "when a client testifies concerning portions of the attorney-client communication, . . . when a client places the attorney-client relationship directly at issue, . . . and when a client asserts reliance on an attorney's advice as an element of a claim or defense . . . ." See Erie II, 546 F.3d at 228 (quoting with approval Sedco Int'l S.A. v. Cory, 683 F.2d 1201, 1206 (8th Cir. 1982)). At issue here are the first and third forms of waiver.

First, courts have recognized that fairness counsels in favor of a subject-matter waiver where a party selectively discloses otherwise privileged communications in a manner that prejudices the opposing party in a litigation. See In re von Bulow, 828 F.2d at 101-02 ("[I]t has been established law for a hundred years that when the client waives the privilege by

testifying about what transpired between her and her attorney, she cannot thereafter insist that the mouth of the attorney be shut.  From that has grown the rule that testimony as to part of a privileged communication, in fairness, requires production of the remainder.") (citations omitted).  To effectuate a waiver, the selective disclosure must have occurred in an adversarial context, i.e., one that has the potential to cause legal prejudice to the proponent's adversary. See John Doe Co., 350 F.3d at 306; In re von Bulow, 828 F.2d at 102 ("[W]e hold therefore that the extrajudicial disclosure of an attorney-client communication -- one not subsequently used by the client in a judicial proceeding to his adversary's prejudice -- does not waive the privilege as to the undisclosed portions of the communication."); see also In re Kidder Peabody Secs. Litig., 168 F.R.D. 459, 470 (S.D.N.Y. 1996) (finding a waiver where defendant "made the invocation of [an attorney-drafted investigative] report and its conclusions a leitmotif of its approach both in judicial fora and in other 'judicial'-type contexts").

Second, courts have held that "the privilege may implicitly be waived" or forfeited, on a subject-matter basis, "when [a] defendant asserts a claim that in fairness requires examination of protected communications."  See Bilzerian, 926 F.2d at 1292 (citations omitted).  For example, a forfeiture may result when a party, in pressing an element of its claim or defense, places in issue the advice of counsel or, more broadly, "'when a party uses an assertion of fact to influence the decisionmaker while denying its adversary access to privileged material potentially capable of rebutting the assertion.'" See Erie II, 546 F.3d at 229 (quoting John Doe Co., 350 F.3d at 306); OneBeacon Ins. Co. v. Forman Int'l Ltd., No. 04 Civ. 2271(RWS), 2006 WL 3771010, at *10 (S.D.N.Y. Dec. 15, 2006); Falise v. Am. Tobacco Co., 193 F.R.D. 73, 84 (E.D.N.Y. 2000); Bowne of N.Y. City, Inc. v. AmBase Corp., 150 F.R.D.

12

465, 488 (S.D.N.Y. 1993).  Although an advice-of-counsel defense will not result in forfeiture unless the proponent relies on privileged advice, see Erie II, 546 F.3d at 229, courts within this Circuit, relying on Bilzerian, have reaffirmed the broader principle that forfeiture of the privilege may result where the proponent asserts a good faith belief in the lawfulness of its actions, even without expressly invoking counsel's advice.  See MBIA Ins. Corp. v. Patriarch Partners VIII, LLC, No. 09 Civ. 3255, 2012 WL 2568972, at *7 (S.D.N.Y. July 3, 2012) (citing Arista Records, LLC v. Lime Grp., LLC, No 06 Civ. 5936(KMW), 2011 WL 1642434, at *2-3 (S.D.N.Y. Apr. 20, 2011) (quoting approvingly Leviton Mfg. Co. v. Greenberg Traurig LLP, No. 09 Civ. 8083(GBD)(THK), 2010 WL 4983183, at *3 (S.D.N.Y. Dec. 6, 2010))).  "In sum, . . . 'it would be unfair for a party asserting contentions [of good faith] to then rely on its privileges to deprive its adversary of access to material that might disprove or undermine the party's contentions.'" Arista Records, 2011 WL 1642434, at *3 (alterations in original) (quoting Newsmarkets Partners, LLC v. Sal. Oppenheim Jr. & Cie. S.C.A., 258 F.R.D. 95, 106 (S.D.N.Y. 2009)).

## 2.    Work Product Protection

The work product protection, as partially codified in Rule 26(b)(3) of the Federal Rules of Civil Procedure, is a qualified privilege for "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative." See Fed. R. Civ. P. 26(b)(3)(A); see also United States v. Nobles, 422 U.S. 225, 237-38 (1975); United States v. Ghavami, No. 10 Cr. 1217(KMW)(JCF), 2012 WL 2090800, at *4 (S.D.N.Y. June 5, 2012).  The work product protection also extends to "intangible work product," including "an attorney's analysis made in anticipation of litigation, but which has not

13

been memorialized." See Ghavami, 2012 WL 2090800, at *5 (citing Hickman v. Taylor, 329 U.S. 495, 505, 509-11 (1947)).

The work product protection is "'distinct from and broader than the attorney-client privilege,'" see In re Grand Jury Proceedings, 219 F.3d at 190 (quoting Nobles, 422 U.S. at 238 & n.11), and encompasses both "opinion" work product and "fact" work product, the former relating to the mental impressions of counsel and the latter relating to factual investigations and technical analyses. See In re Grand Jury Subpoena Dated July 6, 2005, 510 F.3d 180, 183 (2d Cir. 2007) (citing In re Grand Jury Subpoena Dated Oct. 22, 2001, 282 F.3d 156, 161 (2d Cir. 2002); United States v. Adlman, 134 F.3d 1194, 1197 (2d Cir. 1998)). However, even some work product that is "factual" on its face may fall within the rubric of "opinion" work product if it is the result of the "selective judgment" of counsel. See SEC v. Nadel, No. CV 11-215(WFK)(AKT), 2012 WL 1268297, at *7 (E.D.N.Y. Apr. 16, 2012) (quoting SEC v. Sentinel Mgmt. Grp., Inc., No. 07 C 4684, 2010 WL 4977220, at *9 (N.D. Ill. Dec. 2, 2010)); see also Upjohn, 449 U.S. at 400.

The proponent of the privilege bears the "heavy burden" to establish its existence. See In re Grand Jury Subpoena Dated July 6, 2005, 510 F.3d at 183. A document is prepared in anticipation of litigation, and therefore entitled to work product protection, "if in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." See Adlman, 134 F.3d at 1202 (citations and internal alterations omitted). In order to successfully invoke the enhanced protection for opinion work product, the proponent has the added burden of demonstrating "'a real, rather than speculative, concern' that the [work product] will reveal

14

counsel's thought processes 'in relation to pending or anticipated litigation.'" See In re Grand Jury Subpoena Dated July 6, 2005, 510 F.3d at 183-84 (quoting In re Grand Jury Subpoenas Dated Mar. 19, 2002 & Aug. 2, 2002, 318 F.3d 379, 386 (2d Cir. 2003)).

Even where the applicability of the protection has been established, fact work product "may be ordered disclosed upon a showing of substantial need," while opinion work product "is entitled to virtually absolute protection."  See Ghavami, 2012 WL 2090800, at *5 (citations omitted); see also P. & B. Marina, Ltd. P'ship v. Logrande, 136 F.R.D. 50, 57 (E.D.N.Y. 1991) (Weinstein, J.), aff'd, 983 F.2d 1047 (2d Cir. 1992).  Specifically, a party seeking discovery may obtain materials constituting fact work product when it can show that the materials at issue are "otherwise discoverable under Rule 26(b)(1)" and that that party "has a substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means."  See Fed. R. Civ. P. 26(b)(3).  However, even where fact work product is discoverable, courts "must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation."  See Fed. R. Civ. P. 26(b)(3)(B).  Thus, courts in this Circuit have required a "highly persuasive showing" of need to overcome assertions of opinion work product protection.  See In re Grand Jury Proceedings, 219 F.3d at 190-91 (quoting Adlman, 134 F.3d at 1204); Nadel, 2012 WL 1268297, at *6 (citing Upjohn, 449 U.S. at 401; United States v. Jacques Dessange, Inc., No. S2 99 CR 1182 DLC, 2000 WL 310345, at *2 (S.D.N.Y. Mar. 27, 2000)); Gruss v. Zwirn, 276 F.R.D. 115, 127 (S.D.N.Y. 2011) (citing Allied Irish Banks v. Bank of Am., N.A., 240 F.R.D. 96, 105 (S.D.N.Y. 2007)).

As is the case with the attorney-client privilege, a party may waive the work product protection on a subject-matter basis.  See The Shinnecock Indian Nation v. Kempthorne, 652 F.Supp.2d 345, 365-66 (E.D.N.Y. 2009).  However, "courts generally permit discovery of work product based on implied or subject-matter waiver only where the privileged communications have been put at issue or when the defendant seeks to exploit the doctrine for a purpose inconsistent with the privilege."  See id. (collecting cases).  Further, in order to constitute a waiver, the "disclosure must substantially increase the opportunities for potential adversaries to obtain the information."  See Ghavami, 2012 WL 2090800, at *5 (quoting United States v. Stewart, 287 F.Supp.2d 461, 468 (S.D.N.Y. 2003)) (citations and internal alterations omitted).

**B.     Analysis**

Several of the plaintiffs to this litigation have challenged the sufficiency of the defendants' assertions of privilege, and/or have requested an *in camera* inspection by the Court to assess the validity of the claims of privilege.  See *supra* pp. 27-29.  The Court addresses those issues in Parts II and III below.  This section considers the argument advanced by the Senate Minority, and joined by the Lee Intervenors, that the publication of the 2012 Carvin Memorandum worked a forfeiture of the attorney-client privilege and work product protection with respect to all materials concerning the determination of the size of the Senate following the 2010 Census.

As a preliminary matter, the Senate Majority does not invoke either the attorney-client privilege or work product protection with respect to the 2012 Carvin Memorandum.  Instead, it argues that the document was never intended to be kept confidential, and that therefore the

attorney-client privilege does not apply and the publication of the memorandum does not result in a subject-matter waiver.  See 6/25/12 Senate Majority Opp. at 8.  In support of this argument, the Senate Majority notes that the memorandum was posted on the LATFOR website the day after it was drafted, and was intended to serve as a "*public* explanation . . . of the methodology used to determine the size of the Senate for the Senate Plan."  See id. (emphasis in original).  This was done, the Senate Majority states, "in the interest of promoting open government and transparency in redistricting."  See id. at 2.

The Senate Majority's assertion of non-confidentiality is consistent with public statements made by Senator Nozzolio (a member of the Senate Majority) soon after the publication of the 2012 Carvin Memorandum.  Specifically, at a January 10, 2012 LATFOR public meeting, Senator Nozzolio, faced with a challenge from Senator Martin Malavé Dilan (also a defendant and LATFOR member, and a member of the Senate Minority), described the origins of the memorandum:

> SENATOR DILAN: I want to know how last Friday at 5:00 p.m. in a very obscure spot of the LATFOR Senate website a new policy memo appears without ratification of this panel.  I want to know how that happens and who authorized that.  I would like to know if that attorney is a staff member of LATFOR or is he an outside consultant.
>
> SENATOR NOZZOLIO: Senator Dilan, you're referring to a memo from an attorney named Michael [Carvin] who has been retained by this task force as -- he was retained by this task force in 2002 and in 1992 and it's my understanding that Attorney [Carvin] placed a memo after analyzing the tenets of the New York State [C]onstitution and of which it was his responsibility as counsel to this task force to -- that that report or analysis, if you will, just as he made an analysis in 2002, was placed on the task force [web site] in the same protocols that were established 10 years ago. . . .  It's my understanding that the attorney for this

17

> task force placed -- in placing his memo on the LATFOR website and analyzed [alternative proposals] and dealt with them in his memorandum.  His recommendation is based on his analysis of the New York State [C]onstitution. . . .  *It was done by the attorney and that analysis was placed for the public to review on the LATFOR website.  Whether it was 5:00 or -- at night or 5:00 in the morning, it was placed on the website when it was completed and that analysis is for everyone to review.*

See Tr. of Pub. LATFOR Hr'g (Jan. 10, 2012) at 16-18 (emphasis added), Ex. 2 to Decl. of

Senator Martin Malavé Dilan (July 2, 2012) ("Dilan Decl."), DE #427-1.

Although the Senate Majority's assertion that the 2012 Carvin Memorandum was

intended for public review is contained in an unsworn memorandum of law and is unsupported

by any affidavits, the circumstances surrounding the publication of the memorandum, including

the aforesaid discussion at the public LATFOR meeting, support the claim of non-

confidentiality.  To be sure, some indicia on the face of the document tend to point in the

opposite direction.[10]  Nevertheless, where, as here, the would-be proponent of the privilege

declines to assert it over a document that the client published almost immediately after its

creation, there appears to be no reason in law or logic to require the "proponent" to "prove the

negative" -- i.e., to offer proof of non-confidentiality.

As the 2012 Carvin Memorandum was not privileged, its posting on the LATFOR

website cannot be said to constitute a selective waiver of the attorney-client privilege or work

_____

[10]  For example, the memorandum was addressed from an attorney, Michael Carvin, to Senators Skelos and Nozzolio on firm letterhead, and purports to provide requested advice. See 2012 Carvin Memorandum at 1.  However, although no notation reflecting intended confidentiality (e.g., "attorney-client communication" or "confidential") is affixed to the document, the memorandum does not, by its terms, evince any intent that it be published.  See id.

product protection.  Nevertheless, a subject-matter waiver by forfeiture can occur even in the

absence of disclosure of privileged communications.[11]  Here, the Senate Minority does not

contend that the Senate Majority has asserted an advice-of-counsel defense.  Rather, it argues

that the 2012 Carvin Memorandum was the "centerpiece of the Senate Majority's defense in

<u>Cohen</u>" and "*will be* at the center of the Senate Majority's defense in this case."  <u>See</u> 7/2/12

Senate Minority Mem. at 5-6 (emphasis added).  The Senate Minority's waiver argument

assumes a litigation strategy that its opponent has not yet pursued in this case.  Accordingly,

the Court denies the motion to compel without prejudice to a renewed motion in the event the

Senate Minority's prediction proves to be accurate.

## II.    Motion for a Protective Order: Legislative Privilege

On June 18, 2012, the Senate Majority, Assembly Majority, and Assembly Minority

each filed motions for protective orders to prevent the compelled disclosure of documents and

information covered by the legislative privilege.  <u>See</u> 6/18/12 Assembly Majority Mem.;

6/18/12 Senate Majority Mem.; 6/18/12 Assembly Minority Mem.  For the reasons stated

below, the Court defers decision on the defendants' motions pending its completion of an *in

camera* review of withheld documents.

### A.    *Background*

The Court begins its analysis with a discussion of the factual context in which the

claims of privilege arise.  The parties have submitted multiple declarations to provide the

---

[11]  Mindful of the fact that the strategic non-assertion of the attorney-client privilege may allow
a party to avoid a finding of selective waiver, the Court, in conducting its *in camera* inspection
of documents withheld as privileged by the Senate Majority, <u>see</u> <u>generally</u> *infra* pp. 61-62, will
consider the possibility that such conduct may cause a forfeiture.

Court with an overview of the structure and operations of LATFOR.[12]  See Decl. of Debra A. Levine-Schellace (Apr. 27, 2012) ("4/27/12 Levine-Schellace Decl."), Ex. A to 4/27/12 Geremia Decl., DE #336-1; Decl. of Roman Hedges in Supp. of the Assembly Majority Defendants' Mot. for a Protective Order on the Ground of Legislative Privilege (June 18, 2012) ("6/18/12 Hedges Decl."), DE #393-1; Dilan Decl.  From these submissions, a few core facts emerge.

LATFOR was established pursuant to Chapter 45 of the New York State Laws of 1978, and "has all of the powers of a legislative committee."  See 4/27/12 Levine-Schellace Decl. ¶¶ 2-3 (citing N.Y. Legis. Law § 83-m).  LATFOR is comprised of six members, including four legislator appointees and two non-legislator appointees.[13]  See N.Y. Legis. Law § 83-m(2).[14]  The two current Co-Chairs of LATFOR, Senator Nozzolio and Assemblyman

---

[12]  In Rodriguez v. Pataki, the lawsuit relating to the redistricting of the New York State Legislature following the 2000 Census, the court authorized a deposition of Mark Burgeson, the Special Assistant to then LATFOR Co-Chair Skelos, in order to better understand the operations of LATFOR.  See Rodriguez v. Pataki, 293 F.Supp.2d 305, 309 (S.D.N.Y. 2003), aff'd, 293 F.Supp.2d 315 (S.D.N.Y. 2003); see also Hr'g Tr. at 8 (Sept. 3, 2003) ("9/3/03 Tr."), Ex. 2 to Objections of Defendant Senator Joseph L. Bruno to the Decision and Order of Magistrate Judge Maas Dated Sept. 10, 2003 (Sept. 17, 2003) ("9/17/03 Bruno Objections"), DE #259 in Rodriguez v. Pataki, Nos. 02 Civ. 618 (RMB)(JMW)(JGK)(FM), 02 Civ. 3239 (RMB)(JMW)(JGK)(GM).

[13]  The members of LATFOR for the redistricting cycle following the 2010 Census are: (1) Co-Chairman Senator Michael F. Nozzolio (Senate Majority), (2) Co-Chairman Assemblyman John J. McEneny (Assembly Majority), (3) Senator Martin Malavé Dilan (Senate Minority), (4) Assemblyman Robert Oaks (Assembly Minority), (5) Dr. Roman Hedges (Assembly Majority Appointee), and (6) Welquis R. Lopez (Senate Majority Appointee).  See LATFOR Website, available at http://www.latfor.state.ny.us/members/ (last visited Aug. 10, 2012)

[14]  New York Legislative Law provides:

(continued…)

McEneny, also jointly employ a staff to assist with the performance of the task force's operations, and such employees "are considered employees of the legislature for all purposes." See 4/27/12 Levine-Schellace Decl. ¶¶ 2, 4 (citing N.Y. Legis. Law § 83-m(4), (12)).

By statute, LATFOR's responsibilities include "engag[ing] in such activities as its Co-Chairs deem necessary or appropriate in . . . assisting the Legislature in preparing and formulating reapportionment plans," and "hold[ing] public and private hearings in connection with proposed reapportionment plans for the [S]enate, [A]ssembly, and [C]ongressional districts in New York."[15]  See 4/27/12 Levine-Schellace Decl. ¶ 3 (citing N.Y. Legis. Law §

---

[14](…continued)
> The legislative task force on demographic research and reapportionment is hereby continued, consisting of six members of whom two shall be appointed by the temporary president of the senate, two by the speaker of the assembly and one each by the minority leader of the senate and the minority leader of the assembly.  The appointments shall be of members of the respective houses of the legislature, except that one member appointed by the temporary president of the senate and one member appointed by the speaker of the assembly shall not be members of the legislature.  A member of the senate appointed to the task force by the temporary president of the senate and a member of the assembly appointed to the task force by the speaker of the assembly shall be designated by each to serve as the co-chairmen of the task force.

N.Y. Legis. Law § 83-m(2).

[15]  New York Legislative Law specifically provides that "the primary function" of LATFOR is "to compile and analyze data, conduct research for and make reports and recommendations to the legislature, legislative commissions and other legislative task forces."  See N.Y. Legis. Law § 83-m(5).  The statute further provides that "[t]he task force shall engage in such research studies and other activities as its co-chairmen may deem necessary or appropriate in the preparation and formulation of a reapportionment plan for the next ensuing reapportionment of [S]enate and [A]ssembly districts and [C]ongressional districts of the state

(continued…)

83-m(3), (10)); 6/18/12 Hedges Decl. ¶ 2 (citing N.Y. Legis. Law § 83-m(3)).

To carry out its duties, LATFOR functions for eight years out of every decade as a non-partisan body, collecting and storing election data in computerized databases and working with data from the U.S. Census Bureau.  See 4/27/12 Levine-Schellace Decl. ¶ 5 (citing N.Y. Legis. Law § 83-m(1)(a) & (c)); 6/18/12 Hedges Decl. ¶ 3.  However, after each decennial Census, LATFOR establishes four separate partisan redistricting offices, one each for the Senate Majority, Senate Minority, Assembly Majority, and Assembly Minority.  See 4/27/12 Levine-Schellace Decl. ¶ 5; 6/18/12 Hedges Decl. ¶ 3.  In the current redistricting cycle, the four separate offices were reportedly established in April 2011.  See 4/27/12 Levine-Schellace Decl. ¶ 6; 6/18/12 Hedges Decl. ¶¶ 4, 6.

It it undisputed that the 2012 Senate Plan "was developed exclusively within the Senate [M]ajority redistricting office of LATFOR."  See 4/27/12 Levine-Schellace Decl. ¶ 7.  The drafters of the 2012 Senate Plan are "employees of LATFOR and work[ed] exclusively for the Senate [M]ajority redistricting office during the time that they draft[ed] the plan," id. ¶ 5, "work[ing] exclusively under the direction of Senate Majority Leader Skelos, LATFOR Co-Chair Senator Nozzolio, and Senators Skelos' and Nozzolio's Senate staff."  Id. ¶ 7.[16]  And,

---

[15](…continued)
and in the utilization of census and other demographic and statistical data for policy analysis, program development and program evaluation purposes for the legislature."  See N.Y. Legis. Law § 83-m(3).

[16]  Pursuant to the Panel's April 20, 2012 Order to Show Cause, the Senate Majority submitted, in camera and ex parte, a letter identifying those individuals who drew the 2012 Senate Plan.  See 4/27/12 Senate Majority Resp. at 6.

while drafting the plan, the mapmakers "consulted with various Republican Senators -- including Senate Majority Leader Skelos and Chairman Nozzolio[,]" and received "input from the public and from the Senate [M]inority."  See id.[17]

With respect to the drafting of the 2012 Assembly Plan, Dr. Roman Hedges, a defendant and LATFOR member, states that "beginning in April 2011, [he] worked out of a separate Assembly Majority redistricting office located in the Alfred E. Smith State Office Building in Albany, New York."  See 6/18/12 Hedges Decl. ¶ 6.  He further notes that, while formulating the plan, he and his staff "began to work exclusively with the Democrats . . . in connection with their formulation of a 2012 redistricting plan."  See id. ¶ 7.  Moreover, "[his] communications with and assistance to the Democratic Assembly members and staff [were]

_____

[17]  The declaration of Senator Dilan of the Senate Minority confirms the contention of the Senate Majority that the drafting process for the 2012 Senate Plan was completed exclusively within the Senate Majority LATFOR office.  See Dilan Decl. ¶ 4. Senator Dilan alleges:

> Although I am a member of LATFOR, I was consistently and continually shut out of the process of drawing the new Senate districts.  The Senate Majority drafted its own plans for the new Senate lines without consulting me, and LATFOR never had a formal meeting at which the new lines were presented to me and voted upon until March 14, 2012, *after* the plan was introduced in the Legislature and had gone to the printer as a bill.  I therefore had no real opportunity to comment on the Senate lines. In fact, despite the fact that I am a LATFOR member and should have been intimately involved in the crafting of the Senate and Assembly maps and in deciding to recommend the LATFOR staff's maps to the state Legislature, I learned that LATFOR had made its recommendations to the Legislature, and learned what those recommendations were, at the same time as the media.

See Dilan Decl. ¶ 4 (emphasis in original).  He further alleges that "[t]his practice was starkly different from LATFOR's practices in the 1980's, 1990's, and even in 2002."  Id.

23

kept confidential from the other members of LATFOR who were working with either the

Senate Majority, Senate Minority or Assembly Minority in assisting them with formulating

2012 Redistricting Plans[,]" and "their dealings with the groups they were working with were

not shared with [him] or [his] staff." See id.

Lastly, it is clear that, apart from the four partisan redistricting offices, LATFOR

continued to maintain, after the creation of the partisan LATFOR offices, an independent

"technical staff," whose members performed work that was separate from the partisan offices

and yet was related to both the Assembly and Senate redistricting processes. See LATFOR

Emails, Bates Nos. Senate Minority ("SM") 0001-0273, Ex. 2 to Decl. of Eric Hecker in Opp.

to Senate Majority Mot. for a Protective Order (July 2, 2012) ("7/2/12 Hecker Decl."), DE

#428-1.

### B.    *The Parties' Submissions*

#### 1.    **Affirmative Motions**

In the lead brief filed in support of a protective order, the Senate Majority claims an

absolute privilege against the disclosure of documents or information concerning the legislative

activities of legislators or their staffs. See 6/18/12 Senate Majority Mem. at 4-12.  In short,

the Senate Majority argues that because the Supreme Court has held that the Speech or Debate

Clause of the United States Constitution, see U.S. Const., Art. I § 6, affords federal

lawmakers an absolute protection against liability and compelled discovery and testimony, and

because courts have held that the federal constitutional immunity is "on a parity" with the state

legislative common law analogue in (non-discovery) civil contexts, see State Employees

Bargaining Agent Coalition v. Rowland, 494 F.3d 71, 83 (2d Cir. 2007), it follows that a state

24

lawmaker's common law privilege against compelled discovery and testimony is similarly absolute.  See 6/18/12 Senate Majority Mem. at 5-6.

Relying on remarks by Magistrate Judge Frank Maas during telephone conferences in Rodriguez v. Pataki, the litigation concerning the 2002 New York State redistricting cycle, the Senate Majority also contends that, in the last redistricting cycle, "plaintiffs were categorically barred from deposing legislators and their agents," and that, even though Judge Maas allowed the plaintiffs to depose Mark Burgeson, the Special Assistant to LATFOR Co-Chairman Skelos, "the Magistrate Judge concluded that the legislative privilege barred plaintiffs from deposing him on 'the reasons why he and others in the Senate [M]ajority redistricting office drew the lines for particular Senate districts in the ways that they did.'"  See 6/18/12 Senate Majority Mem. at 8 (citing Rodriguez v. Pataki, Nos. 02 Civ. 618RMBFM, 02 Civ. 3239RMBFM, 2003 WL 22109902, at *1 (S.D.N.Y. Sept. 11, 2003), aff'd, 293 F.Supp.2d 313 (S.D.N.Y. 2003); Rodriguez v. Pataki, 293 F.Supp.2d 305, 309 (S.D.N.Y. 2003), aff'd, 293 F.Supp.2d at 315; 9/3/03 Tr. at 11).  In the Senate Majority's view, because the Consolidated Discovery Requests served on the defendants in the instant litigation "go to the very heart of Senators' confidential communications, deliberations, and motives," see 6/18/12 Senate Majority Mem. at 10, the failure to recognize an absolute legislative privilege here would "necessarily expose legislators to burdensome and intrusive discovery in a myriad of contexts."  See id. at 11.  And, "[s]ince the discovery sought by plaintiffs here creates precisely the same litigation burdens and distractions that led the Supreme Court and the Second Circuit to immunize state legislators against injunctive suits, the legislators must also be immunized from such burdensome and intrusive discovery."  Id. at 17.

25

In the alternative, the Senate Majority argues that even assuming that the legislative privilege is qualified, discovery is nevertheless barred under the five-factor balancing test set forth by Judge Maas in Rodriguez, 280 F.Supp.2d at 100-01.[18]  See 6/18/12 Senate Majority Mem. at 24.  Among other reasons, the Senate Majority argues that "legislators' motivations, political or otherwise, are entirely irrelevant" to the claims in the case.  See id. at 24-26.[19]  The Senate Majority further contends that the claim of legislative privilege should be upheld because any relevant evidence exists in the public record, there is "*no* serious federal issue at stake," the government is not a plaintiff, and to allow discovery here would "chill the willingness of legislators, their aides, and LATFOR staff to deliberate freely about legislative matters . . . ."  See id. at 26-27 (emphasis in original).

The Assembly Minority endorses the reasoning of the Senate Majority, and additionally argues, as a matter of New York state law, and under the Speech or Debate Clauses of the federal and New York state constitutions, see 6/18/12 Assembly Minority Mem. at 2-3, that it is entitled to a protective order to avoid "chill[ing] the free flow of information between lawmakers and mak[ing] them reluctant to exchange information or brainstorm with colleagues."  See id. at 6.  Like the Assembly Minority, the Assembly Majority joins in the arguments of the Senate Majority, but focuses on those elements of the plaintiffs' claims aimed at the 2012 Assembly Plan.  See 6/18/12 Assembly Majority Mem. at 1-2.  Although the Assembly Majority's memorandum provides little by way of supplemental legal analysis, it is

---

[18]  See *infra* p. 37 (listing the five Rodriguez factors).

[19]  See *infra* pp. 54-57 (addressing relevance arguments).

notable for its inclusion of a declaration of non-legislator LATFOR member Hedges, who likewise complains of the "chilling effect" that compelled disclosure would have on his and his staff's communications with Assembly members.  See 6/18/12 Hedges Decl. ¶ 9.[20]

### 2.    Oppositions

On July 2, 2012, the Senate Minority, along with the Drayton, Lee, and Ramos Intervenors, filed oppositions to the defendants' motions for protective orders.  See Senate Minority Defendants' Mem. of Law in Opp. to Defendants' Mot. for a Protective Order (July 2, 2012) ("7/2/12 Senate Minority Opp."), DE #426; Plaintiffs-Intervenors Donna K. Drayton, et al. Mem. in Opp. to the Senate Majority, the Assembly Majority, and the Assembly Minority Defendants' Mots. for a Protective Order (July 2, 2012) ("7/2/12 Drayton Opp."), DE #423; Ramos Intervenors' Mem. of Law in Opp. to Defendant[] Senate Majority's Mot. for a Protective Order (July 2, 2012) ("7/2/12 Ramos Opp."), DE #430; Lee Intervenors' Mem. of Law Regarding Disc. Mots. (July 2, 2012) ("7/2/12 Lee Opp."), DE #431.

The Senate Minority argues, in short, that the defendants' motions for protective orders should be denied because "the law is plain that any legislative privilege is, at best, a qualified privilege that yields to the need for disclosure where, as here, important federal interests are at stake."  See 7/2/12 Senate Minority Opp. at 1; see id. at 1 n.1 (noting that the Senate Minority's arguments, while addressed to the Senate Majority, should be applied as against all

---

[20]  The Governor defendants have not weighed in on these discovery issues, as it is undisputed that they played no role in drawing the lines of the New York State legislature.  See Governor Defendants' Letter in Response to Apr. 20, 2012 Order to Show Cause (Apr. 27, 2012), DE #329.

defendants).  In the alternative, the Senate Minority argues that any qualified legislative privilege has been waived.  See id. at 1-2.  With respect to the first point, the Senate Minority avers that the Senate Majority improperly conflates the absolute legislative immunity (from civil suit) with the qualified legislative privilege (against disclosure).  See id. at 2.  Further, the Senate Minority notes that in Rodriguez, Judge Maas explicitly ruled that the legislative privilege is "not absolute," and is, "at best, one that is qualified," see id. at 12 (citing Rodriguez, 280 F.Supp.2d at 95, 100), and must give way to the need for disclosure based on the five Rodriguez factors.  See id. at 14-18; see also infra p. 37 (five Rodriguez factors).

Moreover, according to the Senate Minority, even if the legislative privilege were to apply, it has been waived for four reasons.  See 7/2/12 Senate Minority Opp. at 19-25.  First, it argues that the continued presence of Senator Skelos in this litigation waives his legislative privilege because fairness prohibits him from "affirmatively represent[ing] to the Court that the Senate plan 'promotes traditional redistricting policies' . . . , [while] refus[ing] to explain what the Senate plan actually was designed to do."  See id. at 19-20 (citing Powell v. Ridge, 247 F.3d 520 (3d Cir. 2001)).  Second, the Senate Minority argues that, just as the publication of a similar memorandum authored by attorney Carvin in 2002 (the "2002 Carvin Memorandum") was found to effectuate a waiver of the legislative privilege in Rodriguez, 2003 WL 22109902, at *2, the publication of the 2012 Carvin Memorandum waived legislative privilege as to documents relating to the size of the Senate.  See 7/2/12 Senate Minority Opp. at 20.  Third, the Senate Minority argues that the Senate Majority waived its legislative privilege by producing an inadequate privilege log.  See id. at 21-23.  Fourth, the Senate Minority asserts that the Senate Majority waived its legislative privilege because "it has asserted [it] with

28

respect to numerous documents that are not even arguably privileged." See id. at 23-25.

The Lee Intervenors' opposition largely echoes the arguments of the Senate Minority and the other intervenors, see 7/2/12 Lee Opp. at 2-4, but adds that waiver in the context of legislative privilege does not require an "explicit and unequivocal renunciation of the privilege." See id. at 3 (citing Almonte v. City of Long Beach, No. CV 04-4192(JS)(JO), 2005 WL 1796118, at *3-4 (E.D.N.Y. July 27, 2005) ("Almonte I"), recons. denied, 2005 WL 1971014 (E.D.N.Y. Aug. 16, 2005)).

Responding only to the motion of the Senate Majority, the Ramos Intervenors similarly challenge the sufficiency of the Senate Majority's privilege logs, but also contend that the Senate Majority should produce, in redacted form, those portions of the documents in its privilege logs that "merely convey factual information and data," as well as "any communications with non-state employee consultants." See 7/2/12 Ramos Opp. at 12.

The Drayton Intervenors oppose the protective-order motions of all defendants, and request an in camera inspection of all documents as to which the legislative privilege has been claimed. See 7/2/12 Drayton Opp. at 3; see Decl. of Joan P. Gibbs in Opp. to the Senate Majority, Assembly Majority and the Assembly Minority Mots. for a Protective Order (July 2, 2012) ¶ 8, DE #423-1.

### 3.    Replies

The Senate Majority raises a series of challenges in reply.  First, citing State Employees, 494 F.3d at 83, the Senate Majority argues that there is no "good reason" not to extend an absolute evidentiary privilege to state legislators.  See Senate Majority Defendants' Reply in Further Support of their Motion for a Protective Order ("7/9/12 Senate Majority

Reply") at 3-6, DE #442. Second, the Senate Majority asserts that in <u>Rodriguez</u>, Judge Maas "[u]ltimately [r]ecognized an [a]bsolute [l]egislative [p]rivilege.'" <u>See id.</u> at 6 (citing <u>Rodriguez</u>, 293 F.Supp.2d at 309, <u>aff'd</u>, 293 F.Supp. 2d at 315). Third, the Senate Majority criticizes the plaintiffs' reliance on deliberative process privilege case law, including the argument that "the legislative privilege does not apply when motive is relevant." <u>See</u> 7/9/12 Senate Majority Reply at 7 & n.4, 8. Fourth, the Senate Majority repeats its argument that, even under a qualified legislative privilege, the <u>Rodriguez</u> factors weigh in favor of honoring the privilege. <u>See id.</u> at 9-18.

Finally, the Senate Majority addresses the plaintiffs' waiver arguments, asserting, in turn, (1) that the Senate Majority did not waive its legislative privilege by participating in this litigation because all of the Senate Majority defendants were sued in their official capacities, and did not "voluntarily intervene[] in their personal capacities"; (2) that Judge Maas never reached the question of waiver of legislative privilege as to the 2002 Carvin Memorandum; (3) that the Senate Majority's privilege log provides sufficient detail under applicable legal standards; and (4) that the fact that some of the documents on the Senate Majority's privilege logs had been shared with a representative of the Senate Minority should not be construed to render those documents outside the privilege or to waive the privilege over other documents in the Senate Majority's privilege logs, which were completed "under enormous time pressure." <u>See id.</u> at 18-22 & n.14.

The Assembly Majority, replying to the arguments of the only party that focused on its motion for a protective order, cites the purported weakness of the Drayton Intervenors' claims, and argues that the balance tips against "any judicial jettisoning of the legislative privilege

doctrine vis-à-vis the Assembly Majority Defendants." See generally Assembly Majority Defendants' Reply Mem. of Law in Supp. of Mot. for a Protective Order on the Ground of Legislative Privilege ("7/9/12 Assembly Majority Reply"), DE #439.

In its reply, the Assembly Minority substantially reiterates the arguments of the other defendants, emphasizes that allowing discovery would sharply chill legislative deliberations and, in that regard, supplies the Court with declarations of defendants Robert Oaks and Brian Kolb. See generally Assembly Minority Reply in Supp. of Mot. for Protective Order (July 9, 2012) ("7/9/12 Assembly Minority Reply"), DE #440; see also Decl. of Robert Oaks (July 6, 2012), DE #440-1; Decl. of Brian M. Kolb (July 5, 2012), DE #440-2.

### C.    *Legal Standard: Protective Order*

The Senate Majority, Assembly Majority, and Assembly Minority each request a protective order pursuant to Rule 26(c) of the Federal Rules of Civil Procedure.  Rule 26(c) provides that, on a motion by a party, "[t]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense . . . ." Fed. R. Civ. P. 26(c)(1).  The Court's authority to issue protective orders is broad, and "[t]he touchstone of the court's power under Rule 26(c) is the requirement of 'good cause.'" See In re Zyprexa Injunction, 474 F.Supp.2d 385, 415 (E.D.N.Y. 2007) (Weinstein, J.) (citing Seattle Times Co. v. Rhinehart, 467 U.S. 20, 34-35 (1984); 8 Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc. § 2035 (2d ed. 1994)).  In determining whether the party seeking a protective order has established good cause, the Court must balance "the need for information against the injury that might result if uncontrolled disclosure is compelled." See id. (citing Pansy v. Borough of Stroudsburg, 23 F.3d 772, 787 (3d Cir. 1994)).  And, while a

party may show good cause by "'demonstrating a particular need for protection,'" see <u>Duling</u> v. Gristede's Operating Corp., 266 F.R.D. 66, 71 (S.D.N.Y. 2010) (citing <u>Cipollone v. Liggett Grp., Inc.</u>, 785 F.2d 1108, 1121 (3d Cir. 1986)), courts in this Circuit have noted that "'[b]road allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test.'"  <u>See id.</u> (quoting <u>Schiller v. City of N.Y.</u>, 04 Civ. 7922 KMK JCF, 04 Civ. 7921 KMK JCF, 2007 WL 136149, at *5 (S.D.N.Y. Jan. 17, 2007)).  It is with this standard in mind that the Court turns to the defendants' motions for protective orders.

### D.    *Legal Background: Legislative Privilege*

The parties' submissions invoke the related, but distinct, concepts of legislative immunity, legislative privilege, and the deliberative process privilege.  As the defendants' motions seek protective orders solely on the ground of legislative privilege, a brief delineation of the three protections is warranted.

### 1.    Historical Foundations

The concepts of legislative privilege and legislative immunity developed in sixteenth- and seventeenth-century England as a means of curbing monarchical overreach, through judicial proceedings, in Parliamentary affairs.  <u>See</u> <u>generally</u> <u>United States v. Johnson</u>, 383 U.S. 169, 177-80 (1966); <u>Tenney v. Brandhove</u>, 341 U.S. 367, 372 (1951).  The early American republic, recognizing the importance of preventing executive and judicial interference in legitimate legislative activity, included similar provisions both in the United States Constitution and in constitutions of the various states.  <u>See</u> <u>Tenney</u>, 341 U.S. at 372-73; <u>see</u> <u>also</u> <u>United States v. Gillock</u>, 445 U.S. 360, 369 (1980). The federal Speech or Debate Clause, enshrined in Article I, Section 6, of the United States Constitution, provides that

"Senators and Representatives[,] . . . for any Speech or Debate in either House, . . . shall not be questioned in any other Place."  U.S. Const. art. I, § 6.

The Speech or Debate Clause reflects two related purposes: (1) avoiding executive or judicial interference in the functioning of the legislature, and (2) enhancing legislative deliberative independence.  See Gillock, 445 U.S. at 369 (citing Eastland v. U.S. Servicemen's Fund, 421 U.S. 491, 502-03 (1975)).  As a general matter, the clause is guided by the principle "that it [is] not consonant with our scheme of government for a court to inquire into the motives of legislators."  Tenney, 341 U.S. at 377 (quoting Fletcher v. Peck, 10 U.S. 87, 130 (1810)).  Instead, "[s]elf-discipline and the voters must be the ultimate reliance for discouraging or correcting such abuses."  Id. at 378.  Therefore, courts have interpreted the Speech or Debate Clause to provide members of Congress with absolute immunity from suit as well as from compelled discovery or testimony.  See, e.g., United States v. Rayburn House Office Bldg., 497 F.3d 654, 662 (D.C. Cir. 2007) ("If the testimonial privilege under the Clause is absolute and there is no distinction between oral and written materials within the legislative sphere, then the non-disclosure privilege for written materials . . . is also absolute, and thus admits of no balancing.") (citations omitted) (citing Brown & Williamson Tobacco Corp. v. Williams, 62 F.3d 408, 421 (D.C. Cir. 1995)).

By its terms, the Speech or Debate Clause applies only to federal legislators.  And while most states -- including New York, see N.Y. Const. art. III, § 11 -- have ratified similar provisions in their constitutions, federal courts are not bound by those state protections where, as here, the plaintiffs have asserted federal claims.  See Rodriguez, 280 F.Supp.2d at 95 (citing Gillock, 445 U.S. at 370).  In the interest of comity, however, federal courts in civil cases

have extended absolute legislative immunity to state legislators to the same extent as to federal

legislators.  See Tenney, 341 U.S. at 788-89; State Employees, 494 F.3d at 83 (holding that

state legislative immunity in suits brought under 42 U.S.C. § 1983 is "on a parity" with

federal immunity provided under the Speech or Debate Clause) (quoting Johnson, 383 U.S. at

180); see also Star Distribs., Ltd. v. Marino, 613 F.2d 4, 9 (2d Cir. 1980).  However, unlike

federal constitutional legislative immunity, state legislative immunity in federal question cases

is governed by federal common law.  See Tenney, 341 U.S. at 372; Gillock, 445 U.S. at 371-

72 & n.10 (citing Lake Country Estates, Inc. v. Tahoe Regional Planning Agency, 440 U.S.

391, 404 (1979)).

### 2.      State Legislative Immunity

The Supreme Court has held that state legislators are afforded absolute immunity from

civil liability -- warranting dismissal from suit -- for a wide array of legislative acts within "the

sphere of legitimate legislative activity."  See Bogan v. Scott-Harris, 523 U.S. 44, 46 (1998)

(citing Tenney, 341 U.S. at 376); see also United States v. Helstoski, 442 U.S. 477, 488-89

(1979) (broadly defining "legislative acts" as those that are "generally done in [the legislature]

in relation to the business before it") (quoting United States v. Brewster, 408 U.S. 501, 512

(1972); Johnson, 383 U.S. at 177); MINPECO, S.A. v. Conticommodity Servs., Inc., 844

F.2d 856, 860 (D.C. Cir. 1988) (defining the legislative sphere as including the preparation of

statements for inclusion in a subcommittee report); Morris v. Katz, No. 11-CV-3556 (JG),

2011 WL 3918965, at *4-5 (E.D.N.Y. Sept. 4, 2011) (noting that legislative immunity is to be

construed broadly) (collecting cases).

Legislative immunity applies both to legislators and -- in a more limited fashion -- to

34

legislative staffs, officers, and other employees.  See United States v. Gravel, 408 U.S. 606, 621 (1972); Rodriguez, 280 F.Supp.2d at 95; Marylanders for Fair Representation, Inc. v. Schaefer, 144 F.R.D. 292, 298-99 (D. Md. 1992) (citing Dombrowski v. Eastland, 387 U.S. 82, 85, 87 (1967); Tenney, 341 U.S. at 378)).  Moreover, legislative immunity has been held to apply to non-legislators whose "acts [are] both: (1) substantively legislative, *i.e.*, acts that involve policy making; and (2) procedurally legislative, *i.e.*, passed by means of established legislative procedures."  State Employees, 494 F.3d at 89-90 (citations and internal quotations omitted).  Finally, courts decline to find a waiver of legislative immunity from liability absent an "explicit and unequivocal renunciation of the protection."  See United States v. Biaggi, 853 F.2d 89, 103 (2d Cir. 1988) (citing Helstoski, 442 U.S. at 490-91, which noted in dicta that testifying before a grand jury and voluntarily producing documents did not constitute a waiver of immunity from liability).

### 3.       State Legislative Privilege

State legislative privilege in federal question cases protects state legislators and their staffs from compelled disclosure of documentary and testimonial evidence with respect to actions within the scope of legitimate legislative activity.  See Kay v. City of Rancho Palos Verdes, No. CV 02-03922 MMM RZ, 2003 WL 25294710, at *9-11 (C.D. Cal. Oct. 10, 2003); see also Rodriguez, 280 F.Supp.2d at 93-94, 101 (broadly defining the scope of legitimate legislative activity to include preliminary fact-finding and bill-drafting activities, since, "[a]s every high school student knows, the process of drafting legislation is also an important part of how a bill becomes law.").  The legislative privilege is governed by federal common law, as applied through Rule 501 of the Federal Rules of Evidence.  See Rodriguez,

280 F.Supp.2d at 93-94.  The privilege must be "strictly construed and accepted 'only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth.'"  See id. (citing Trammel v. United States, 445 U.S. 40, 50 (1980)).

Legislative privilege is related to, but distinct from, the concept of legislative immunity.  See Rodriguez, 280 F.Supp.2d at 95.  Specifically, as further discussed infra pp. 45-54, while "common law legislative immunity for state legislators is absolute," see Rodriguez, 280 F.Supp.2d at 95 (citing Bogan, 523 U.S. at 46), the legislative privilege for state lawmakers is, "at best, one which is qualified."  See Rodriguez, 280 F.Supp.2d at 100 (citing In re Grand Jury, 821 F.2d 946, 957 (3d Cir. 1987); In re Grand Jury Subpoena Dated Aug. 9, 2000, 218 F.Supp.2d 544, 553 (S.D.N.Y. 2002)); see also East End Ventures, LLC v. Inc. Vill. of Sag Harbor, No. CV 09-3967(LDW)(AKT), 2011 WL 6337708, at *2 (E.D.N.Y. Dec. 19, 2011); ACORN v. Cnty. of Nassau, No. CV 05-2301(JFB)(WDW), 2007 WL 2815810, at *2 (E.D.N.Y. Sept. 25, 2007) ("ACORN I"), aff'd, 2009 WL 2923435 (E.D.N.Y. Sept. 10, 2009) ("ACORN II"); Manzi v. DiCarlo, 982 F.Supp. 125, 129 (E.D.N.Y. 1997).[21]

_____

[21]  The Second Circuit's holding in State Employees, 494 F.3d at 90, does not alter this conclusion.  As relevant here, State Employees stands for the limited proposition that legislative immunity applies both to actions for damages and to actions for injunctive relief. See id. at 88 (citing Star Distribs., 613 F.2d at 8-9).  Contrary to the contention of the Senate Majority, see 6/18/12 Senate Majority Mem. at 4-12, the decision in State Employees did not hold that the legislative privilege is absolute.  Indeed, to the extent that State Employees addressed discovery, it simply held that discovery into legislative motives is irrelevant when making the threshold determination as to whether a challenged activity is indeed "legislative," entitling an individual to assert the immunity.  See State Employees, 494 F.3d at 90 (citing

(continued…)

To determine whether the legislative privilege precludes disclosure, a court must balance the interests of the party seeking the evidence against the interests of the individual claiming the privilege.  See ACORN I, 2007 WL 2815810, at *2 (citing Rodriguez, 280 F.Supp.2d at 96).  The court in Rodriguez identified five factors to aid in this determination, including:

> (i) the relevance of the evidence sought to be protected; (ii) the availability of other evidence; (iii) the "seriousness" of the litigation and the issues involved; (iv) the role of the government in the litigation; and (v) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable.

280 F.Supp. 2d at 101 (citing In re Franklin Nat'l Bank Secs. Litig., 478 F.Supp. 577, 583 (E.D.N.Y. 1979) (Weinstein, J.) (setting forth factors in the context of the "official information privilege")).[22]  In performing this balancing, it is important to bear in mind that

---

[21](...continued)
Bogan, 523 U.S. at 54).

[22]  This Court recognizes that, since Rodriguez, at least one court in this District has held that the legislative privilege does not apply in situations where "the legislative deliberations are among the central issues in the case."  See East End Ventures, 2011 WL 6337708, at *3 (citing, inter alia, Conte v. Cnty. of Nassau, No. CV 06-4746(JFB)(ETB), 2009 WL 1362784, at *5 (E.D.N.Y. May 15, 2009); Mr. & Mrs. "B" v. Bd. of Educ. of Syosset Cen. Sch. Dist., 35 F.Supp.2d 224, 230 (E.D.N.Y. 1998)).  This central-issue exception is based on case law arising under the related deliberative process privilege, which "protects the decisionmaking processes of the executive branch in order to safeguard the quality and integrity of governmental decisions."  See Rodriguez, 280 F.Supp.2d at 97-98 (quoting A. Michael's Piano, Inc. v. FTC, 18 F.3d 138, 147 (2d Cir. 1994)) (emphasis added).  Like the legislative privilege, the deliberative process privilege is a "qualified privilege which may be overcome upon a showing that the adverse party's need for disclosure outweighs the interest in confidentiality," see Rodriguez, 280 F.Supp.2d at 98; however, its protections are decidedly less robust.  See East End Ventures, 2011 WL 6337708, at *4 (collecting cases).  Although many courts have conflated the two privileges, the existence of rule-swallowing exceptions like

(continued...)

the legislative privilege protects a *process*.  As such, it encompasses legislative work product and confidential deliberations (including communications even as between political *adversaries*), extends to staffs (and retained experts),[23] and, where the balance weighs in favor of nondisclosure, protects against both compelled document discovery and testimony.  However, whether the assertion of the legislative privilege will support the issuance of a protective order depends in large part on a functional analysis of the roles of the individuals made privy to a given communication, document, or other piece of information.  See ACORN II, 2009 WL 2923435, at *5-6.

### E.     Waiver

Having established the qualified nature of the legislative privilege, the Court turns to a threshold issue raised by the parties: whether the legislative privilege has been waived.  In this case, the parties opposing the motions for protective orders raise four separate grounds for finding waiver of the legislative privilege: (1) defendants' continued voluntary participation in

---

[22](…continued)
the central-issue exception is an obvious, but not exclusive, reason to differentiate them. Indeed, "[w]ere [the central-issue exception] a basis for denying a defendant's legislative privilege claim, there would be few, if any, cases in which state legislators could shield their personal thought processes from view."  See Rodriguez, 280 F.Supp.2d at 99.  As a result, this Court declines to import the broad exceptions of the deliberative process privilege into the present analysis.  In this Court's view, absent a waiver, the appropriate approach is to perform the five-factor balancing, with the centrality of the legislative deliberations to the litigation serving as a persuasive, but not dispositive, factor.

[23]  As further explained *infra* pp.42-43 in the discussion of waiver, courts have held that the privilege attaches to confidential communications between legislators, their staffs, and "experts retained by them to assist in their legislative functions."  See ACORN II, 2009 WL 2923435, at *5-6 (citing Almonte v. City of Long Beach, 478 F.3d 100, 107 (2d Cir. 2007) ("Almonte II")).

this action, (2) disclosure of otherwise privileged material, (3) improper assertions of

privilege, and (4) inadequacy of the proffered privilege logs.  The Court addresses the first

three grounds here, and the fourth in Part III below.

### 1.     Voluntary Participation

The Senate Minority argues that Senator Skelos, "[b]y declining to seek dismissal on

legislative immunity grounds, . . . voluntarily injected himself into these proceedings," and

has thereby waived the protection of the legislative privilege.  See 7/2/12 Senate Minority

Opp. at 19-20.  The Senate Minority relies -- as it did in the Rodriguez litigation -- on the

Third Circuit's decision in Powell v. Ridge, 247 F.3d at 525 (holding that defendant-

intervenors, "Legislative Leaders" of the Pennsylvania General Assembly, were not entitled to

assert legislative privilege because they were "self-made defendants" who had not sought the

"complete remedy" of legislative immunity).  The defendants counter that Powell is

distinguishable from this case because the legislators here did not voluntarily intervene but

rather were sued in their official capacities; the Panel has denied defendants' motions to

dismiss; and Powell involved a question of legislative immunity, not legislative privilege.  See

7/9/12 Senate Majority Reply at 19; 7/9/12 Assembly Minority Reply at 13-14.  Although, as

discussed below, none of these distinctions is persuasive, the Court nevertheless rejects the

notion that the defendants' participation in this lawsuit, standing alone, automatically waives

the legislative privilege in all respects.

As an initial matter, Powell is not distinguishable on the ground that the defendants

here are involuntary participants in this litigation.  While the defendants have not sought to

assert legislative immunity, it is available to them as a complete defense.  See State

Employees, 494 F.3d at 87-88.[24]  Hence, the mere fact that the defendants in this case were

sued in their official capacities does not provide adequate grounds to reject the plaintiffs'

waiver arguments.  Moreover, insofar as no defendant has sought dismissal on the basis of

legislative immunity from suit, the Panel's denials of the defendants' dispositive motions have

no bearing on the waiver issue.  Finally, the defendants should not be heard to distinguish

Powell on the ground that that case involved a claim of legislative immunity; after all, in

moving for protective orders, the defendants highlight the purported parity between the

privilege and the immunity, and the key question here is whether, by failing to assert the

immunity, the privilege, in fairness, has been forfeited.

     In any event, this Court concludes that the defendants' failure to assert legislative

immunity from suit should not be construed to waive the evidentiary privilege of state

legislators.  First, because legislative immunity and legislative privilege are distinct concepts,

it makes good sense to keep them untethered in the context of waiver.  Second, the focus must

---

[24]  The Senate Majority correctly notes that in Rodriguez, Judge Maas faced an identical argument, and "decline[d] . . . to find" that the failure to assert legislative immunity waived legislative privilege.  See Rodriguez, 280 F.Supp.2d at 103; see also 9/3/03 Tr. at 5-7, aff'd, 293 F.Supp.2d 313, 314-15 (S.D.N.Y. 2003).  However, in so ruling, Judge Maas relied on Goldberg v. Town of Rocky Hill, 973 F.2d 70 (2d Cir. 1992), which dealt with the availability of legislative immunity for municipalities under 42 U.S.C. § 1983.  See 9/3/03 Tr. at 7.  In the intervening years since Rodriguez, the Second Circuit has explicitly rejected the application of Goldberg in the context of state legislators sued in their official capacities.  In State Employees, a case involving state-level legislators, the Second Circuit distinguished Goldberg and similar cases on the ground that while local officials sued in their official capacities were not entitled to assert legislative immunity because a section 1983 suit was a de facto suit against the municipality, "claims for injunctive relief against defendant state officials, sued in their official capacities, may be barred by the doctrine of legislative immunity" because a suit against a state legislator in his or her official capacity is not a de facto suit against the state.  See State Employees, 494 F.3d at 86-88.

be on fairness to the parties, notwithstanding any claim of immunity. The decision of a legislator to defend himself or herself and to forgo invoking absolute legislative immunity should, however, cut against the legislator in the Rodriguez balancing analysis. Indeed, the "role of the government in the litigation" is one of the five Rodriguez factors, and if the role of the government (here, the state legislators) is not only direct, but voluntary, then, as a matter of fairness, the defendants' claims of privilege against compelled disclosure must be weakened.

## 2. Remaining Waiver Arguments

The Court now considers whether the legislative privilege has been waived through other means, including selective disclosure and improper assertions of privilege.

It is well settled that the legislative privilege "'is a personal one and may be waived or asserted by each individual legislator.'" See ACORN I, 2007 WL 2815810, at *2 (quoting Marylanders for Fair Representation, 144 F.R.D. at 298). It follows, then, that a legislator cannot assert or waive the privilege on behalf of another legislator. See Almonte I, 2005 WL 1796118, at *3 n.2 (quoting A Helping Hand, LLC v. Baltimore Cnty., Md., 295 F.Supp.2d 585, 590 (D. Md. 2003)) . Unlike a waiver of legislative immunity, the waiver of the privilege need not be "explicit and unequivocal," see id. at *3-4, and may occur either in the course of the litigation when a party testifies as to otherwise privileged matters, or when purportedly privileged communications are shared with outsiders. See Trombetta v. Bd. of Educ., Proviso Twp. High Sch. Dist. 209, No. 02 C 5895, 2004 WL 868265, at *5 (N.D. Ill. Apr. 22, 2004) (noting that legislative privilege "is waivable and is waived if the purported legislator testifies, at a deposition or otherwise, on supposedly privileged matters") (citing Alexander v. Holden, 66 F.3d 62, 68 n.4 (4th Cir. 1995); Virgin Islands v. Lee, 755 F.2d

41

514, 520 n.7 (3d Cir. 1985); <u>Marylanders for Fair Representation</u>, 144 F.R.D. at 298); <u>see</u> <u>also</u> <u>Comm. for a Fair & Balanced Map v. Ill. State Bd. of Elections</u>, No. 11 C 5065, 2011 WL 4837508, at *10 (N.D. Ill. Oct. 12, 2011) ("As with any privilege, the legislative privilege can be waived when the parties holding the privilege share their communications with an outsider.") (citing <u>ACORN I</u>, 2007 WL 2815810, at *4).  Importantly, courts have been loath to allow a legislator to invoke the privilege at the discovery stage, only to selectively waive it thereafter in order to offer evidence to support the legislator's claims or defenses.  <u>See</u> <u>Comm. for a Fair & Balanced Map</u>, 2011 WL 4837508, at *11 (subpoenaed non-party state legislators "cannot invoke the privilege as to themselves yet allow others to use the same information against plaintiffs at trial").  Accordingly, once the privilege is invoked, the Court should not later allow the proponent of the privilege to strategically waive it to the prejudice of other parties.

The law is clear that a legislator waives his or her legislative privilege when the legislator publicly reveals documents related to internal deliberations.  <u>Rodriguez</u>, 2003 WL 22109902, at *3.  Moreover, although in this Circuit communications between legislators and "experts retained by them to assist in their legislative functions" are subject to the qualified privilege, <u>see</u> <u>ACORN II</u>, 2009 WL 2923435, at *6 (citing <u>Almonte II</u>, 478 F.3d at 107), communications with "knowledgeable outsiders" -- e.g., lobbyists -- fall outside the privilege. <u>See</u> <u>Rodriguez</u>, 280 F.Supp.2d at 101.  Further, courts have indicated that communications with technical employees who "provide information to legislators collectively," but who "do not advise a particular legislator as his or her personal staff," at best deserve weak deference in the balancing of competing interests.  <u>Id.</u> (citing <u>Fla. Ass'n of Rehab. Facilities v. State of Fla.</u>

42

Dep't of Health & Rehab. Servs., 164 F.R.D. 257, 267 (N.D. Fla. 1995)).[25]

Here, the plaintiffs raise three arguments with respect to selective disclosure and improper privilege assertions. First, the Senate Minority argues that the publication of the 2012 Carvin Memorandum effectuated a waiver of the legislative privilege with respect to documents related to the size of the Senate. See 7/2/12 Senate Minority Opp. at 20. Taking a cue from Rodriguez, where the failure to keep the subject of the 2002 Carvin Memorandum "carefully cloistered" was found to have caused a waiver of the privilege with respect to documents related to the size of the Senate, see Rodriguez, 2003 WL 22109902, at *3, this Court discerns no reason to reach a different conclusion in this case, where the exact same course of events came to pass. Nevertheless, out of an abundance of caution, and because the Senate Majority's assertions of attorney-client privilege and work product protection in connection with many of the same documents implicate somewhat different analyses, the Court will defer ruling definitively on the waiver issue until after it has an opportunity to review the documents in camera.

Second, the Ramos Intervenors argue that the Senate Majority "waived any applicable legislative privilege with respect to their communications with non-state employee

---

[25] In contrast, some out-of-Circuit cases have held that even communications with retained consultants may waive the privilege. See Baldus v. Members of the Wis. Gov't Accountability Bd., Nos. 11-CV-562, 11-CV-1011, 2011 WL 6122542, at *2 (E.D. Wis. Dec. 8, 2011) ("The Legislature has waived its legislative privilege to the extent that it relied on outside [redistricting] experts for consulting services") (citing Comm. for a Fair & Balanced Map, 2011 WL 4837508, at *10 ("Thus, to the extent that [the legislators] relied on reports or recommendations generated by outside consultants to draft the 2011 Map, they waived their legislative privilege as to these documents.")), order clarified, 2011 WL 6385645 (E.D. Wis. Dec. 20, 2011).

consultants," including Duke University Professor Richard Engstrom.  See 7/2/12 Ramos Opp. at 12 & n.3, 13. The Court rejects this waiver argument.  Retained consultants who aid legislators in the performance of their legislative duties fall within the scope of the qualified legislative privilege, and any confidential communications involving such consultants and experts are subject to the qualified privilege balancing test.  See supra p. 38 n. 23.

Third, the Senate Minority argues that the Senate Majority waived its legislative privilege to the extent that it claimed a privilege over documents that either (1) were not confidential deliberations, (2) did not contain privileged information, or (3) were later published to the public.  See 7/2/12 Senate Minority Opp. at 24; 7/2/12 Ramos Opp. at 11-12. To that end, the Senate Minority has submitted and referenced various LATFOR emails related to prisoner reallocation data.  See generally LATFOR Emails, SM 0001-0273, Ex. 2 to 7/2/12 Hecker Decl, DE #428-1.  The Court is unwilling to find on the existing record that the dissemination of these emails waived the privilege as to other documents and communications contained within the Senate Majority's privilege log.  The legislative privilege, while qualified, casts a wide net.  As such, the mere fact that emails were exchanged between legislators (and staffs) of opposing parties is not dispositive.[26]

Therefore, the Court defers ruling on these and other waiver issues until it has an

---

[26]  To the extent that the Senate Majority errantly included within its privilege logs documents that have been made public or were shared with individuals outside the legislative process, it cannot reasonably claim a privilege.  As stated in Part III below, the Court directs the defendants to review and revise their privilege logs.  See infra pp. 62-71.  If this review uncovers non-responsive documents, those documents should be removed from the privilege log.  If it uncovers responsive documents erroneously claimed to be privileged, those documents should be produced.

opportunity to perform an *in camera* review of the allegedly privileged documents to determine whether the claim of privilege trumps discovery.

### F.    Legislative Privilege in Redistricting Cases

Most decisions in redistricting cases involving claims of legislative privilege -- including decisions from within this Circuit -- have recognized a qualified legislative privilege, and have balanced the parties' competing interests when determining if and to what extent the privilege applies and protects against compelled disclosure. See Baldus, 2011 WL 6122542, at *2; Comm. for a Fair & Balanced Map, 2011 WL 4837508, at *7-8; Rodriguez, 280 F.Supp.2d at 100-02; United States v. Irvin, 127 F.R.D. 169, 170, 173-74 (C.D. Cal. 1989). A slim minority of (out-of-Circuit) cases have analyzed the legislative privilege under principles governing legislative immunity. Backus v. South Carolina, No. 3:11-cv-03120-HFF-MBS-PMD (D.S.C. Feb. 9, 2012), Ex. B to 6/18/12 Geremia Decl., DE #395-2; Marylanders for Fair Representation, 144 F.R.D. at 304-05 (Murnaghan, J., and Motz, J.). However, even in Marylanders, two of the three judges on the panel ultimately held that legislative testimonial "immunity" was qualified in the context of redistricting.[27, 28]  See id.

---

[27]  In Marylanders, on which the Senate Majority relies, a divided three-judge court addressed claims of legislative privilege raised by, among others, legislator defendants, in the context of the 1990 Maryland state redistricting cycle. See 144 F.R.D. at 295-96. Specifically, the case involved a quasi-legislative Redistricting Advisory Committee, comprised of two legislators and three non-legislator private citizens, appointed by the Governor (pursuant to a state constitutional provision) for the purpose of recommending a redistricting plan to the General Assembly. See id.  The defendants had asserted legislative immunity in response to discovery demands including interrogatories, document requests, and depositions touching upon the factors used to develop the redistricting plan and the reasons for rejecting alternative plans. See id.  The controlling opinion of the court, supported by two of the three judges, held that because "[l]egislative redistricting . . . is not a routine exercise of [legislative] power," and

(continued…)

Having scrutinized the relevant precedent, this Court concludes that the perfunctory ruling in Backus does not provide a persuasive reason to depart from the clear weight of authority holding that the legislative privilege is qualified and subject to a judicial balancing test. Because this Court is not the first to apply the qualified legislative privilege in the redistricting context, it is appropriate to briefly survey how the prior opinions viewed the various factors before applying the balancing test in the present case.

### 1.   1981 Los Angeles County Redistricting Plan

In 1989, in United States v. Irvin, the Central District of California analyzed the Los Angeles County Board of Supervisors' assertions of privilege during depositions in response to certain questions related to the motivations behind the Board's adoption of a county

---

[27](…continued)
"[i]nevitably . . . involves the self-interest of the legislators themselves," "a less categorical, more flexible approach should be taken to the question of testimonial legislative immunity in shaping the scope of discovery." See id. at 304 (Murnaghan, J., and Motz, J., concurring). Therefore, the court permitted the three private-citizen members of the committee to be "deposed concerning the Committee's deliberations," which "would provide a means for learning pertinent information without impacting upon legislative sovereignty." See id. at 304-05. Moreover, the court deferred ruling on whether the *legislator* members of the committee could be deposed, "until a more complete factual record [was] developed." See id. at 305. However, the entire panel noted that it would "flatly prohibit . . . their depositions from being taken as to any action which they took after the redistricting legislation reached the floor of the General Assembly . . . ." See id. Lastly, the panel also agreed that the legislative privilege (which it referred to as "legislative immunity") "does not . . . extend to certain types of documentation," see id. at 302 (majority op.) (citations omitted); therefore, the panel "required [the defendants] to produce any documents prepared by the Committee during the course of its deliberations which [were] requested by the plaintiffs," subject to other available privileges. The spirit of Marylanders, that a legislator's evidentiary privilege is a qualified one, is thus in accordance with the law in this Circuit and this Court's holding.

[28]  One other recent redistricting case has deferred decision whether the privilege is absolute or qualified. See Texas v. United States, 279 F.R.D. 24, 33-34 (D.D.C. 2012), vacated in part on other grounds, 279 F.R.D. 176 (D.D.C. 2012).

redistricting plan.  See 127 F.R.D. at 170.  The plaintiff had asserted claims against the Board under Section 2 of the Voting Rights Act ("VRA"), and sought to compel county officials to answer questions related to "communications occurring between the Supervisors and their staff members during non-public meetings immediately preceding the plan's adoption."  See id. The Board challenged the motion, citing the deliberative process privilege.  See id.  Noting the "paucity of federal case law directly on point," the court outlined eight factors to consider when balancing the interests.  Irvin, 127 F.R.D. at 171-73.

Upon balancing the factors, the court concluded that all but two favored disclosure. See id. at 173-74.  It first found that the "desirability of accurate fact finding" supported disclosure, "as it would in every case."  See id. at 173.  The court next held that evidence concerning the Board's decision-making process was relevant and was not otherwise available, a factor that further tipped the balance in favor of disclosure.  See id.  Moreover, disclosure was warranted because, according to the court, the plaintiff's VRA claims "raise[d] profound questions concerning the validity of the redistricting plan," potentially "implicate[d] intentional or negligent governmental misconduct," and "place[d] in issue the Supervisors' deliberations themselves."  Id. at 174 (citations omitted).  The court also noted that "the federal interest in enforcement of the Voting Rights Act weighs heavily in favor of disclosure," since the Act itself "requires vigorous and searching federal enforcement."  Id.

The court in Irvin found that two factors -- the threat of a chilling effect and the Board's role in the litigation -- "militated against disclosure," but that the weight of these factors was "difficult to gauge."  See id.  Specifically, the court was unwilling to find that "the occasional instance in which disclosure may be ordered in the civil context [would] add

47

measurably to the inhibitions already attending legislative deliberations." See id. (citing

Gillock, 445 U.S. at 373, which held, in the criminal context, that any chilling effect on

legislative debate was "speculative" and "minimal"). Therefore, the court in Irvin granted the

motion to compel, holding that the deliberative process privilege had to give way to the

plaintiff's interests in discovering information regarding the County's redistricting plan. See

id.

### 2.     2002 New York State Redistricting Plan

In Rodriguez, Judge Maas applied a five-factor balancing test in response to the

plaintiffs' motion to compel, and determined that the claims of legislative privilege should be

sustained in part. First, he found that the plaintiffs' discovery requests with respect to the

development of the 2002 redistricting plan were relevant, insofar as they sought evidence of a

discriminatory intent in violation of Section 2 of the VRA. See 280 F.Supp.2d at 101-02

("While evidence of discriminatory animus may not be an essential element of all of the

plaintiffs' claims, it certainly is something that can be considered in deciding whether the New

York Legislature's 2002 redistricting plans pass judicial muster.") (citing Vill. of Arlington

Heights, 429 U.S. at 268; Irvin, 127 F.R.D. at 171). Second, the court found that the

defendants had failed to demonstrate that the information sought could have been obtained

through another source, further undermining the strength of their claim of privilege. See 280

F.Supp.2d at 102. Third, the court noted that there was "no question" that the case "raise[d]

serious charges about the fairness and impartiality of some of the central institutions of our

state government," thereby cutting against sustaining the privilege. See id. Fourth, the court

found that the state government's central role in the litigation weighed against honoring the

48

privilege.  See id.  Fifth and finally, because LATFOR contained two outsider non-legislators, the court concluded that disclosure of its operations would not serve to inhibit legislative deliberations in the future.  See id. at 101 (noting that communications between legislators and non-legislators in LATFOR were "more akin to a conversation between legislators and knowledgeable outsiders, such as lobbyists, to mark up legislation -- a session for which no one could seriously claim privilege.").

Judge Maas ultimately held that "the defendants' qualified legislative privilege was overcome to the extent that the plaintiffs sought information concerning the 'operations' of [LATFOR]," but that the privilege supported nondisclosure "to the extent that the plaintiffs sought documentation reflecting the thought processes of individual legislators 'which took place outside LATFOR or after the proposed [2002] redistricting plan reached the floor of the Legislature.'"  See Rodriguez, 2003 WL 22109902, at *1 (citing Rodriguez, 280 F.Supp.2d at 103).[29]

---

[29]  The Senate Majority vigorously asserts that Judge Maas, shortly after issuing his written opinion of July 28, 2003, 280 F.Supp.2d 89, "self-correct[ed]" his purported error and recognized an absolute legislative privilege.  See 7/9/12 Senate Majority Reply at 7; 6/18/12 Senate Majority Mem. at 9.  A review of the record in Rodriguez reveals the fallacy of this argument.  To be sure, in the September 3, 2003 conference call cited by the Senate Majority, Judge Maas did in fact note that, "at the time that [he] drafted the [July 28, 2003] decision, [he] didn't contemplate the scenario . . . that LATFOR had, in effect, four subsets in addition to the entity itself, one of which was a . . . separate [S]enate [M]ajority office."  See 9/3/03 Tr. at 7-8.  However, Judge Maas qualified his statement, adding that "[e]xactly how that shakes out, frankly, I'm not certain," id. at 8, since it was a "somewhat confusing area."  Id.  Moreover, Judge Maas offered a "guess" that he would not allow the deposition of legislator-defendants (whose depositions were, in any event, never noticed), but noted that it was a closer question with respect to LATFOR staff.  See id. at 11.  In fact, in a September 11, 2003 conference call with the parties, Judge Maas indicated that LATFOR employees could be deposed to the extent that they had not been "detailed" to one of the four partisan LATFOR

(continued…)

After conducting an *in camera* inspection, Judge Maas made specific rulings as to three categories of withheld documents.  First, to the extent that Judge Maas held that "requests by Republican legislators to adjust the lines of their districts" were protected from disclosure by the legislative privilege, such protection was warranted only because plaintiffs "ha[d] not established a substantial need" for those documents, with the exception of a single document utilizing racial terms, for which "the qualified privilege must yield to the plaintiffs' need for information."  See id., at *2-3.  Second, alluding to the 2002 Carvin Memorandum, Judge Maas held that the Senate Majority had waived its privilege as to documents reflecting the Senate size, an issue that it had not sought to keep "carefully cloistered within the confines of its separate redistricting office."  See id. at *3.  Third, Judge Maas held that expert reports submitted to the United States Department of Justice as a part of LATFOR's VRA Section 5 submission were not covered by the privilege because the documents were prepared by "LATFOR's experts, not the Senate Majority's experts."  See id. at *4.

As for depositions, Judge Maas concluded that, on balance, legislators and their staffs -- including those individuals who were "detailed" to one of the four partisan redistricting offices -- were protected by the qualified privilege, but that "anybody other than . . . a legislator or that legislator's individual aid[e] . . . is somebody who's potentially subject to

---

[29](...continued)
offices.  See Hr'g Tr. Sept. 11, 2003 ("9/11/03 Tr.") at 13-14, Ex. 4 to 9/17/03 Bruno Objections.  Furthermore, the Senate Majority ignores the fact that Judge Maas reaffirmed the qualified nature of the legislative privilege in a written opinion issued one week after the September 3, 2003 conference call.  See Rodriguez, 2003 WL 22109902, at *3 (assessing whether plaintiffs had established a substantial need for certain documents, so as to warrant disclosure of documents withheld based on legislative privilege).

being questioned . . . ."  See 9/11/03 Tr. at 14.  Importantly, and contrary to the Senate

Majority's assertions, Judge Maas never found an absolute legislative privilege.

### 3.    2011 Illinois State Redistricting Plan

In Committee for a Fair and Balanced Map, the Northern District of Illinois applied the

five-factor balancing test from Rodriguez in the context of the 2011 Illinois congressional

redistricting plan.  2011 WL 4837508, at *7-10 (citing, inter alia, Rodriguez, 280 F.Supp.2d

at 101; ACORN II, 2009 WL 2923435, at *2).  The plaintiffs in that case had served a number

of subpoenas on certain non-parties -- including the Illinois House of Representatives, the state

Senate and House redistricting committees, various legislators, and legislative staff members --

seeking four broad categories of documents related to the development of the state's 2011

Congressional district map.  See id. at *2.[30]  In response, select legislative non-parties filed a

motion to quash the subpoenas, citing legislative immunity and legislative privilege.  See id.

Denying the motion, the court first held that there was no common law "absolute immunity for

non-party state lawmakers that protects them from producing documents in federal redistricting

cases[,]" and that the non-parties' privilege claims were "best analyzed under the doctrine of

legislative privilege."  See id. at *7.

The court then performed the Rodriguez balancing analysis.  See id. at *7-10.  The

court first noted that the seriousness of the claims favored disclosure based on the "profound

---

[30]  Specifically, the plaintiffs sought "(1) information concerning the motives, objectives, plans, reports, and/or procedures used by lawmakers to draw the 2011 Map; (2) information concerning the identities of persons who participated in decisions regarding the 2011 Map; (3) the identities of experts and/or consultants retained to assist in drafting the 2011 Map and contractual agreements related thereto; and (4) objective facts upon which lawmakers relied in drawing the 2011 Map."  See Comm. for a Fair & Balanced Map, 2011 WL 4837508, at *2.

questions about the legitimacy of the redistricting process and the viability of the 2011 Map."

Id. at *8.  The court further stated that the direct involvement of non-party legislators in the

drawing of the map supported disclosure, as well as the fact that "the decisionmaking process

. . . [itself was] the case," insofar as the plaintiffs had alleged intentional racial and partisan

discrimination.  See id.  However, the court found that the evidence sought was "relevant,

[but] not central" to the case, and that the "[p]laintiffs already had considerable information at

their fingertips," both factors militating against disclosure.  See id.

Moreover, the court concluded that the final factor -- i.e., the threat of a chilling effect

on legislative deliberations -- weighed against disclosure and in favor of sustaining the claim of

legislative privilege.  See id. at *9.  Specifically, the court noted that, as a general matter, "the

need for confidentiality between lawmakers and their staff is of utmost importance."  Id. at *8.

Moreover, the court found, "[i]n the redistricting context, full public disclosure would hinder

the ability of party leaders to synthesize competing interests of constituents, special interest

groups and lawmakers, and draw a map that has enough support to become law."  Id.

The court therefore held that "the legislative privilege shields from disclosure pre-

decisional, non-factual communications that contain opinions, recommendations or advice

about public policies or possible legislation," but not "facts or information available to

lawmakers at the time of their decision."  Id. at *10.  As such, the court determined that the

plaintiffs' document requests with respect to the motives, plans, reports, or procedures utilized

in drafting the plan, as well as the identities of individuals who participated in the

decision-making process, were protected from disclosure by the legislative privilege.  See id.

Nevertheless, the court also held that the identities of retained experts and consultants used in

the redistricting process were not privileged, nor were the objective facts upon which the legislators relied in the map-making process.  See id.

### 4.      2011 Wisconsin Redistricting Plan

In Baldus v. Members of the Wisconsin Government Accountability Board, a case involving challenges to the 2011 Wisconsin state redistricting plans, the court addressed claims of legislative privilege by the Wisconsin Assembly and Senate, neither of which was a party to the case.  See 2011 WL 6122542, at *1.  Specifically, the Assembly and Senate sought to quash subpoenas served on an outside redistricting expert retained by the state legislature and on a legislative aide to the Senate Majority Leader.  See id. at *1.  Both subpoenas requested documents used in drawing the redistricting plans and requested that the individuals sit for depositions.  See id.

The court, relying on Committee for a Fair and Balanced Map, 2011 WL 4837508, denied the motions to quash, holding that the legislative privilege did not prevent disclosure. See Baldus, 2011 WL 6122542, at *2.  First, the court held that the legislature had waived the privilege insofar as it "relied on . . . outside experts for consulting services" in developing its plan.  See id. at *2.  Second, the court noted that "even without that waiver," the qualified legislative privilege yielded, based on the plaintiff's showing of need.  See id.  Applying the same five factors utilized in Rodriguez, the court concluded that "the highly relevant and potentially unique nature" of the evidence outweighed any future chilling effect on legislative deliberations, and that the seriousness of the case and the government's direct role in crafting

the plan also weighed in favor of disclosure.  See id.[31]

This Court, like nearly every court to address the issue in the redistricting context, concludes that state legislators enjoy only a qualified evidentiary privilege.

### G.    Application of Balancing Test

Before the Court proceeds with the requisite balancing analysis, it bears mention that LATFOR's operations during the current redistricting cycle were in many ways similar to its operations in the 2000 Census redistricting cycle.  See 6/18/12 Hedges Decl. ¶¶ 4-7; 4/27/12 Levine-Schellace Decl. ¶ 5.  If the process differed in any way, it was simply as a matter of degree.  See generally Dilan Decl.  With that in mind, the Court provides a preliminary balancing, and orders the Senate Majority to provide to the Court, for in camera inspection, all documents for which the Senate Majority has asserted the legislative privilege.  The Assembly Majority and Assembly Minority are directed to produce, for in camera inspection, the documents described below.  The Court defers its rulings on discoverability of specific documents until after it has completed its review.

#### 1.   Relevance

The first factor in the balancing analysis concerns the relevance of the evidence sought to be protected.  The defendants in general, and the Senate Majority in particular, vigorously dispute the relevance of the requested information and documents, arguing, among other

---

[31]  The court subsequently reaffirmed its ruling in a clarifying opinion, see Baldus v. Members of the Wis. Gov't Accountability Bd., Nos. 11-CV-562 JPS-DPW-RMD, 11-CV-1011 JPS-DPW-RMD, 2011 WL 6385645 (E.D. Wis. Dec. 20, 2011), and later imposed sanctions on the legislature's attorneys -- "those ultimately responsible for the sandbagging, hide-the-ball trial tactics" -- for failure to cooperate with the court's discovery orders.  See Baldus v. Members of Wis. Gov't Accountability Bd., 843 F.Supp.2d 955, 960 (E.D. Wis. 2012).

things, that "legislators' motivations, political or otherwise, are entirely irrelevant." See 6/18/12 Senate Majority Mem. at 24.  Plaintiffs counter that the discovery sought is relevant to the "central" issues in the case: "whether the Senate Majority made an *honest and good faith effort* to construct [nearly equipopulous] districts," see 7/2/12 Senate Minority Opp. at 15 (citations omitted), and whether the redistricting plan for each house of the New York State Legislature "discriminated against racial minority communities . . . ." See 7/2/12 Ramos Opp. at 7; 7/2/12 Drayton Opp. at 6.

It is not the function of this Court, in assessing relevance for purposes of discovery, to decide issues of admissibility or resolve potentially dispositive disputes.[32]  Suffice it to say, "[r]elevant information need not be admissible" to be discoverable, see Fed. R. Civ. P. 26(b)(1); indeed, "[t]he deposition-discovery regime set out by the Federal Rules of Civil Procedure is an extremely permissive one to which courts have 'long accorded a broad and liberal treatment . . . .'" In re Subpoena Issued to Dennis Friedman, 350 F.3d 65, 69 (2d Cir. 2003) (Sotomayor, J.) (citations omitted); accord Garcia v. Benjamin Grp. Enter. Inc., 800 F.Supp.2d 399, 403 (E.D.N.Y. 2011).  This Court has been vested with broad discretion to manage discovery.  See In re Subpoena Issued to Dennis Friedman, 350 F.3d at 69; Garcia, 800 F.Supp.2d at 403; see also Favors, 2012 WL 1802073, at *15.  As an exercise of that discretion, and for the reasons that follow, the Court rejects the defendants' relevance challenge under Rule 26(b)(1), without deciding whether the discovery sought is ultimately

---

[32]  Those disputes are currently pending before the Panel in connection with the defendants' pending motions for summary judgment.  See, e.g., Senate Majority's Mem. in Supp. of Mot. for Summary Judgment (June 29, 2012) at 10, 16, DE #420-2; Senate Majority's Reply in Supp. of Mot. for Summary Judgment (Aug. 3, 2012) at 2, DE #468.

admissible.  See Garcia, 800 F.Supp.2d at 404.

In support of their demand for discovery relating to the defendants' purpose or intent, the plaintiffs cite the Supreme Court's decision in Reynolds v. Sims, wherein the Court held that "a State [must] make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable."  377 U.S. 533, 577 (1964); see, e.g., 7/2/12 Senate Minority Opp. at 15.  The Senate Majority dismisses this pronouncement as "isolated language" of the Supreme Court, see 7/9/12 Senate Majority Reply at 10, and ignores the fact that the Panel presiding over this case has adopted that language as the applicable legal standard for testing Equal Protection challenges to redistricting plans.  See Favors, 2012 WL 1802073, at *9 (quoting Reynolds, 377 U.S. at 577). Furthermore, the plaintiffs have also asserted violations of Section 2 of the VRA, as well as racial and ethnic discrimination in violation of the Equal Protection Clause.  See generally id. Rodriguez and other opinions involving similar claims in redistricting cases have rebuffed comparable relevance challenges to discovery demands.  See Baldus, 2011 WL 6122542, at *1 (noting that in claims "under both the Voting Rights Act and the Equal Protection Clause[,] . . . proof of a legislative body's discriminatory intent is relevant and extremely important as direct evidence"); Rodriguez, 280 F.Supp.2d at 102 ("While evidence of discriminatory animus may not be an essential element of all of plaintiffs' claims, it certainly is something that can be considered in deciding whether the New York Legislature's 2002 redistricting plans pass judicial muster.") (citing Vill. of Arlington Heights, 429 U.S. at 268; Irvin, 127 F.R.D.

at 171).[33]

For the foregoing reasons, this Court likewise concludes that the relevance factor

weighs in favor of disclosure, including with respect to information relating to the Senate size,

which is "inextricably intertwined" with the plaintiffs' Equal Protection malapportionment

claims. See 7/2/12 Senate Minority Reply at 2.

### 2.    Availability of Other Evidence

The second balancing factor also supports disclosure in this case. The defendants,

hanging their hats on the purported irrelevance of legislative intent in relation to the plaintiffs'

claims, argue that any information needed to prove the VRA and Equal Protection claims here

is already located in the public record, and that therefore this second factor tips in favor of

---

[33] In contending that subjective motivations are irrelevant, the Senate Majority argues that "New York City districts are *under*populated relative to upstate districts in terms of the only population that matters when assessing a one-person, one-vote claim: citizen population." 6/18/12 Senate Majority Mem. at 25. In other words, the Senate Majority urges the Court to use Citizen Voting Age Population data ("CVAP") to assess whether the malapportionment complained of injured the plaintiffs. Whatever the Panel's ultimate disposition of this argument, this Court does not regard it as sufficient to block discovery of otherwise relevant information. First, because the New York State Constitution requires that legislative districts be apportioned based upon the "whole number of persons" rather than citizens, see N.Y. Const. art. 3, §§ 4, 5, 5-a, the Second Circuit in 2010 upheld the dismissal of a claim that the plaintiffs' "votes were diluted by the inclusion of aliens for the purposes of apportionment." Loeber v. Spargo, 391 F.App'x 55, 58 (2d Cir. 2010) (Pooler, Sack and Raggi, JJ.), cert. denied sub nom. Van Allen v. Spargo, 131 S.Ct. 2934 (2011). That is, the Court of Appeals declined to utilize CVAP in determining whether the plaintiffs had suffered any injury. See id.

Second, the legislation pursuant to which the 2012 Senate Plan was enacted expressly provides that the apportionment of the districts was based not on CVAP, but "on the basis of the number of inhabitants of the state[,]" according to the 2010 Census. See 7/2/12 Drayton Opp. at 13 (citing 2012 New York State Redistricting Plan, S. 6696, A. 9525, art. 8 § 123 (N.Y. 2012) (enacted)). Indeed, when this Court sought to obtain CVAP data from LATFOR, for the purpose of conducting a VRA analysis of the parties' proposed Congressional plans, the Court was informed that LATFOR did not maintain such data. Therefore, the Court does not regard the defendants' CVAP argument as a reason to bar discovery.

honoring the privilege and granting them protective orders.  See 6/18/12 Senate Majority

Mem. at 26-27; 7/9/12 Assembly Majority Reply at 3-4, 8.  As stated above, however, the

internal legislative process is highly relevant to all of the plaintiffs' claims.  See *supra* pp. 54-

57.  And, while LATFOR has indeed produced substantial material on its website -- including

maps, analyses, data, and memoranda -- such evidence may provide only part of the story.  To

the extent that the information sought by the plaintiffs relates to non-public, confidential

deliberations that occurred within LATFOR or one of the partisan LATFOR redistricting

offices, or between legislators, their staffs, and retained experts, such information likely

cannot be obtained by other means.  See Rodriguez, 280 F.Supp.2d at 102.  Therefore, this

factor militates in favor of disclosure.

### 3.   Seriousness of the Claims

As for the third balancing factor, it is indisputable that racial and malapportionment

claims in redistricting cases "raise serious charges about the fairness and impartiality of some

of the central institutions of our state government," and thus counsel in favor of allowing

discovery.  See id.; see also Baldus, 2011 WL 6122542, at *2; Comm. for a Fair & Balanced

Map, 2011 WL 4837508, at *8.  The defendants suggest that the viability of the plaintiffs'

claims (or the existence of defenses to the claims) should bear on this factor.  See 6/18/12

Senate Majority Mem. at 27; 7/9/12 Senate Majority Reply at 17; 7/9/12 Assembly Majority

Reply at 8.  However, the question presented here is whether the litigation and the issues

therein are of a *serious type*, not whether the claims will ultimately prevail.  See ACORN II,

2009 WL 2923435, at *4 (defining the "seriousness of the litigation" in relation to "the civil

rights implicated"); Rodriguez, 280 F.Supp.2d at 102.  To hold otherwise would distort this

factor -- intended to give due consideration to some of the most invidious forms of government malfeasance -- into a threshold question that would, in most cases, cut off the balancing test before it begins.  The seriousness of the claims in this case further tips the balance toward disclosure.

### 4.       The Role of the Government

With regard to the fourth factor, the state government's role in the instant litigation is direct, and the motives and considerations behind the 2012 Senate and Assembly Plans, to a large degree, "[are] the case."  See Comm. for a Fair & Balanced Map, 2011 WL 4837508, at *8 (citations omitted).  Hence, the fourth factor also weighs against issuance of a protective order.  Indeed, insofar as the central issues in this case ask whether the Senate Majority failed to make an "honest and good faith" effort to create equipopulous districts, or otherwise violated the Equal Protection Clause, and whether the Assembly Majority failed to create multiple majority-minority Black districts in violation of Section 2 of the VRA, the subjective decision-making process remains at the core of the plaintiffs' claims.  And, as stated above, the fact that the legislators here have declined to assert legislative immunity weakens their claims of qualified privilege.  Therefore, the legislature's direct role in the litigation supports overcoming the privilege.

### 5.       Future Timidity

Fifth and finally, although allowing discovery here may not create a specific legislative chill in future redistricting cases in New York, it may inhibit full and frank deliberations in analogous legislative activity.  On the one hand, any chilling effect on legislative debate in the redistricting context is mitigated by the fact that New York State has now passed a new law

designed to ensure a more independent redistricting process. See Redistricting Reform Act of 2012, S. 6736, A. 9557 (N.Y. 2012) (enacted). This new scheme, which contemplates a constitutional amendment and supporting legislation, will create an "independent redistricting commission" comprised entirely of non-legislators. See id. As a result, any depositions of, for example, the mapmakers in this case are unlikely to inhibit legislative deliberations in future redistricting cycles: the independent redistricting commission will more closely resemble Judge Maas' view of the intended structure of LATFOR, which was "more akin to a conversation between legislators and knowledgeable outsiders, such as lobbyists, to mark up legislation -- a session for which no one could seriously claim privilege." See Rodriguez, 280 F.Supp.2d at 101. Further, the Court agrees with the Senate Minority that allowing discovery in this case is unlikely to dissuade citizens from serving on a prestigious committee. See 7/2/12 Senate Minority Opp. at 18 (citing Marylanders for Fair Representation, 144 F.R.D. at 305 n.23 (Murnaghan, J., and Motz, J.)). Moreover, the Senate Majority's fear that discovery here would "chill the willingness of . . . LATFOR staff" to engage in full and frank deliberations, see 6/18/12 Senate Majority Mem. at 27, ignores the fact that the court in Rodriguez declined to extend protection to LATFOR staff not detailed to a partisan redistricting office; significantly, under the contemplated scheme for future redistricting in New York, LATFOR will not play a role in the process. Therefore, as applied to redistricting, the threat of a chilling effect would be minimal.

Nevertheless, allowing discovery to draw back the legislative curtain has the potential, outside the redistricting context, to deter legislators from open and honest deliberations with one another, with their staffs, and with retained experts, for fear that any such communications

will be discoverable in future litigation.  It is not sufficient to argue, as the Senate Minority does, see 7/2/12 Senate Minority Opp. at 18, that because redistricting presents a unique legislative situation, allowing discovery here will not weaken the legislative privilege in other areas of public policy and debate within the legislative branch.  Indeed, the declarations of Assemblymen Kolb and Oaks and LATFOR member Hedges all emphasize a potential chill.  And, as reflected in the statements of Senator Dilan, there apparently *was* a chill in legislative deliberations since the previous redistricting cycle, lending credence to the defendants' warnings.

In the end, while the five factors here generally support overcoming the privilege, the threat of inhibiting legislative deliberations hangs in the air.  Consequently, the prudent course is for the Court to perform an analysis of the allegedly privileged documents, *in camera*, prior to ruling as to the specific documents (or categories of documents) over which the privilege has been invoked.  See ACORN II, 2009 WL 2923435, at *5 (explaining that *in camera* review and subsequent production of any "documents [that] reveal that racial considerations played any role in the legislative deliberations . . . will ensure that the factors relating to the qualified legislative privilege are properly balanced"); Rodriguez, 2003 WL 22109902, at *3 (finding, after an *in camera* review, that a memorandum between a redistricting expert and a legislator that discussed racial considerations should be produced over a claim of legislative privilege); see also In re Grand Jury, 821 F.2d at 959 (citing Kerr v. United States District Court, 426 U.S. 394, 406 (1976)).  It is only in this way that the Court can make the contextual investigation necessary to weigh the claim of privilege against the need for disclosure, and to determine whether the defendants have established the requisite good cause to justify the

issuance of protective orders.

Therefore, the Court orders the Senate Majority to produce all of the documents in its privilege log over which it claims legislative privilege.  Moreover, to the extent that the Assembly Majority and Assembly Minority have withheld responsive documents relating to Assembly districts in Nassau County, those documents should be produced as well for *in camera* inspection.

III.   **Privilege Log**s

Lastly, the Court addresses an issue that relates to each of the asserted privileges: whether the defendants' privilege logs are adequately detailed under the governing rules and case law.

A.   *The Parties' Submissions*

While the plaintiffs' challenges to the privilege logs focus on those of the Senate Majority, their arguments, fairly read, are not so limited.  See 7/2/12 Senate Minority Opp. at 1 n.1 (noting that its arguments are directed at all defendants); 7/2/12 Drayton Opp. at 3, 16 (challenging all defendants' reliance on "conclusory, stereotypical statements" and the failure to specifically establish their claims of privilege).  The defendants all reply that their respective privilege logs comply with the relevant law.  See 7/9/12 Senate Majority Reply at 20-22; 7/9/12 Assembly Majority Reply at 9 n.6; 7/9/12 Assembly Minority Reply at 15.  For the reasons that follow, the Court finds that the entirety of the privilege logs of the Senate Majority, the final segment of the privilege logs of the Assembly Majority, and certain entries of the Assembly Minority's log are inadequate, and therefore directs those parties to file revised privilege logs, with the particulars detailed below.  Moreover, all defendants are

directed to file personnel lists and supplemental affidavits as described herein.

### B.     *Legal Standard*

Where, as here, challenges have been lodged against the withholding of allegedly privileged documents, the production of a privilege log that satisfies the requirements of the Federal and Local Rules is insufficient, standing alone, to defeat those challenges;[34] in addition, the proponent of the privilege bears the burden of establishing, for each document, "those facts that are essential elements of" the claimed privilege or privileges.  See Safeco Ins. Co. of Am. v. M.E.S., Inc., -- F.R.D. --, 2011 WL 6102014, at *3 (E.D.N.Y. Dec. 7, 2011) (quoting Bowne, 150 F.R.D. at 470); see also Rodriguez, 280 F.Supp.2d at 103 (finding that a privilege log was inadequately detailed despite its compliance with the "minimal burdens" of the Federal and Local Rules); A.I.A. Holdings, S.A. v. Lehman Bros., Inc., No. 97 Civ. 4978(LMM), 2002 WL 31385824, at *6 (S.D.N.Y. Oct. 21, 2002) ("If the assertions of privilege [in a privilege log] are challenged and the dispute cannot be resolved informally, the withholding party then has to submit evidence, by way of affidavit, deposition testimony or otherwise, establishing only the challenged elements of the applicable privilege or protection,

---

[34]  Rule 26(b)(5)(A) of the Federal Rules of Civil Procedure provides that "[w]hen a party withholds information otherwise discoverable by claiming that the information is privileged or subject to protection as trial-preparation material, the party must (i) expressly make the claim; and (ii) describe the nature of the documents, communications, or tangible things not produced or disclosed -- and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim."  Fed. R. Civ. P. 26(b)(5)(A).  In this District, Local Civil Rule 26.2(a)(2)(A) further provides that a privilege log must include, for each document, "(i) the type of document . . . ; (ii) the general subject matter of the document; (iii) the date of the document; and (iv) the author of the document, the addressees of the document, and any other recipients, and, where not apparent, the relationship of the author, addressees, and recipients to each other[.]"  S.D.N.Y./E.D.N.Y. Local Civil Rule 26.2(a)(2)(A).

with the ultimate burden of proof resting with the party asserting the privilege or protection.")
(citing von Bulow v. von Bulow, 811 F.2d 136, 144 (2d Cir. 1987); In re Grand Jury
Subpoena Dated Jan. 4, 1984, 750 F.2d 223, 224 (2d Cir. 1984); Bowne, 150 F.R.D. at 470).

In assessing the adequacy of privilege logs, courts ask whether, "as to each document,
[the privilege log] sets forth specific facts that, if credited, would suffice to establish each
element of the privilege . . . ." See Safeco, 2011 WL 6102014, at *3 (quoting Golden Trade
S.r.L. v. Lee Apparel Co., Nos. 90 Civ. 6291 (JMC), 90 Civ. 6292 (JMC), 92 Civ. 1667
(JMC), 1992 WL 367070, at *5 (S.D.N.Y. Nov. 20, 1992)).  Additionally, to facilitate a
judicial determination of privilege, the Court may require, through affidavits or testimony,
additional information, "such as the relationship between the individuals listed in the log and
the litigating parties, the maintenance of confidentiality, and the reasons for any disclosures of
the document to individuals not normally within the privileged relationship . . . ." See Bowne,
150 F.R.D. at 474 (quoted with approval in Constr. Prods. Research, 73 F.3d at 473); see also
Davis v. City of New York, No. 10 Civ. 699(SAS)(HBP), 2012 WL 612794, at *5 (S.D.N.Y.
Feb. 27, 2012) (citing Johnson Matthey, Inc. v. Research Corp., 01 Civ. 8115(MBM) (FM),
2002 WL 31235717, at *3 (S.D.N.Y. Oct. 3, 2002)), recons. denied, 2012 WL 2005826
(S.D.N.Y. June 4, 2012); A.I.A. Holdings, 2002 WL 31385824, at *6 (denying a motion to
compel where defendant subsequently "submitted affidavits . . . that fill in the 'gaps' asserted
by plaintiff" with respect to the challenged privilege log).

Courts in this Circuit have long held that the "fail[ure] to include sufficiently
descriptive information [in a privilege log] may result in waiver of the privilege."  See Weiss
v. Nat'l Westminster Bank, PLC, 242 F.R.D. 33, 66 (E.D.N.Y. 2007) (citing OneBeacon Ins.

Co., 2006 WL 3771010, at *6; Constr. Prods. Research, 73 F.3d at 473; Chase Manhattan

Bank, N.A. v. Turner & Newall, PLC, 964 F.2d 159, 166 (2d Cir. 1992); Grossman v.

Schwarz, 125 F.R.D. 376, 386-87 (S.D.N.Y. 1989); NextG Networks of NY, Inc. v. City of

New York, No. 03 Civ. 9672RMBJCF, 2005 WL 857433, at *2 (S.D.N.Y. Apr. 13, 2005);

Bowne, 150 F.R.D. 465, 474-75 (S.D.N.Y. 1993)).  At the same time, however, courts must

remain mindful of the burden and cost of preparing privilege logs when assessing challenges

and ordering remedies.  See A.I.A. Holdings, 2002 WL 31385824, at *5-6 (quoting ECDC

Envtl. L.C. v. N.Y. Marine & Gen. Ins. Co., 96 Civ. 6033(BSJ)(HBP), 1998 WL 614478, at

*3-4 (S.D.N.Y. June 4, 1998)).

>     *C.*     *Analysis*

Measured against these legal principles, the privilege logs of the Senate Majority,

Assembly Majority, and Assembly Minority are deficient to varying degrees, and must be

revised to the extent indicated below.

>     **1.     The Defendants' Privilege Logs**

The Senate Majority, whose privilege logs contain 6,732 items purportedly covered by

some combination of the attorney-client privilege, work product protection, and legislative

privilege, denotes, for each document, the "author, recipient (if applicable), date, the basis for

the privilege assertion, the type of document, and the general subject matter" of the document.

See 7/9/12 Senate Majority Reply at 21; see generally Senate Majority Privilege Logs, Ex. 1 to

7/2/12 Hecker Decl., DE #428-1.  For nearly every document, the subject matter is noted to

be related to "redistricting issues."  See generally id.  In addition to its privilege logs, the

Senate Majority also served personnel lists, which identify, for each individual, his or her

name, "department" (e.g., Senate, Assembly, LATFOR, Caliper or law firm), and position (e.g., legislator, staff, attorney, or consultant).  <u>See</u> Privilege Log Personnel Lists, at 409-12, Ex. 1 to 7/2/12 Hecker Decl., DE #428-1.[35]

The Assembly Majority's logs, which were entered into ECF in nine segments, <u>see</u> Letter from C. Daniel Chill to the Court (Aug. 6, 2012), DE #473; Assembly Majority Privilege Logs, DE #474-482, assert the attorney-client privilege, work product protection, and legislative privilege, and denote for each document the date, Bates reference number, document type and description, author, addressees, copyees, and the type of privilege asserted. <u>See</u> <u>generally</u> Assembly Majority Privilege Logs.  For all but one of the privilege log installments (hereinafter, the "Final Installment"), the "document type/description" column reflects the document title or e-mail subject line.  <u>See</u> <u>id.</u>  However, the Final Installment, which contains no Bates reference numbers, simply states, for each of the 1,605 documents on that particular log, that the document contains "[i]nformation relating to redistricting," without any substantive description.  <u>See</u> <u>generally</u> Final New York State Assembly Majority Privilege Log (June 25, 2012), DE #481.  Additionally, each of the Assembly Majority's privilege logs contains a personnel list stating whether the individual was, e.g., a member of the "New York State Assembly Majority" or "LATFOR Assembly Majority."  <u>See</u> Assembly Majority Privilege Log Installment One (June 18, 2012) at 8, DE #474.

The Assembly Minority's log, submitted in a single installment spanning eighteen

---

[35]  Pursuant to a court order, the Senate Majority submitted, under seal and *ex parte*, a more detailed personnel list, which included, among other information, a description of each individual's job responsibilities in connection with the 2010 Census redistricting cycle.  <u>See</u> *infra* p. 70.

pages, asserts only the legislative privilege, and sets forth, for each document, the document format, date, sender, recipient, subject (or description), and specific privilege asserted.  See generally Assembly Minority Privilege Log (Aug. 6, 2012), DE #485.  The subject/description field includes, as applicable, a file name, subject line, or document description.  See id.  While some entries contain substantive descriptions (see, e.g., March 7, 2011 Email from Darren McGeary to T. Kraus regarding "Inquiry about Nassau-Suffolk and Massapequa[]," Assembly Minority Privilege Log at 9), others simply state that a document relates to "Redistricting" (see, e.g., January 25, 2012 Letter from John McEneny to Robert Oaks regarding "Redistricting," Assembly Minority Privilege Log at 6).  Unlike the Senate Majority and Assembly Majority, the Assembly Minority did not submit a personnel list.  See Letter from Jennifer K. Harvey to the Court (Aug. 6, 2012) ("8/6/12 Harvey Ltr.") at 1, DE #484.

### 2.    Document Descriptions

The document descriptions within the Senate Majority's privilege logs, the Final Installment of the Assembly Majority's privilege log, and various entries within the Assembly Minority's privilege log are inadequate to allow either the plaintiffs or this Court to determine whether a given privilege applies.  Indeed, the insufficiency of the aforesaid logs is starkly apparent when compared to many entries in the privilege log of the Assembly Minority and to all of the earlier installments (and the supplemental installment) of the Assembly Majority's privilege logs.

As a preliminary matter, it is insufficient for the Senate Majority to describe each document as "relating to" (or "regarding") "redistricting issues."  See generally Senate Majority Privilege Logs.  It is similarly insufficient for the Assembly Majority's Final

Installment to describe every one of its documents as containing "[i]nformation relating to redistricting," see generally Final Assembly Majority Privilege Log, or for the Assembly Minority to describe certain documents as discussing, simply, "[r]edistricting." See generally Assembly Minority Privilege Log.  This is a redistricting case.  Presumably, all responsive documents will in some way relate to "redistricting issues."  What is *specifically* at issue is whether the documents discuss race or ethnicity; the size of the Senate; Assembly districts in Nassau County; district line-placement; alternative proposals; or the under- or overpopulation of districts or regions.  See, e.g., Erie I, 473 F.3d at 421-22 (court lists six broad categories describing "the general subject matter of the document," within the meaning of Local Civil Rule 26.2 counterpart in the Western District of New York).

Moreover, given today's litigation technology, there is no good reason why privilege logs should not include -- where to do so would not itself reveal privileged or protected information, see SEC v. Beacon Hill Asset Mgmt. LLC, 231 F.R.D. 134, 145 (S.D.N.Y. 2004) -- other readily accessible metadata for electronic documents, including, but not limited to: addressee(s), copyee(s), blind copyee(s), date, time, subject line, file name, file format, and a description of any attachments.  Indeed, the Assembly Majority's privilege logs and the Assembly Minority's privilege log contain some such information, and Judge Maas likewise ordered that subject lines be included in the parties' privilege logs in the Rodriguez case.  See Hr'g Tr., Aug. 27, 2003 ("8/27/03 Tr."), at 16, Ex. 10 to 9/17/03 Bruno Objections.  The defendants herein should now revise their privilege logs to include all such readily accessible (and often automated) metadata and descriptive information to the extent such information has

not already been provided.[36]

   While the Court is thus unable to resolve the parties' pending discovery disputes on the basis of the information contained in the defendants' privilege logs, the Court nevertheless, in its discretion, declines to hold that the defendants thereby waived all their privilege claims. See Davis, 2011 WL 1742748, at *4; see also Reino De Espana v. Am. Bureau of Shipping, No. 03CIV3573LTSRLE, 2005 WL 1813017, at *13-14 (S.D.N.Y. Aug. 1, 2005).  Instead, the Court directs the Senate Majority, Assembly Majority, and Assembly Minority to submit revised privilege logs, and, where appropriate, evidentiary submissions, that cure the inadequacies described above.  Insofar as the challenges to the 2012 Assembly Plan are now limited to Nassau County, the Assembly Majority and Assembly Minority need only supplement their privilege logs with respect to documents that discuss or pertain to Assembly districts in Nassau County.  All privilege logs shall be served and filed with the Court in both static (e.g., PDF) and native (e.g., Excel) file formats.

   Finally, although this Memorandum and Order defers decision on the issue of waiver, the Court echoes the warning of Judge Shira A. Scheindlin of the Southern District of New York in Davis v. City of New York, and cautions the defendants "to reassess [their] assertion of all privileges carefully prior to resubmitting the logs," or risk a broad finding of waiver. See Davis, 2011 WL 1742748, at *4.

---

[36]  However, where merely listing the subject line, file name, or document title would result in "vague, confusing, or conclusory descriptions," see Davis v. City of N.Y., 10 Civ. 0699(SAS), 2011 WL 1742748, at *3 (S.D.N.Y. May 5, 2011), it is the defendant's obligation to supplement its privilege log with an affidavit or description of general subject matter sufficient to establish its claim of privilege.  And, to the extent that a document falls within one or more of the broad categories outlined above, the category or categories should be identified in the privilege logs.

3.      **Personnel Lists**

A detailed privilege log is necessary, but not sufficient, to sustain a claim of privilege. There is ample case law in this Circuit for the "unremarkable proposition that a communication is not protected by legislative privilege if it was made in the presence of someone who was not a legislator and was not an agent of a legislator." See 7/9/12 Senate Majority Reply at 20 n.13 (citing Almonte I, 2005 WL 1796118, at *3). Additionally, it is "[o]bviously[ the case that] when communications between a party and her attorney occur in the presence of a third party, the [attorney-client] privilege may be waived," unless the third party was an "agent of the attorney" (e.g., an accountant or translator). See NXIVM Corp. v. O'Hara, 241 F.R.D. 109, 138 (N.D.N.Y. 2007) (citations omitted). Hence, the functional roles and relationships between those individuals involved in the 2010 Census redistricting cycle are of paramount importance in determining whether either privilege applies.

In that connection, on July 12, 2012, the Court directed the Senate Majority to produce, under seal and *ex parte*, a letter and revised personnel list, providing detailed information as to the relationships between those individuals listed on their privilege logs. See Order (July 12, 2012), DE #447. Having reviewed the Senate Majority's submission, the Court concludes that much of the information reflected in that revised personnel list is not itself protected by any privilege. Therefore, all defendants are directed to serve and file personnel lists that include, for each individual listed in their respective privilege logs, the job title, supervisor (including, for legislative staff, the name of the relevant legislator), and whether the individual worked within one of the four partisan LATFOR offices during the 2010 Census redistricting cycle. In addition, the defendants are directed to serve and file supplemental affidavits for each

individual identified as LATFOR staff (including staff within the four partisan offices), describing in detail his or her roles and responsibilities in connection with the 2010 Census redistricting cycle.  Finally, where the attorney-client privilege is asserted, defendants are to provide evidentiary submissions establishing its applicability.

## CONCLUSION

For the reasons stated above, the Court denies without prejudice the Senate Minority's motion to compel, and defers decision on the motions for protective orders filed by the Senate Majority, Assembly Majority, and Assembly Minority, pending the Court's completion of an *in camera* inspection of documents.

The defendants are directed to produce, by August 17, 2012, the following documents for *in camera* inspection: The Senate Majority is directed to produce all documents listed in its privilege logs; the Assembly Majority and Assembly Minority are directed to produce all documents listed in their privilege logs relating to Assembly districts in Nassau County.  The documents produced for *in camera* inspection are to be provided in both hard copy and in electronic format.  The Court will issue a separate order with further instructions regarding the protocol for electronic production.

Further, the Senate Majority, Assembly Majority, and Assembly Minority are each directed to file, by August 20, 2012, a revised privilege log and personnel list that cure the defects identified in Part III of this Memorandum and Order, along with a supplemental affidavit regarding redistricting responsibilities for each LATFOR staff member, and evidentiary submissions to support any claims of attorney-client privilege.

Any objections to this Memorandum and Order shall be served and filed by August 24,

2012.  The production of documents for *in camera* inspection and the production of privilege

logs and personnel lists are not stayed in the interim.

   **SO ORDERED.**

**Dated:**  **Brooklyn, New York**
     **August 10, 2012**

         /s/ **Roanne L. Mann**     
        **ROANNE L. MANN**
        **UNITED STATES MAGISTRATE JUDGE**