UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
MARK A. FAVORS, et al.,

                               Plaintiffs,

              -against-

ANDREW M. CUOMO,
*as Governor of the State of New York*,
et al.,

                               Defendants.
----------------------------------------------------------------x

                               **REPORT AND**
                               **RECOMMENDATION**

                               **11-CV-5632 (DLI)(RR)(GEL)**

ROANNE L. MANN, UNITED STATES MAGISTRATE JUDGE:

     More than two years ago, the Three-Judge Panel (the "Panel") assigned to this case, assisted by the undersigned magistrate judge, undertook the "unwelcome obligation" of redrawing the State of New York's electoral districts for the United States Congress.  Perry v. Perez, –– U.S. ––, 132 S.Ct. 934, 940 (2012) (quoting Connor v. Finch, 431 U.S. 407, 415 (1977)).  Although the parties to the instant lawsuit continue to litigate the redistricting of the maps for the New York State legislature, the Panel has entered judgment on claims related to the congressional districts.  Now, four groups of plaintiff-intervenors, referred to herein as the Rose, Lee, Drayton, and Ramos Intervenors, move for awards of attorney's fees and costs. These motions are before this Court on a referral from the Panel.  For the reasons set forth below, this Court respectfully recommends (1) that the Rose Intervenors' motion be denied in its entirety; (2) that the Lee Intervenors be awarded $61,444 in attorney's fees; (3) that the Drayton Intervenors be awarded $88,502.75 in attorney's fees, $15,780 in expert fees, and $0.75 in litigation expenses; and (4) that the Ramos Intervenors be awarded $97,196.25 in attorney's fees.

## BACKGROUND

This Court recounts only the background necessary to resolve the pending motions for attorney's fees and costs.[1]

This litigation arose out of the failure of New York's legislature to timely enact a new congressional redistricting plan in response to the 2010 Census.  Plaintiffs Mark A. Favors, Howard Leib, Lillie H. Galan, Edward A. Mulraine, Warren Schreiber, and Weyman A. Carey (collectively, the "Primary Plaintiffs") commenced this action on November 17, 2011, seeking, *inter alia*, a judgment declaring the then-existing congressional districts invalid and appointing a Special Master to draw new congressional districts in compliance with the law. See Favors Complaint (Nov. 17, 2011) at 32–33, ECF Docket Entry ("DE") #1.  Over the next few months, four more sets of individuals intervened in the litigation as plaintiffs: Donna Kaye Drayton, Edwin Ellis, Aida Forrest, Gene A. Johnson, Joy Woolley, and Shelia Wright (the "Drayton Intervenors"); (2) Juan Ramos, Nick Chavarria, Graciela Heymann, Sandra Martinez, Edwin Roldan, and Manolin Tirado (the "Ramos Intervenors"); (3) Linda Lee, Shing Chor Chung, Jung Ho Hong, and Julia Yang (the "Lee Intervenors"); and (4) Linda Rose, Everet Mills, Anthony Hoffman, Kim Thompson-Werekoh, Carlotta Bishop, Carol Rinzler, George Stamatiades, Josephine Rodriguez, and Scott Auster (the "Rose Intervenors").

---

[1]  A fuller history of this case is set forth in Favors v. Cuomo, No. 11–CV–5632 (DLI)(RR)(GEL), 2012 WL 928216, at *1–5 (E.D.N.Y. Mar. 12, 2012), which is the Panel's opinion and order adopting a new congressional redistricting plan.  Subsequent references to that order and to the Court's other orders in this case will cite the docket entries in the Court's Electronic Case Filing ("ECF") system.

See Order Granting Motions to Intervene (Feb. 14, 2012); Order Granting Motion to Intervene (Feb. 21, 2012).[2]

After several months of litigation, the Panel referred the creation of a congressional redistricting plan to the undersigned magistrate judge.  See Order of Referral (Feb. 28, 2012), DE #133.  To provide technical assistance, the Panel appointed Dr. Nathaniel Persily, an expert in election law and redistricting.  See id. ¶ 4.  The Panel authorized this Court to "recommend a new plan" or to "incorporate all or parts of extant or newly proposed plans" submitted by either "the parties or interested members of the public."  Id. ¶ 6.

The four intervenor groups (the "Intervenors") submitted their proposed redistricting plans, along with supporting arguments and data, by February 29, 2012.  The Rose Intervenors submitted a statewide redistricting plan.  See Rose Intervenors' Maps (Feb. 29, 2012), DE #141-1.  The Ramos, Drayton, and Lee Intervenors submitted modified versions of the so-called "Unity Plan" or "Unity Map," described as "the joint effort of four voting rights advocacy organizations for the protected population groups in New York City."  Drayton Intervenors' Memorandum in Support of Congressional Unity Map (Feb. 29, 2012) at 4, DE #139.  Unlike the Rose Intervenors' proposed plan, these maps covered only the New York City area.  See, e.g., Lee Intervenors' Proposed Congressional Plan (Feb. 29, 2012), DE #138-6.  Several groups of defendants also submitted plans, but the Primary Plaintiffs did not.

---

[2]  Thereafter, other individuals sought to challenge the recently enacted redistricting plans for the New York State legislature; one such group (led by Todd Breitbart) was denied leave to intervene, and another intervenor (Yitzchok Ullman) had his claims dismissed by the Panel. See Order (May 16, 2012) at 21, 34, 35, DE #367.  Therefore, their involvement in this lawsuit is not relevant to the fee issue before this Court.

In accordance with a schedule set by this Court, see Minute Entry (Feb. 27, 2012), DE #129, the parties filed responses and objections to the various plans submitted to the Court. The parties also advocated for their respective proposed plans and against competing proposals at a four-hour hearing before this Court on March 5, 2012. See Minute Entry (Mar. 5, 2012), DE #183.

That same day, the undersigned magistrate judge unveiled a draft congressional redistricting plan (the "Proposed Plan"), and directed the parties to show cause why the Proposed Plan should not be presented to the Panel as this Court's recommendation. See Order to Show Cause (Mar. 5, 2012) ("3/5/12 OTSC"), DE #184. After receiving responses from the Intervenors and other parties, this Court recommended a slightly modified version of the Proposed Plan (the "Recommended Plan") to the Panel. See Report and Recommendation (Mar. 12, 2012) ("3/12/12 R&R"), DE #223; Changes Made From Proposed Plan to Recommended Plan (Mar. 12, 2012), DE #223-9. Neither the Proposed Plan nor Recommended Plan adopted district lines advocated by any of the parties.

In the week following the filing of the Recommended Plan, the parties responded to that plan through written submissions and argument at a hearing before the Panel on March 15, 2012. See Minute Entry (Mar. 15, 2012), DE #238. Four days later, the Panel issued an order adopting the Recommended Plan with a few minor modifications (the "Adopted Plan"). See Order Adopting Report and Recommendations (Mar. 19, 2012) ("3/19/12 Order"), DE #242. In its 3/19/12 Order, the Panel declared New York's then-existing congressional districts unconstitutional and ordered the defendants to implement the Adopted Plan. See id. at

-4-

43–44.  The following year, on November 5, 2013, the Panel entered final judgment on claims related to congressional redistricting.  See Judgment Order (Nov. 5, 2013) at 2, DE #639.

Fourteen days after the Panel entered the aforesaid judgment, the Rose and Drayton Intervenors moved for attorney's fees and costs.  See Rose Intervenors' Motion for Attorney Fees (Nov. 19, 2013), DE #647; Drayton Intervenors' Motion for Attorney Fees (Nov. 19, 2013), DE #650.  That same day, the Drayton Intervenors sought an extension to file an additional fee application.  See Drayton Intervenors' Letter Motion for Extension (Nov. 19, 2013), DE #645.  Likewise, the Ramos and Lee Intervenors requested extensions to file their respective fee applications.  See Ramos Intervenors' Letter Motion for Extension (Nov. 20, 2013), DE #653; Lee Intervenors' Letter Motion for Extension (Nov. 20, 2013), DE #654.  The Panel granted these extensions, see Order Granting Motions for Extension (Dec. 3, 2013), and the Ramos and Lee Intervenors subsequently moved for fees, see Ramos Intervenors' Notice of Motion for Attorney Fees and Costs (Dec. 13, 2013), DE #657; Lee Intervenors' Motion for Attorney Fees (Dec. 19, 2013), DE #659.  A second fee application also came forth from the Drayton Intervenors.  See Drayton Intervenors' Motion for Attorney Fees and Expert Fees (Dec. 19, 2013), DE #658.  The only parties to file oppositions to the Intervenors' fee applications were the Governor and Lieutenant Governor of the State of New York (collectively, the "State"), who are defendants in this action.

The Panel referred the Intervenors' various fee applications to the undersigned magistrate judge for issuance of a report and recommendation.  See Order Referring Motion (Dec. 3, 2013); Order Referring Motion (Dec. 16, 2013); Order Referring Motion (Dec. 20,

2013).  This Court has considered the parties' submissions and provides its recommendations herein.

## DISCUSSION

In an action brought under 42 U.S.C. § 1983, "the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs . . . ."  42 U.S.C. § 1988(b).  Similarly, a court may award reasonable attorney's fees, expert fees, and litigation expenses "[i]n any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment . . . ."  Id. § 1973*l*(e).  "Since § 1973*l*(e) and § 1988 contain nearly identical language and are driven by similar Congressional intent, the Courts construe these fee shifting statutes similarly."  Davis v. City of New Rochelle, 156 F.R.D. 549, 553 (S.D.N.Y. 1994) (footnote omitted) (citing, *inter alia*, Hensley v. Eckerhart, 461 U.S. 424, 433 n.7 (1983); Hastert v. Illinois State Bd. of Election Comm'rs, 28 F.3d 1430, 1439 n.10 (7th Cir. 1993)).  The purpose of such fee-shifting provisions is to ensure "'effective access to the judicial process' for persons with civil rights grievances.  Accordingly, a prevailing plaintiff 'should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.'"  Hensley, 461 U.S. at 429 (citations omitted); see Wilder v. Bernstein, 965 F.2d 1196, 1201–02 (2d Cir. 1992); Hastert, 28 F.3d at 1439.  Here, the Intervenors assert that they are prevailing parties, but the State disputes this characterization.  Hence, the Court addresses whether Intervenors prevailed before determining what amount of fees, if any, each group should recover.

## I. Intervenors' Eligibility for Fees

"[A] plaintiff prevails when actual relief on the merits of a claim materially alters the legal relationship between the parties by modifying the defendants' behavior in a way that

directly benefits the plaintiff[.]" Abrahamson v. Bd. of Educ. of Wappingers Falls Cent. Sch. Dist., 374 F.3d 66, 78 (2d Cir. 2004) (citing Farrar v. Hobby, 506 U.S. 103, 111–12 (1992); Buckhannon Board & Care Home, Inc. v. West Virginia Dep't of Health & Human Resources, 532 U.S. 598, 604 (2001)). To prevail, a party need neither "succeed on the central issue in the litigation" nor "achieve the primary relief sought." Texas State Teachers Ass'n v. Garland Indep. Sch. Dist., 489 U.S. 782, 784, 790–91 (1989) [hereinafter "Garland"] (internal quotation marks omitted). Although a "purely technical or de minimis" victory may, in some circumstances, fail to support prevailing-party status, a party ordinarily passes the "prevailing" threshold where it succeeds on "any significant issue in litigation which achieve[d] some of the benefit [the party] sought in bringing the suit." Id. at 791–92 (internal quotation marks omitted) (quoting Nadeau v. Helgemoe, 581 F.2d 275, 278–79 (1st Cir. 1978)). If parties entering the litigation as intervenors satisfy this "generous formulation," Hensley, 461 U.S. at 433, they, like prevailing primary plaintiffs, are eligible for reasonable fee awards, see Wilder, 965 F.2d at 1201–02; United States v. Bd. of Educ. of Waterbury, 605 F.2d 573, 576–77 (2d Cir. 1979) [hereinafter "Waterbury"].

    This Court concludes that in the circumstances presented here, the Intervenors are prevailing parties. At a minimum, the Intervenors succeeded on a "significant issue in litigation which achieve[d] some of the benefit" they sought in entering the case. Garland, 489 U.S. at 791–92. The Intervenors' complaints alleged that New York's existing congressional districts were malapportioned in light of the 2010 Census and sought a judicially ordered congressional redistricting plan. See Drayton Complaint (Dec. 19, 2011), DE #28-4; Ramos Complaint (Dec. 27, 2011), DE #37; Lee Complaint (Dec. 28, 2011), DE #38-5; Rose Complaint (Feb. 15, 2012), DE #81-2. In this respect, the Intervenors obtained the relief

-7-

sought in their complaints: The Panel declared New York's existing congressional districts unconstitutional and ordered the defendants to implement a judicially created redistricting plan. See 3/19/12 Order at 43–44.[3] The Panel's judgment achieved the requisite modification of the defendants' behavior in a way beneficial to the Intervenors, see Abrahamson, 374 F.3d at 78, whose "ability to vote in upcoming elections in accordance with rights guaranteed by the federal and state constitutions" was no longer jeopardized, see 3/19/12 Order at 2. Moreover, the Intervenors' success was not a "purely technical or de minimis" victory insufficient to support prevailing-party status. Garland, 489 U.S. at 792. For these reasons, the Intervenors are prevailing parties. Cf. Perrin v. Kitzhaber, 83 P.3d 368, 375 (Or. App. 2004) (holding that plaintiffs and intervenors achieved prevailing-party status under section 1988 where trial court declared existing congressional districts unconstitutional and issued injunction preventing elections based on those districts).

The State's arguments against prevailing-party status are unavailing. According to the State, the Second Circuit's decision in Wilder, 965 F.2d at 1202–05, imposes two additional hurdles that an intervenor must overcome in order to prevail for fee-shifting purposes: i.e., an intervenor must (1) receive a direct benefit from the judgment; and (2) do more than "merely duplicate the efforts of the primary plaintiffs." See State's Memorandum in Opposition (Dec. 2, 2013) ("First Opp.") at 3, DE #656; State's Memorandum in Opposition (Jan. 31, 2014) ("Second Opp.") at 4–5, DE #666. The State further argues that the Intervenors do not satisfy

---

[3] The Court subsequently entered judgment in favor of the Intervenors on one or more counts of their complaints, or portions thereof, that pertain to congressional redistricting. See Judgment Order at 2.

-8-

these requirements because the only direct benefit they received was "the fact of a redrawn map," which they claim was the same relief sought by the Primary Plaintiffs and unchallenged by any party.[4]  First Opp. at 3; Second Opp. at 5.  For an intervenor to prevail, the State contends, the court must adopt a map proposed by that intervenor.  See First Opp. at 3–4; Second Opp. at 5–6 (citing Hastert, 28 F.3d at 1439; Korman v. Giambra, No. 01–CV–0369E(SR), 2003 WL 23350130, at *5 (W.D.N.Y. Oct. 17, 2003)).  In this case, the State argues, the Court "did not adopt a map or any portion thereof submitted by any of the Intervenors."  Second Opp. at 5.  Hence, the argument goes, the Panel's judgment would have resulted without the Intervenors' participation, and they therefore merely duplicated the Primary Plaintiffs' efforts.  See First Opp. at 3–4; Second Opp. at 5–7.

A fatal flaw in the State's argument is that Wilder does not, as the State contends, create a different test for determining whether plaintiff-intervenors prevail in suits involving their own constitutional rights.  In fact, Wilder says little about the Intervenors' prevailing-party status in this case aside from affirming, generally, that an intervenor may be a prevailing party for fee-shifting purposes, see 965 F.2d at 1201–02.[5]

---

[4]  The latter contention is inaccurate.  Although no one disputed that New York needed a new congressional district map, several defendants argued that the Court should not draw one.  See, e.g., Motion to Dismiss (Dec. 12, 2011), DE #22; Memorandum in Support (Dec. 12, 2011), DE #22-1.  In any event, prevailing-party status does not depend on the vigorousness of an opposing party's defense.  See, e.g., Maher v. Gagne, 448 U.S. 122, 129 (1980) ("[P]arties may be considered to have prevailed when they vindicate rights through a consent judgment or without formally obtaining relief.") (internal quotation marks omitted).

[5]  Wilder establishes several principles relevant to the Court's determination of reasonable fee amounts in this case, see infra p. 15, but these principles do not speak to prevailing-party status.  For similar reasons, the district court's decision in Korman, 2003 WL 23350130,

(continued…)

To be sure, this Court's approach to determining prevailing-party status departs from the Seventh Circuit's analysis in Hastert, 28 F.3d at 1439–43, which the State urges this Court to follow, see First Opp. at 3–4; Second Opp. at 5.  In Hastert, the original plaintiffs (the "Hastert group") filed suit in anticipation of a legislative deadlock on congressional reapportionment in Illinois.  See 28 F.3d at 1435.  The Hastert group sought a declaration that the existing congressional districts were unconstitutional, as well as an injunction preventing the use of existing districts in the 1992 elections.  Id.  Eventually, the case grew to include a total of six plaintiff groups, each with its own redistricting plan to present to the district court. See id. at 1435, 1439.  As the litigation progressed, there was some consolidation of positions among the groups.  See id. at 1439–43.  Eventually, the district court adopted an amended map proposed by the Hastert group.  See id. at 1435, 1442.  The plaintiff groups thereafter moved for attorney's fees, and the district court denied their motions.  See id. at 1435–37.

In reviewing five of the plaintiff groups' fee applications on appeal, the Seventh Circuit noted that "the principal issue in litigation . . . involved the determination of which proposed [congressional redistricting] plan for the entire State of Illinois best met constitutional and

---

[5](…continued)
another case cited by the State, is irrelevant to the Court's prevailing-party analysis.  In Korman, which concerned the reapportionment of election districts for the Erie County Legislature, a group of voters "sought to intervene . . . primarily to represent the rights of citizens residing in legislative districts other than plaintiff's and to oppose plaintiff's proposed redistricting plan."  Id. at *1, *5.  The court found that their intervention did not contribute significantly to the court's eventual remedy.  See id. at *5.  In concluding that the intervenors' efforts did not warrant a fee award, see id., the district court in Korman had no need to and did not address the threshold issue of whether the intervenors had prevailed, see generally Farrar, 506 U.S. at 118 (O'Connor, J., concurring) (indicating that, in certain cases, "the reasonable fee is no fee at all.").

statutory criteria." Id. at 1440 (internal quotation marks omitted) (alteration in original).  The

Seventh Circuit endorsed a "lay person's perspective," according to which the "winner . . . is

the litigant whose plan and objectives (usually incorporated in its map) the district court

adopted." Id. at 1439.  Under this approach, four groups of voters whose objectives had been

achieved were held to be prevailing parties, see id. at 1440–42,[6] but a final group was found

not to have prevailed.  See id. at 1442–43.  This latter group had proposed a map favoring

Democrats, whereas the successful Hastert group's map favored Republicans.  See id. at 1443.

Notwithstanding the final group's argument "that it was a substantial factor in eradicating

conduct that violates the Voting Rights Act," the Seventh Circuit concluded that that group was

not a prevailing party, noting that "in the redistricting context the touchstone for whether a

party 'prevails' is simply whether that party's map (or the map the party ultimately embraces)

is ultimately adopted." Id.

Although intuitively appealing, the Seventh Circuit's approach has not been adopted in

this Circuit and seems incompatible with the Supreme Court's decisions on prevailing-party

status.  See generally Perrin, 83 P.3d at 375–76.  Simply put, at the first stage of the analysis,

the relevant question is not, as the Hastert court asserted, whether a party succeeded on the

---

[6]  The Hastert group, whose redistricting plan was adopted by the district court, was held to
have prevailed, along with a second group that had formally adopted "the prevailing Hastert
map" and had achieved "its fundamental objective, the creation of a Hispanic district . . . ."
28 F.3d at 1440.  A third group, which had been concerned only with the configuration of a
"relatively small geographic area," prevailed because "[it] convinced the Hastert group to
incorporate their proposed configuration into the Hastert master plan," thereby
"accomplish[ing] everything it set out to achieve." Id. at 1440–41.  A fourth group, which
had unsuccessfully advocated for its own map through trial, nevertheless also prevailed
because the final Hastert map achieved the group's goals and, in a post-trial brief, the group
urged the district court to adopt the Hastert map.  See id. at 1441–42.

principal issue in litigation, but whether it succeeded on "any significant issue in litigation which achieve[d] some of the benefit [the party] sought in bringing the suit." Garland, 489 U.S. at 791–92; see also id. at 790 ("[T]he *degree* of the plaintiff's success in relation to the other goals of the lawsuit is a factor critical to the determination of the size of a reasonable fee, not to eligibility for a fee award at all."); see Fox v. Vice, -- U.S. --, 131 S.Ct. 2205, 2214 (2011) ("A court should compensate the plaintiff for the time his attorney reasonably spent in achieving the favorable outcome, even if the plaintiff failed to prevail on every contention.'") (quoting Hensley, 461 U.S. at 435). "[S]uccess on the threshold question of unconstitutional malapportionment suffices to confer 'prevailing party' status, regardless of the ultimate remedy." Perrin, 83 P.3d at 375–76 & n.10 (collecting cases).

Because the Intervenors are prevailing parties,[7] the Court next considers the amount of fees that each group should be awarded.

**II. Reasonable Fee Calculations**

A party "who has 'prevail[ed]' in the litigation has established only his eligibility for, not his entitlement to, an award of fees." LeBlanc-Sternberg v. Fletcher, 143 F.3d 748, 758 (2d Cir. 1998) (citing Farrar, 506 U.S. at 114; Hensley, 461 U.S. at 433). "The district court retains discretion to determine, under all the circumstances, what constitutes a 'reasonable' fee,

---

[7] The State also contends that "[i]f Intervenors should argue that they pursued distinct interests, then that weighs against giving them prevailing-party status in the first place. Intervenors cannot all have pursued distinct interests and all have simultaneously prevailed." Second Opp. at 9 n.2. This Court disagrees. To be sure, since the Intervenors pursued different interests, see *infra* p. 17, it would be surprising if each intervenor group achieved everything it set out to. Nevertheless, there is no inconsistency between the Intervenors' pursuit of separate interests and their having crossed the threshold of prevailing-party status.

and in appropriate circumstances the court may conclude that, even though a plaintiff has formally prevailed, no award of fees to that plaintiff would be reasonable." Id. (citations omitted). In exercising its discretion, the Court must "provide a reasonably specific explanation for all aspects of a fee determination . . . ." Perdue v. Kenny A. *ex rel*. Winn, 559 U.S. 542, 558 (2010). "The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." Hensley, 461 U.S. at 433. Nevertheless, the "most critical factor" in determining a reasonable fee award is the degree of success obtained. Id. at 436. A reasonable fee award should be "just high enough to attract competent counsel." Simmons v. New York City Transit Auth., 575 F.3d 170, 174–75 (2d Cir. 2009).

**A. Reasonable Hours**

An applicant for attorney's fees "bears the burden of establishing entitlement to an award and documenting the appropriate hours expended . . . ." Hensley, 461 U.S. at 437. The applicant's documentation must include "contemporaneous time records . . . [that] specify, for each attorney, the date, the hours expended, and the nature of the work done." New York Ass'n for Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1148 (2d Cir. 1983). Furthermore, "[i]f the documentation is inadequate, the court may reduce the award accordingly." Struthers v. City of New York, No. 12–CV–242, 2013 WL 5407221, at *8 (E.D.N.Y. Sept. 25, 2013) (citing Hensley, 461 U.S. at 433–34).

"In determining the hours reasonably expended, the court must 'examine the hours expended by counsel and the value of the work product of the particular expenditures to the client's case.'" Id. (quoting Gierlinger v. Gleason, 160 F.3d 858, 876 (2d Cir. 1998)). "In

addition, the court should exclude 'excessive, redundant, or otherwise unnecessary' hours from the lodestar calculation." Id. (quoting Bliven v. Hunt, 579 F.3d 204, 213 (2d Cir. 2009)). "In making this examination, the district court does not play the role of an uninformed arbiter but may look to its familiarity with the case and its experience generally as well as to the evidentiary submissions and arguments of the parties." Gierlinger, 160 F.3d at 876 (quoting DiFilippo v. Morizio, 759 F.2d 231, 235–36 (2d Cir. 1985)). The goal is "to do rough justice, not to achieve auditing perfection." Fox, 131 S.Ct. at 2216. Trial courts "need not, and indeed should not, become green-eyeshade accountants." Id. Instead, they "may take into account their overall sense of a suit" and "use estimates in calculating and allocating an attorney's time." Id. Accordingly, district courts may "make across-the-board percentage cuts in hours as a practical means of trimming fat from a fee application." Green v. City of New York, 403 F.App'x 626, 630 (2d Cir. 2010) (internal quotation marks omitted) (quoting In re Agent Orange Prod. Liab. Litig., 818 F.2d 226, 237 (2d Cir. 1987)).

As noted above, the "results obtained" constitute the most important consideration in determining what hours were reasonably expended. See generally Hensley, 461 U.S. at 434.[8]

---

[8] One clarification is in order. The Hensley Court did not state that the "results obtained" must be factored into the calculation of the reasonably expended hours, but rather that they were to be considered in making adjustments to the "product of reasonable hours times a reasonable rate." 461 U.S. at 434. However, the Supreme Court suggested in the same opinion that a district court could factor the degree of success into the calculation of reasonably expended hours. See id. at 436–37 ("The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success."). The resulting number will be the same whether the adjustment is made before or after the hourly rate is factored into the lodestar equation. Nevertheless, in terms of the legal analysis, this Court believes that the degree of success and similar factors warranting an adjustment to the overall fee are logically considered while assessing the reasonable number of

(continued…)

"Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee." Id. at 435.  On the other hand, where a party achieves only limited success, the court has discretion to reduce the fees awarded, see id. at 436–37, or, "in appropriate circumstances," to deny them entirely, see LeBlanc-Sternberg, 143 F.3d at 758. "A district court's assessment of the 'degree of success' achieved in a case is not limited to inquiring whether a plaintiff prevailed on individual claims." Barfield v. N.Y. City Health & Hosps. Corp., 537 F.3d 132, 152 (2d Cir. 2008) (citing Kassim v. City of Schenectady, 415 F.3d 246, 254 (2d Cir. 2005)).  Both "the quantity and quality of relief obtained" are key factors in determining the degree of success a party achieved.  Id. (quoting Carroll v. Blinken, 105 F.3d 79, 81 (2d Cir. 1997)).

When the parties requesting fees are intervenors, courts must also consider the extent to which the intervenors' "participation contributed importantly to the creation of remedies." Wilder, 965 F.2d at 1204 (internal quotation marks omitted) (quoting Waterbury, 605 F.2d at 576).  Efforts that merely duplicate those of the primary plaintiffs should not count toward a fee award.  See id. at 1204–05.  However, "when nonduplicative efforts by intervenors effectuate the civil rights at issue they are entitled to an award because such a result furthers the purpose of the civil rights statutes in a fashion envisioned by Congress."  Id. at 1205.

The State advances several arguments for across-the-board cuts to the hours of all the

---

[8](…continued)
hours expended.  Cf. United States v. City of New York, No. 07–CV–2067 (NGG)(RLM), 2013 WL 5542459, at *9–11 (E.D.N.Y. Aug. 30, 2013) [hereinafter "NYC Firefighters"] (making reductions to hours for work by intervenors' counsel on an unsuccessful claim, for duplication of effort, and for excess billing).

Intervenors.[9]  First, the State contends that broad cuts are appropriate because the Intervenors achieved limited success.  According to the State, the Intervenors achieved only "a simple outcome: a judgment that the Congressional districts needed to be redrawn."  Second Opp. at 8.  The State implies that the Panel's Adopted Map did not represent success for the Intervenors because "[t]his Court did not adopt any of the Intervenors' proposed plans or any portion thereof."  Id. at 7.  And, since there was a "relative lack of disagreement on" issues other than how the map should be redrawn, the Intervenors purportedly achieved at most a "small degree of success."  First Opp. at 5–6.  In light of this limited success, the State's argument continues, "a reasonable fee in this case is either zero or a low number that reflects the time reasonably necessary to prove that the district lines required redrawing."  Second Opp. at 2.[10]

In order to assess the strength of the State's arguments, the Court must consider the circumstances of each individual intervenor group; contrary to the State's assumption, the Intervenors enjoyed varying degrees of success with respect to the Adopted Map.  It is true, as the State suggests, that the proper measure of the Intervenors' success is the extent to which the Adopted Map met the Intervenors' objectives, and the similarity between the parties'

---

[9]  Although the State framed some of their arguments as challenges to prevailing-party status, they are more appropriately considered in connection with the hours awarded.

[10]  The State also suggests that any work the Intervenors devoted to proving that New York's congressional districts were malapportioned would have been duplicative of the Primary Plaintiffs' efforts.  See, e.g., First Opp. at 4 (Intervenors "saw that this action had been filed, came along for the ride, and obtained only the same judgment that the Primary Plaintiffs achieved."); Second Opp. at 7 ("[N]one of these Intervenors achieved any success beyond that which this Court would have granted without the Intervenors' presence.").

proposed maps and the Adopted Map is clearly relevant on this issue.  However, an intervenor may recover fees for its contributions to a remedy even if the ultimately adopted remedy is not the precise one it had proposed.  See, e.g., Waterbury, 605 F.2d at 576–77.  Hence, the fact that the Panel did not adopt the Intervenors' proffered maps does not end the Court's inquiry into their respective contributions and degrees of success, which will be considered below on a group-by-group basis.  See infra pp. 18–32.

In further support of across-the-board cuts, the State also complains that the Intervenors did not collaborate sufficiently.  According to the State, the Intervenors are "parties with common interests," and should not have "filed separate motions to intervene, separate motions in support of their respective proposed Congressional maps, and separate fee applications." Second Opp. at 9.  Id.  The Court remains unpersuaded.  Each of the Intervenor groups represented different interests and had different concerns regarding the congressional districts. "While all the intervenors were interested in ensuring their votes were not diluted, they put forward plans focused on different areas and supported by different arguments."  Reply Memorandum in Support of Lee Intervenors' Motion (Feb. 14, 2014) ("Lee Reply") at 7, DE #670; see Memorandum of Law in Reply to State Defendants' Opposition (Feb. 14, 2014) ("Drayton Reply") at 7, DE #668; Reply in Support of the Rose Intervenors' Motion (Feb. 14, 2014) ("Rose Reply") at 8, DE #669; Reply Memorandum of Ramos Intervenors (Feb. 14, 2014) ("Ramos Reply") at 6, DE #671.  Additionally, given the extremely compressed timeline involved in this case, it is understandable that counsel were not able to coordinate for maximal efficiency.  See Rose Reply at 8.  Notably, the State does not contend that the

Intervenors duplicated the Primary Plaintiffs' efforts in establishing liability.[11]  This Court therefore would not reduce the Intervenors' compensable hours based on insufficient collaboration.

### 1. Rose Intervenors

The Rose Intervenors are a group of voters from districts that were overpopulated in light of the 2010 Census, and they sought to intervene to protect their individual voting rights. See Proposed Rose Intervenors' Memorandum of Law in Support of Motion to Intervene as Plaintiffs (Feb. 15, 2012) at 1–4, 13, DE #81-1.  As evidenced by the entire record, the Rose Intervenors' main objective was to propose and persuade the Court to adopt that group's statewide redistricting plan.  See Rose Intervenors' Memorandum on Proposed Map (Feb. 29, 2012), DE #141; Rose Intervenors' Proposed Plan (Feb. 29, 2012), DE #141-1.  Their counsel in this litigation were attorneys with the firm Perkins Coie LLP.  See Memorandum in Support of Rose Intervenors' Motion for Attorneys' Fees, Expert Fees, and Costs (Nov. 19, 2013) ("Rose Mem.") at 8, DE #648.  The Rose Intervenors seek compensation for 571.4 hours of work by Perkins Coie.  See id. at 5.  According to the Rose Intervenors, this number of hours was reasonable "[i]n light of the complexity of this case and the Rose Intervenors' ultimate success . . . ."  Id. at 6.

The State opposes any award of fees to the Rose Intervenors, arguing that they have not

---

[11]  After the Lee, Drayton and Ramos Intervenors were granted leave to intervene, see Order (Feb. 14, 2012), they did not seek permission to file papers that would have duplicated the original plaintiffs' submission opposing the then pending motion to dismiss.

identified any significant contributions made by them toward the resolution of this case.  See First Opp. at 4.  The Rose Intervenors' proposed (and rejected) map, the State argues, did not contribute to the remedy granted by the Court.  See id.  Relying on an isolated passage in Barfield, 537 F.3d at 152, the Rose Intervenors counter that they are entitled to fees because they achieved everything they sought *in their complaint*.  See Rose Reply at 6–7.  However, the outcome in Barfield makes abundantly clear that in measuring a party's level of success, a court is not confined to an examination of the pleadings but may consider the record as a whole to determine whether the fee applicant achieved its litigation objectives.[12]  So too here, the Rose Intervenors' complaint is an inadequate guide to their primary aim in this litigation, which was the adoption of their proposed map or a substantially similar map, incorporating the principles espoused by them.

Taking into account the Rose Intervenors' main objective in seeking to intervene in this case, it cannot be said that their participation -- however capable their counsel -- contributed significantly to the remedies granted.  Although the simple fact that the Court rejected the Rose Intervenors' map is not dispositive, cf. Waterbury, 605 F.2d at 576–77, the Rose Intervenors identify no aspect of the Adopted Map that was influenced by their advocacy or their proposed map.  In fact, this Court rejected the Rose Intervenors' challenges to the map that it had initially proposed; specifically, they complained that the Court had failed to take incumbency

---

[12]  Although the plaintiff in Barfield had prevailed on the single cause of action in her complaint, the Second Circuit affirmed a 50-percent reduction in fees, because she had failed to succeed on her "primary aim," class certification.  See 573 F.3d at 152–53.

-19-

into account or to better preserve the cores of existing districts.  See Rose Intervenors' First Response to 3/5/12 OTSC (Mar. 7, 2012), DE #191; Rose Intervenors' Second Response to 3/5/12 OTSC (Mar. 7, 2012), DE #215.  This Court declined to make the requested modifications, see 3/12/12 R&R at 28–38, and the Panel adopted its recommendations, see 3/19/12 Order at 5–6 & n.5.

Nor could the Rose Intervenors be said to have made any meaningful contribution on the issue of liability -- that is, to their entitlement to a judicially crafted redistricting plan. While the Rose Intervenors correctly observe that they intervened while the question of liability was technically still open, see Rose Reply at 5, they identify no contributions by them to the resolution of that question.[13]  Moreover, although the Primary Plaintiffs did not share the Rose Intervenors' position on incumbency, the Rose Intervenors' interests with respect to the question of liability were "adequately represented" by the Primary Plaintiffs, such that any work performed by the Rose Intervenors aimed at establishing liability would likely have been duplicative and ineligible for reimbursement.[14]   See Wilder, 965 F.2d at 1204–05.

_____

[13]  In fact, the Panel did not even grant the Rose Intervenors leave to intervene before denying the defendants' motions to dismiss and asking the undersigned magistrate judge to create and recommend a congressional redistricting plan.  See Order Denying Motions to Dismiss and Granting Motion to Intervene (Feb. 21, 2012).

[14]  The Rose Intervenors correctly observe that, in contrast to a duplication of efforts, a "duplication of benefits" among original plaintiffs and plaintiff-intervenors does not warrant a fee reduction.  Rose Reply at 4.  Hence, the Rose Intervenors should not be penalized for achieving the same success on liability as the Primary Plaintiffs and other Intervenors, but rather, as discussed below, for having failed to identify any important, nonduplicative contributions toward that success.

Instead of identifying achievements, the Rose Intervenors cite their counsel's efforts to "diligently defend[] their clients' interests." Rose Mem. at 7. They argue that they contributed to the outcome of this case through the submission of a statewide redistricting map based on expert testimony "that educated the Court about alternative ways to draw New York's districts," and through their research and explanation of governing legal standards, participation in hearings, and "identif[ication of] problems with other proposed maps by submitting comments and objections." Id. at 4–5. Diligent though the efforts of Rose Intervenors' counsel may have been, such efforts, without more, do not constitute "important contributions to the outcome of this case." Id. at 4.[15] If the Rose Intervenors were merely seeking an "A for effort," this Court might indulge them. However, since their degree of success—not effort—is the most important consideration in a fee award, see Hensley, 461 U.S. at 434, counsel's diligent efforts cannot justify a fee award where those efforts produce no identifiable results beneficial to their clients.[16]

---

[15] The Rose Intervenors cite Shaw v. Hunt, 154 F.3d 161, 166 (4th Cir. 1998), in support of their professed entitlement to fees. However, that decision is of little help here because the defendant in Shaw did "not question on appeal that [the fee applicants] contributed significantly to the success of the litigation and [he] stipulated to the reasonable amount of their fees." Id.

[16] The only arguable contribution that the Rose Intervenors identify is their proposal that the Court retain Professor Nathaniel Persily as its expert, see Rose Intervenors' List of Proposed Experts (Feb. 24, 2012) at 3, DE #118, which the Panel then did, see Panel's Minute Entry (Feb. 27, 2012). However, the selection of one of their three proposed experts cannot, without more, sustain an award of attorney's fees, particularly since the Primary Plaintiffs and three other parties proposed the same expert. See Assembly Majority's List of Experts (Feb. 24, 2012), DE #117; Primary Plaintiffs' List of Experts (Feb. 24, 2012), DE #121; Senate Minority's List of Experts (Feb. 24, 2012), DE #123; State's List of Experts (Feb. 24, 2012),
(continued…)

-21-

The Rose Intervenors bear the burden of establishing their entitlement to fees, see Hensley, 461 U.S. at 437, and since they have not identified an important contribution to the resolution of this case, this Court concludes that a reasonable award is no fee at all, see Wilder, 965 F.2d at 1204.  The Rose Intervenors are in the same position as the plaintiffs in Hastert found ineligible for a fee award, in that they had proposed a map favoring Democrats while the court-adopted map favored Republicans.  See 28 F.3d at 1443.  Although this Court would eschew the Seventh Circuit's prevailing-party analysis, it concurs with the practical result in Hastert.[17]  This Court respectfully recommends that the Rose Intervenors' request for attorney's fees be denied.

### 2. Lee Intervenors

The Lee Intervenors are four Asian American registered voters who reside in New York City and "represent the interests of Asian Americans, as well as their own interests as voters."  Lee Complaint ¶ 6.  In this litigation, the Lee Intervenors primarily "sought to ensure that the redistricting process resulted in congressional districts that keep the Asian American communities of common interest in which they reside whole and together, to ensure that their voting power is not diluted."  Lee Reply at 4 (internal quotation marks and brackets

---

[16](…continued)
DE #125.

[17]  Similarly, the Korman decision, discussed supra pp. 9–10 n.5, supports denying the Rose Intervenors' request for attorney's fees notwithstanding their prevailing-party status.  See 2003 WL 23350130, at *5; cf. Genera-Valentin v. Koch, 739 F.2d 755, 759 (2d Cir. 1984) ("[A] duplicative action which contributes virtually nothing to the ultimate result cannot justify an award of counsel fees.").

omitted).  The Lee Intervenors were represented by attorneys with the firm Kaye Scholer and the Asian American Legal Defense and Education Fund ("AALDEF"), and they request reimbursement for a total of 290.01 hours of work by these attorneys.

The Lee Intervenors were substantially successful.  Although the Court did not adopt their proposed district lines, the Court "ultimately adopted a map that included districts that maintained the integrity of several Asian-American communities."  Id. at 3.  Hence, the Adopted Map "reflects the substance of the Lee Intervenors' arguments to protect the integrity of Asian American communities in New York."  Id. at 3–4 (citing Declaration of Jerry G. Vattamala (Dec. 20, 2013) ("Vattamala Decl.") ¶¶ 13–14, DE #665).  Specifically, the Lee Intervenors persuasively argue that this Court's redistricting map, adopted by the Panel, meets the Lee Intervenors' objectives in several respects:  (1) adopted District 6 retains within a single district the Asian American community in Flushing/Bayside, Elmhurst, and Briarwood/Jamaica Hills, Queens; (2) adopted District 7 retains the community of interest in Manhattan's Chinatown and Brooklyn's Sunset Park; (3) adopted District 14 holds the Asian American community of interest in Jackson Heights and Woodside, Queens, within a single district; and (4) adopted District 5 retains the Asian American community of interest in Richmond Hill/South Ozone Park within a single district.  See Memorandum of Law in Support of Lee Intervenors' Motion (Dec. 19, 2013) ("Lee Mem.") at 3, DE #660.[18]

---

[18]  Unsurprisingly, therefore, the Lee Intervenors filed no objections to this Court's Recommended Plan prior to its adoption by the Panel.  See Lee Intervenors' Response to 3/12/12 R&R (Feb. 14, 2012), DE #227.

The State suggests that the Lee Intervenors did not succeed because the adopted districts cited by them as successes do not match their proposed districts, but instead were based on previously existing districts.  See Second Opp. at 6 (citing Persily Aff. ¶¶ 76–77, 81, 83, 88). This argument has only partial merit.  The fact that the Court did not adopt the Lee Intervenors' proposed lines qualifies their success, but does not completely negate it, because the Court's plan incorporated the substance of the Lee Intervenors' proposal.[19]  First, District 6, which perhaps represents the Lee Intervenors' greatest success, was largely redrawn to accommodate "many of Queens' Asian communities in a compact district."  Persily Aff. ¶ 139; see also Lee Reply at 4–5 & n.3 (noting that adopted District 6 had the highest Asian American percentage of any congressional district in New York's history, and that this district elected New York's first Asian American Congressperson in the 2012 elections).  Second, notwithstanding the similarity of some of the new districts to prior configurations, this Court finds that the Lee Intervenors contributed importantly to the creation or retention of Asian American communities of interest in the Adopted Map.  As the Lee Intervenors observe: "This outcome was by no means inevitable at the outset – notably, the maps submitted by the defendants and by the Rose Intervenors failed to protect the integrity of these communities." Lee Reply at 4 (citing Lee Intervenors' Response to Congressional Redistricting Plans (Mar. 2, 2012), DE #167).  Much like the Rose Intervenors, the Lee Intervenors submitted a

---

[19]  The Court could not adopt wholesale the Lee Intervenors' plan, nor any other partial or individual district plans, while fulfilling the requirement that it create a plan with 27 districts. Persily Aff. ¶ 65.

redistricting plan, provided comments and critiques on alternative proposals, and participated in hearings before this Court and the Panel.  See Lee Mem. at 7; Minute Entry (Feb. 27, 2012), DE #129; Lee Intervenors' Congressional Redistricting Submission (Feb. 29, 2012), DE #138; Lee Intervenors' Response to Congressional Redistricting Plans; Lee Intervenors' Response to 3/12/12 R&R.  In contrast to the Rose Intervenors, however, the Lee Intervenors succeeded in having the substance of their proposal incorporated in the Adopted Map.

Accordingly, this Court believes that only a 20-percent reduction in the Lee Intervenors' requested hours is appropriate on the basis of their degree of success.  Cf. Healey v. Leavitt, 485 F.3d 63, 72 (2d Cir. 2007) (holding that district court did not abuse its discretion in applying percentage reductions to plaintiff's fee award to reflect limited success in litigation as a whole).  This moderate reduction ensures that parties like the Lee Intervenors can find competent counsel in redistricting cases, while incentivizing them to submit plans that meet not only their interests but other necessary characteristics of a court-supervised plan.  Cf. Barfield, 537 F.3d at 152 (district court's reduction in fees for plaintiff who succeeded on FLSA claim while failing to achieve primary aim of collective certification was appropriate because awarding the requested amount would decrease attorneys' incentives to vigorously litigate collective action certification and encourage the filing of weak collective-action-based claims).

To ensure that the Lee Intervenors' requested hours are otherwise reasonable, this Court has reviewed the timesheets submitted by their attorneys.  See Declaration of James D.

-25-

Herschlein (Dec. 19, 2013) ("Herschlein Decl.") ¶ 5; Exhibit ("Ex.") A to Herschlein Decl., DE #661-1; Declaration of Glenn D. Magpantay (Dec. 20, 2013) ("Magpantay Decl.") ¶ 2, DE #664; Ex. A to Magpantay Decl., DE #664-1; Declaration of Jerry G. Vattamala (Dec. 20, 2013) ("Vattamala Decl.") ¶ 2, DE #665; Ex. A to Vattamala Decl., DE #665-1.  The Court has found no significant issues warranting a further reduction in hours.[20]  The State likewise does not quibble with the Lee Intervenors' timesheets, except for complaining that the Lee Intervenors unnecessarily sent two attorneys to a hearing on March 21, 2012.  See Second Opp. at 10.  While in some cases, it might be excessive to have multiple attorneys work on a case and attend related hearings, see, e.g., Rostolder v. Life Energy & Tech. Holdings, Inc., No. 03-CV-3375 (SMG), 2006 WL 5838184, at *4 (E.D.N.Y. Sept. 20, 2006), it was reasonable to do so here in light of the extremely compressed time schedule.  Hence, this Court respectfully recommends that the Panel award the Lee Intervenors attorney's fees for their requested hours, reduced by only 20 percent on the basis of qualified success.[21]

---

[20]  One issue with the AALDEF attorneys' time records is that they tracked their time in fifteen-minute increments, rather than the customary six-minute increments.  See Ex. A to Magpantay Decl.; Ex. A to Vattamala Decl.  In other circumstances, this Court might be inclined to apply a reduction in hours on this basis.  See generally infra p. 52.  However, AALDEF's lead attorney on the case, Jerry Vattamala, notes that he has excluded from his hours "periods of time of less than a half-hour on phone calls or other matters."  Vattamala Decl. ¶ 3.  Moreover, the reasonableness of the Lee Intervenors' overall request for hours is bolstered by the fact that they claim fewer hours than any of the other Intervenors in this case and they purportedly have not sought fees for the contributions of a number of attorneys and support staff at Kaye Scholer and AALDEF.  See Lee Reply at 8; Herschlein Decl. ¶ 8.

[21]  A table of the hours and rates requested by the Lee Intervenors and those recommended by this Court is attached to this Report and Recommendation as Appendix A.

*3. Drayton Intervenors*

The Drayton Intervenors are six Black voters residing in New York City who intervened "to protect their rights as Black voters . . . ." Proposed Drayton Intervenors' Memorandum of Law in Support of Motion to Intervene (Dec. 19, 2011) at 1, DE #28-3. Their primary aim in this litigation was to promote a modified version of the Unity Map to protect Black communities of interest. See Memorandum in Support of Congressional Unity Map (Feb. 29, 2012), DE #139. The Drayton Intervenors were represented by attorneys with the law firm Newman Ferrara and the Center for Law and Social Justice at Medgar Evers College ("CLSJ"). The Drayton Intervenors seek compensation for a total of 331.05 hours of work by the attorneys and their support staff.

The Drayton Intervenors' efforts, which paralleled those of the other Intervenors, were largely successful. While the Panel did not adopt the Drayton Intervenors' proposed Unity Map, they nonetheless succeeded in preserving Black communities of interest. "[T]he geographical locations and the number of Black majority-minority congressional districts contained in the adopted plan are substantially similar [to] those contained in the Unity Map." Drayton Reply at 3. Notably, the Drayton Intervenors persuaded this Court, based on their response to this Court's 3/5/12 OTSC, to reallocate the Fort Greene and Clinton Hill neighborhoods. See Drayton Intervenors' Response to 3/5/12 OTSC (Mar. 6, 2012), DE #189; Recommended Plan Maps (Mar. 12, 2012), DE #223-2; 3/12/12 R&R at 27. However, the Drayton Intervenors were unsuccessful in their other attempts, such as to have Greenpoint

-27-

and Williamsburg reassigned.  See Drayton Intervenors' Response to 3/5/12 OTSC; Drayton Intervenors' Response to 3/12/12 R&R (Mar. 14, 2012), DE #226; 3/19/12 Order at 27–29. Considering the Drayton Intervenors' partial success in persuading this Court to alter its Proposed Map and the relationship between the Drayton Intervenors' proposed Unity Map and the Adopted Map, this Court concludes that the Drayton Intervenors were only somewhat less successful than the Lee Intervenors.  Accordingly, the Court respectfully recommends that the Panel apply a 30-percent reduction on the basis of the Drayton Intervenors' degree of success.

After examining the time records of the Drayton Intervenors' attorneys, the Court finds that the hours claimed were generally reasonable.  See Declaration of Randolph M. McLaughlin (Nov. 19, 2013) ("McLaughlin Decl.") ¶ 3, DE #652; Ex. B to McLaughlin Decl., DE #652-2; Declaration of Joan P. Gibbs (Dec. 19, 2013) ("First Gibbs Decl.") ¶¶ 8, 15, DE #658-2; Ex. B to First Gibbs Decl.; Ex. D to First Gibbs Decl.  The Court has identified two issues, however.  First, the Drayton Intervenors inexplicably request compensation for 91.25 hours for attorney Esmeralda Simmons' work even though her time records account for only 88 hours and 25 minutes.  See Ex. D to First Gibbs Decl. Accordingly, this Court uses 88.4 hours as the starting point for Simmons' hours before applying the aforementioned percentage reduction.  The second issue is that Newman Ferrara included tasks performed between March 23, 2012 and May 29, 2012, that appear to concern aspects of this case unrelated to congressional redistricting.  See Ex. B to McLaughlin Decl. Hence, this Court has subtracted the time associated with these tasks prior to applying the

-28-

recommended 30-percent reduction.  Specifically, this Court has subtracted 20.6 hours from Randolph McLaughlin's time charges, 3.4 hours from Jeffrey Norton's time charges, and 3.0 hours from Courtney Chenette's time charges.[22]

The State raises two additional arguments for reducing the Drayton Intervenors' requested hours.  First, the State criticizes the Drayton Intervenors for submitting two separate fee applications, contending that the Court should consider only one such fee motion.  See Second Opp. at 10.  In response, the Drayton Intervenors explain that they submitted multiple fee applications because, at the time fee applications were originally due, their lead counsel, Joan Gibbs, had been preparing for oral argument in connection with a later stage of this redistricting litigation, and they therefore filed for an extension.  See Drayton Reply at 8. Since the extension was not granted until December 3, 2013, the Drayton Intervenors understandably first filed a separate motion to recover fees for Newman Ferrara's work on the case.  They should not be penalized for filing two separate motions.

The State's final argument is that a reduction is appropriate because the Drayton Intervenors unnecessarily sent three attorneys to court hearings on March 5 and March 15, 2012.  See Second Opp. at 10.  However, for reasons explained in its discussion of the Lee Intervenors' requested hours, this Court would not apply a further reduction on this basis.

_____

[22]  Chenette performed this work while she was a law clerk at Newman Ferrara.  See McLaughlin Decl. ¶¶ 19–20; Ex. B to McLaughlin Decl.  She later became an associate and continued to work on this case.  See McLaughlin Decl. ¶ 20; Ex. B to McLaughlin Decl. After subtracting the time billed for tasks unrelated to the relevant portions of this case, the only reimbursable time remaining for Chenette is for work performed as an associate, rather than as a law clerk.

Hence, it is respectfully recommended that the Panel award the Drayton Intervenors attorney's fees for those requested hours related to congressional redistricting, reduced by 30 percent on the basis of qualified success.[23]

### 4. Ramos Intervenors

The Ramos Intervenors are six Latino voters who intervened to represent the Latino community's interests in redistricting.  See Ramos Intervenors' Memorandum in Support of Complaint in Intervention (Dec. 27, 2011) at 6, DE #37-1; Memorandum of Law in Support of Ramos Plaintiffs' Motion for Attorney's Fees and Costs (Dec. 13, 2013) ("Ramos Mem.") at 7, DE #657-2.  Like the Lee Intervenors and Drayton Intervenors, the Ramos Intervenors promoted a partial redistricting plan based on the Unity Map.  See Ramos Reply at 4; Ramos Intervenors' Plan Submissions (Feb. 29, 2012), DE #142.  The Ramos Intervenors were represented in this action by LatinoJustice PRLDEF ("LatinoJustice"), and they seek reimbursement for 343.1 hours of work.

This Court concludes that an award of fees is appropriate because the Ramos Intervenors substantially achieved their litigation objectives.  Their proposed plan is not inconsistent with the Panel's Adopted Map, and they "achieved the preservation of two Congressional districts held by preferred Latino minority representatives, in the Bronx and Kings County, and a district in Central Harlem, which was redrawn for the Latino majority residents . . . ."  Ramos Mem. at 4.  However, one issue on which the Ramos Intervenors did

---

[23]  A table of the hours and rates requested by the Drayton Intervenors and those recommended by this Court is attached to this Report and Recommendation as Appendix B.

not succeed is the placement of Greenpoint and Williamsburg.  In response to this Court's Proposed Map and Recommended Map, they (like the Drayton Intervenors) unsuccessfully argued for placing these neighborhoods in a different district than the one ultimately adopted by the Panel, see Ramos Intervenors' Response to Proposed Map (Mar. 6, 2012), DE #190; Ramos Intervenors' Response to Recommended Map (Mar. 14, 2012), DE #228-1; 3/19/12 Order at 27–29.  Accordingly, the Court finds that the Ramos Intervenors' level of success is roughly comparable to that of the Drayton Intervenors, and therefore recommends the same 30-percent reduction to the Ramos Intervenors' hours on the basis of qualified success.[24]

The State argues, as it did in connection with the Lee Intervenors, that the relevant adopted districts were based on previously existing districts, rather than on the Ramos Intervenors' map.  See Second Opp. at 6.  The Court is not convinced that this provides a basis for further reducing the Ramos Intervenors' hours.  Even if the relevant districts resemble previous configurations, this similarity was by no means a preordained outcome.  The Ramos Intervenors' efforts in this case, see generally Ramos Mem. at 3, 8, contributed importantly to their substantial success.

---

[24]  The Ramos Intervenors billed travel time at 50 percent of their usual rates.  In order to take this reduction into account in creating an award from adjusted hours and rates, the Court has subtracted half the time billed for travel, so that all hours can simply be multiplied by applicable full hourly rates.  Specifically, the Court has subtracted 1.3 hours of attorney Cartagena's time, 1.95 hours of attorney Perez's time, and 2.4 hours of attorney Chin's time. These subtractions were made prior to applying the 30-percent reduction.

-31-

Upon reviewing the Ramos Intervenors' time records, the Court concludes that the hours and tasks documented are reasonable.[25]  See Declaration of Jackson Chin (Dec. 13, 2013) ("First Chin Decl.") ¶ 3, DE #657-1; Ex. A to First Chin Decl., DE #657-3.  However, no time records were submitted to document the hours of LatinoJustice's law clerk Natalie Knotts or law fellow Rodrigo Diaz, who purportedly performed 22 and 15 hours of work, respectively.  Hence, the Court recommends that the Ramos Intervenors not be reimbursed for their work.  See Carey, 711 F.2d at 1148.

Accordingly, it is respectfully recommended that the Panel award the Ramos Intervenors attorney's fees for their requested hours (except for those attributed to Knotts and Diaz), reduced by 30 percent on the basis of qualified success.[26]

## B. Reasonable Hourly Rates

Generally speaking, a reasonable hourly rate "is the rate a paying client would be willing to pay."  Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany, 522 F.3d 182, 190 (2d Cir. 2007).  Hence, courts look to rates "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation," commonly referred to as "prevailing market rates."  Blum v. Stenson, 465 U.S. 886, 895 & n.11 (1984).  A court, in determining the prevailing market rate, must evaluate the evidence

---

[25]  The State objects to the fact that the Ramos Intervenors sent two lawyers to court hearings on March 5, March 15, and March 21, 2012.  See Second Opp. at 10.  For reasons discussed above, the Court rejects this challenge.

[26]  A table of the hours and rates requested by the Ramos Intervenors and those recommended by this Court is attached to this Report and Recommendation as Appendix C.

proffered by the parties.  Farbotko v. Clinton Cnty., 433 F.3d 204, 209 (2d Cir. 2005).

Additionally, the court may take judicial notice of rates awarded in prior cases and rely on its

own familiarity with prevailing rates in the community.  See id.  "[T]he burden is on the fee

applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that

the requested rates are in line with" prevailing market rates.  Blum, 465 U.S. at 895 n.11.  If

the fee applicant carries this burden, the requested rates are normally deemed reasonable.  See

id.

For purposes of determining prevailing market rates, the relevant community is the

district in which the court sits.  Farbotko, 433 F.3d at 208.  According to the "forum rule,"

courts ordinarily award in-district rates.  See Simmons, 575 F.3d at 174 (citing Arbor Hill,

493 F.3d at 119).  "[W]hen faced with a request for an award of higher out-of-district rates, a

district court must first apply a presumption in favor of application of the forum rule."  Id. at

175.  "[T]o overcome that presumption, a litigant must persuasively establish that a reasonable

client would have selected out-of-district counsel because doing so would likely (not just

possibly) produce a substantially better net result."  Id.  This principle applies even where, as

here, the forum district is the Eastern District of New York, and a number of the attorneys are

based in the same city, but in the adjacent Southern District of New York.  See id. at 176. A

litigant cannot merely rely on the proximity of the districts or the "brand name" of her selected

counsel, but instead must make a showing of "experience-based, objective factors."  Id.

"Among the ways an applicant may make such a showing is by establishing that local counsel

possessing requisite experience were unwilling or unable to take the case, or by establishing, in

a case requiring special expertise, that no in-district counsel possessed such expertise." Id. (citation omitted).

In addition to considering prevailing market rates, courts setting reasonable hourly rates must "bear in mind all of the case-specific variables" that the Second Circuit and other courts have identified as relevant to the reasonableness of attorney's fees. Arbor Hill, 522 F.3d at 190 (emphasis omitted); see also NYC Firefighters, 2013 WL 5542459, at *6.[27] A court "should also bear in mind that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively," and that the reputational benefits inuring in handling a particular case may provide a client with negotiating leverage. Arbor Hill, 522 F.3d at 190.

*1. Attorneys' Hourly Rates in the Eastern District*

"Recent opinions in this district suggest that reasonable hourly rates are 'approximately $400–$450 for partners, $200–$325 for senior associates, and $100–$200 for junior associates.'"[28] NYC Firefighters, 2013 WL 5542459, at *6 (quoting Bogosian v. All Am.

---

[27] "These factors include: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases." NYC Firefighters, 2013 WL 5542459, at *6 (citing Johnson v. Georgia Highway Exp., Inc., 488 F.2d 714, 717–19 (5th Cir. 1974)); see also Green, 403 F.App'x at 629.

[28] The Ramos Intervenors, citing Vilkhu v. City of New York, No. 06–CV–2095 (CPS)(JO), 2009 WL 1851019, at *4 (E.D.N.Y. June 26, 2009), vacated, 372 F.App'x 222 (2d Cir. 2010), mistakenly argue that Eastern District rates are as high as $600 for partners. See
(continued...)

-34-

Concessions, No. 06–CV–1633 (RRM)(RML), 2012 WL 1821406, at *2–3 (E.D.N.Y. May

18, 2012)); see also Ferrara v. Prof'l Pavers Corp., No. 11–CV–1433 (KAM)(RER), 2013

WL 1210522, at *9 (E.D.N.Y. Feb. 15, 2013) (recommending $400 per hour for partners,

$300 per hour for senior associates, and $200 per hour for junior associates), adopted, 2013

WL 1212816 (E.D.N.Y. Mar. 23, 2013); Spence v. Ellis, No. CV 07–5249(TCP)(ARL), 2012

WL 7660124, at *4, *6 (E.D.N.Y. Dec. 19, 2012) (recommending $375 per hour for a

principal who had 20 years' experience "with a primary focus of practice in civil rights" and

$150 per hour for an associate with over two and a half years' experience), adopted, 2013 WL

867533 (E.D.N.Y. Mar. 7, 2013); Dowdell v. Imhof, No. 10-CV-1332 (SJF)(ARL), 2012 WL

959474, at *2–3 (E.D.N.Y. Mar. 19, 2012) (awarding $375 hourly rate billed by attorneys

with at least 25 years of practice and $350 by an attorney practicing for close to 20 years);

Luca v. County of Nassau, 698 F.Supp.2d 296, 301–02 (E.D.N.Y. 2010) (concluding that

$400 per hour was a reasonable rate for partner who had over 25 years of experience

"specializing in plaintiffs-side civil rights cases," was recognized "as an authority . . . as

evidenced by his numerous teaching and speaking engagements," and had handled

approximately 180 civil rights cases in the Eastern District alone); Rodriguez v. Pressler &

Pressler, LLP, No. 06-CV-5103, 2009 WL 689056 (BMC)(JO), at *1 (E.D.N.Y. Mar. 16,

2009) ($450 for civil rights attorney with seventeen years' experience), adopting, as modified,

2008 WL 5731854 (E.D.N.Y. Sept. 11, 2008); Ueno v. Napolitano, No. 04 CV

---

(...continued)
Ramos Mem. at 8.  However, the district court in Vilkhu applied higher Southern District
rates, see 2009 WL 1851019, at *4, and, for that reason, the Second Circuit vacated and
remanded the case for reconsideration in light of the Circuit's intervening decision in
Simmons, 575 F.3d 170, see 372 F.App'x at 223–24.

1873(SJ)(VVP), 2007 WL 1395517, at *10 (E.D.N.Y. May 11, 2007) ($450 for a partner with 42 years of civil rights practice experience who served as Legal Director of the Anti-Discrimination Center, and $400 for a partner with 21 years of experience who was also a law professor at Fordham Law School and founder of the Anti-Discrimination Center).  "The highest rates in this district are reserved for expert trial attorneys with extensive experience before the federal bar, who specialize in the practice of civil rights law and are recognized by their peers as leaders and experts in their fields." Hugee v. Kimso Apartments, LLC, 852 F.Supp.2d 281, 300 (E.D.N.Y. 2012).

### 2. Case-Specific Factors

Redistricting litigation "is not like ordinary civil rights litigation." Davis v. Perry, Nos. SA–11–CA–788–OLG–JES–XR, A–11–CA–855–OLG–JES–XR, –– F.Supp.2d ––, 2014 WL 106990, at *28 (W.D. Tex. Jan. 8, 2014) (three-judge panel) (citing Balderas v. Texas, 6:01–CV–158, 2002 WL 32113830, at *3 (E.D. Tex. Feb. 20, 2002)).  One unique aspect of redistricting litigation is that it generally arises on a decennial basis.  For that reason, "it would appear that any attorney would need to practice for at least a decade before he or she could appear in an apportionment litigation cycle with significant experience." Desena v. Lepage, 847 F.Supp.2d 207, 216 (D. Me. 2012) (three-judge panel).  When experienced attorneys are involved, courts have awarded fees at relatively high rates in redistricting cases. See, e.g., Davis, 2014 WL 106990, at *30–31 (awarding rates at upper end of range for large firms in relevant community to (1) in-state attorney who had "been practicing trial law in Texas since 1957, focusing on constitutional and redistricting litigation"; (2) a D.C.-based solo

-36-

practitioner who had "extensive experience in redistricting," having co-written a book on the subject and conducted a voting rights institute at American University Law School; and (3) a partner of a D.C.-area law firm that was primarily responsible for representing some of the plaintiffs in the United States Supreme Court); Desena, 847 F.Supp.2d at 214–15 (rejecting demand for $595 per hour and awarding $475 hourly rate for out-of-state attorney with "over thirty years of legal experience, including extensive experience in the specialized field of election law"). Similarly, in a voting rights case in the Southern District of New York, the court in 1994 awarded a relatively high partner-level rate ($300) for lead counsel who was a "seasoned voting rights litigator" with fourteen years of litigation experience and academic publications in the field. Davis, 156 F.R.D. at 558.[29] Although the hourly rates awarded in these cases are closely tied to their specific contexts, for purposes of this action they suggest that this Court could appropriately award hourly rates lying toward the higher end of those typically awarded in the Eastern District to attorneys with relevant experience.

Despite the applicability of the forum rule, several groups of Intervenors seek hourly rates in excess of $450 for a handful of attorneys. They argue that these rates are warranted in light of this case's complexity, expedited schedule, and resource requirements. See Rose Reply at 11 ("[T]his was a complicated case with many parties that required significant resources and specialized knowledge to comply with an accelerated schedule."); Ramos Mem. at 6 (arguing that this case "encompassed a complex, highly technical and specialized area of

---

[29] Lead counsel in the Southern District case was Randolph McLaughlin, see Davis,156 F.R.D. at 558, who appears in this case on behalf of the Drayton Intervenors.

civil rights practice" that is "atypical for many civil rights and civil law practitioners," and "necessitate[d] the use of demographic and mapping expertise").[30]

Even accepting the Intervenors' characterization of this case, this Court does not believe an upward departure from typical in-district rates is warranted here, for several reasons. First, to the extent that the compressed timeline placed heavy demands on the resources of counsel for the Intervenors, this demand is apparently reflected in the number of attorneys utilized and number of hours requested for reimbursement. There is no need to cumulatively compensate the Intervenors by also allowing an upward departure in hourly rates, particularly since the compressed timeline was taken into account in recommending that they not be penalized for potential overstaffing and lack of coordination. Additionally, the fact that this case required demographic and mapping expertise certainly justifies the Intervenors' use of experts, but does not warrant higher rates for the attorneys. Finally, this Court is not convinced that the specialized knowledge required in this case warrants fees exceeding the high end of the in-district spectrum, since some of the attorneys in this case with the greatest amount of relevant experience—such as the Drayton Intervenors' Randolph McLaughlin—have requested rates within the established ranges for the Eastern District. See, e.g., infra p. 44.

The Ramos Intervenors' additional arguments in favor of higher rates are unconvincing. First, to justify awarding higher rates, the Ramos Intervenors point to the Jones Day law firm's representation of several members of the New York State Senate (the "Senate Majority") in

---

[30] The Lee Intervenors do not argue that case-specific factors warrant an upward departure from typical Eastern District rates, but contend that the Court should award higher Southern District rates. See Lee Mem. at 10–11.

-38-

defending this case.  See Ramos Reply at 9.  According to the firm's agreement with the
Senate Majority, the hourly rates for two Jones Day partners on the case were $700 and
$607.50, respectively, while two associates' time was billed at $427.50 and $360 per hour,
respectively.  See Declaration of Jackson Chin (Feb. 14, 2014) ("Second Chin Decl.") ¶ 6, DE
#617-1; Ex. B to Second Chin Decl., DE #671-3 at 12, 16.  As reflected in correspondence
from Michael Ostrander, Special Assistant to the Secretary of the Senate, to the Office of the
State Comptroller, the rationale for selecting Jones Day was that "[t]he area of law involving
redistricting requires extremely specialized knowledge to handle the intricate federal
requirements that must be met throughout the redistricting process."  Ex. C to Second Chin
Decl. at 2, DE #671-4; see Second Chin Decl. ¶ 8.  In this Court's view, however, the
assortment of rates requested by experienced attorneys in this case, many of which fall within
the approved range for Eastern District litigators, provide a more useful benchmark than the
rates charged by a large out-of-district firm like Jones Day.  Moreover, the Ramos Intervenors
apparently made no attempt whatsoever to retain in-district counsel.  See NYC Firefighters,
2013 WL 5542459, at *5.

   Finally, the Ramos Intervenors note that in NYC Firefighters, "a court in this forum
found $550 an hour was an appropriate rate for partner level attorneys" based on "the
complexity, effort and skill required for the case."  Ramos Reply at 10 (citing NYC
Firefighters, 2013 WL 5542459).  In NYC Firefighters, the court ruled on the attorney's fee
application of the plaintiff-intervenor Vulcan Society, which had alleged racial discrimination

-39-

claims of disparate impact and disparate treatment based on the New York City Fire Department's hiring practices.  See 2013 WL 5542459, at *1.  The district court found that the "long-running litigation[31] . . . involved numerous complex issues," "continuous work by many of the litigation attorneys," "unusually contentious discovery," and the pursuit of "several different types of relief, including class relief, individualized damages, and equitable relief."  Id. at *7.  In sum, the case "operated on many levels and . . . required high levels of skill and attention from counsel."  Id.  While concluding that the Vulcans had not made a particularized showing sufficient to overcome the application of the forum rule, see id. at *6, the court nevertheless found that the lawsuit was "an exceptional case meriting departure from the typically-awarded rates in this district," and awarded a maximum rate of $550 per hour to partner-level attorneys with "extensive experience in civil rights practice" who "customarily bill at rates higher than those" requested in the case.[32]  Id. at *7–8.

This Court agrees with the Ramos Intervenors that NYC Firefighters constitutes precedent for, in some limited circumstances, awarding hourly rates higher than $450. However, in light of the other considerations discussed above, the Intervenors have not convinced the undersigned magistrate judge (who was personally involved in the highly complex NYC Firefighters case) that such rates are appropriate here.  Accordingly, this Court finds $450 per hour to be the highest reasonable rate for attorneys in this case, whose specific

---

[31]  Counsel for the Vulcans had, at that point, litigated the case, without remuneration, for more than six years.  See NYC Firefighters, 2013 WL 5542459, at *7.

[32]  The court also awarded associate-level hourly rates "slightly higher than those typically awarded in this district."  NYC Firefighters, 2013 WL 5542459, at *8.

recommended rates are discussed on an individual basis below.

   *1. Lee Intervenors*

   The AALDEF attorneys representing the Lee Intervenors in the congressional redistricting portion of this case were Jerry Vattamala and Glenn Magpantay. Vattamala, a Staff Attorney with AALDEF's Democracy Program, served as lead counsel to the Lee Intervenors. See Vattamala Decl. ¶¶ 1, 3. Vattamala has been an attorney for six years and clerked in the preceding two years. See id. ¶ 8. His first four years of practice were spent as a commercial litigation associate at Proskauer Rose LLP, and he has worked at AALDEF for almost three years. See id. Vattamala describes himself as "a recognized authority on minority voting rights and political participation," citing, *inter alia*, his experience litigating Voting Rights Act cases, testimony at hearings on redistricting, and participation on voting rights speaker panels. See id. For Vattamala's work on this case, the Lee Intervenors request an hourly rate of $300. This Court finds the requested rate reasonable.[33]

   The other AALDEF attorney working on this case, Glenn Magpantay, is the director of the organization's Democracy Program. Declaration of Glenn D. Magpantay (Dec. 20, 2013) ("Magpantay Decl.") ¶ 1, DE #664. He has been a "voting rights and civil rights attorney for 15 years," and describes himself as "a recognized authority on minority voting rights and

---

[33] It has not escaped this Court's notice that Vattamala accumulated much of his experience in voting rights after his work on the portion of this case currently at issue. See Ex. B to Vattamala Decl. Nonetheless, since the State concedes the reasonableness of Vattamala's requested hourly rate, see Second Opp. at 13, which is consistent with rates awarded in this District, this Court will not *sua sponte* recommend a discounted rate for him.

-41-

political participation."[34]  Id. ¶ 7.  Magpantay oversees AALDEF's voting rights efforts in 15 states and has published articles, taught courses, and testified before Congress on civil rights and voting rights-related topics.  See id.  His requested rate is $350 per hour, the reasonableness of which is undisputed.  See Second Opp. at 13.  This Court agrees that the rate is reasonable.

In addition to the AALDEF attorneys, the Lee Intervenors were represented by attorneys James Herschlein and Noah Peters with the firm Kaye Scholer.  Herschlein joined Kaye Scholer after graduating from law school in 1985 and currently serves as co-chair of the firm's Complex Commercial Litigation Department.  See Herschlein Decl. ¶ 3; Ex. B to Herschlein Decl., DE #661-2 at 2.  Herschlein's legal experience is primarily in commercial litigation, with some involvement in civil rights litigation, including as co-counsel in Brown v. Giuliani, 98 Civ. 7743 (S.D.N.Y.), for which he received the Legal Aid Society's *Pro Bono Publico* Award.  See Ex. B to Herschlein Decl. at 2; Herschlein Decl. ¶ 15.  He apparently has no previous redistricting or voting rights experience, however.

Peters is a 2009 law graduate who clerked for two years after graduation and became an associate at Kaye Scholer in October 2011.  Herschlein Decl. ¶ 16.  "He has experience in numerous aspects of complex commercial litigation, and recently co-authored an *amicus curiae* brief submitted to the U.S. Supreme Court in a Voting Rights Act redistricting case from Texas."  Id.  Of course, Peters gained much of the experience cited by the Lee Intervenors *after* his involvement with the initial stages of this litigation, in connection with which the Lee

---

[34]  Magpantay has prior redistricting litigation experience.  See Ex. B to Magpantay Decl., DE #664-2.

-42-

Intervenors are seeking reimbursement.  See Ex. B to Herschlein Decl.

The Lee Intervenors request higher Southern District rates for the Kaye Scholer attorneys, specifically $600 per hour for Herschlein and $350 for Peters, "[b]ecause Kaye Scholer is located in Manhattan . . . ."  Lee Mem. at 10–11.[35]  However, the Lee Intervenors have made no showing of the requisite "experience-based, objective factors" to demonstrate that selecting out-of-district counsel was likely to produce a substantially better result and thus justify departing from the forum rule.  Simmons, 575 F.3d at 175–76.  Particularly for lawyers with no prior experience in redistricting or voting rights litigation, the Court finds no basis for awarding Southern District rates.

In light of Eastern District norms, the Kaye Scholer attorneys' requested rates for their work on behalf of the Lee Intervenors are excessive.  At the time the congressional redistricting phase of this case was litigated, Peters had virtually no experience as a litigator, much less in the area of civil rights.  Similarly, Herschlein's civil rights experience is modest in comparison to the extensive resumes of numerous other attorneys involved in this case.  According to the State, Herschlein and Peters should receive no more than $300 and $100 per hour, respectively, because of their limited civil rights experience.  See Second Opp. at 13.  Considering Herschlein's extensive civil litigation experience and competent advocacy in this case, this Court, however, believes that $400 is a reasonable rate for Herschlein.  For Peters, $150 is a reasonable rate, lying at the approximate midpoint of rates for junior associates in this district.  See NYC Firefighters, 2013 WL 5542459, at *6.

---

[35]  The requested rates reflect a discount from their usual billing rates for 2012, which were $885 for Herschlein and $425 for Peters.  See Lee Mem. at 13–14.

-43-

2. *Drayton Intervenors*

The Drayton Intervenors seek fees for work performed by Newman Ferrara and the CLSJ.  The individuals associated with Newman Ferrara who worked on this case are Randolph McLaughlin, Jeffrey Norton, Courtney Chenette, and Dhara Patel.  McLaughlin, who has been practicing civil rights law since joining the bar in 1979, acted as supervisor to the others.  See First Drayton Mem. at 4–5.  Additionally, he has authored scholarly articles on civil rights and voting rights, is a tenured law professor at Pace University School of Law, and serves as co-chair of the Civil Rights Practice Group at Newman Ferrara.  See id. at 4.  Almost twenty years ago, a court in the Southern District of New York noted McLaughlin's voting rights expertise, see Davis, 156 F.R.D. at 558, and McLaughlin has actively litigated in the field since that time, see McLaughlin Decl. ¶¶ 7–8.  The Drayton Intervenors seek an hourly rate of $450 for McLaughlin's work in this case, see id. ¶ 11, which the States does not contest, see First Opp. at 8.  The Court finds the requested rate reasonable in light of McLaughlin's extensive relevant experience.

Jeffrey Norton is a partner at Newman Ferrara and "chair of the firm's Class Action and Complex Litigation Practice Group . . . ."  First Drayton Mem. at 5.  He has "over 17 years of experience" in a variety of practice areas, including civil rights, and he teaches mass torts and class action litigation at Pace Law School.  McLaughlin Decl. ¶¶ 12, 15, 16.  The Drayton Intervenors request a rate of $400 per hour for Norton.  See First Drayton Mem. at 5.  The State argues that Norton should command no more than $350 per hour because he is "a fairly junior partner with only sixteen years of experience as a lawyer with a specialty of mass

-44-

torts and class-action litigation, as opposed to civil-rights litigation . . . ." First Opp. at 8. The Court, however, finds that $400 per hour, a rate near but not at the top of Eastern District rates for partners, is appropriate because of his many years of experience in complex civil litigation.

Courtney Chenette is a former law clerk and current associate of Newman Ferrara, see First Drayton Mem. at 5, having graduated from law school in 2012, see McLaughlin Decl. ¶ 17. As an associate, Chenette worked on Newman Ferrara's fee application on behalf of the Drayton Intervenors,[36] see McLaughlin Decl. ¶ 22, and the Drayton Intervenors request $200 per hour for this work, id. ¶ 23. The State argues that Courtney Chenette, "a junior associate barely out of law school," should command an hourly rate no higher than $125. First Opp. at 8. Yet, the State also does not contest $125 per hour as a reasonable rate for law clerks in this case, see id., and an admitted attorney clearly merits a higher hourly rate than a law student. This Court finds $150 per hour to be a reasonable rate for Chenette's work as a junior associate.

Dhara Patel worked on this case as a law clerk, and the Drayton Intervenors request $125 per hour for her work. See First Drayton Mem. at 5. Since the State does not object and other courts in this district have found $125 to be a reasonable hourly rate for law clerks, see NYC Firefighters, 2013 WL 5542459, at *8; Fuerst v. Fuerst, No. 10–CV–3941, 2012 WL 1145934, at *3 (E.D.N.Y. Apr. 5, 2012), this Court concludes that the requested rate is reasonable.

---

[36] For reasons discussed above, *supra* pp. 28–29 & n.22, Chenette's work as a law clerk is not compensable in connection with this motion.

-45-

Two CLSJ attorneys, Joan Gibbs and Esmeralda Simmons, have also represented the Drayton Intervenors in this case.  Joan Gibbs is the CLSJ's General Counsel, and she is the Drayton Intervenors' lead attorney.  <u>See</u> Second Drayton Mem. at 5–7; First Gibbs Decl. ¶ 7.  Since her admission to the bar in 1986, Gibbs "has devoted her entire legal career" to the practice of constitutional and civil rights law.[37]  Second Drayton Mem. at 5.  She has also been appointed to the New York City Voter Assistance Advisory Committee and has taught law school and undergraduate courses.  <u>See</u> First Gibbs Decl. ¶ 6.  The Drayton Intervenors seek $400 per hour for Gibbs' work on this matter.  <u>See</u> Second Drayton Mem. at 4.  The State does not oppose this request, <u>see</u> Second Opp. at 14, which appears to be a reasonable rate for her.

Esmeralda Simmons is the CLSJ's Executive Director.  <u>See</u> First Gibbs Decl. ¶ 10.  She has practiced constitutional and civil rights law since 1978 and has previous experience in redistricting litigation.  <u>See</u> Second Drayton Mem. at 7–8.  She was also appointed as "Vice Chair to the initial New York City Districting Commission" in the early 1990s.  First Gibbs Decl. ¶ 13.  For Simmons' work on this matter, the Drayton Intervenors seek $450 per hour, <u>see</u> Second Drayton Mem. at 4, a rate the State does not oppose, <u>see</u> Second Opp. at 14.  This Court finds the requested rate reasonable.

---

[37]  Gibbs' relevant litigation experience includes representing CLSJ's clients in <u>Rodriguez v. Pataki</u>, No. 02-CV-618 (S.D.N.Y.), a case involving similar redistricting challenges to New York's congressional and state legislative maps, following the 2000 Census.  <u>See</u> Second Drayton Mem. at 6.

### 3. Ramos Intervenors

The Ramos Intervenors were represented in this matter by LatinoJustice, and they seek fees for work performed by Juan Cartagena, Jackson Chin, Jose Perez, Rodrigo Diaz, and Natalie Knotts.[38]  Juan Cartagena, the General Counsel for LatinoJustice, "provided overall supervision and guidance" in this case.  First Chin Decl. ¶¶ 22, 28.  He has been a member of the bar since 1981, and is described as having "vast experience litigating on behalf of Latino and African American communities in the areas of voting rights, employment discrimination, language rights, access to public education for poor and language minority children, and housing."  Id. ¶¶ 22–23.  Cartagena has been involved in at least a dozen voting rights cases since the 1980s, see id. ¶ 27, and he has also lectured, testified before Congress, and published articles on related topics, see id. ¶¶ 25–26.  The Ramos Intervenors argue that although LatinoJustice attorneys do not charge their clients any fees, the private market rate for Cartagena, with his more than 33 years of practice, would be at least $550 per hour, which is the rate they are requesting for his time.  See Ramos Mem. at 8.  Since the Ramos Intervenors have not attempted to overcome the presumption in favor of utilizing in-district rates,[39] this Court is unwilling to recommend hourly rates above $450, which is an appropriate rate for Cartagena.

---

[38]  As mentioned above, supra p. 32, the hours attributable to nonlawyers Diaz and Knotts are not compensable because the Ramos Intervenors submitted no contemporaneous time records for their work.  Accordingly, this Court discusses only the other individuals' reasonable hourly rates.

[39]  Indeed, they mistakenly suggest that that rate is consistent with "the prevailing hourly rates of the Eastern District . . . ."  Ramos Mem. at 9; but see supra pp. 34–41 & n.28.

Jackson Chin serves as senior counsel with LatinoJustice and lead attorney for the Ramos Intervenors.  See First Chin Decl. ¶¶ 1–2.  He has been a member of the bar since 1987.  See id. ¶ 11.  Chin has litigated civil rights and voting rights cases with LatinoJustice since 2000, and participated in the litigation concerning New York's last redistricting cycle, Rodriguez v. Pataki.  See First Chin. Decl. ¶¶ 12, 14.  The State does not oppose the Ramos Intervenors' requested rate of $400 per hour for Chin's time.  See Second Opp. at 13.  The Court finds the requested rate reasonable.

Jose Perez has been a member of the bar since 1986.  See First Chin Decl. ¶ 18. During the congressional redistricting phase of this litigation, Perez was LatinoJustice's Assistant General Counsel.[40]  See id.  While at LatinoJustice, Perez has served as lead or co-counsel in "many of the civil rights cases in LatinoJustice's litigation docket," including at least one prior voting rights case.  Id.  Prior to joining LatinoJustice, he practiced in government and Legal Aid settings, and also served as a supervisor and instructor in law school clinics.  See id. ¶¶ 19–21.  The State does not oppose the Ramos Intervenors' requested rate of $425 per hour for Perez's time, see Second Opp. at 13, which this Court finds to be a reasonable rate.

## C. Expert Fees

The Rose, Ramos, and Drayton Intervenors move for expert fee awards.  The State asserts that expert fees are unavailable to the Intervenors under either section 1988 or 1973*l*. First, the State contends that section 1988 does not authorize shifting expert fees in section

---

[40]  Perez has since been appointed Deputy General Counsel.  See First Chin Decl. ¶ 18.

-48-

1983 cases.  See First Opp. at 9; Second Opp. at 10.  Second, according to the State, section

1973*l* is inapplicable here because that provision "is part of the Voting Rights Act" and "this

Court did not find a violation of [that act]."  Second Opp. at 11.

      Addressing the State's second argument, this Court concludes that the State's

construction of section 1973*l* is unduly narrow and that reasonable expert fees are available in

this case under that provision.  Section 1973*l* authorizes an award of expert fees in "any action

or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment . . . ."

42 U.S.C. § 1973*l*(e); see also Jordan v. Allain, 619 F.Supp. 98, 104 (N.D. Miss. 1985) ("[A]

prevailing voting rights litigant is entitled to recover attorneys' fees regardless of the statutory

or constitutional predicate of the action.").  This litigation is such an action or proceeding.  As

the State acknowledges, see Second Opp. at 2, the Intervenors alleged that the existing

congressional districts violated the "one person one vote" requirement of the Equal Protection

Clause of the Fourteenth Amendment, see, e.g., Drayton Complaint ¶ 58, and the Panel

granted judgment on the relevant counts of the parties' complaints, see Judgment Order at 2.

Moreover, the central issue in this phase of the litigation was the creation of a redistricting

plan that complied with the Voting Rights Act and constitutional requirements.  See, e.g.,

3/12/12 R&R at 13–21; 3/19/12 Order at 10–13.  Finally, numerous courts have applied

section 1973*l*(e) in this context.  See, e.g., Hastert, 28 F.3d at 1439; Stenger v. Kellett, No.

4:11CV2230 TIA, 2012 WL 6085163, at *3 (E.D. Mo. Dec. 6, 2012); King v. State Bd. of

Elections, 2002 WL 221606, at *2 (N.D. Ill. 2002); Johnson v Mortham, 950 F.Supp. 1117,

1120–21 (N.D. Fla. 1996).  Therefore, the Intervenors are eligible for an award of reasonable

expert fees under section 1973*l*.[41]

The State contends, next, that no expert fee award is reasonable here because the issue on which the Intervenors prevailed was simple and did not require an expert.  See Second Opp. at 11.  In support, the State asserts that "[t]his Court used none of the expert declarations to make its basic finding that the previous district map violated the Equal Protection Clause."  Id. According to the State, because the Intervenors used their respective experts to draw competing maps and this Court used its own expert to draw the Proposed Map, the Intervenors' experts were purportedly unnecessary.  See id.

The State's argument is unavailing.  The Panel explicitly authorized this Court to consider the parties' proposals, see Order of Referral (Feb. 28, 2012) ¶ 6, and special expertise was undoubtedly required to create such proposals,[42] see Ramos Reply at 13.  To the extent that the Intervenors' proposed maps and data contributed to the Court's remedies in this case, the Intervenors are entitled to some amount of expert fees.  Hence, this Court will review the reasonableness of the Intervenors' individual expert fee applications.

*1. Rose Intervenors*

The Rose Intervenors seek $6,000 in fees to pay for 15 hours of work by Dr. Stephen Ansolabehere.  See Rose Mem. at 10.  Having concluded, on the basis of their limited contributions and success, that the Rose Intervenors should not be awarded any attorney's fees, this Court likewise recommends that their request for expert fees be denied.  See generally

---

[41]  Hence, the Court need not address the State's argument concerning section 1988.

[42]  The fact that this Court retained Professor Persily as an expert underscores the necessity of technical expertise.

Husain v. Springer, No. 97 CV 2982(NG)(CLP), 2013 WL 1122718, at *11 (E.D.N.Y. Mar. 15, 2013) (reducing reimbursement for electronic research charges by same percentage reduction applied to attorney's fees on the basis of partial success); NYC Firefighters, 2013 WL 5542459, at *13 (where plaintiff-intervenors prevailed on some but not all claims, court awarded "60% of the requested electronic research costs, corresponding to the 40% across-the-board reduction for attorney hours"); Kim v. Dial Serv. Int'l, Inc., No. 96 CIV. 3327(DLC), 1997 WL 458783, at *20 (S.D.N.Y. Aug. 11, 1997) (reducing award of costs by same percentage as attorney's fees on the basis of limited success).

### 2. Drayton Intervenors

The Drayton Intervenors seek expert fees for the services of Dr. Andrew Beveridge, Dr. Zulema Blair, Frank Lewis, and Edwin Dei. As an initial matter, all their expert fees should be reduced by at least 30 percent, to reflect the partial success achieved by the Drayton Intervenors. In addition, the fees of each individual expert should be further reduced or eliminated for the reasons discussed below.

Dr. Andrew Beveridge is a university professor whose areas of expertise "include demography, the statistical and quantitative analysis of social science datasets, most particularly including Census data, survey data and administrative records." Declaration of Andrew A. Beveridge (Nov. 19, 2013) ("Beveridge Decl.") ¶ 1, DE #652-4. He has experience testifying as an expert in demographic and statistical analysis in federal and state courts across the country. See id. ¶ 2. In this case, Dr. Beveridge was engaged to assess the "Unity Congressional Plan" proposed by the Unity Maps coalition as well as other proposals

submitted between February 27, 2012, and March 14, 2012.  See id. ¶ 3.  He drafted two

declarations that were submitted to the Court, testified at the March 5, 2012 hearing, and

assisted attorneys with various submissions.  See id.  The Drayton Intervenors seek a total of

$15,200.00 for 76 hours of Dr. Beveridge's time, at a rate of $200 per hour, which is his

customary fee for "work with public bodies and pro-bono cases."  Beveridge Decl. ¶ 4; see

McLaughlin Decl. ¶ 32.  The State has voiced no objections to Beveridge's rate, which appears

reasonable to this Court.  Also, Dr. Beveridge's tasks and time records do not appear

unreasonable, except to the extent that his records track time only in full hours.  See Ex. E to

McLaughlin Decl., DE #652-5.  In light of this imprecise billing, this Court recommends

reducing the requested fee by an additional 10 percent (a total reduction of 40 percent), for a

total award of $9,120.  See La Barbera v. Pass 1234 Trucking, Inc., No. 04 CV

1364(SJ)(MDG), 2007 WL 2908175, at *7 (E.D.N.Y. Sept. 28, 2007) (reducing attorney's fee

by 15% due to billing in quarter-hourly increments); DeStefano v. Astrue, No. 05-CV-3534

(NGG) (RLM), 2008 WL 623197, at *3 n.5 (E.D.N.Y. Mar. 4, 2008) ("Although

fifteen-minute increments are not unreasonable *per se*, [counsel's] time sheets are necessarily

less precise than they could be, and may be reduced on that basis.") (citation omitted),

adopted, 2008 WL 2039471 (E.D.N.Y. May 9, 2008).

 Another of the Drayton Intervenors' experts, Frank Lewis, is "an Adjunct Instructor at

New York University where he has taught courses in . . . Mathematics, Statistics, Economics,

Finance and Information Systems over the span of nineteen years."  Second Drayton Mem. at

9.  Lewis' "redistricting experience spans the last three redistricting cycles," and he "was one

-52-

of the main co-authors of the 2011 Unity Congressional Plan," having drawn the Black majority-minority districts.  Id. at 10.  He "also provided background information to the [Drayton Intervenors'] counsel" for use in their complaint and other submissions.  Id.  The Drayton Intervenors seek an award for 74 hours of Lewis' work at a rate of $150 per hour.  The requested hourly rate, which the State does not challenge, appears reasonable to this Court.  Lewis' time records are also reasonable, except to the extent they track time in one-hour increments.  See Affidavit of Frank C. Lewis (Dec. 19, 2013) ("Lewis Aff.") ¶ 7; Ex. B to Lewis Aff.  This Court therefore recommends awarding the requested amount reduced by an additional 10 percent (a total reduction of 40 percent), or $6,660.

Dr. Zulema Blair is an "Adjunct Assistant Professor in the Department of Political Science at John Jay College of the City University of New York."  Second Drayton Mem. at 10–11.  Blair was retained "to assist in the analysis of racially polarized voting, Black voter opportunities in congressional districts within New York City, and the development of the Black majority-minority districts for the Unity Map."  Declaration of Zulema Blair (Dec. 19, 2013) ("Blair Decl.") ¶ 8, DE #658-4.  The Drayton Intervenors seek a rate of $100 per hour for nineteen hours of Blair's time.  See Second Drayton Mem. at 11.  However, virtually every entry in Blair's time records reflects a meeting or conference call of some unspecified sort, with no indication of the nature of her contribution.  See Blair Decl. ¶ 10; Ex. B to Blair Decl.  Based on the Drayton Intervenors' submissions, this Court cannot conclude that Blair's services were necessary, as opposed to redundant.  See Desena, 847 F.Supp.2d at 211 (excluding all hours requested by expert whose billing records reflected "[a]ustere

-53-

descriptions" such as "review," "conf. call", or "phone calls"; ruling that "the minimal explanations provided in the submitted invoices and Plaintiffs' briefs do not support the amounts claimed"); BD v. DeBuono, 177 F.Supp.2d 201, 208 (S.D.N.Y. 2001) (cited in NYC Firefighters, 2013 WL 5542459, at *13) ("A Court may refuse to grant [expert] fee requests that are excessive or redundant."); see also Kirsch v. Fleet Street, Ltd., 148 F.3d 149, 173 (2d Cir. 1998) (upholding 20% reduction for vague and inconsistent entries); Trs. of Metal Polishers Local 8A-28A Funds v. Superiro Scaffolding Servs. Inc., No. 12–CV–4251 (ARR)(RML), 2013 WL 4095495, at *4 (E.D.N.Y. Aug. 9, 2013) ("Courts may impose an across-the-board reduction in fees for vague time records.") (citing Green, 403 F.App'x at 630).

This Court is of the same opinion with respect to Edwin Dei.  Dei, who has "extensive experience in research and statistical analysis," Second Drayton Mem. at 11, states that his "primary responsibility was to assist in the development of Black majority-minority districts in the 2012 Unity Plan Congressional map," Declaration of Edwin Dei (Dec. 19, 2013) ("Dei Decl.") ¶ 4, DE #658-5.  He asserts that, to this end, he "reviewed and analyzed census data and other relevant data, met with and had telephone conferences" with counsel and (other) experts for the Drayton, Lee, and Ramos Intervenors.  Id.  The Drayton Intervenors seek compensation for nine hours of work by Dei at a rate of $75 per hour.  See Second Drayton Mem. at 11.  However, since every entry in Dei's time records references a meeting, see Ex. B to Dei Decl., it is unclear what value was added by Dei's involvement.  Based on the Drayton Intervenors' submissions, the Court cannot conclude that Dei's services were

necessary in this case.  Hence, this Court recommends that the Drayton Intervenors not be reimbursed for either Blair or Dei's fees.

### 3. Ramos Intervenors

The Ramos Intervenors seek reimbursement for the services of Asher Ross.  Ross "served as a Demography, Database, and GIS consultant, preparing and analyzing demographic and geographic data from the 2000 and 2010 censuses as well as the data issued in the American Community Survey."  Declaration of Asher Ross ("Ross Decl.") ¶ 3, DE #657-4.  Specifically, he prepared and analyzed data used in creating the Ramos Intervenors' proposed congressional districts and also helped review alternative proposals.  See id. ¶ 4. The Ramos Intervenors seek a total of $4,270 in expert fees to reimburse them for 122 hours of Ross' time, billed at $35 per hour.  See Ramos Mem. at 10.  However, the Ramos Intervenors have not supported their request with contemporaneous time records, thereby preventing this Court from determining the reasonableness of the claimed hours.  For this reason, the Court recommends denying the Ramos Intervenors' request for expert fees.  Cf. Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ., 402 F.3d 332, 339 (2d Cir. 2005) (ruling prospectively that a plaintiff's application for expert fees in IDEA actions will normally not be approved absent contemporaneous time records), rev'd on other grounds sub nom. Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy, 548 U.S. 291 (2006).[43]

### D. Litigation Costs

Under sections 1973*l* and 1988, the court may award prevailing parties their reasonable

---

[43]  In any event, any expert fee award should be reduced to reflect the partial success of the Ramos Intervenors.

costs incurred in pursuing the litigation.  See 42 U.S.C. §§ 1973*l*(e), 1988(b); LeBlanc-Sternberg, 143 F.3d at 763 ("[A]ttorney's fees awards include those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients.") (internal quotation marks omitted) (quoting United States Football League v. National Football League, 887 F.2d 408, 416 (2d Cir. 1989)); Kuzma v. Internal Revenue Service, 821 F.2d 930, 933–34 (2d Cir. 1987) ("Identifiable, out-of-pocket disbursements for items such as photocopying, travel, and telephone costs are generally taxable under § 1988 and are often distinguished from nonrecoverable routine office overhead, which must normally be absorbed within the attorney's hourly rate.").

### 1. Rose Intervenors

The Rose Intervenors seek $8,108.32 for litigation expenses.  See Rose Mem. at 10. For the same reasons this Court has recommended denying the Rose Intervenors' requests for attorney's fees and expert fees, this Court recommends denying their request for litigation expenses.

### 2. Drayton Intervenors

The Drayton Intervenors seek photocopying and Federal Express charges incurred in connection with this matter.  First Drayton Mem. at 6.  The total amount claimed is $798.59. See McLaughlin Decl. ¶ 31; Ex. B to McLaughlin Decl. at 6–7.  However, based on the dates associated with the itemized charges, this Court concludes that only the first listed item is related to the congressional redistricting portion of this case.  See Ex. B to McLaughlin Decl. at 6–7.  Hence, this Court recommends granting costs for only the first item—photocopies on

March 5, 2012—for a total of $0.75.

## CONCLUSION

This Court respectfully recommends (1) that the Rose Intervenors' request for attorney's fees, expert fees, and costs be denied entirely; (2) that the Lee Intervenors be awarded $61,444 in attorney's fees; (3) that the Drayton Intervenors be awarded $88,502.75 in attorney's fees, $15,780 in expert fees, and $0.75 in litigation expenses; and (4) that the Ramos Intervenors be awarded $97,196.25 in attorney's fees.

Any objections to the recommendations contained herein must be filed on or before June 6, 2014. Failure to file objections in a timely manner may waive a right to appeal the resulting court order.

The Clerk is requested to enter this Report and Recommendation into the ECF System.

**SO ORDERED.**

**Dated:**     **Brooklyn, New York**
            **May 20, 2014**

                              /s/ *Roanne L. Mann*
                              **ROANNE L. MANN**
                              **UNITED STATES MAGISTRATE JUDGE**

-57-

**APPENDIX A – LEE INTERVENORS' HOURS AND RATES**

| Timekeeper | Requested Hours | Requested Rate | Recommended Hours | Recommended Rate | Recommended Award |
|---|---|---|---|---|---|
| James Herschlein | 75.76 | $600 | 60.61 | $400 | $24,244 |
| Noah Peters | 124.5 | $350 | 99.6 | $150 | $14,940 |
| Glenn Magpantay | 18 | $350 | 14.4 | $350 | $5,040 |
| Jerry Vattamala | 71.75 | $300 | 57.4 | $300 | $17,220 |
| | | | | **TOTAL**: | **$61,444** |

**APPENDIX B – DRAYTON INTERVENORS' HOURS AND RATES**

| Timekeeper | Requested Hours | Requested Rate | Recommended Hours | Recommended Rate | Recommended Award |
|---|---|---|---|---|---|
| Joan Gibbs | 110 | $400 | 77 | $400 | $30,800 |
| Esmeralda Simmons | 91.25 | $450 | 61.88 | $450 | $27,846 |
| Randolph McLaughlin | 94 | $450 | 51.38 | $450 | $23,121 |
| Jeffrey Norton | 24.7 | $400 | 14.91 | $400 | $5,964 |
| Courtney Chenette | 3.6 (as associate) | $200 | 2.52 | $150 | $378 |
| Dhara Patel | 4.5 | $125 | 3.15 | $125 | $393.75 |
| | | | | **TOTAL**: | **$88,502.75** |

## APPENDIX C – RAMOS INTERVENORS' HOURS AND RATES

| Timekeeper | Requested Hours | Requested Rate | Recommended Hours | Recommended Rate | Recommended Award |
|---|---|---|---|---|---|
| Juan Cartagena | 37.7 | $550 | 25.48 | $450 | $11,466 |
| Jose Perez | 83.9 | $425 | 57.37 | $425 | $24382.25 |
| Jackson Chin | 221.5 | $400 | 153.37 | $400 | $61,348 |
| | | | | **TOTAL**: | **$97,196.25** |