UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
                                            :

MARK A. FAVORS, HOWARD LEIB,    :
LILLIE H. GALAN, EDWARD A.      :
MULRAINE, WARREN SCHREIBER,  :
and WEYMAN A. CAREY,        :

                :

           Plaintiffs,      :

                :

DONNA KAYE DRAYTON, EDWIN    :
ELLIS, AIDA FORREST, GENE A.    :
JOHNSON, JOY WOOLLEY, SHEILA  :
WRIGHT, LINDA LEE, SHING CHOR  :
CHUNG, JULIA YANG, JUNG HO    :
HONG, JUAN RAMOS, NICK       :
CHAVARRIA, GRACIELA  HEYMANN,  :
SANDRA MARTINEZ, EDWIN      :
ROLDAN, MANOLIN TIRADO, LINDA  :
ROSE, EVERET MILLS, ANTHONY   :
HOFFMAN, KIM THOMPSON-     :
WEREKOH, CARLOTTA BISHOP,   :
CAROL RINZLER, GEORGE       :
STAMATIADES, JOSEPHINE      :
RODRIGUEZ, and SCOTT AUSTER,  :

                :

      Intervenor-Plaintiffs,  :

                :

      -against-      :     11 Civ. 5632 (RR)(GEL)(DLI)(RLM)

                :

ANDREW M. CUOMO, as Governor of the :
State of New York, ROBERT J. DUFFY,  :     **OPINION AND ORDER**
as President of the Senate of the State of  :
New York, DEAN G. SKELOS, as Majority :
Leader and President Pro Tempore of the  :
Senate of the State of New York,     :
SHELDON SILVER, as Speaker of the   :
Assembly of the State of New York, JOHN :
L. SAMPSON, as Minority Leader of the  :
Senate of the State of New York, BRIAN  :
M. KOLB, as Minority Leader of the    :
Assembly of the State of New York, NEW  :
YORK STATE LEGISLATIVE TASK    :
FORCE ON DEMOGRAPHIC      :

RESEARCH AND REAPPORTIONMENT :
 ("LATFOR"), JOHN J. McENENY, as :
Member of LATFOR, ROBERT OAKS, as :
Member of LATFOR, ROMAN HEDGES, :
as Member of LATFOR, MICHAEL F. :
NOZZOLIO, as Member of LATFOR, :
MARTIN MALAVÉ DILAN, as Member :
of LATFOR, and WELQUIS R. LOPEZ, as :
Member of LATFOR, :
 :
          Defendants, :
 :
-------------------------------------------------------x

**REENA RAGGI, United States Circuit Judge,**
**GERARD E. LYNCH, United States Circuit Judge,**
**DORA L. IRIZARRY, United States District Judge:**

      This three-judge court was originally convened on February 14, 2012, pursuant to

28 U.S.C. § 2284(a), to address the original plaintiffs' complaint that defendants had

failed to redraw New York's state and federal congressional districts in a manner

consistent with the results of the 2010 Census, and had thus deprived plaintiffs of their

constitutionally guaranteed right to vote. At the time the original complaint was filed, the

New York State legislature (the "Legislature") had simply been unable to enact a plan to

redraw congressional and legislative districts in conformity with the census; with respect

to the congressional districts in particular, this failure left New York not only with

malapportioned districts, but with the wrong number of districts, as New York had lost

two seats in the House of Representatives. In light of this impasse, and with primary

elections looming, the Court was compelled to redraw the congressional districts. See

<u>Favors v. Cuomo</u>, No. 11-cv-5632 (RR)(GEL)(DLI)(RLM), 2012 WL 928223 (E.D.N.Y. Mar. 19, 2012).

In the meantime, the Legislature reached an agreement on a plan to redraw the state legislative districts, which was duly enacted and signed by the Governor on March 15, 2012. The adoption of this plan mooted the "impasse" claims of the original plaintiffs, insofar as those claims concerned the new districting plan, but did not end the litigation. While the new districting plan for the state Assembly proved uncontroversial – whether because it was an ideal plan or because it left the traditional Democratic majority in place, and no constitutionally feasible plan to disturb that majority could easily be imagined – the plan for the state Senate (the "Senate Plan") provoked claims, both by some of the parties to the original litigation and by various intervenor-plaintiffs and cross-claimants, that the Senate Plan violated the Constitution of the United States.[1] This opinion resolves the outstanding substantive claims that have been raised in this action.

Because of the complex procedural history of the case, it will be helpful to clarify the identity of the various parties. Since the original complaint asserted that the

---

[1] The Senate Plan led to other litigation as well. New York State voters brought an action in the state courts arguing that the plan violated the New York State Constitution insofar as it expanded the size of the Senate. That argument was ultimately rejected by the New York Court of Appeals. <u>Cohen v. Cuomo</u>, 19 N.Y.3d 196 (2012). Various parties also challenged aspects of the plan as violating the Voting Rights Act of 1965, and asked the U.S. Department of Justice ("the Department"), which under the Act must pre-clear certain election law changes in New York, to deny clearance. The Department rejected those challenges. To the extent that any of those arguments were pressed in this litigation, they have been resolved or abandoned.

3

Legislature, by its inaction, had created an unconstitutional situation, the original plaintiffs named the majority and minority leaders of both houses of the Legislature, as well as the New York State Governor and the members of the advisory body created by the Legislature to advise it on districting issues, the New York State Legislative Task Force on Demographic Research and Reapportionment ("LATFOR"), as defendants. Once the legislative redistricting plan was adopted, the Senate Plan was challenged by three groups of intervenor-plaintiffs: the Drayton Intervenors, representing black voters in New York State, the Ramos Intervenors, representing Hispanic voters in New York State, and the Lee Intervenors, representing Asian voters in New York State. The Lee Intervenors' outstanding claims were resolved by this court's Judgment Order of November 5, 2013, Dkt. Entry 639, an order which also resolved the Drayton and Ramos Intervenors' various Voting Rights Act and congressional redistricting claims. Therefore only the Drayton and Ramos Intervenors (together, the "Intervenors") remain parties to this litigation, and only with regards to their various equal protection claims.

In addition, Senate Minority Leader John L. Sampson and Democrat-appointed LATFOR member Senator Martin Malavé Dilan (the "Cross-Claimants") filed a cross-claim challenging the constitutionality of the Senate Plan.[2] Although the complaints

_____

[2]  In a Memorandum and Order, this court dismissed the claims of the Cross-Claimants for want of standing. Favors v. Cuomo, No. 11-cv-5632 (RR)(GEL)(DLI)(RLM), 2013 WL 5818773 (E.D.N.Y. Oct. 29, 2013), Dkt. Entry 636. However, the Intervenor-Plaintiffs "raise analogous claims" to the Cross-Claimants, and the Cross-Claimants remain party to this litigation as named defendants. Memorandum and Order dated

raised by the Intervenors and Cross-Claimants (together, for the purposes of this

memorandum, the "Plaintiffs") named as defendants the Governor and the leadership of

both parties in the Assembly, because the objections by the Plaintiffs are directed towards

the Senate Plan, the defense of the Senate Plan has been provided by the members of the

Senate associated with the Republican Majority (the "Senate Majority Defendants"),

including Robert J. Duffy, the President of the Senate, and Dean G. Skelos, the Majority

Leader.

The remaining substantive claims of the litigation are addressed in this opinion.

The Plaintiffs contend that the Senate Plan violates voters' constitutionally guaranteed

right to equal representation in state legislatures, which requires that "houses of a state

legislature must be apportioned on a population basis." Reynolds v. Sims, 377 U.S. 533,

577 (1964); see also Motion to Amend/Correct/Supplement Answer to Amended

Complaint by Martin Malavé Dilan, John L. Sampson, Dkt. Entry 344, at 1-2; Drayton

Intervenors' First Amended Complaint for Declaratory Judgment and Injunctive Relief,

Dkt. Entry 254, at 18; Ramos Intervenors' First Amended Complaint, Dkt. Entry 257, at

---

October 29, 2013 at 9; see also Drayton Intervenors' Memorandum of Law in Opposition
to Senate Majority Defendant's Motions for Summary Judgment, Dkt. Entry 452, at 11-
13; Ramos Intervenors' Memorandum of Law in Opposition to Defendant Senate
Majority Leader's Motions for Summary Judgment, Dkt. Entry 458, at 10-11 (asserting,
as do the Cross-Claimants, that the Senate Plan violates equal protection for failure to
apportion districts on an equal population basis). Cross-Claimants were thus permitted to
participate in the oral argument regarding these summary judgment motions, and we will
consider their briefing and argument regarding the claim that the Senate Plan is
unconstitutional on equal protection grounds.

8.  The Intervenors further contend that the Senate Plan was the product of impermissible racial animus and thus violates the Equal Protection Clause of the 14th Amendment.  <u>See</u> Motion to Intervene by Donna Kaye Drayton et. al., Dkt. Entry 28; Notice of Motion to Intervene for Juan Ramos, et. al., Dkt. Entry 37.  The Senate Majority Defendants have moved for summary judgment with regards to both sets of these claims.  <u>See</u> Notice of Motion for Summary Judgment on all Equal-Population Claims Asserted Against the Senate Plan, Dkt. Entry 420.

While the Senate Plan does not reflect perfect equality in population apportionment, its minor deviations comport with the discretion afforded to the states to legislate their own redistricting.  We thus conclude that the Senate Plan does not violate the one-person one-vote principle, and grant the Senate Majority Defendants' motion for summary judgment as to the Plaintiffs' claims.  Because, after adequate opportunity for discovery, the Intervenors have failed to produce any evidence suggesting that the redistricting process was infected by racial prejudice, we grant the Senate Majority Defendants' motion for summary judgment as to the Intervenors' racial discrimination claims.  We elaborate on the reasoning for both these decisions more extensively below. We assume familiarity with the record of prior proceedings in this case, and review the facts as necessary to address the motions before us.

**DISCUSSION**

I.      <u>The One-Person One-Vote Equal Protection Claim</u>

The Plaintiffs allege that the Senate Plan is rendered unconstitutional by its violation of the one-person one-vote principle articulated in Reynolds, and the Senate Majority Defendants move for summary judgment on this claim. To succeed on a summary judgment motion the moving party must demonstrate "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears "the burden . . . to demonstrate that no genuine issue respecting any material fact exists," and in reviewing a motion for summary judgment, "all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought." Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir. 1994).

The Plaintiffs' version of the relevant facts is offered in the Declaration of Todd Breitbart, Dkt. Entry 327, and the exhibits thereto. That declaration contains the population data which underlie the Plaintiffs' allegations that the Senate Plan violates the Equal Protection Clause. Those data establish that the population deviation range of the Senate Plan – calculated by adding together the percentage deviation from the ideally populated district of the most over-populated district and the most under-populated district – is 8.80%, and the average (mean) deviation of all districts is 3.67%. Id., Ex. 2 at 20.[3] The effect of these deviations from perfect population equality is, the Plaintiffs

---

[3] These numbers are undisputed. The Senate Majority Defendants concede that the maximum deviation is 8.80%, Memorandum of Law in Support of Senate Majority Defendants' Motion for Summary Judgment, Exhibit 2, Dkt. Entry 420, and furthermore

contend, to allocate approximately one seat to the New York "upstate region" that, if the

districts contained exactly equal population, would be allocated to the "New York City"

region.  Decl. of Todd Breitbart at 8-9, ¶¶ 19-22, Dkt. Entry 327.

The Plaintiffs claim that, based on this evidence, it is apparent that

> the population deviations in the 2012 Senate plan result not
> from any good faith effort to pursue traditional redistricting
> principles, but rather from the Senate Majority's single-
> minded effort to maximize partisan advantage for the
> Republicans without exceeding a ten percent total deviation.
> . . . [T]he Senate Majority increased the size of the Senate to
> 63 seats under false pretenses and maximally under-populated
> virtually all of the upstate districts in order to shoehorn an
> additional district into the upstate region that it expects a
> Republican will win.

Memorandum in Opposition to Defendants' Motion for Summary Judgment at 1, Dkt.

Entry 453.  The Plaintiffs further argue that, at the least, they should receive the

opportunity to conduct further discovery in order to unearth the true motives behind the

legislature's decision to adopt the Senate Plan.  Id. at 24.

The Equal Protection Clause of the Fourteenth Amendment establishes the

principle of  "one person, one vote," Reynolds v. Sims, 377 U.S. at 558, and "prohibits

the dilution of individual voting power by means of state districting plans that allocate

legislative seats to districts of unequal population and thereby diminish the relative voting

---

put forth underlying population data identical to those of the Plaintiffs, Decl. of Todd R.
Geremia in Support of the Senate Majority Defendants' Motion for Summary Judgment,
Exhibit A, Dkt. Entry 419.

strength of each voter in overpopulated districts," <u>Rodriguez v. Pataki</u>, 308 F. Supp. 2d 346, 363 (S.D.N.Y. 2004), aff'd 543 U.S. 997 (2004). States must "make an honest and good faith effort to construct districts, in both houses of [their] legislature[s], as nearly of equal population as is practicable." <u>Reynolds</u>, 377 U.S. at 577.

However, it is well established that, with regards to population equality, the apportionment of state legislative districts faces a less stringent standard than the apportionment of federal congressional districts. <u>Id</u>. at 577-78. "[W]hereas population alone has been the sole criterion of constitutionality in congressional redistricting under Art. I, s 2, broader latitude has been afforded the States under the Equal Protection Clause" because of the greater number of state districts and the states' interest in serving other legitimate political goals. <u>Mahan v. Howell</u>, 410 U.S. 315, 322 (1973). "The ultimate inquiry, therefore, is whether the legislature's plan may reasonably be said to advance a rational state policy and, if so, whether the population disparities among the districts that have resulted from the pursuit of this plan exceed constitutional limits." <u>Brown v. Thompson</u>, 462 U.S. 835, 843 (1983) (internal quotation marks and brackets omitted). Archetypally legitimate political aims which validate some deviation from population equality are "maintain[ing] the integrity of various political subdivisions . . . and provid[ing] for compact districts of contiguous territory," <u>Reynolds</u>, 377 U.S. at 578, but the Supreme Court has recognized that other goals, such as avoiding contests between incumbents, may also justify deviation, <u>Karcher v. Daggett</u>, 462 U.S. 725, 740 (1983).

However, the "overriding objective [in state apportionment] must be substantial equality of population among various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen." Reynolds, 377 U.S. at 579.

So long as a state redistricting plan satisfies this requirement of substantial equality, the Supreme Court, building from the principle that "legislative reapportionment is primarily a matter for legislative consideration and determination," id. at 586, has concluded that states possess considerable discretion to apportion their own legislative districts. Brown quantifies one critical threshold that assays whether deviations are constitutional: so long as the percentage deviation between the most over-represented district and the most under-represented district (the "maximum deviation," calculated by simply adding the deviations of the two districts together) remains below 10%, the deviation is a "minor deviation[]." 462 U.S. at 842. Such minor deviations "are insufficient to make out a prima facie case of invidious discrimination under the Fourteenth Amendment so as to require justification by the State." Id., quoting Gaffney v. Cummings, 412 U.S. 735, 745 (1973). The Supreme Court has been explicit that within the 10% limit, even where the deviation approaches its margins, population variations alone do not establish justiciable violations. White v. Regester, 412 U.S. 755, 764 (1973) (upholding a plan with 9.9% deviation, and indicating that as such permissiveness is "as applicable to Texas as [it is] to Connecticut," it should be universal).

As the maximum deviation of the Senate Plan is 8.80%, it incorporates only minor deviations from population equality. While that fact does not create a safe harbor immunizing a plan from judicial review, it alleviates the state's burden to justify that deviation. See Rodriguez, 308 F. Supp. 2d at 364-65. Plaintiffs who wish to challenge such a plan must "prove that the 'minor deviation' does not result from the promotion of other legitimate state policies, but rather from an impermissible or irrational purpose." Id. at 364. In the absence of evidence that the minor deviations reflect the "taint of arbitrariness or discrimination," Roman v. Sincock, 377 U.S. 695, 710 (1964), they will not, in and of themselves, render a redistricting plan constitutionally invalid.

Because the Senate Plan reflects only such "minor deviations," so long as we can identify a rational state policy that explains the deviations, the burden falls upon the Plaintiffs to offer evidence from which a reasonable fact finder could conclude that the redistricting process was tainted by an impermissible motive. The Plaintiffs fail to do that, adducing only various statistical analyses of the Senate Plan as evidence of its tainted character and arguing that by these metrics the Senate Plan is "materially worse" than the 2002 New York State Senate redistricting plan adopted in response to the 2000 census (the "2002 Plan") that was upheld in Rodriguez. Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment at 16, Dkt. Entry 453. However, regardless of the sophistication of the Plaintiffs' demographic analysis, we remain bound by controlling precedent that establishes that the maximum deviation is the

most relevant statistical factor. Since it is undisputed that the Senate Plan's maximum deviation is under 10% and thus qualifies as minor, and further elaboration upon statistical data comprises the sole basis of the claim of the Senate Plan's tainted character, the Plaintiffs fail to adequately demonstrate an impermissible motive on apportionment grounds.

Moreover, the Senate Majority Defendants offer explanations for the Senate Plan's attributes that validate the presence of minor deviations, and thus comprise a rational state policy. The Senate Plan preserves the cores of prior districts and avoids contests between incumbent representatives more effectively than the various alternative plans offered by the Plaintiffs. See Memorandum of Law in Support of Senate Majority Defendants' Motion for Summary Judgment at 18, Dkt. Entry 420; see also Senate Minority's Rule 56.1 Counterstatement of Material Facts at 50, Dkt. Entry 455 (conceding that the Senate Plan preserves the cores of existing districts "marginally better" than the alternatives offered by the Plaintiffs). The Senate Plan thus advances the types of political goals that exonerate deviations from perfect equality. As the Supreme Court has stated, "[a]ny number of consistently applied legislative policies might justify some variance, including, for instance . . . preserving the cores of prior districts, and avoiding contests between incumbent Representatives. As long as the criteria are nondiscriminatory, these are all legitimate objectives that on a proper showing could justify minor population deviations."

Karcher, 462 U.S. at 740-41 (citation omitted).[4]

In assessing the Senate Plan, we are mindful of the principle that the redistricting process, in the absence of indications of the taint of illicit or discriminatory motives, is best left to the legislative branch. The Supreme Court has emphatically stated that in the context of minor deviations, federal courts should not impose perfectionist demands on state legislatures. See Gaffney, 412 U.S. at 747-49 (overturning a district court opinion that invalidated a plan with only minor deviations). Rather, courts are instructed to respect redistricting's status as "a political and legislative process" rather than a judicial one, and recognize that "the goal of fair and effective representation [is not] furthered by making the standards of reapportionment so difficult to satisfy that the reapportionment task is recurringly removed from legislative hands and performed by federal courts." Id. at 749. The minor deviation rule operationalizes this principle by denoting that, if

---

[4] Indeed, the Supreme Court has suggested that political justifications for divergence from population equality, if applied in a nondiscriminatory manner, will justify deviations greater than those considered minor, so long as the deviations are not shockingly large, there is no evidence of irrational motive, and some plausible traditional justification for such variance is offered. See, e.g., Mahan, 410 U.S. at 325 (upholding a plan with a maximum deviation spread of 16.4% and an average deviation of 3.89% when the asserted reason was "maintaining the integrity of political subdivision lines"); Brown, 462 U.S. at 839, 843 (upholding a plan with a maximum deviation spread of 89% and an average deviation of 16% when the plan was justified by the traditional allocation of at least one state representative to each county); Abate v. Mundt, 403 U.S. 182, 185 (1971) (upholding a plan with a deviation spread of 11.9% in a county plan that served traditional county governance structure); cf. Roman, 377 U.S. at 707-08 (invalidating a plan where the maximum deviation was 15 to 1 in the state senate, and "two-thirds of the Senate [was] elected from districts where only about 31% of the State's population reside.").

substantial equality of population apportionment is satisfied and there is no evidence of illegitimate intent in the redistricting process, courts ought to defer to the legislative process. As the Senate Plan reflects only minor deviations, the Senate Majority Defendants have offered a nondiscriminatory rationale for the deviations, and the Plaintiffs have failed to demonstrate that a discriminatory motive underlies the plan, we will not arrogate to ourselves the legislature's responsibility to perform the redistricting process.

The Plaintiffs lean heavily on Larios v. Cox, 300 F. Supp. 2d 1320 (N. D. Ga.), aff'd 542 U.S. 947 (2004), in which Georgia's state senate redistricting plan following the 2000 census was struck down by the courts despite possessing only a "minor deviation." With a maximum deviation of 9.98% and an average deviation of 3.78%, id. at 1327, the defective plan in Larios possessed statistical characteristics which were marginally worse than, but roughly comparable to, those of the Senate Plan at issue here. The Larios court, however, identified two defects in the redistricting process – neither present here – that rendered that plan unconstitutional: explicit regional favoritism that overpopulated Republican-leaning geographic areas to the benefit of the incumbent Democratic party; and implementation of incumbent protection that strongly favored incumbent Democrats but not incumbent Republicans by forcing Republican incumbents into competition with

one another.[5]  Furthermore, the record in <u>Larios</u> attested to the facial presence of

discrimination based on partisanship, as witnesses testified to the impact of explicit,

politicized regional favoritism on the redistricting process, <u>id</u>. at 1327-28, and the court

concluded that the record as a whole revealed the influence of illicit partisanship, <u>id</u>. at

1329-30.

The facial presence of an irrationally prejudiced partisan agenda and the

aggressively opportunistic splitting and reorganizing of incumbent districts differentiates

the facts of <u>Larios</u> from those before us.[6]  Thus, while the Plaintiffs assert that the Senate

Plan is infected with the type of regional partisan bias favoring one party and condemned

by the <u>Larios</u> court, in <u>Larios</u> that harm was supported by explicit evidence of

discrimination in the record.  Here the Plaintiffs are only able to argue that the regional

bias speaks for itself.  The other type of harm identified in <u>Larios</u>, the specific and

aggressively prejudicial targeting of one party's standing incumbents, is entirely absent

_____

[5]  "While Democratic incumbents who supported the plans were generally protected,
Republican incumbents were regularly pitted against one another in an obviously
purposeful attempt to unseat as many of them as possible. . . . [T]he 2002 Senate Plan
included six incumbent pairings: four Republican-Republican pairings and two
Republican-Democrat pairings."  <u>Larios</u>, 300 F. Supp. 2d at 1329.

[6]  At oral argument regarding the Motion for Summary Judgment, November 13, 2013,
Senate Minority Cross-Claimants' Counsel suggested <u>Larios</u> was somehow a <u>less</u>
egregious redistricting because the partisan interest was baldly expressed, whereas the
Senate Plan reflected "deception."  Artful as this argument is, it is merely an attempt to
make a virtue of the absence of evidence.

here.[7]  Finally, the court in <u>Larios</u> concluded that the justifications offered by the creators

of the invalidated <u>Larios</u> plan failed to conform to those the Supreme Court has

acknowledged as traditional redistricting principles, <u>id</u>. at 1350-51, further differentiating

the facts in <u>Larios</u> from those before us.[8]

The most recent decision concerning the apportionment of the New York State

---

[7] We note one other significant practical distinction between this case and <u>Larios</u>.  In
<u>Larios</u>, a political party sought to retain control of both houses of the Georgia legislature,
effectively disenfranchising the party that apparently had the support of a majority of the
state's residents.  The redistricting plan at issue here is not the unilateral product of a
legislative majority party seeking to preserve its dominant role in the state despite
shrinking popular support.  Although the Republicans who appear to benefit politically
from the Senate Plan hold a majority in the Senate, and appear to have devised the Senate
Plan with little or no input from their Democratic colleagues, the Republican Senate
Majority had no power to enact the Plan into law.  The plan was passed, as of course it
needed to be to become law, by the Democratic-controlled Assembly, and signed by a
Democratic Governor.  Either the Assembly or the Governor could have blocked adoption
of the Senate Plan.  The redistricting plan for both houses of the New York State
legislature was thus the result of precisely the sort of political process that the Supreme
Court has instructed us should not be lightly displaced.

[8] <u>Larios</u> is the only three-judge district court decision invalidating a plan with only minor
deviations that has been affirmed by the Supreme Court.  While the Plaintiffs cite other
decisions that invalidated districting plans within the 10% margin, those cases possess
even more clearly distinguishing features (and, in any case, are not binding on us).  <u>See</u>
<u>Hulme v. Madison County</u>, 188 F. Supp. 2d 1041, 1050-51 (S.D. Ill., 2001) (apportioning
found unconstitutional due to abusively partisan atmosphere during redistricting); <u>Vigo
County Republican Cent. Comm. v. Vigo County Comm'rs</u>, 834 F. Supp. 1080, 1085
(S.D. Ind., 1993) (apportioning found unconstitutional because prior plan had deviation
spread of 37%, and subsequent corrections, while bringing spread below 10%, did not
reflect "<u>good</u> <u>faith</u>" effort to satisfy the equal population principle); <u>Sutton v. Dunne</u>, 681
F.2d 484, 488 (7th Cir. 1982) (apportioning found unconstitutional because it occurred in
a two-district plan, where equality could be achieved with logistically trivial adjustments).

legislature, <u>Rodriguez</u>, offers a closer factual analogue than <u>Larios</u>. In bringing a "one

person, one vote" challenge to the 2002 Plan, the plaintiffs in <u>Rodriguez</u> made essentially

the same arguments made by the Plaintiffs here. 308 F. Supp. 2d at 363. The statistical

characteristics of the 2002 Plan, with a maximum deviation of 9.78% and an average

deviation of 2.22%, <u>id</u>. at 365, are comparable to those of the Senate Plan.[9] Perhaps most

saliently, the allegations in <u>Rodriguez</u> mirror those made here – that the redistricting

"impermissibly and arbitrarily discriminates against 'downstate' residents . . . by

systematically overpopulating all of those districts and systematically underpopulating all

of the 'upstate' districts," and locating an additional district upstate instead of downstate.

<u>Id</u>. at 366. The defendants in <u>Rodriguez</u> offered traditional redistricting rationales to

justify the 2002 Plan, including "contiguity, compactness, preserving the cores of existing

districts, desiring not to pit incumbents against one another, respecting then-current

political subdivisions and county lines, and staying within the ten-percent-deviation

parameter of <u>Brown</u>." <u>Id</u>. at 367. Observing that the 2002 Plan involved only minor

deviations from equal apportionment, that the 2002 Plan advanced traditional redistricting

goals, and that the total impact of the deviations changed the allocation of only a single

seat, <u>id</u>. at 370-71, the <u>Rodriguez</u> court granted defendants' summary judgment motion.

 We need not precisely delineate the relationship between the precedential authority

---

[9] The maximum deviation was higher, and the average deviation lower, in the 2002 Plan
than in the Senate Plan.

of Rodriguez and our decision here.  Nor need we attempt to reconcile Larios and Rodriguez, or synthesize them to extract a universal principle for assessing equal population claims in the state redistricting context. We observe only that, as Rodriguez was summarily affirmed by the Supreme Court after the Supreme Court summarily affirmed Larios, the Supreme Court evidently found Rodriguez consistent with Larios, and that Rodriguez, broadly speaking, offers an analysis akin to our analysis of the Senate Plan.  Rodriguez thus reinforces our conclusion that summary judgment must be granted in favor of the Senate Majority Defendants on the Plaintiffs' equal population claim.

There are a number of outstanding motions related to discovery on the one-person, one-vote claims.  There has already been extensive discovery practice, and the remaining motions before us relate to difficult issues regarding the extent to which the work product, legislative, and attorney-client privileges protect various Senate documents sought by the Plaintiffs.  The case before us, however, reveals no issue of material fact that remains in dispute.  Rather, the critical facts for resolving this motion consist of the agreed-upon characteristics of the Senate Plan, and those facts reveal no violation of the Equal Protection Clause on one-person, one-vote grounds.  In these circumstances any further discovery on this issue would be based on "speculation," Nat'l Union Fire Ins. Co. of Pittsburgh v. Stroh Cos., Inc., 265 F.3d 97, 117 (2d Cir. 2001).  We therefore deny as moot the Senate Minority Cross-Claimants' Motion to Compel dated April 10, 2013, Dkt. Entry 581; the Ramos Intervenors' Amended Motion to Compel Production from the

Defendant Senate Majority, dated June 7, 2013, Dkt. Entry 607; the Appeal of the

Magistrate Judge Decision by the Senate Majority Defendants, dated February 25, 2013,

Dkt. Entry 565; the Appeal of the Magistrate Judge Decision by the Senate Minority

Cross-Claimants, dated February 25, 2013, Dkt. Entry 563; and the Assembly Majority

Defendants' Appeal of Magistrate Judge Decision, dated February 25, 2013, Dkt. Entry

562.

II.      Intervenors' Racial Discrimination Claims

The Intervenors further allege that the Senate Plan violates the Constitution

because it intentionally discriminates on the basis of race.[10]  Drayton Intervenors'

Memorandum of Law in Opposition to Senate Majority Defendant's Motions for

Summary Judgment, Dkt. Entry 452; Ramos Intervenors' Memorandum of Law in

Opposition to Defendant Senate Majority Leader's Motions for Summary Judgment, Dkt.

Entry 458.  The Intervenors claim that "race was a 'motivating factor' . . . in [the Senate

Majority's] drawing of the 2012 Senate plan and their location of the new Senate district

upstate rather than downstate."  Drayton Memorandum at 13.  They further argue that the

Senate Majority Defendants' motion for summary judgment should be rejected, as further

---

[10]  The Intervenors originally raised multiple other claims, alleging various constitutional
claims due to New York's failure to adopt a congressional redistricting plan and alleging
Voting Rights Act Section 2 claims against the Senate Plan.  We found in favor of the
Intervenors regarding the claims for failure to adopt a congressional plan, and the
Intervenors have withdrawn by stipulation their Section 2 claims.  The Intervenors'
instant allegations are the only substantive claims remaining.

discovery could reveal "[m]aterial facts . . . which will ultimately determine . . . whether racial bias was a motivating factor" in the redistricting process. Ramos Memorandum at 12 (emphasis omitted). For the instant inquiry, therefore, we must determine whether summary judgment in favor of the Senate Majority Defendants is appropriate, or whether the Intervenors ought to receive the opportunity to conduct further discovery.

The Intervenors allege that because racial animus contributed to the legislature's decisionmaking process, the Senate Plan violates the Equal Protection Clause. The Intervenors do not, however, argue that the Senate Plan reflected a "predominantly racial, not political" agenda in which the "legislature subordinated traditional race-neutral districting principles to racial considerations." Easly v. Cromartie, 532 U.S. 234, 241 (2001) (ellipses omitted). Rather they argue that racial animus was merely a motivating factor (not necessarily the "dominant" or "primary" one), whose presence would regardless taint the decision as arbitrary or irrational. Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 265 (1977).[11]

Arlington Heights "set[s] forth a framework for analyzing whether invidious discriminatory purpose was a motivating factor in a government body's decisionmaking." Reno v. Bossier Parish School Bd., 520 U.S. 471, 488 (1997) (internal quotation marks omitted). Such an analysis "demands a sensitive inquiry into such circumstantial and

_____

[11] While the Drayton Intervenors suggest in passing that racial discrimination may have been a "predominate factor" in the creation of the Senate Plan, Drayton Memorandum at 13, they offer neither evidence nor substantive argument to support this claim.

direct evidence of intent as may be available." Arlington Heights, 429 U.S. at 266.

Whether the state action "bears more heavily on one race than another" provides a

starting point for the inquiry, but it is "rare" that a "clear pattern, unexplainable on

grounds other than race, emerges from the effect of the state action even when the

governing legislation appears neutral on its face." Id. "In the absence of a pattern" that is

"stark . . . impact alone is not determinative, and the Court must look to other evidence of

race-based decisionmaking." Miller v. Johnson, 515 U.S. 900, 914 (1995) (quoting

Arlington Heights, 429 U.S. at 266) (internal quotation marks omitted). In these

situations, "[racially discriminatory] impact alone is not determinative" but may provide a

"starting point" for the inquiry into discriminatory intent. Arlington Heights, 429 U.S. at

266. The court then must turn to other types of evidence, including "historical

background," "[t]he specific sequence of events leading up [to] the challenged decision,"

"[d]epartures from the normal procedural sequence" of governmental decisionmaking,

and "legislative or administrative history," particularly if relevant records of bodies'

decision-making process exist, to identify unconstitutionally discriminatory motive. Id. at

267-68. See also United States v. Yonkers Bd. of Educ., 837 F.2d 1181, 1221 (2d Cir.

1987) (discussing application of the Arlington Heights factors).

In sum, in all but the most "starkly" discriminatory cases, alleged discriminatory

legislative intent must be grounded in two types of evidence: the discriminatory impact on

racial groups, and signs that the lawmaking process itself was corrupted by racial animus.

While the Drayton Intervenors allege that the Senate Plan's characteristics are sufficient to create an inference of the legislature's discriminatory purpose, Drayton Memorandum at 13, with the withdrawal or dismissal of all vote-dilution § 2 claims with regards to the Senate Plan, the Intervenors adduce no real evidence that the Senate Plan is racially discriminatory. See Bossier Parish, 520 U.S. at 486 (observing that § 2 vote dilution evidence may be helpfully probative of discriminatory intent in conducting the Arlington Heights test). Rather, the Intervenors repackage evidence advanced by the Cross-Claimants' equal population argument regarding the uneven upstate-downstate allocation of population and the location of the additional Senate seat. See Drayton Memorandum at 13; Ramos Memorandum at 10-11. While the Intervenors assert that "invidious discrimination" contributed to the minor deviations present in the Senate Plan, Ramos Memorandum at 10, see also Drayton Memorandum at 13, the Intervenors offer no material evidence that the Senate Plan is racially motivated. Rather, they offer conclusory assertions that the population deviations of the Senate Plan can be attributed to racial discrimination.

That the Senate Majority Defendants have advanced valid justifications for the Senate Plan's deviations from strict equal allocation of population further undermines the claim that the Senate Plan's minor deviations provides evidence of discrimination. Where the population of a state is not distributed in a racially homogenous fashion, population deviations, such as the minor deviations in the Senate Plan, will necessarily create

differences in racial representation. However, the mere fact that a decision "arguably bear[s] more heavily on racial minorities" does not alone establish discriminatory motive. Arlington Heights, 429 U.S. at 269. The Supreme Court has "rejected the notion that a law is invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than another," Rodgers v. Lodge, 458 U.S. 613, 618 (1982).

Because the evidence of racially disparate impact is unavailing, the Intervenors must demonstrate that the process by which the Senate Plan was passed reveals legislators' illicit racial animus in order to show that the Senate Plan is discriminatory. However, the Intervenors are unable to cite any procedural irregularities or suspect legislative conduct indicating that the Senate Plan was so contaminated. Nor do any other features of the Senate Plan or of the legislative history surrounding it support an inference of racial discrimination. The disposition of similar claims in Rodriguez, 308 F. Supp. 2d at 444, further weighs against the conclusion that the "historical background," Arlington Heights, 429 U.S. at 266, of the Senate Plan suggests racial animus. As the Intervenors have also failed to demonstrate that the racial impact of the Senate Plan supports an inference of discriminatory intent, the Intervenors have offered no proof to suggest that the Senate Plan was motivated in any part by racial animus.

The Intervenors nevertheless oppose the Senate Majority Defendants' summary judgment motions by arguing that they should be permitted to continue to pursue discovery with the hope of excavating some evidence that will allow them to argue a

disputed material fact exists regarding the presence of racial prejudice in the passage of

the Senate Plan.  In particular, the Intervenors have sought broad discovery of documents

related to the creation of the Senate Plan.  See Drayton Memorandum in Opposition to the

Senate Majority et. al. Motions for a Protective Order, Dkt. Entry 423; Ramos Motion to

Compel Production of Documents in Senate Majority's Privilege Logs, Dkt. Entry 606.

The Senate Majority Defendants have asserted legislative privilege over various classes

of these documents, resulting in extensive motion practice regarding the permissible

extent of the discovery.  The court has reviewed these documents in camera to determine

the appropriate extent of the privilege.  See Memorandum and Order dated February 8,

2013, Dkt. Entry 559 (following extensive in camera review of documents listed in

privilege log, granting in part and denying in part Senate Majority Defendants' motion for

a protective order); Memorandum and Order dated August 27, 2013, Dkt. Entry 615

(granting Ramos Intervenor Motion to Compel, and instructing Senate Majority

Defendants to produce further documents for in camera review).  During this in camera

review of privileged materials, we have found no evidence that would support a finding

that racial animus was a motivating factor in the creation of the Senate Plan.  In view of

the strong policies disfavoring disclosure of confidential records of legislative

deliberation, we see no justification for ordering disclosure of privileged records that do

nothing to advance the Intervenors' allegations.

      While summary judgment should not be granted before the nonmoving party has

had "a fully adequate opportunity for discovery," <u>Berger v. United States</u>, 87 F.3d 60, 65

(2d Cir. 1996), a district court is within its discretion to deny additional discovery that is

sought only on the basis of "speculation." <u>Nat'l Union Fire Ins. Co.</u>, 265 F.3d at 117.

The decision to deny further discovery and grant summary judgment is particularly

appropriate where, despite already extensive discovery, the nonmovant has been unable to

"demonstrate the existence of any genuine issue of fact." <u>Waldron v. Cities Serv. Co.</u>,

361 F.2d 671, 673 (2d Cir. 1966).

On the well-developed record before us, there is no disputed issue of material fact,

and no evidence of discrimination in the adoption of the Senate Plan. Thus, any

suggestion that the Senate Plan was tainted by racial animus is purely speculative. We

therefore grant the Senate Majority Defendants' motion for summary judgment with

regard to the Drayton and Ramos Intervenors' claims. With the Intervenors' claims

dismissed, we deny as moot the Ramos Intervenors' Amended Motion to Compel

Production, Dkt. Entry 607.

## CONCLUSION

In light of the lack of any material fact before us regarding either the Senate

Minority Cross-Claimants' or the Intervenors' equal protection allegations, and the failure

of both complaints to demonstrate that the Senate Plan violates the Equal Protection

Clause on either deviations in apportionment or the presence of illicit racial motivation in

the legislative process, we hereby:

(1) GRANT the Senate Majority Defendants' motions for summary judgment as to the

Drayton Intervenors' and Ramos Intervenors' claims; and

(2) DENY the discovery motions by the Senate Minority Cross-Claimants and the Ramos

Intervenors, as well as the appeals of the Magistrate Judge Decisions by the Senate

Minority Cross-Claimants, the Senate Majority Defendants, and the Assembly Majority

Defendants.

SO ORDERED.

DATED:  Brooklyn, New York
        May 22, 2014

_____/s/_____
            REENA RAGGI
      United States Circuit Judge

_____/s/_____
          GERARD E. LYNCH
      United States Circuit Judge

_____/s/_____
          DORA L. IRIZARRY
      United States District Judge